THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 75-CR-26-3
No. 5:06-CV-24-F

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| JEFFREY R. MacDONALD, | ) | |
| Movant | ) | |

Jeffrey R. MacDonald is back before the court with a new flurry of post-conviction
motions. More than thirty-eight years after the February 1970, murder of his pregnant wife and
two daughters, MacDonald continues to discover "new" evidence that he was not the
perpetrator. Presently ripe for disposition are the following motions:

DE-111[1]    MacDonald's Motion to Vacate pursuant to 28 U.S.C. § 2255

DE-122    MacDonald's Motion to Add Additional Predicate

DE-124    MacDonald's Motion to Expand the Record with Itemized Evidence

DE-129    The Government's Motion to Strike Exhibits

DE-144    MacDonald's Motion to Supplement Itemized Evidence

In the early morning hours of February 17, 1970, Jeffrey MacDonald's pregnant wife,
Colette, and his two young daughters were murdered in their home. MacDonald sustained non-
life-threatening injuries. From that date, MacDonald consistently has maintained that his
Fayetteville, North Carolina, home was invaded by a band of drug-crazed hippies, including a
woman with long blonde hair who wore a floppy hat. The Army's charges against MacDonald

---

[1]    "[DE-x]" designates the docket entry number of the referenced document. The
designation ["DE-x #y"] refers to a numbered Appendix or Exhibit attached to the referenced
documents. For example, a reference to Trial Transcript pages 5928-50, contained in Docket
Entry 131 in Appendix 4, would read: Tpp. 5928-50 [DE-131 #4].

were dismissed on October 23, 1970, following a formal pre-court martial investigation and hearings conducted pursuant to Rule 32 of the Uniform Code of Military Justice. Just as the statute of limitations was about to expire, the Government indicted Jeffrey MacDonald on January 24, 1975. Following rounds of pretrial motions and appeals, the trial of *United States v. MacDonald*, No. 75-CR-26-3 (E.D.N.C.) began in Raleigh, North Carolina, on July 16, 1979, the late Honorable Franklin T. Dupree, Jr., United States District Judge, presiding.

# I. PROCEDURAL HISTORY

After a twenty-nine-day jury trial, MacDonald was convicted of the murders of his pregnant wife and two daughters, and was sentenced to three consecutive life sentences. The Government's case was presented by Assistant United States Attorney ("AUSA") James L. Blackburn ("Blackburn") of the Eastern District of North Carolina, and Brian Murtaugh of the United States Department of Justice. MacDonald's defense team included Mr. Wade M. Smith of Raleigh, North Carolina, and Mr. Bernard Segal of the San Francisco, California, bar.

The Fourth Circuit Court of Appeals reversed MacDonald's convictions on speedy trial grounds, *see United States v. MacDonald*, 632 F.2d 258 (4th Cir. 1980), but the Supreme Court reversed and remanded, *see United States v. MacDonald*, 456 U.S. 1 (1982). On remand, the Fourth Circuit affirmed, *see United States v. MacDonald*, 688 F.2d 224 (4th Cir.), *cert. denied*, 459 U.S. 1103 (1983). A year later, the post-conviction phase began.

## A. First Post-Conviction Motion

MacDonald filed his first post-conviction motion in 1984 seeking to vacate his convictions and obtain a new trial based on newly discovered evidence and government misconduct ("**First Motion**"). *See MacDonald v. United States*, No. 75-26-CR-3 (E.D.N.C. April 3, 1984). The First Motion consisted of three motions; two for collateral relief pursuant to 28 U.S.C. § 2255 (on grounds not relevant here), and the third for a new trial pursuant to Rule 33, Federal Rules of Criminal Procedure. It was the Rule 33 motion that contained the same

2

fundamental argument and much of the same evidence that MacDonald offers in support of the instant request to file a successive § 2255 motion. Following an evidentiary hearing on the three motions, Judge Dupree denied MacDonald's request for a new trial in a thorough Memorandum and Order, *see United States v. MacDonald*, 640 F. Supp. 286 (E.D.N.C. 1985). The Fourth Circuit Court of Appeals affirmed. *See United States v. MacDonald*, 779 F.2d 962 (4th Cir. 1985), *cert. denied*, 479 U.S. 814 (1986).

## B. Second Post-Conviction Motion

MacDonald instituted his second post-conviction motion in 1990, again based on newly discovered evidence and government misconduct concerning physical evidence ("**Second Motion**"). *See MacDonald v. United States*, No. 75-26-CR-3/5:90-CV-104 (E.D.N.C. Oct. 19, 1990). The district court denied relief without conducting an evidentiary hearing. *See United States v. MacDonald*, 778 F. Supp. 1342 (E.D.N.C. 1991). Again the Fourth Circuit Court of Appeals affirmed the denial of relief. *See United States v. MacDonald*, 966 F.2d 854 (4th Cir. 1992), *cert. denied*, 506 U.S. 1002 (1992).

## C. Third Post-Conviction Motion

In April 1997, MacDonald filed a motion to reopen his 1990 Second Motion, alleging fraud by the Government concerning the 1990 motion, and seeking an order permitting new DNA testing of certain evidence that had been collected from the crime scene ("**Third Motion**"). This court denied the Third Motion insofar as it sought to reopen the Second Motion, and transferred the remaining matters to the Fourth Circuit Court of Appeals for consideration as a petition for leave to file a successive § 2255 motion. *See United States v. MacDonald*, 979 F. Supp. 1037 (E.D.N.C. 1997). The appellate court affirmed denial of MacDonald's motion to reopen the Second Motion, *see United States v. MacDonald*, No, 97-7297, 161 F.3d 4 (4th Cir. Sept. 8, 1998) (unpublished), but remanded the matter to this court to

3

oversee mitochondrial DNA testing. The full text of the Court of Appeals' order on appeal of the Third Motion, is:

> Upon consideration of the motion of Jeffrey R. MacDonald, filed pursuant to 28 U.S.C. § 2244
>
> IT IS ADJUDGED AND ORDERED that the motion with respect to DNA testing is granted and this issue is remanded to the district court.
>
> In all other respects, the motion to file a successive application is denied.

*United States v. MacDonald*, No. 97-713 (4th Cir. Oct. 17, 1997) (unpublished) (reproduced in App. Vol. I, to Government's Response to § 2255 motion [DE-132, #6]).

On remand, this court entered orders setting the parameters for DNA testing. It took nine years for the testing protocol to be agreed upon by the parties, the tests to be conducted, and the results submitted. The DNA report from the Department of Defense Armed Forces Institute of Pathology was issued on March 10, 2006. *See* DE-119; *see also* DE-147.

D. Fourth Post-Conviction Motion

Just before the DNA test results were reported, MacDonald submitted to this court what he hopes will be accepted as his fourth attempt at post-conviction relief (**"Fourth Motion"**) [DE-111], once again on grounds of newly discovered evidence and government misconduct. *See MacDonald v. United States*, No. 75-26-CR-3/5:06-CV-24-F (E.D.N.C. Jan. 17, 2006) [DE-111]. The Fourth Circuit Court of Appeals had issued MacDonald a Prefiling Authorization ("PFA"), pursuant to 28 U.S.C. § 2244(b) and § 2255, *In re MacDonald*, No. 05-548 (4th Cir. Jan. 12, 2006), permitting him to submit his proposed successive § 2255 motion for this court to determine whether he meets the requirements necessary for filing it in this court. *See In re Williams*, 330 F.3d 277, 281 (4th Cir. 2003) ("Williams I").[2]

---

[2] Upon receipt of the PFA, this court conducted a review pursuant to Rule 4(b), Federal Rules Governing § 2255 Proceedings. Finding that it did not clearly appear on the face of the motion that MacDonald was entitled to no relief thereunder, the court ordered the Government to respond.

4

This Fourth Motion, filed pursuant to § 2255, seeks to have MacDonald's convictions vacated and set aside on grounds of "newly discovered evidence," the presentation of which would result in his acquittal. MacDonald offers the 2005 affidavit of former Deputy United States Marshal, Jim Britt, who avers that Helena Stoeckley confessed to him in 1979, that she had been present in the MacDonald home on the night of the murders. Britt also declares that he was the only witness to an exchange between AUSA Blackburn and Ms. Stoeckley when, after Stoeckley made the same statement to Blackburn she had made to Britt, Blackburn threatened to indict her for first degree murder if she so testified. MacDonald contends that Britt's affidavit proves AUSA Blackburn's threat of prosecution intimidated Stoeckley into changing her intended trial testimony, and that Blackburn lied to Judge Dupree at trial the following day by representing that Ms. Stoeckley told the Government she had *not* been involved in the MacDonald murders, and could not remember where she had been on the night the crimes took place. MacDonald contends that Britt's withholding this evidence for almost thirty years must be attributed to the Government, and that its suppression of the facts revealed in the affidavit constitutes prosecutorial misconduct requiring that his conviction be vacated and set aside.

MacDonald has appended ten exhibits to this Fourth Motion. Among those exhibits are the affidavits of Everett Morse, Bryant Lane, and Donald Buffkin. *See* Exhibit No. 7 to [DE-111]; [DE-120]; *see also* [DE-126], Itemized Statement of Material Evidence, p. 16, n.6. The Government objects to the court's consideration of these exhibits, arguing that they contain or relate to information known to MacDonald's defense team more than a year prior to the filing date of the Fourth Claim and therefore are barred by the one-year statute of limitations. Specifically, the Government claims that each affidavit was executed by a person to whom Stoeckley's former boyfriend, the late Greg Mitchell, long ago allegedly admitted that he murdered the MacDonald family. *See* Government's Response [DE-128] at 47-48 & nn. 50-51; *see also* Motion to Strike, [DE-129], pp. 3-4. It is not apparent whether these affidavits were

5

among materials presented to the Fourth Circuit Court of Appeals for consideration of

MacDonald's application for a PFA to file the instant motion.

E. Fifth Post-Conviction Motion

MacDonald also has filed a motion styled, "Motion to Add an Additional Predicate to His

Previously Filed Motion Under 28 U.S.C. § 2255." [DE-122] **("Fifth Motion")**. This motion

seeks to add to his Fourth Motion a new claim for relief, based on the "newly discovered" results

of the mitochondrial DNA testing. As grounds for inserting this additional basis for relief into

his Fourth Motion, MacDonald explains in part:

> The petitioner submits that since these DNA tests were previously ordered by the
> U.S. Court of Appeals for the 4th Circuit, and since the matter was remanded to
> this Court to oversee and manage such testing, it is implicit in the 1997 Order
> from the 4th Circuit that this court has been authorized to consider the effect of
> the results of such testing.

Motion to Add Additional Predicate [DE-122] at p. 2, ¶ 3. He describes the "additional

predicate" as: "newly discovered DNA evidence proving the presence of unsourced hairs at the

crime scene, including one such hair found with blood residue in a critical location, under the

fingernail of Kristen MacDonald, and one two inch hair with root and follicle intact found under

the body of Colettte MacDonald." *Id.* at 1. MacDonald has submitted a large, bound collection of

documents in support of his Fifth Motion, *see* Appendix One to [DE-122] ("DNA Evidence"), and

an additional collection of three notebooks containing digital photographs and supporting

documents, *see* [DE-147].

F. Sixth Post-Conviction Motion

One day after he filed his Fifth Motion, MacDonald filed his "Motion, Pursuant to Rule 7,

of the Rules Governing Section 2255 Proceedings, to Expand the Record to Include the Itemized

Authenticated Evidence Set Forth Herein." *See* [DE-124] **("Sixth Motion").**[3] The Sixth Motion

---

[3] While DE- 124 does not *purport* to add a new ground for relief, it seeks "to expand
the record" with much material that is new or was rejected in the past.

ostensibly is a compilation of all the "evidence" MacDonald contends must be considered by this court in ruling on the Fourth Motion. This motion is addressed below in Section IV-B.

## G. Seventh Post-Conviction Motion

Finally, and without citation to authority, MacDonald's latest motion seeks "To Supplement Applicant's Statement of Itemized Material Evidence." *See* [DE-144] ("**Seventh Motion**"). Here, he proposes to add yet again to the body of "evidence as a whole" or "itemized authenticated evidence," including that set out in his Fifth and Sixth Motions. Specifically, he proposes adding the March 31, 2007, affidavit of Helena Stoeckley's mother, also named Helena Stoeckley (the "elder Ms. Stoeckley"), relating that her daughter twice confessed to having been present during, and having participated in, the murders of MacDonald's family members in February 1970. MacDonald explains that the elder Ms. Stoeckley's affidavit "corroborate[s] the sworn statement of former U.S. Marshal Jim Britt . . . in many critical respects, and add[s] additional profound proof of the innocence of Jeffrey MacDonald." MacDonald's Seventh Motion [DE-144] at p. 4.

## II. ONLY THE RELEVANT FACTS

Reams and reams have been written about the "facts" and circumstances occurring before, during, and after the murder of Jeffrey MacDonald's family in February 1970.[4] Among the more thorough of the accounts appears in *United States v. MacDonald*, 640 F. Supp. 286 (E.D.N.C. 1985), the Memorandum and Order penned by trial judge Franklin T. Dupree, Jr., Senior United States District Judge, in his ruling on MacDonald's first round of post-conviction motions relevant to this order. An effort is made below to relate just the facts most pertinent to the motions now before the court.

---

[4] Seventeen years ago, the late Honorable Franklin T. Dupree, Jr. observed, "Virtually every aspect of the case has been detailed in eleven reported judicial opinions, a best-selling book, a television drama, various documentaries, and countless articles and news reports." *United States v. MacDonald*, 778 F. Supp. at 1344-45.

At the close of the Army's investigation and Article 32 proceedings against him, MacDonald was cleared of wrongdoing. The investigating officer recommended that civilian authorities investigate Helena Stoeckley as a possible suspect. Although insisting that he could not clearly remember all the details of the event, MacDonald's description of the attackers as including a woman in a blonde wig carrying a candle and wearing a floppy hat and boots is a detail that has endured for nearly 40 years. Only hours after discovery by authorities of the murders, Stoeckley became a person in whom the military police were interested. She was a Fayetteville, North Carolina, resident who was known to be a heavy drug user, and was known to wear clothing similar to that described by MacDonald.

Stoeckley was interviewed concerning the MacDonald murders as early as the morning they were reported. She continued to be interviewed and to make notoriously inconsistent statements about her knowledge of the murders, or lack thereof, until she died in 1983. She repeatedly confessed to having been in the MacDonald home on the night of the murders, only to recant and/or admit that she did not remember what she had done or where she had been that night.

A. Stoeckley's Mid-Trial Interviews and Trial Testimony

Stoeckley and her seemingly insatiable need to talk about the events as she thought she recalled them were well known to the Government as well as to the MacDonald defense team during the nine years preceding MacDonald's 1979 federal trial. At trial, after the Government had rested its case and during hearings on August 13, 1979, in preparation for the defense to begin its own, Segal advised Judge Dupree that he had Helena Stoeckley's parents present under subpoena. *See* Tpp. 4846-50 [DE-132 #13, TAB 2]. The defense team reportedly still had been unable to locate Stoeckley to serve a trial subpoena. *See id.* Segal wanted to examine the parents on the record to preserve his attempts to locate Stoeckley in order to form a foundation for his

8

motion "to have [Stoeckley] deemed unavailable for the purpose of various 800 rules." *See id.* at 4846. The Government had not subpoenaed Stoeckley either. *See id.* at 4848.

MacDonald's lawyers sought and obtained a material witness bench warrant for Helena Stoeckley's arrest and transport from Greenville, South Carolina, to Raleigh, North Carolina, where the trial was ongoing. Stoeckley's arrest and transport by car to Raleigh was executed by former Deputy United States Marshals ("DUSM") Jerry Holden and Jim Britt, both of whom now are deceased.[5]

The trial was suspended on Thursday, August 16, 1979, while Stoeckley was delivered by DUSM Britt first to the MacDonald defense team, who interviewed her in the Raleigh federal building for more than three hours. When the defense team had completed its interview, DUSM Britt escorted Stoeckley to the United States Attorney's Office in the same building. AUSA Jim Blackburn purportedly asked DUSM Britt to sit in on the interview. Almost thirty years later, Britt revealed for the first time that he heard Stoeckley admit to Blackburn that she had been in the MacDonald home on the night of the murders, and then heard AUSA Blackburn threaten to prosecute her for murder were she to so testify in court.

Before Stoeckley was called by the defense to testify the next morning, AUSA Blackburn inquired of Judge Dupree whether an attorney should be present to represent Stoeckley's interests. *See* Tp. 5513 [DE-130 #1]. Defense counsel Smith responded, "We will do whatever Your Honor wishes to do – but I feel that we will just go ahead with her and see what happens." *Id.* Stoeckley did not have benefit of counsel before or during her interviews by the parties or her testimony at trial. Counsel finally was appointed to represent her over the weekend under bizarre circumstances. *See* Tpp. 5980-81 [DE-131 #5], & note 25 *infra.* She already had completed her testimony by that time, however.

---

[5] Sadly, Jim Britt died only days before this order was finalized.

The summary contained in the Government's Response to the Fourth Motion fairly represents the more material aspects of Stoeckley's examination by defense counsel, Bernie Segal. *See* Government's Response [DE-128], at 18–19; Tpp. 5513-5642; 5672-76 [DE-130 ##1 & 4]. During that examination, Segal showed Stoeckley photographs of the crime scene, repeatedly reminding her that he had discussed them with her the day before. *See, e.g.*, Tp. 5532 [DE-130 #1]. The form of his questions concerning the photographs plainly conveyed the message that Stoeckley's in-court responses were not consistent with what she had led the defense team to believe the day before, and were not what the defense wanted or expected to hear.

During one bench conference at which Segal sought leave to question Stoeckley as a hostile witness, Judge Dupree responded, "I have detected nothing in the demeanor or answers or anything else in this witness to indicate any hostility whatever to your questioning." *Id.* at Tp. 5538. He later commented, "You [Segal] are up here just to see if you may vary the form of the questioning, so that you may give her the answers in the question, and that is what I am precluding your doing right now under the present circumstances, so ask your question." *Id.* at Tp. 5540.

After he thoroughly had established that Stoeckley had been addicted to heroin and opium, and was a heavy, regular user of all manner of hallucinogenic drugs during the period in question, and had quizzed Stoeckley about Charles Manson, witchcraft, and the effects of her drug use, Segal sought another bench conference, the content of which is so critical to the instant motion that portions of it merit extensive reproduction here:

> MR. SEGAL: . . . . I represent to the Court that during the interviews with me and with other persons present she stated that when she looked at the [photograph] she had a recollection of standing over a body holding a candle, seeing a man's body on the floor.
>
> I also may say, Your Honor, we are now down to the bottom five or six critical things that she revealed yesterday. I have a feeling, based upon her answer to this one now, that when and if I ask her in direct fashion, that I may get negative answers.

I had no anticipation of that, because yesterday throughout the time that she made these statements, we accepted them, did not expect contrary.

We have not had any different statements from her and we feel that we are entitled to the plea of surprise as well as the fact, I think, at this point – the extent of her hostile relationship not in terms of manner but the hostility of her interest to the Defendant.

I am going to tell Your Honor the other things that she has said....

. . . . .

The photograph that I showed her of the bedroom of Kristen MacDonald: during the interview yesterday, she stated that she remembered riding the rocking horse when she looked at that picture.

She also stated yesterday she remembered standing at the end of the sofa holding a candle. She also said when she saw the body of Kristen MacDonald – the one when she was clothed, with the baby bottle – that that picture looked familiar to her.

. . . . She also said when she was shown the photograph of Colette MacDonald – the same one I showed her today – that she said that the face in that picture looked familiar, except that the chin was broken and made it a little hard.

She also stated . . . that she was standing of [sic] the corner of Honeycutt across from Melony Village.

She has a recollection of standing there during the early morning hours of February 17th, 1970. She further stated yesterday, and I intend to ask her now, that she has a recollection of standing outside the house looking at her hands and saying, "My God, the blood; oh my God, the blood."

She said that took place February 17, 1970. There are witnesses to each of these things. I must say, Your Honor, there were persons present the entire time this [interview] took place.

Tpp. 5614-16 [DE-130 #3].

Segal went on to explain to Judge Dupree that he intended to question Stoeckley again on

the stand concerning each of these representations, and if she denied having made the

representations to him the previous day, he would impeach her "under the rules." *Id.* at Tp.

5626.[6] AUSA Blackburn spoke up:

> MR. BLACKBURN: Of course, I was not there when she talked with the Defense yesterday, but in her interview with the Government none of those statements were made. She specifically told us –

> THE COURT: (Interposing) Did you ask her any?

> MR. BLACKBURN: Yes, sir. She specifically told us that she had been shown the photographs and we asked her, "Did you recognize any of the scenes in those photographs?"

> The answer was no. I asked her, "Have you even been in that house?" She said no. I said, "Do you know anything about that?" "No." "Who do you think did it?" "Dr. MacDonald." You know, it just went one right after the other.

> I discussed – I told [defense attorney] Mr. Smith last night what she told us. I was under the impression to this very moment that what she told us was essentially what she told them.

> It is difficult for me – you know– I am not saying that they are not saying what she said. I just don't know what way it is, because she has not indicated anything to the Government.

> [DEFENSE COUNSEL] MR. SMITH: Judge, here I think is where we are. Generally, she said to us the same thing and that is, "I don't remember." But in two or three or four instances – whatever the list would reveal – she says something which would give an interesting insight into her mind. . . .

> . . . .

> THE COURT: I am not going to cross the hostility thing until there is a reason shown to indicate it; but I am going to ask the witness a question myself.

> (Bench conference terminated.)

Tpp.5616-18 [DE-130 #3]. Among the questions Judge Dupree asked Stoeckley was, "Now, did

you tell both sides the same story?" to which Stoeckley answered, "As far as I know, yes, sir." *Id.*

at Tp. 5619.

---

[6] Segal later explained that the "other persons present the entire time this [interview] took place" through whom he intended to impeach Stoeckley "under the rules," were Posey, Zillioux, and Underhill. *See* Tp. 5774 [DE-130 #7].

Upon further questioning by Segal, Stoeckley reiterated that she did not recognize the crime scene photographs, and denied stating that she had touched or used a rocking horse depicted in one of the photographs, commenting that it appeared in the photograph to be broken. She also denied having discussed the rocking horse with defense counsel. *See id.* at Tpp. 5621-27.

On cross examination by AUSA Blackburn, Stoeckley continued to claim failure of recollection, and testified consistently with her testimony on direct examination. When Stoeckley was excused for the day, Segal sought to call a number of witnesses (hereinafter, the "Stoeckley Witnesses")[7] who Segal explained would impeach Stoeckley by relating that she had confessed some personal knowledge or belief to them at some time in the past. Some were persons who purportedly had attended the defense team's interview of Stoeckley the previous day. Segal argued that the Stoeckley Witnesses' hearsay testimony was admissible to impeach Stoeckley because it contained statements against her penal interests. *See* Tpp. 5780-85 [DE-130 #7] (Segal's argument for admission of the Stoeckley Witnesses' testimony under Rule 804(b)(3)).

Judge Dupree excused the jury and permitted Segal to *voir dire* the six Stoeckley Witnesses, *see* Tpp. 5689-5774 [DE-130 #4 & # 7] concerning what Stoeckley had said about the MacDonald murders in the relatively distant past, then recessed for the weekend to consider whether to allow Segal to examine them in the presence of the jury. On Monday, August 20, 1979, having observed Stoeckley's testimony and that of the proffered Stoeckley Witnesses, Judge Dupree denied Segal's motion to introduce Stoeckley's out-of-court statements through the Stoeckley Witnesses under Rule 804(b)(3) ("statements against interest") because he concluded, "the defense failed to sufficiently show that [Stoeckley's statements] were trustworthy when made and the testimony would only have served to confuse the jury," *MacDonald*, 640 F. Supp. at 316 (citing Tpp. 5806-10 [DE-131 #1]; FED. R. EVID. 403 and 804(b)(3); *United States v. MacDonald*,

---

[7] The "Stoeckley Witnesses" were Jane Zillioux, James Gaddis, Charles ("Red") Underhill, Robert Bristentine, Jr., Prince E. Beasley, and William Posey.

485 F. Supp. 1087, 1091-94 (E.D.N.C. 1979), *aff'd*, 688 F.2d 224, 230-34 (4th Cir. 1982), *cert. denied*, 459 U.S. 1103 (1983)). Three of the Stoeckley Witnesses later were permitted to testify in the presence of the jury concerning their prior relationships with Stoeckley, but were not to repeat anything Stoeckley allegedly said to them concerning the MacDonald case. *See* Tpp. 5822-65 [DE-131 #1 & #2] (Prince Beasley; Tpp. 5867-87 [DE-131 # 2 & #3] (Jane Zillioux); Tpp. 5889-5907 [DE-131 #3] (Red Underhill); and Tpp. 5983-6031 [DE-131 #5 & #6] (William Posey). The transcript reflects that the defense team was able to craft many of its questions to these witnesses so that the Government's objections were rendered useless. For instance, Segal asked Jane Zillioux:

> SEGAL: "Did Ms. Stoeckley say anything to you within the time that you were in the room – witness room with her – about having carried a lighted candle in February of 1970"?
>
> MR. BLACKBURN: Objection.
>
> THE COURT: Sustained.

Tpp. 5885-86 [DE-131 #3].

After 29 days of trial the evidence, including MacDonald's own testimony, had concluded, the lawyers argued and the court instructed. On August 29, 1979, the jury returned a verdict of "guilty" against MacDonald on each of the three counts of murder (one count in the first degree, and two in the second degree), in violation of 18 U.S.C. § 1111.

On direct appeal, following remand from the Supreme Court on unrelated grounds, the Fourth Circuit Court of Appeals summarized its conclusion that Judge Dupree's exclusion of the Stoeckley Witnesses' testimony did not violate MacDonald's constitutional rights:

> At bottom, the sticking point here, as recognized by the District Court, is the fundamental problem of trustworthiness. While MacDonald is able to point to a number of corroborating circumstances, he does not demonstrate, finally, that they make Stoeckley's alleged declaration trustworthy. Her apparent longstanding drug habits made her an inherently unreliable witness. Moreover, her vacillation about whether or not she remembered anything at all about the night of crime lends force to the view that everything she has said and done in this regard was a product of

14

her drug addiction. Given the declarant's "pathetic" appearance, our conviction is
that the District Court was not in error in adjudging that defendant failed to carry
his burden under Rule 804(b) (3). Thus MacDonald's argued violation of the Due
Process clause fails.

*MacDonald*, 688 F.2d at 233. That court also affirmed Judge Dupree's alternative grounds for

exclusion under Rule 403, Federal Rules of Civil Procedure. *See id.* at 234.

### B. Summary of Post-Trial Efforts Concerning Hearsay Statements

After his conviction, MacDonald continued to seek a new trial based, in part, on the

testimony of the Stoeckley Witnesses, as well as others who have surfaced over the decades. It has

been his position that if a jury could hear the testimony of all these people to whom Stoeckley

allegedly admitted her presence in the MacDonald home and/or testimony of persons to whom

Stoeckley's purported cohorts confessed their participation, that his version of the events would be

sufficiently corroborated and he would be acquitted.[8]  In his 1985, Memorandum and Order,

Judge Dupree thoroughly explored and rejected the theory that these witnesses' statements

amounted to "new evidence" entitling MacDonald to a new trial pursuant to Rule 33, Federal

Rules of Criminal Procedure. *See MacDonald*, 640 F. Supp. 318-33. Judge Dupree concluded

that, even assuming the new evidence was discovered after trial using due diligence, "the newly

discovered evidence with its multiple inaccuracies and inconsistencies would not produce a

different result were it introduced at a second trial, nor is there any reasonable likelihood that a

jury would acquit MacDonald based upon the newly discovered evidence." *Id.* at 333.

---

[8]  Among the persons whose testimony or statements MacDonald has proffered as
grounds for a new trial over the years are Ted L. Gunderson, Ernest Leroy Davis, Homer Young,
Fred Bost, Det. P.E. Beasley, Margaret Mauney, Diane Hedden Cazares, Richard J. Mahon,
Helena Stoeckley's parents, Shelby Don Harris, Dwight Edwin Smith, Greg Mitchell, Keith
Bowen, Deborah Lee Harmon, Mabel Campbell, John Humphries, Frankie Bushey, Marian
Campbell, Joe Greene Sonderson, Addie Willis Johnstone, Dorothy Averitt, Edith Boushey,
Elizabeth Ramage, Carlos Torres, Ann Sutton Cannady, Juanita Sisneros, Rev. Randy Phillips,
Norma and Bryant Lane, Dr. Ronald K. Wright, and Cathy Perry Williams. *See MacDonald*,
640 F. Supp at 318-29.

MacDonald and his defense team have made a career of pursuing every imaginable avenue

and theory of post-conviction relief, and the theme of "prosecutorial misconduct" has been a

common thread throughout. The instant motion is no exception. MacDonald seeks, not only to

have the court consider the grossly belated affidavit of a retired Government officer containing

allegations of witness intimidation, perjury, malfeasance, and fraud on the part of the prosecuting

attorney, but also all the evidence heretofore introduced in this case, excluded from this case, and

"newly discovered" in the intervening decades.

It bears emphasizing that MacDonald already has litigated exactly the same basic legal

issues he raises herein, except the prior motion was presented under Rule 33, Federal Rules of

Criminal Procedure (motion for a new trial). In affirming Judge Dupree's Memorandum and

Order denying relief on the newly discovered evidence[9] claims, the appellate court wrote, in

pertinent part:

> It is contended that MacDonald is entitled to a new trial because of evidence
> discovered after his conviction. This evidence consists *primarily* of post trial
> statements by Helena Stoeckley, and one each by two of her former associate drug
> addicts.
>
> * * * * *
>
> At the trial, the defense sought to introduce evidence of two earlier hearsay
> statements. They were excluded as being untrustworthy, and this court affirmed
> the exercise by the trial judge of his discretion in excluding them for lack of
> trustworthiness. *United States v. MacDonald*, 688 F.2d at 230-34.
>
> Helena Stoeckley has since died, apparently as the result of drug abuse.
> After the trial and during her lifetime, however, she continued to make conflicting
> statements. Sometimes she remembered nothing about what happened that night,
> while, apparently depending upon who questioned her, she sometimes remembered
> in some gory detail being with the slayers of the MacDonald mother and children.
> The details she gave, however, contain many inconsistencies with MacDonald's

---

[9] "In support of his [Rule 33] motion, MacDonald has filed almost 1,000 pages of
transcripts of 'confessions' allegedly made by Helena Stoeckley to private investigators, and
statements by Greg Mitchell and Cathy Perry Williams which he offers to show their
participation in the crimes. The [Rule 33] Motion is further supported by dozens of affidavits of
witness who MacDonald says corroborate the involvement of Stoeckley, Mitchell and Perry."
*MacDonald*, 640 F. Supp. at 309-10.

version of what occurred and with the circumstantial evidence derived from the scene.

\* \* \* \* \*

    To obtain a new trial on the basis of after discovered evidence, that evidence must be admissible in a new trial. There is substantial doubt that these hearsay statements would be admissible since corroborating circumstances do not clearly indicate their trustworthiness. *See* F.R.E. 804(b)(3); *United States v. Carvalho*, 742 F.2d 146 (4th Cir. 1984). However, we need go no further than to observe that the district judge found that this melange of hearsay evidence would not produce a different result in a new trial. *United States v. Lott*, 751 F.2d 717 (4th Cir. 1985). That assessment was for the district judge. There is an evidentiary basis for the finding, and there are no extraordinary circumstances that might warrant our intervention. *See United States v. Carmichael*, 726 F.2d 158 (4th Cir. 1984).

*MacDonald*, 779 F.2d 962, 964-65 (4th Cir. 1985) (emphasis added), *cert. denied*, 479 U.S. 813

(1986). The opinion did go on to observe, "Perhaps it would have been better if evidence of

Stoeckley's pretrial statements had been received, as Judge Murnaghan observed in his

concurring opinion, 688 F.2d at 234-36, but the district judge could appropriately find that the

post trial statements were all lacking in trustworthiness and that they did not meet the

materiality requirement for a new trial." *Id.* at 965.

    MacDonald's Fourth Motion, under consideration here, is a collateral attack pursuant to

28 U.S.C. § 2255, on the constitutionality of his conviction in light of additional "newly

discovered evidence," which he contends demonstrates that because of prosecutorial misconduct,

he was convicted in violation of his Fifth and Sixth Amendment rights to due process and to

present and confront witnesses.

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

17

*Washington v. Texas*, 388 U.S. 14, 19 (1967). Before addressing the substantive Fourth Motion authorized by the Fourth Circuit Court of Appeals, however, the court deems it most expedient to rule on the Government's Motion to Strike, and MacDonald's Fifth, Sixth and Seventh Motions.

## III. GOVERNMENT'S MOTION TO STRIKE

Appended to MacDonald's successive § 2255 petition [DE-111] as Exhibit 7 are three affidavits executed by individuals who aver that prior to his death from alcohol-related disease in 1982, Greg Mitchell made incriminating statements and/or confessed to murdering the MacDonald family. The Government has moved to strike [DE-129] these affidavits for one or both of two reasons: first, because MacDonald's claims relating to Mitchell's "confessions" previously were considered and rejected in this court's earlier post-conviction motions; and, second, because this evidence is untimely.

The court carefully has considered the parties' positions, and has reviewed the content and timing of the Lane, Morse and Buffkin affidavits in light of other evidence in the case as well as relevant prior orders herein. Having done so, the court concludes that the Government's motion to strike is well-taken, and is ALLOWED for the reasons cogently set forth in that motion [DE-129].

## IV. MacDONALD'S UN-AUTHORIZED MOTIONS

### A. Fifth and Seventh Motions

Both MacDonald's **Fifth** and **Seventh Motions,** [DE-122 & -144] seek to add discrete factual bases to his Fourth Motion. MacDonald's Fifth Motion [DE-122] suggests that he is may supplement his successive § 2255 motion [the **"Fourth Motion"**] [DE-111] with a claim based on the mitochondrial DNA testing procedures and results thereof. The Seventh Motion [DE-144] seeks to tack onto the Fourth Motion the untimely affidavit of the elder Helena Stoeckley.[10]

---

[10]    In a March 31, 2007, affidavit, 86-year old Mrs. Helena Stoeckley avers for the first time that her daughter, Helena Stoeckley, confided in her on two occasions "that she was

18

Of course, MacDonald has sought and obtained a PFA as to only one item of "newly discovered evidence" underlying his Fourth Motion – the Britt affidavit. The facts underlying MacDonald's Fifth and Seventh Motions [DE-122 & -144] have been the subject of neither an application for a PFA nor an award thereof. Although Judge's Ellis's opinion in *Hazel v. United States*, 303 F. Supp. 2d 753, 758-59 (E.D. Va. 2004), at first blush seems to authorize MacDonald's strategy, a closer reading of *Hazel*, together with *United States v. Winestock*, 340 F. 3d 200, 205-06 (4th Cir.), *cert. denied*, 540 U.S. 995 (2003), upon which it relied, reveals that such an interpretation lacks application here.

Hazel had obtained a PFA from the Fourth Circuit Court of Appeals to pursue a successive § 2255 petition in the district court on a claim of "actual innocence," in light of newly discovered evidence: the ten-year delayed affidavit of a purported eyewitnesses exonerating the petitioner of the murder. When Hazel presented the petition and PFA to the district court, he had included two additional claims. The district court first had to decide whether address two additional claims that Hazel had added to his PFA, "given the absence of circuit certification of these claims." *Hazel*, 303 F. Supp. 2d at 758. The district court relied on *Winestock* for the proposition that "once the court of appeals finds that the application contains 'any claim' that satisfies § 2255, 'the court [of appeals] should authorize the prisoner to file the entire application in the district court, even if some of the claims in the application do not satisfy the applicable standards.' " *Id.* (quoting *Winestock*, 340 F.3d at 205).

Here, MacDonald did not present a *Winestock* "mixed petition" either to the Fourth Circuit or to this court. His Fifth and Seventh Motions claims are entirely independent of his Fourth and of each other, and have been presented only to this court in the guise of entirely unrelated

---

present in the MacDonald house during the murders on February 17, 1970." The elder Stoeckley's Affidavit, Exhibit to Motion to Supplement [DE-144], at ¶ 3. The first occasion was after the MacDonald trial, and the second occasion was shortly before Stoeckley's death in 1983. *Id.* ¶ 4.

additional factual bases for successive § 2255 relief on the theory that they also are "newly discovered." The undersigned deems it more than "arguably anomalous that a law designed to shield the federal district courts from the flood of successive habeas petitions" would be interpreted "to permit a petitioner who wins certification on only one ground to use that certification as a means to piggyback in for review a host of other uncertified and unscrutinized claims." *Hazel*, 303 F. Supp. 2d at 758, n.6.

The only grounds upon which MacDonald sought or obtained a PFA, and now seeks this court's gatekeeping examination, are contained in his Fourth Motion concerning the Britt affidavit; the DNA and the elder Stoeckley affidavit motions are bootstrapping, "piggybacking" attempts. Those latter claims are untimely, successive and independent, and this court lacks subject matter jurisdiction over them. *Cf. Evans v. Smith*, 220 F.3d 306, 325 (4th Cir. 2000) (concerning § 2254 petition), *cert. denied*, 532 U.S. 925 (2001).

This court's independent research and analysis mirrors that expressed in the Government's Memoranda [DE-135] and [DE-145], filed in opposition to MacDonald's Fifth and Seventh Motions. In the interest of judicial economy, the court ADOPTS the Government's rationale set forth in [DE-135] and [DE-145] in support of its conclusion that both MacDonald's Motion to Add Additional Predicate [DE-122] (the **Fifth Motion**), and his Motion to Supplement Itemized Evidence [DE-144] (the **Seventh Motion**) must be, and hereby are, DENIED. MacDonald is free to seek authorization from the Fourth Circuit Court of Appeals to raise these grounds in yet another successive § 2255 motion.

## B. Sixth Motion

It appears to be MacDonald's intent in his Sixth Motion [DE-124] ("Motion to Expand the Record with Itemized Evidence)," to assemble in one filing a relatively concise statement of his theory of the case. This Motion to Expand is accompanied by two large, bound and tabbed collections of documents – and a video recording – purportedly containing evidence that "was

20

not part of the trial record," [DE-126] at pp. 2-3, n.1, including the "new" DNA materials and the

affidavit of Jim Britt and Helena Stoeckley's mother.[11] *See* [DE-126], p. 1. MacDonald's

"Itemized Statement of Material Evidence" [DE-126], consists of 48 numbered paragraphs of text

setting forth his version of what is proved by the universe of evidence he has compiled to date –

old and new, admitted and rejected.

It is MacDonald's position that this court must consider the propriety of allowing the

Fourth Motion "in light of the evidence taken as a whole." [DE-126] at 1-2. He summarizes his

theory supporting the court's review of all evidence he has acquired before, during, and after his

trial as follows:

> In reviewing [his] claim of innocence, which is concomitant to a
> claim of "manifest injustice," this Court is required to conduct an
> analysis of the evidence "as a whole," including evidence developed
> post-trial. 28 U.S.C. Section 2255; *see also Herrera v. Collins*, 506
> U.S. 390, 442 (1992), (Blackmun, J., *dissenting*) (collecting various
> versions of the Court's "probability of innocence" test for
> miscarriage of justice); *Sawyer v. Whitley*, 50[5] U.S. 333, 339 &
> n.5 [(1992)] (the prisoner must show "that, in light of all the
> evidence, including that alleged to have been illegally admitted (*but
> with due regard to any unreliability of it*) and evidence tenably
> claimed to have been wrongly excluded or to have become available
> only after the trial, the trier of fact would have entertained a
> reasonable doubt of his guilt.") ([Q]uoting *Kuhlmann v. Wilson*,
> 477 U.S. 436, 455 n.17 (1986) (quoting Henry J. Friendly, *Is
> Innocence Irrelevant? Collateral Attack on Criminal Judgments*,
> 38 U. CHI. L. REV. 142, 160 (1970))); *Schlup v. Delo*, 513 U.S. 298
> (1995).

*Id.* at 2 (citing pre-AEDPA authority) (emphasis added).

The court believes MacDonald's reliance on the above-quoted authority is misplaced, and

rejects his suggestion that this court is required, under the circumstances presented by this case,

to expand the record and to consider every manner of supplementary material he deems

supportive of his position, regardless of its source or its competence. The court finds the record

---

[11]   See *infra*, discussion of MacDonald's "Seventh Motion."

as it presently is constituted to be more than adequate to permit a thorough and complete understanding of the material facts pertinent to the motions now before it. MacDonald's Sixth Motion is DENIED.

# IV. THE FOURTH MOTION

## A. Overview

Only the Fourth Motion – that predicated on former Deputy United States Marshal Jim Britt's 2005 affidavit – is the subject of a PFA from the Fourth Circuit Court of Appeals. The court perceives the gravamen of MacDonald's Fourth Motion to be that the Government, through AUSA Blackburn and former DUSM Britt, violated his Fifth and Sixth Amendment rights by withholding the fact and content of statements made by and to a defense witness that, if known to MacDonald and revealed to the jury, would have resulted in his acquittal. As will be more thoroughly explored below, the Britt Affidavit suggests three independent, but related, factual bases for MacDonald's Fourth Motion.

The propriety of Judge Dupree's 1979 evidentiary ruling to exclude the Stoeckley Witnesses' testimony at trial, and his rejection in 1985 of additional "newly discovered evidence," are not subjects of the Fourth Motion, except to the extent that such rulings appropriately may be considered among the facts and circumstances relevant to the court's inquiry with regard to this Fourth Motion.

## B. Standard of Review

The overarching principles governing a proposed second or successive motion for collateral relief are summarized in 17B WRIGHT & MILLER: FEDERAL PRAC. & PROC. § 4267, Successive Applications for Writ (2007):

> If a claim presented in a second or successive application had been presented in an earlier application the claim must be dismissed. Even if the claim is not one that has been previously presented, it must be dismissed unless the applicant shows one of two things. One is that the claim relies on a new rule of

22

constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. The other is to show that the factual predicate for the claim could not have been discovered previously through the exercise of due diligence[,] and that the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* (footnotes omitted). On top of this traditional rule initially announced in *Sanders v. United States*, 373 U.S. 1 (1963), the amendments to the federal habeas statutes imposed by the Antiterrorism and Effective Death Penalty Act of 1999 ("AEDPA"), Pub. L. No. 104-134, tit. VIII, 110 Stat. 1321, 1321-66 (1996), added, inter alia, the onerous requirement that a prisoner first obtain a pre-filing certification from the court of appeals before seeking to prosecute a successive habeas petition in the district court.

The bedrock premise of each of MacDonald's collateral attacks in this regard is identical: that he unconstitutionally was denied the opportunity to present third party testimony/affidavits to impeach Helena Stoeckley, whose trial testimony failed to corroborate his version of the events. That is, MacDonald's Fourth Motion, like his First, ultimately is motivated by out-of-court statements allegedly made by Helena Stoeckley. Regardless of the theory or vehicle he employs to raise the argument again, the bottom line of MacDonald's position is that Helena Stoeckley lied at trial, and he should have been permitted to impeach her testimony with hearsay evidence of inconsistent statements she had made outside the courtroom.

All of the motions before the court are subject to the AEDPA amendments. The procedures governing consideration of MacDonald's successive motions for collateral relief are described below.

1. *AEDPA's Gateway Scheme for Successive § 2255 Motions*

A movant must pass through two "gates" before the merits of a successive § 2255 motion may be entertained in the district court. *See Bennett v. United States*, 119 F.3d 468, 470 (7th Cir. 1997). Pursuant to § 2255 ¶ 8, and § 2244(b)(3), a federal prisoner seeking to file a successive

habeas petition in the district court first must submit a PFA motion in the court of appeals and obtain PFA certification from that court under § 2244(b)(3). If he is successful in obtaining a PFA from the appellate court, he may present that application and proposed petition to the district court for a more searching analysis and determination whether he has met the stringent requirements for litigating a successive § 2255 petition.

### a. First Gate - Pre-Filing Authorization by Court of Appeals

The PFA motion to file a successive petition based on newly discovered evidence must demonstrate: (1) "the existence of facts that could not have been discovered previously through the exercise of due diligence," and (2) that "the facts of the underlying claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the [movant] guilty of the offense." 28 U.S.C. § 2244(b)(2)(B); *see also Winestock*, 340 F.3d at 208 (citing § 2255 ¶ 8). Only "a *prima facie* showing that the application satisfie[s the foregoing] requirements. . . ." is required to pass through the first gate. 28 § 2244(b)(2)(C). That burden has been described as,

> simply a sufficient showing of possible merit to warrant a fuller exploration by the district court. . . . . If in light of the documents submitted with the [PFA motion] it appears reasonably likely that the [motion] satisfies the stringent requirements for the filing of a second or successive petition, [the court of appeals] shall grant the motion.

*Williams I*, 330 F.3d at 281 (citations omitted). This *prima facie* standard governs the propriety of " '*filing* of a second or successive petition,' . . . not the possibility that the claim will ultimately warrant a favorable decision in favor of the applicant." *Id.* (emphasis added) (quoting *Bennett*, 119 F.3d at 469). The motion seeking a PFA is considered by a three-judge panel of the court of appeals and must be digested by the panel members, and granted or denied within a mere 30 days after it is filed. *See* 28 U.S.C. § 2244 (b)(3) (B), (D). MacDonald has passed through this first gate by virtue of having obtained his PFA from the Fourth Circuit Court of Appeals.

24

## b. Second Gate – Thorough District Court Examination

Upon presentation with a PFA from the appellate court, the district court conducts the second gatekeeping step by examining each claim of the proposed successive application without reaching the merits, and dismissing those that fail to satisfy the "requirements for the filing of such a motion" under 28 U.S.C. § 2244(b)(4)) or § 2255. *See* Rule 4(b), RULES GOVERNING § 2255 PROCEEDINGS; *see also Winestock*, 340 F.3d at 205 (citing *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) (stating that a district court must conduct its own gatekeeping review)). Unlike the appellate court's cursory PFA examination, the "district court must conduct a *thorough review* of all allegations and evidence presented . . . to determine whether the motion meets the statutory requirements," *United States v. Villa-Gonzalez*, 208 F.3d 1160, 1165 (9th Cir. 2000) (emphasis added), because "a review of successive applications is available only in limited circumstances.[12] In order for these limitations to be effective, courts must not allow prisoners to circumvent them by attaching labels other than 'successive application' to their pleadings." *Winestock*, 340 F.3d at 203 (internal quotation omitted).

There are twin locks on the Second Gate. Both locks must be opened in order for a petitioner to pass through the Second Gate; if he cannot turn one lock, then he need not even try the other.

---

[12] When MacDonald's Fourth Motion was presented in January 2006 with his PFA, this court applied the relatively cursory test required by Rule 4(b), Federal Rules Governing § 2255 Proceedings, and determined that on its face, the Fourth Motion was not subject to summary dismissal. In light of the history of this case and the nature of the allegations contained in the Fourth Motion, the court deemed it essential that the Government respond in order to present a more complete record. The January 2006 order was not intended to represent this court's exercise of its responsibility to conduct a searching review of, or permit MacDonald's passage through, the Second Gate.

### 2. *Only the Fourth Motion Properly is Before This Court*

Having obtained his PFA, *In re Jeffrey R. MacDonald,* No. 05-548 (4th Cir. Jan. 12, 2006), from the Court of Appeals to file his proposed Fourth Motion, MacDonald has passed through the first "gate" of the dual gatekeeping process *as to that motion only* [DE-111]. Accordingly, the following analysis consists of this court's gatekeeping analysis only as to MacDonald's Fourth Motion, as it is the only one for which he has sought or obtained a PFA to submit a proposed successive application.

Reduced to its essence, MacDonald's claim is that he has obtained "new evidence" – the Britt affidavit – proving that Helena Stoeckley lied when she denied at trial any knowledge or involvement in the murders of his wife and daughters, that such proof supports his theory that Stoeckley and other drug-crazed hippies, in fact, murdered his family, which conclusion, in turn, proves that he is actually innocent. He contends that the guarantees of the Fifth and Sixth Amendments require that his convictions be vacated and set aside. His theory, generally, may be characterized as grounded on allegations of prosecutorial misconduct, and is comprised of three sub-claims.

Facially, the Britt affidavit contains two statements that are factually and analytically independent. *First,* Britt contends that Stoeckley admitted to him and to the late DUSM Holden that she had been present in the MacDonald home on the night of the murders (the "confession" claim). *Second,* Britt avers that he personally witnessed Stoeckley make the same admission to AUSA Blackburn, who, in response, threatened to prosecute Stoeckley for murder if she so testified before the jury (the "threat" claim). From this second assertion, MacDonald has extracted a *third* "newly discovered" fact: that having procured Stoeckley's false trial testimony by threat and intimidation, AUSA Blackburn then lied to the presiding judge in order to withhold exculpatory evidence, conceal his malfeasance, and ensure MacDonald's unlawful conviction (the "fraud" claim).

26

### a. The First Lock – Due Diligence Component

MacDonald comments almost glibly that, "[o]bviously, there is no way that the MacDonald defense could have forced Blackburn or Britt, two government officials, to reveal the information known to them of Blackburn's conduct." Memorandum in Support of § 2255 Motion [DE-111], at p. 28. That suggestion compels the observation that perhaps he simply might have asked.

The unusual circumstances surrounding Stoeckley's production and preparation as a trial witness might have raised in the minds of defense counsel some curiosity whether any pertinent information might have been exchanged between Stoeckley and the deputies or the prosecutor, yet no inquiry was made of Stoeckley or, as far as the record reflects, of any agent of the Government. That is, at MacDonald's request, Stoeckley involuntarily was arrested pursuant to a bench warrant in the middle of the trial, and transported to North Carolina by Deputy United States Marshals. Without benefit of counsel, she was interviewed independently by the lawyers for both parties and was called by MacDonald to testify under oath. She certainly had no attorney-client privilege with MacDonald's or the Government's lawyers that would have precluded questioning by either side about the contents of her communications with the other. Nevertheless, MacDonald's counsel made no effort to question either Stoeckley or the deputies concerning any conversation they may have had during the five- hour car ride, nor did defense counsel inquire of Stoeckley, under oath, concerning the substance of her interview with AUSA Blackburn the day before.[13] Nor did Segal re-call Stoeckley to the stand after a bizarre weekend during which she allegedly made odd and conflicting statements to various participants in the trial. *See infra*, pp. 42-45.

---

[13] After MacDonald's own lawyer, Mr. Smith, told Judge Dupree, "Generally, she said to us the same thing [she said to the Government] and that is, "I don't remember," Tp. 5617 [DE-130 #3], Judge Dupree specifically asked Stoeckley whether, in fact, she had. Stoeckley responded, "As far as I know, yes, sir." *Id.* at Tp. 5619.

Notwithstanding the foregoing, however, the court affords MacDonald the benefit of the assumption that he exercised due diligence in discovering Britt's assertions. The court cannot help but observe, however, that the bulk of Britt's affidavit is devoted to explaining why he did not come forward until 2005 with his revelation of events that allegedly occurred in 1979.

### b. The Second Lock – "No Reasonable Factfinder"

#### (i) The "Confession" Claim

Britt's 2005 affidavit reveals that while he was transporting Stoeckley to Raleigh from Greenville, South Carolina, Stoeckley told him "about a hobby horse in the MacDonald home, and that she, in fact, along with others, was in Jeffrey MacDonald's home on the night of the MacDonald murders." Britt Affidavit, Exhibit 1 to [DE-115] at ¶15.

MacDonald contends that Britt's 2005 revelation of Stoeckley's 1979 "confession" constitutes unassailable corroborative evidence of MacDonald's consistently-held position that he is innocent, and that long-haired hippies invaded his home, murdered his wife and children and injured him in February 1970. Frustrated by Stoeckley's failure to testify as he had hoped, MacDonald sought to get before a jury the testimony and statements of third persons to whom Stoeckley allegedly had spoken over the previous nine years about her belief that she was or may have been present during the 1970 murders, and who would add details tending to support MacDonald's position. MacDonald believes that if a jury could hear from the many people he has discovered through the years willing to testify that Stoeckley in some manner or to some degree had admitted to them that she believed she may have been in the MacDonald home on the night of the murders, he would be acquitted.

Stripping the Britt affidavit of its sensationalism, it merely is cumulative evidence of *exactly* the same nature as the excluded testimony of the Stoeckley Witnesses, half of whom also were active or former law enforcement officers. The record is replete with evidence that Stoeckley

28

"confessed" knowledge of the MacDonald murders to friends, neighbors, police officers, and

relative strangers. Judge Dupree observed in 1985,

> From the day after the murders until her death on January 9, 1983, from
> bronchopneumonia complicated by cirrhosis of the liver, Stoeckley gave a
> seemingly unending series of statements concerning the murders, at times denying
> any knowledge of or participating in the crimes, and at other times fully confessing
> to have been a co-conspirator in their commission.

*MacDonald*, 640 F. Supp. at 315.

Contrary to MacDonald's suggestion, Britt's relative credibility as an "unassailable"

witness neither is established nor especially relevant under these circumstances. MacDonald

never has had a shortage of credible hearsay witnesses to relate what Stoeckley had said at various

times in the past. Regardless of the credentials of the person relating them, however, Stoeckley's

"confessions" were untrustworthy in 1970, in 1979, in 1990, and in 2005, and they remain so in

2008. Neither the passage of time nor the identity of the hearsay witness improves the reliability

of what Stoeckley said or believed about the night of February 17, 1970.

Britt is yet another (former) law enforcement officer to whom Stoeckley allegedly confided

some direct knowledge of the MacDonald murders. His affidavit merely is one more of many

instances of perfectly credible persons relating what they heard Helena Stoeckley confess and

retract for more than a decade after the MacDonald murders. Britt's relative credibility does not

differentiate his (grossly belated) affidavit from the others.

In 1985, Judge Dupree wrote,

> Helena Stoeckley testified before the court at trial and the court has reviewed her
> statements, the affidavits relating to her, and the videotape supplied by MacDonald
> of a television program featuring her, all of which lead to the conclusion that *this*
> *woman is not credible.* . . .
>
> * * * *
>
> Thus, although the inconsistencies in Stoeckley's confessions and contradictions of
> the statements by the facts of the case and the affidavits of other witnesses would be
> more than enough to lead the court to conclude that the confessions are untrue,
> Stoeckley's unreliability adds even greater force to this conclusion.

29

*MacDonald*, 640 F. Supp. at 324 (emphasis added). Britt's affidavit, taken in light of all the circumstances and the other competent evidence of record, is insufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found MacDonald guilty of the underlying offenses. Accordingly, as to the "confession" aspect of Britt's affidavit as "newly discovered evidence," MacDonald cannot open the second lock, and his motion for leave to file a successive § 2255 petition on that ground, therefore, is DENIED.

        (ii) Blackburn's "Fraud" and "Threat" Claims

        In August 1979, when the defense team's mid-trial interview of Stoeckley was completed, she was escorted to the U.S. Attorney's office and interviewed by AUSA Blackburn, purportedly in the presence of DUSM Jim Britt. According to Britt, Stoeckley told Blackburn:

> the same things she had stated to me on the trip from Greenville to Raleigh. She specifically mentioned the hobbyhorse and various other things, and *specifically told Mr. Blackburn that she, along with others, had been inside Jeffrey MacDonald's house to acquire drugs.*

Britt Affidavit at ¶ 22 (emphasis added). Britt states he then overheard AUSA Blackburn tell Stoeckley, " 'If you testify before the jury as to what you have told me or said to me in this office, I will indict you for murder.' " *Id.* at ¶ 24. When the trial resumed the next day, Stoeckley steadfastly denied under oath any recollection of her actions during the early morning hours of February 17, 1970. *See MacDonald*, 640 F. Supp. at 317-18.

        It is MacDonald's argument that Britt's affidavit proves (a) by Britt's affirmative statement, that Stoeckley testified contrary to MacDonald's expectations *because* AUSA Blackburn threatened her with prosecution if her trial testimony were to support MacDonald's theory; and, (b) by inference, that AUSA Blackburn lied to Judge Dupree concerning the nature of Stoeckley's responses during Blackburn's interview of her, thus concealing evidence exculpatory to MacDonald that would have resulted in his acquittal. These contentions are inextricably intertwined.

30

As related above, the events critical to MacDonald's "newly discovered" "threat" and "fraud" claims occurred during the August 17th bench conference in the midst of Stoeckley's direct examination by defense counsel, Bernie Segal, the details of which are reflected in Section II-A, *supra*.[14] To recap, Segal had attempted to elicit from Stoeckley admissions that, during the previous day's interview by the defense team, she had admitted that she recognized items depicted in crime scene photographs and all but confessed, at least, to having been present during the murders. On the witness stand, however, Stoeckley denied familiarity with the photographs and testified she could not recall where she had been or what she had done in the early morning hours of February 17, 1970.

Obviously frustrated, Segal requested a bench conference where he sought leave to examine Stoeckley as a "hostile witness," "as on cross." *See* Tp. 5614 [DE-130 #3]. By way of explanation, Segal told Judge Dupree that during his interview of Stoeckley the previous day, she had made statements suggesting familiarity with the crime scene, and recalled standing over a body holding a candle. *See id.* at Tpp. 5617-18. Segal related further details of Stoeckley's alleged interview statements, and said, "I must say, Your Honor, there were persons present [at the interview] the entire time this took place." *Id.* at Tp. 5616.[15] Segal continued, "If she persists in

---

[14]  All of Stoeckley's trial testimony should be considered for a full appreciation of the underlying facts. *See* Tpp. 5513-5676 [DE-130 ##1-4].

[15]  The Government claims that, in addition to the Stoeckley Witnesses, another person present was author Joe McGinniss, who later published FATAL VISION, a "true crime" novel about the MacDonald case (Putnam & Sons 1983). According to Government's Memorandum [DE-128] in opposition to the instant motion, McGinniss wrote that Stoeckley consistently *denied* during her interview by defense counsel having been present or having had anything to do with the murders. *See* [DE-128] at 16-17 & n.24, and App., Vol. II, Tab 4, pp. 527-31. McGinniss reported that after telling Stoeckley she could not be prosecuted because the statute of limitations for the crime had expired, and after she nevertheless continued to insist that "I can't help you," Segal said to Stoeckley, "You have it in your power to end it. Right now. Otherwise, Helena, I guarantee you: I am going to take you into court." *Id.* at p. 530.

While they are intriguing, Mr. McGinniss's observations carry no weight and have no evidentiary value or legal import insofar at this court's present analysis is concerned.

denying it we will of course impeach her as we have the right to impeach her under the rules.

Although we have called her as a witness, there are rules that permit that to be done." *Id.*

AUSA Blackburn then remarked, *inter alia*,

> I discussed – *I told [defense attorney] Smith last night what she told us. I was under the impression to this very moment that what she told us was essentially what she told them. . . .* I just don't know which way it is, *because she has not indicated anything to the Government.*

*Id.* (emphasis added).

Local defense counsel, Wade Smith, spoke up:

> Judge, here I think is where we are. *Generally, she said to us the same thing and that is, "I don't remember."* But in two or three or four instances . . . she says something which would give an interesting insight into her mind.
>
> I would submit that we have a right to cross her on those ["two or three or four instances"]; if she denies them then they have a right to impeach her on the statements or show that she did not say anything like that.

*Id.* at Tp. 5617-18 (emphasis added). When Judge Dupree asked Stoeckley whether she had told

both sides the same story, she responded, "As far as I know, yes, sir." *Id.* at Tp. 5619.

### (A) Blackburn's "Fraud"

In seeking leave to question Stoeckley as a hostile witness, Segal represented that he was

surprised by Stoeckley's responses to his direct examination, strongly implying that those

responses were *contrary* to what she had said during his interview of her the day before.[16]

MacDonald contends in this Fourth Motion that Britt's affidavit now proves Stoeckley had been

ready to admit her involvement when she arrived in Raleigh and was interviewed by the defense

team. That is, taking as accurate Britt's recollection that Stoeckley made admissions to him on the

drive to Raleigh, and representing that she continued to make admissions during the defense

---

[16] Even though Segal stated he expected Stoeckley to testify in his client' s favor, he had at least six "impeachment" witnesses under subpoena and waiting in the wings.

team's interview of her, MacDonald suggests that Britt's affidavit is the "smoking gun" linking Blackburn's subsequent interview of Stoeckley with her startling change of position on the witness stand the following morning.

The theory is this: if Stoeckley still was ready to "confess" after the defense team was finished with her, and Britt recalls that she made admissions during the Government's interview, then Blackburn must have lied to Judge Dupree by suggesting that Stoeckley's failure of recollection on the witness stand was *consistent* with what she had said to him. Further, Britt's affidavit explains *why* Stoeckley experienced an unexpected lapse of memory in court – because Blackburn's threat of prosecution, overheard by Britt, so frightened and intimidated her that she feigned amnesia rather than expose herself to trial for murder. In short, MacDonald's fraud theory is that Blackburn browbeat a drug-addled young murderer into silence in order to achieve MacDonald's convictions, then committed a fraud on the court by lying to the presiding judge to cover up his misconduct.

The fraud aspect of this theory depends on the truth of Segal's representations to Judge Dupree that Stoeckley essentially had cleared MacDonald of the crimes by her admissions during the defense team's interview in the presence of half a dozen or more witnesses the day before. However, a close examination of MacDonald's brief reveals that his current defense team does not paint with quite so broad a brush. MacDonald's memorandum in support of the Fourth Motion mentions only Stoeckley's alleged out-of-court statements to certain of the Stoeckley Witnesses, to Wendy Rouder, and now to Jim Britt. *See* Memorandum [DE-111] at 18-20. If, as MacDonald's memorandum now seems to concede by omission, Stoeckley had *not* delivered the self-damning admissions during the defense interview that Segal's representations to Judge Dupree so plainly suggested, then *Segal's* candidness might well be challenged as to the factual basis offered for his request to examine Stoeckley as a hostile witness and to present the half-dozen Stoeckley Witnesses for "impeachment."

33

Again, MacDonald's own lawyer, Mr. Smith, told Judge Dupree, "*Generally, she said to us* the same thing [she said to the Government] and that is, *"I don't remember."* If, indeed, Stoeckley essentially said "I don't remember" during the defense team's interview, then her failure of recollection on the witness stand was not inconsistent or surprising as represented, but merely disappointing to the defense. It would not provide a predicate for impeachment by hearsay testimony or examination of Stoeckley as a hostile witness.

The court perceives that this is where MacDonald meets himself coming. Given the contents of the trial transcript, the court is confident that MacDonald cannot reconcile that contemporaneous record with Britt's thirty-year delayed recollection of what he thought he heard during the Government's pre-trial interview of Helena Stoeckley. Moreover, MacDonald has not suggested how a misrepresentation to the trial judge by Blackburn of the content of Stoeckley's statements to him in any way affected MacDonald's right to present a defense and to confront witnesses against him. Judge Dupree denied Segal's request to lead Stoeckley during direct examination because Segal had not demonstrated that her testimony was "hostile." The record reveals that Segal did so anyway, and persisted in questioning Stoeckley at great length, in great detail, and with very little restraint.

Judge Dupree declined to admit the Stoeckley Witnesses' hearsay testimony because MacDonald's own evidence conclusively established the unreliability and lack of trustworthiness of anything Stoeckley said to anyone. *See, e.g.*, Tpp. 5523-31 [DE-130 #1] (extensive direct examination concerning Stoeckley's long-term heavy drug use); *see also id.* at Tpp. 5553-54 (Stoeckley's responses to Segal's questions concerning the various drugs she had used on February 16, 1970); *MacDonald*, 688 F.2d at 233 (affirming Judge Dupree's exclusion of the Stoeckley Witnesses' testimony under Rule 804(b)(3), Fourth Circuit Court of Appeals observed that Stoeckley's "longstanding drug habits made her an inherently unreliable witness. Moreover her vacillation about whether or not she remembered anything at all about the night of the crime

34

lends force to the view that everything she has said and done in this regard was a product of her drug addiction.").

It would serve no worthwhile purpose now to entertain a dead-end excursion to explore the intriguing, but ultimately unhelpful, question of who misled whom in the presentation of Helena Stoeckley's testimony. Ms. Stoeckley's attendance at trial finally was procured at MacDonald's request and with the Government's assistance, and defense counsel had every opportunity to question her in the presence of the jury about a wide range of subjects and at great length. Insofar as it is based on "new evidence" that AUSA Blackburn defrauded the court by misrepresenting to Judge Dupree that Stoeckley's trial testimony was consistent with the gravamen of the Government's interview, MacDonald's motion for leave to file a successive § 2255 petition is DENIED.

## (B) Blackburn's "Threat"

According to Britt's recollection of Stoeckley's interview with the Government, "After Helena Stoeckley had given the story of her visit to Jeffrey MacDonald's home, Mr. Blackburn stated, 'If you testify before the jury as to what you have told me or said to me in this office, I will indict you for murder.' " Britt affidavit [DE-111], ¶ 24. MacDonald interprets the quoted statement as Blackburn's "threat" on behalf of the Government intended to intimidate Stoeckley into changing her testimony. MacDonald contends Britt's affidavit constitutes irrefutable evidence that on August 16, 1979, Stoeckley confessed first to DUSM Britt, next to the defense team, and finally to AUSA Blackburn, but that after Blackburn threatened her with prosecution for murder if she so testified, Stoeckley changed her trial testimony to, "I don't remember." MacDonald explains that, but for Blackburn's threat of prosecution and witness intimidation, Stoeckley would have confessed on the witness stand to having been present in the MacDonald home on the night of the murders. *See* [DE-115], at p. 20. After hearing that confession, he concludes, no reasonable jury could have convicted him.

35

MacDonald is correct that the constitutional rights to due process and to present a defense are violated if Government intimidates a defense witness into changing her testimony or refusing to testify. A defendant's right to present witnesses in his defense is a fundamental element of due process. *See Washington v. Texas*, 388 U.S. at 23 ( holding that habeas petitioner "was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense"). Such intimidation of a witness may violate a defendant's due process if it amounts to " 'substantial government interference with a defense witness' free and unhampered choice to testify.' " *United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991), *cert. denied*, 502 U.S. 1105 (1992) (citations omitted).

Faced with an unrepresented defense witness such as Stoeckley who may be asked to provide self-incriminating testimony under oath, a prosecutor may advise the witness of the risks she faces in testifying if such advice is relayed "in a manner calculated to engender informed and uncoerced decision-making on the part of the witness." *United States v. Jackson*, 935 F.2d 832, 847 (7th Cir. 1991). However, any additional, unnecessary comments by the prosecutor concerning the witness's right to invoke the Fifth Amendment may constitute an interference with the witness's free and unhampered choice to testify, thereby depriving defendant of his right to freely-given testimony. Where "the substance of what the prosecutor communicates to the witness is 'a threat over and above what the record indicate[s] was timely, necessary, and appropriate,' the inference that the prosecutor sought to coerce a witness into silence is strong." *Id.* at 847 (quoting *United States v. Simmons*, 670 F.2d 365, 369 (D.C. Cir. 1982)). *See also United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir. 1980) (holding that substantial governmental interference with a defense witness's free and unhampered choice to testify violates defendant's Fifth Amendment due process rights).

36

Many reported cases have addressed allegations that a prosecutor's comments to a defense witness, directly or through counsel, negatively affected the witness's willingness to testify on behalf of a defendant. *See, e.g., Davis v. Straub*, 430 F.3d 281, 287 (6th Cir. 2005) (holding that by ensuring that defense witness was aware of his right not to incriminate himself, "the prosecutor . . . did not engage in any unconstitutional intimidation"), *cert. denied*, 127 S. Ct. 929 (2007);[17] *United States v. Golding*, 168 F.3d 700, 703 (4th Cir. 1999) (where defendant's wife had been prepared to testify that the gun was hers, the Government's threat to prosecute her if she so testified, then repeatedly referred to wife's failure to testify during closing, violated the defendant's Sixth Amendment rights); *United States v. MacCloskey*, 682 F.2d 468 (4th Cir. 1982); *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976); *United States v. Aguilar*, 90 F. Supp. 2d 1152 (D. Colo. 2000) (concluding that prosecutor's statements in presence of defense witness that government intended to challenge validity of witness's plea agreement which could possibly result in reinstatement of previously dismissed charges, violated defendant's right to due process and compulsory process, where witness had been prepared to testify on defendant's behalf, but invoked his privilege against self-incrimination after hearing prosecutor's statements, and witness's testimony would have been material and favorable to defense). *Cf. Webb v Texas*, 409 U.S. 95, 98 (1972) (holding that trial judge's unnecessarily strong admonition drove witness off the stand and violated petitioner's right to due process under Fourteenth Amendment).

---

[17] In dicta, the Sixth Circuit observed in *Straub* that, "Neither the prosecutor's nor the judge's conduct was unconstitutional, especially considering the ethical obligation, imposed on prosecutors by the ABA's model guidelines, to:

> advise a witness who is to be interviewed of his or her rights against self-incrimination and the right to counsel whenever the law so requires. It is also proper for a prosecutor to so advise a witness whenever the prosecutor knows or has reason to believe that the witness may be the subject of a criminal prosecution.

*Straub*, 430 F.3d at 287 (quoting ABA Standards for the Administration of Criminal Justice § 3-3.2(b)). The court is not aware whether that standard existed in 1979.

37

> To establish a . . . due process violation based on the denial of the right to
> compulsory process, a defendant must establish "more than the mere absence of
> testimony." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). There
> must be a plausible showing that *an act by the government caused the loss or
> erosion of testimony that was both material and favorable to the defense. Id.*; *see
> also United States v. Hoffman*, 832 F.2d 1299 (1st Cir. 1987) (construing
> *Valenzuela-Bernal* to require a nexus between the challenged government conduct
> and the defendant's inability to present evidence)."

*Griffin v. Davies*, 929 F.2d 550, 553 (10th Cir.) (emphasis added), *cert. denied*, 502 U.S. 878

(1991). "Reversible prosecutorial misconduct occurs when the prosecutor's conduct is improper

and such conduct deprives the defendant of a fair trial." *See United States v. Francisco*, 35 F.3d

116, 120 (4th Cir. 1994), *cert. denied*, 513 U.S. 1133 (1995).

### 1. *Causation is Lacking*

Although the results of the cases alleging prosecutorial intimidation amounting to denial

of due process and/or the right to present a defense understandably are fact-specific, they all

include at least one thing in common: proof of a causative impact. In those cases, the record in

some way establishes that the witness otherwise would have testified favorably for the defendant.

Here, that element is absent and cannot be established. *Cf. People v. Harris*, 37 Cal. 4th 310, 33

Cal. Rptr. 3d 509, 118 P.3d 545, 569 (2005) ("Defendant bears the burden of demonstrating at

least a reasonable possibility that the witness could have given testimony that would have been

both material and favorable; that the prosecution engaged in activity that was entirely

unnecessary to the proper performance of its duties and of such a character as to transform a

defense witness from a willing witness to one who would refuse to testify; and a causal link

between that misconduct and his inability to present witnesses on his own behalf"), *cert. denied*,

547 U.S. 1065 (2006).

Even accepting the accuracy of Britt's recollection that Stoeckley made admissions to him

and to Blackburn on August 16th,[18]  it simply does not necessarily follow (1) that Stoeckley had

---

[18]  The court accepts Britt's affidavit as a true representation of what he heard or
genuinely thought he heard on August 15-16, 1979.

38

intended to testify consistently therewith if called as a witness, or (2) that, but for Blackburn's alleged threats, she would have. While such an exercise in inference-stacking might be defensible in the ordinary case, MacDonald's is not an ordinary case, and Helena Stoeckley was anything but an ordinary witness. There is nothing in the record to support MacDonald's suggestion that because Stoeckley made what he believes to be statements exculpatory of him to the Government and its agents on one day, it follows that she therefore intended to make the same statements under oath on the next day, but did not do so because she was "threatened" with prosecution if she did. The record in this case is well-established that Stoeckley was not a reliable witness and her statements were untrustworthy.

### 2. *Speculation as to Context*

MacDonald's theory assumes the accuracy of Britt's recollection, not only of the content of what he heard, but also the context, when Blackburn interviewed Stoeckley nearly thirty years earlier. Although the court accepts the accuracy of Britt's recollection of the words he heard, the accuracy of his interpretation thereof is sheer conjecture. Under the circumstances, a person untrained in the law easily could have perceived those words to constitute a threat – and it may have been. However, persons educated in the criminal and constitutional law would recognize *at least the possibility* that what Britt heard was an officer of the court advising an unrepresented potential trial witness that if she were to admit under oath that she had in some way been involved in three murders, it would be his duty to indict her for those crimes.[19]

Notwithstanding exactly what Blackburn actually said to Stoeckley and what he meant by it, what Britt heard or thought he heard, or what Stoeckley understood Blackburn to mean by his statement, assuming he made it, Stoeckley's death over twenty years ago prevents there *ever* being

---

[19] In support of his motion to introduce the Stoeckley Witnesses' testimony Segal himself argued "There is clearly evidence in my mind from all these witnesses that she carried a candle and was present[;] that is good enough to indict her in [sic] murder as a conspirator under the felony murder rule." Tp. 5789 [DE-130 #7].

a reliable factual determination that even arguably might support post-conviction relief. Even if Blackburn now were to admit having made the statement, no living person accurately can reveal how Stoeckley interpreted it or what, if any, impact it had on the content of her trial testimony.

Contrary to MacDonald's bald assertion,[20] there is absolutely no evidence to support MacDonald's assumption that before she spoke with Blackburn, Stoeckley was ready to testify under oath in court that she had been present during the murder of MacDonald's family. [21] Resolution of the prosecutorial misconduct by intimidation claim would require the testimony of Stoeckley, and that is impossible. Only Stoeckley could testify whether she, in fact, had intended to testify in a manner favorable to MacDonald and whether she, in fact, was intimidated by Blackburn's "threat" into failing to do so. Even if Stoeckley were still alive to testify, her credibility – indeed, her ability, even days afterward, to accurately recall and convey a reliable account of whether she was or was not in the MacDonald home during the early morning hours of February 17, 1970 – long ago was judicially determined to be utterly non-existent because of her prolonged drug abuse. MacDonald's right to compulsory process was to obtain "witness[es] who w[ere] *physically and mentally capable of testifying to events that [they] had personally observed." Washington v. Texas*, 388 U.S. at 23 (emphasis added). The record, including Judge Dupree's findings, establishes that Helena Stoeckley did not satisfy that qualification. Absent competent evidence that, but for Blackburn's "threat" of prosecution, Stoeckley would have testified favorably to MacDonald, MacDonald's claim that his Fifth and Sixth Amendment rights

---

[20] MacDonald declares, "It is apparent from the new evidence recently provided by former U.S. Deputy Marshal Jim Britt, that Helena Stoeckley was, in fact, prepared to admit to her involvement in the MacDonald crime to the court and jury." Memorandum [DE-111] at p. 18.

[21] The observation frequently has been made that Stoeckley tended to say what she believed the listener wanted to hear. *See, e.g., MacDonald*, 640 F. Supp. at 322 ("[H]er certainty about whether the events took place at all changes depending upon whether she is talking to MacDonald's investigators or to the FBI.").

40

thereby were violated is founded on sheer speculation.[22] Even less likely is the suggestion that had she done so, the jury would have believed her and acquitted MacDonald.

### 3. Futility

The court is fully aware that the Fourth Circuit Court of Appeals has held that governmental misconduct amounting to witness intimidation should automatically require a new trial without regard to a harmless error analysis. *See United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir.1982). However, after *MacCloskey* was decided, the United States Supreme Court reached an inapposite decision in *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), leading even a panel of the Fourth Circuit Court of Appeals to doubt the continued validity of *MacCloskey*. *See United States v. Alston*, No. 95-5303, 1996 WL 570422 (4th Cir. Oct. 7, 1996) (UP). *Cf. United States v. Collins*, 415 F.3d 304, 185 (4th Cir. 2002) (subjecting claim of prosecutorial misconduct by improper vouching to a harmless error analysis).

Here, however, MacDonald's alleged violations of due process can never be proven because Helen Stoeckley is dead. Only Helena Stoeckley could say whether or not she really intended to testify favorably for MacDonald prior to meeting with Blackburn the day before her court appearance, and that is assuming, first that she had formed any intent regarding the substance of her testimony, and second, that she could accurately report what that intent was. Stoeckley's death 25 years ago has made that impossible. The passage of time has rendered a factual determination of MacDonald's prosecutorial misconduct claim factually impossible. Neither Britt's testimony nor that of Blackburn or Segal could establish a factual basis for what, if anything, Helena Stoeckley intended to say before she was interviewed by the Government prior

---

[22] Additionally, it appears that at some time or times prior to MacDonald's trial, the Government had extended immunity offers to Stoeckley. *See MacDonald*, 620 F. Supp. at 330, n.27. Even evidence that a prosecutor informed a defense witness on the eve of trial that a prior immunity offer no longer stood, without more, does not necessarily demonstrate violation of a defendant's Sixth Amendment rights absent evidence that the witness thereby was induced to change her testimony or refuse to testify.

to say before she was interviewed by the Government prior to being called as a witness by MacDonald's defense team. Ordering an evidentiary hearing on MacDonald's new claim of prosecutorial misconduct by threat and intimidation of a witness would constitute a disgraceful waste of judicial and Government resources, and unrealistically would raise MacDonald's hope of relief where none is possible under the circumstances.

Under the unique and often bizarre circumstances of this case, the court concludes after *much* serious deliberation, that MacDonald's prosecutorial misconduct claim based on Britt's affidavit – that AUSA Blackburn threatened or intimidated Stoeckley into abandoning her planned favorable testimony -- does not satisfy the threshold requirements for this court's entertaining a successive §2255 claim. No testimony could be elicited in an evidentiary hearing now that would be competent to alter or embellish the already massive record so as to entitle MacDonald to the relief he seeks. Insofar as it is based on "new evidence" that AUSA Blackburn intimidated Helena Stoeckley so that she refused to testify favorably to him at trial, MacDonald's motion for leave to file a successive § 2255 petition is DENIED.

### (iii) *One More Theory*

Perhaps anticipating this conclusion, and seeking to avoid it, MacDonald has offered a new affidavit by one of his trial witnesses. The affidavit concerns events that occurred over the weekend of August 18-19, 1979, immediately following Stoeckley's testimony and the voir dire of the Stoeckley Witnesses. To place this new affidavit in context, it is necessary to relate events that took place during a weekend recess of MacDonald's trial.[23]

After Stoeckley had completed her testimony on Friday, August 17th, the defense team served her with a subpoena so that she could be released from the bench warrant, and had

---

[23] The trial transcript reflects that on Monday, August 20, 1979, defense counsel Bernie Segal proffered an explanation for calling on voir dire, Red Underhill, a former acquaintance of Stoeckley's in Nashville, Tennessee, who had been subpoenaed by the defense, and Ms. Wendy Rouder, then a clerk for Segal and a member of the defense team. *See* Tpp. 5951-53 [DE-131 # 4].

42

provided her with the means to rent a motel room over the weekend, with the instruction that she return to court on Monday. *See id.* at Tp. 5951 [DE-131 # 4]. Mid-morning on Sunday, August 19, 1979, Segal dispatched Rouder to the Raleigh motel where Stoeckley was staying. *See id.* at Tp. 5929. The motel management had complained of a disturbance involving Stoeckley and the complaint had gotten back to Segal. Rouder explained, "Mr. Segal had informed me that Ms. Stoeckley had been beaten and possibly had been subjected to a drowning. He asked me to check into her well-being. The rumor or the hearsay as you might say had been that her fiancé had inflicted this attack upon her and it would be best if in some way I could help separate them for her own safety." *Id.* Rouder drove to the motel with Underhill, *see id.*, located and talked with Stoeckley, who had acquired a black eye and bloody nose since she had been in court.[24] Stoeckley wanted her fiancé, Mr. Davis to leave, and she packed his suitcase. *See id.* at Tp. 5930.

Rouder arranged for Stoeckley to relocate to the Hilton, and drove her and Underhill there. *See id.* at Tpp. 5929-30; 5935; 5943-44. Stoeckley told Rouder that she was afraid and wanted someone to stay with her.[25] *See id.* Tp. 5931; 5936. While the packing, driving and relocating took place, Rouder talked privately with Stoeckley about the substance of Stoeckley's trial testimony. *See id.* at Tpp. 5932-34, 5937; 5939-42.

---

[24] Rouder believed Stoeckley had been assaulted by her then-boyfriend, Ernest Davis, who also was present at the original motel. Red Underhill also testified on voir dire that he observed the black eye and bloody nose. *See* Tp. 5907 [DE-131 #3]. Stoeckley had told him that an unknown person had approached her at the motel and punched her in the face, blackening her eye. *See* Tp. 5925 [DE-131 #4]. Stoeckley told both Underhill and Rouder that she had fallen in the bathroom and bloodied her nose. *See id.*; *see also id.* at Tp. 5944.

[25] Underhill related during voir dire that Stoeckley had wanted him to stay with her over the weekend because she was afraid. She had told him that, "her life would not be worth five cents out on the street, because, said [sic], "They'll kill me for sure." *Id.* at Tp. 5922; *see also id.* at Tpp. 5913-22. Underhill also testified that Stoeckley was "deathly scared" of Allen Mazzarole, *id.* at Tp. 5924, whose name had been tossed around during the trial suggesting he might have been one of the "hippies" who had committed the MacDonald murders.

---

43

According to Rouder's voir dire testimony in 1979 with the aid of her notes made at Segal's request, *see id.* at Tp. 5932, Stoeckley had said she still thought she "could have been there that night," *see id.* at Tp. 5932; 5938-39, because of the rocking horse, *see id.* at Tp. 5939; that when she saw the crime scene photographs of one of the children she "knew" she had seen her somewhere before, *see id.* at Tp. 5932; that she remembered being on that concrete driveway, *see id.*; and that she had a memory of "standing at the couch, holding a candle, only – you know – it wasn't dripping wax. It was dripping blood." *Id.* at Tp. 5937; 5945. Rouder had remarked, "It must have been difficult living with the guilt all these years," to which Stoeckley allegedly responded, "yes . . . . Why do you think I've taken all those damned drugs"? *Id.* at Tp. 5941. Rouder asked Stoeckley, "Isn't there anything you think you can do to help get rid of the guilt," to which Stoeckley allegedly suggested, "I just want to take sodium pentothol or hypnosis or something." *Id.*

Blackburn cross-examined both Underhill and Rouder, but neither he nor the defense team ever called Stoeckley back as a witness. Judge Dupree refused to permit either Rouder or Underhill to testify in the presence of the jury concerning the weekend's activities and Stoeckley's alleged statements. *See* Tpp. 5976-77 [DE-131 #5].

In her new affidavit, Rouder now avers that when she was contacted by MacDonald's present wife Kathryn about Britt's 2005 affidavit, "Helena Stoeckley's unexpected response to my questions in August of 1979 then made sense to me." *Id.* at ¶ 12. In her September 2005, affidavit, Rouder recalls that Stoeckley had admitted "her involvement in the MacDonald family murders – that she had seen a hobby horse in the MacDonald home, that she was there the night of the murders, and that she could name the people who killed Dr. MacDonald's family." Rouder affidavit, Exhibit 5 to [DE-111].[26]  Rouder recalls,

---

[26]  Ms. Rouder did not testify in 1979 that Stoeckley told her that she could name MacDonald's killers. It was Red Underhill who repeatedly testified on voir dire that Stoeckley had said to him that she could "name three people," but would not do so because "I doubt if

44

I had asked her why she was making admissions to me in private when she had made public denials at the courthouse, and why she did not testify in court as to what she was telling me. She had then responded: "I can't. I'm afraid." I asked her what she was afraid of. I *fully expected* her to say that she was afraid of the people with whom she was involved the night of the MacDonald family murders, or the person or persons who the motel manager had reported as having assaulted her. Thus, I was very surprised when Ms. Stoeckley responded that she could not testify as to what she was sharing with me because of *"those damn prosecutors sitting there."* And she added words to the effect of *"They'll fry me."*

*Id.* at ¶ 10 (emphasis in original); *see also* Tpp. 5928-50 [DE-131 #4]. Rouder added that while she was in the motel room talking with Stoeckley, "the phone rang and the hotel operator had asked for me specifically. The call was from Judge Franklin Dupree. He addressed me by name, and asked me why I was there with Helena Stoeckely, and warned me not to ask her any questions." *Id.* at ¶ 13.[27]

The Wendy Rouder incident is not new, and MacDonald does not claim otherwise. On the first court day after it occurred, defense counsel brought the matter to the attention of Judge Dupree, who permitted Ms. Rouder to be questioned on voir dire. *See* Tpp. 5928-50 [DE-131 #4].[28] Rouder's 2005 affidavit does not amount to "new evidence" entitling MacDonald to

_____

[sic] I live if I do." *See, e.g.*, Tp. 5923 [DE-131 #4].

[27]    Rouder had not included this detail in her *voir dire* testimony in 1979.

[28]    According to the trial transcript, Stoeckley made a number of surprising statements to some unexpected and reluctant listeners over that weekend. Judge Dupree revealed to counsel at the bench that Stoeckley had called him twice over the weekend and had told him, *inter alia,* that "she was in mortal fear of physical harm by Bernard Segal, counsel for the Defendant, and that she wanted a lawyer to represent her." *See* Tp. 5980 [DE-131 #5]. Judge Dupree informed counsel that he located an amendment to the Criminal Justice Act that authorized compensation for appointed counsel in such a situation, and that after his law clerk had called "everyone in the book just about," he located a local attorney who accepted the appointment. *See id.* at Tpp. 5980-81.

The trial transcript reveals, therefore, that over the weekend of August 18-19, 1979, Stoeckley had expressed her mortal fear of an unknown person who had punched her in the face at the motel, the "damn prosecutors," defense counsel Bernard Segal, unidentified persons who rendered her life "not worth five cents on the street," Allen Mazzarole, and possibly her fiancé, Ernest Davis.

prosecute a successive § 2255 petition, nor does it enhance the value of or "corroborate" Britt's affidavit. If anything, the 2005 Britt and Rouder affidavits further reinforce Judge Dupree's personal observations of Stoeckley as a witness, and his conclusion that her statements, being "all over the lot," lacked any measure of trustworthiness.

c. Conclusion

Assuming proof of the facts alleged therein in light of the evidence as a whole, even if Britt's affidavit were deemed "newly discovered," it simply cannot establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found MacDonald guilty. For the foregoing reasons, the court concludes that MacDonald cannot open the second lock on the second gate to a successive review of his convictions, on grounds of Britt's affidavit as newly discovered evidence. MacDonald's **Fourth Motion** seeking leave to file a successive § 2255 motion on grounds of newly discovered evidence, to wit, the Britt affidavit, is DENIED.

## VI. SUMMARY

MacDonald's Motion to Add Additional Predicate [DE-122], MacDonald's Motion to Expand the Record with Itemized Evidence [DE-124], and MacDonald's Motion to Supplement Itemized Evidence [DE-144] are DENIED. The Government's Motion to Strike Exhibits [DE-129] is ALLOWED.

Having conducted its gatekeeping function pursuant to the Fourth Circuit's PFA in this case, the court finds and concludes that MacDonald has failed to satisfy at least the second of the dual statutory requirements for district court review of a successive § 2255 petition on grounds of newly discovered evidence. That is, MacDonald has not demonstrated that the Britt affidavit, taken as true and accurate on its face and viewed in light of the evidence as a whole, could establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found MacDonald guilty of the murder of his wife and daughters.

46

Consequently, MacDonald's Motion for Leave to File Successive § 2255 Motion [DE-111] is DENIED.

SO ORDERED.
This the ___ day of November, 2008.

JAMES C. FOX
Senior United States District Judge

47