UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 3:75-CR-00026-F
No. 5:06-CV-00024-F

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| JEFFREY R. MacDONALD, | ) | |
| Movant. | ) | |
| | ) | |

This matter is back before the court following the opinion of the Fourth Circuit Court of

Appeals, *United States v. MacDonald* (*MacDonald XI*), 641 F.3d 596 (4th Cir. 2011), vacating this

court's decision[1] to deny Movant Jeffrey MacDonald's Motion to Vacate, Set Aside or Correct

pursuant to 28 U.S.C. § 2255 [DE-111][2] and remanding for further proceedings. After conducting

an evidentiary hearing, receiving voluminous supplementary briefing, and examining the evidence

as a whole, the court finds that MacDonald has failed to establish, by clear and convincing evidence,

that no reasonable factfinder would have found him guilty of the murder of his wife and two

daughters. Alternatively, the court finds that MacDonald has failed to adequately establish the merits

of any of his claims. Accordingly, for the reasons more fully set forth below, MacDonald's Motion

to Vacate [DE-111] is DENIED.

---

[1] *See United States v. MacDonald* (*MacDonald X*), Nos. 75-CR-26-3, 5:06-CV-24-F, 2008 WL
4809869 (E.D.N.C. Nov. 4, 2008).

[2] For purposes of this Order, "DE" designates the docket entry on the court's official Docket
Sheet. "Ttr." refers to the transcript from the trial. "Htr" refers to the transcript from the September 2012
evidentiary hearing, and "GX" and "DX" refer to exhibits offered by the Government and MacDonald,
respectively, at the September 2012 hearing. "GXP" refers to photographic Government exhibits.

## PROCEDURAL BACKGROUND

Although this order presumes some familiarity with this long-running case, the court nevertheless finds it necessary to review some of the procedural background.

In the early morning hours of February 17, 1970, Jeffrey MacDonald's pregnant wife, Colette, and his two young daughters, Kristen and Kimberly, were murdered in their home. MacDonald, a physician and Captain in the Army Medical Corps, sustained non-life threatening injuries. From that date, MacDonald has consistently maintained that his Fort Bragg apartment was invaded by a band of drug-crazed hippies, including a woman with long blonde hair who wore a floppy hat and boots.

Law enforcement initially accepted MacDonald's story. However, as the investigation continued, physical evidence was discovered which cast doubt on MacDonald's version. In fact, investigators came to believe that MacDonald had killed his wife and daughters and staged the crime scene to cover up their murders.

The Army eventually charged MacDonald with the murders of his family. The Army's charges were ultimately dismissed on October 23, 1970, following a formal pre-court martial investigation and hearings conducted pursuant to Rule 32 of the Uniform Code of Military Justice. The investigating officer recommended that civil authorities investigate Helena Stoeckley as a possible suspect. Stoeckley was a Fayetteville, North Carolina, resident who was known to be a heavy drug user, and known to wear clothing similar to that described by MacDonald. Stoeckley had also, on numerous occasions, given conflicting statements as to whether she participated in the murders of MacDonald's family.

2

Just as the statute of limitations was about to expire, MacDonald was indicted by a grand jury for the Eastern District of North Carolina for the murders of his wife and his two daughters. The seven-week trial of MacDonald's case was held during July and August of 1979. The Honorable Franklin T. Dupree, Jr., United States District Judge, presided over the trial.[3] The Government's case against MacDonald was presented by James L. Blackburn, Assistant United States Attorney for the Eastern District of North Carolina, and Brian Murtagh, an attorney with the Department of Justice. MacDonald's defense team included Wade M. Smith of Raleigh, North Carolina, and Bernard Segal of the San Francisco, California bar.

The trial included testimony from both MacDonald and Stoeckley, the latter of which is detailed more fully later in this order. Stoeckley's testimony at trial was not what MacDonald or his defense team wanted or expected to hear. In short, she denied any involvement in the murders, and could not recall anything from shortly before midnight on February 16, 1970 until approximately 4:30 a.m. on February 17th due to the large amounts of drugs she had ingested. At the conclusion of the 29-day trial, it took the jury only six hours of deliberation to find MacDonald guilty of second degree murder of his wife and his daughter Kimberly and first-degree murder of his daughter Kristen. MacDonald was sentenced to three consecutive life sentences.

Thereafter, MacDonald filed a direct appeal to the Fourth Circuit Court of Appeals raising a number of issues. *See United States v. MacDonald*, 632 F.2d 258 (4th Cir. 1980). A divided panel reversed MacDonald's convictions, on the basis that his Sixth Amendment right to a speedy trial had

---

[3] Judge Dupree presided over the trial and all subsequent proceedings in the MacDonald case held in the District Court until his death in December of 1995.

been violated. *Id.* at 267.[4] The Supreme Court, however, reversed the Fourth Circuit and remanded for further proceedings. *See United States v. MacDonald*, 456 U.S. 1, 9-11 (1982). On remand, the Fourth Circuit assessed MacDonald's remaining appellate arguments, found no error, and affirmed his convictions. *United States v. MacDonald* (*MacDonald II*), 688 F.2d 224 (4th Cir. 1982). In the following years, MacDonald filed several motions in this court for post-conviction relief. The first two of these were denied. *United States v. MacDonald* (*MacDonald III*), 640 F. Supp. 286 (E.D.N.C. 1985) (denying motions for a new trial and for a writ of habeas corpus), *aff'd* (*MacDonald IV*), 779 F.2d 962 (4th Cir. 1985) (affirming denial of motions for recusal, new trial, and habeas relief), *cert. denied*, 479 U.S. 813 (1986); *United States v. MacDonald* (*MacDonald V*), 778 F. Supp. 1342 (E.D.N.C. 1991) (denying MacDonald's second motion for habeas relief), *aff'd* (*MacDonald VI*), 966 F.2d 854 (4th Cir. 1992), *cert. denied*, 506 U.S. 1002 (1992).

In 1997, MacDonald filed a motion, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, to reopen the proceedings on his second post-conviction motion which was filed in 1990. MacDonald alleged fraud by the Government concerning the 1990 motion, and sought an order permitting new DNA testing of certain evidence that had been collected from the crime scene. This court denied the motion insofar as it sought to reopen the 1990 motion, and transferred the remaining matters to the Fourth Circuit Court of Appeals for consideration as a petition for leave to file a successive § 2255 motion. *See United States v. MacDonald* (*MacDonald VII*), 979 F. Supp. 1057, 1069 (E.D.N.C. 1997).

---

[4] Prior to trial, MacDonald filed an interlocutory appeal, and the Fourth Circuit found that his speedy trial rights had been violated. *United States v. MacDonald*, 531 F.2d 196 (4th Cir. 1976). The Supreme Court later reversed the Fourth Circuit, on the basis that the argument was not ripe for review prior to trial. *United States v. MacDonald*, 435 U.S. 850 (1978).

4

There were two appeals to the Fourth Circuit from this court's 1997 decision. In the first appeal, the Fourth Circuit denied MacDonald authorization to file a successive § 2255 motion, but remanded the matter to this court to oversee mitochondrial DNA testing. *See In re MacDonald* (*MacDonald VII*), No. 97-713 (4th Cir. Oct. 17, 1997) (unpublished). With regard to the second appeal, the Fourth Circuit affirmed this court's denial of MacDonald's Rule 60(b) motion to reopen the proceedings. *See United States v. MacDonald* (*MacDonald IX*), No. 97-7297, 161 F.3d 4 (4th Cir. Sept. 8, 1998) (unpublished) (per curiam).

On remand, this court entered orders setting the parameters for DNA testing. It took nine years for the testing protocol to be agreed upon by the parties, the tests to be conducted, and the results submitted. The DNA report from the Department of Defense Armed Forces Institute of Pathology was issued on March 10, 2006.

Just before the DNA report was issued, MacDonald sought and received a pre-filing authorization from the Fourth Circuit, pursuant to 28 U.S.C. § 2244(b) and § 2255, permitting him to submit his proposed successive § 2255 motion to determine whether he meets the requirements for a successive § 2255 motion. MacDonald promptly filed his proposed successive § 2255 motion [DE-111] in this court on January 17, 2006.

This proposed successive § 2255 motion asserted what has become known as the "Britt claim." Specifically, MacDonald sought to have his convictions vacated and set aside on the grounds of "newly discovered evidence," the 2005 affidavit of former Deputy United States Marshal Jim Britt, the presentation of which MacDonald asserts would result in his acquittal. In brief summary, Britt averred that Stoeckley confessed to him in 1979 that she had been present in the MacDonald home on the night of the murders. Britt also declared that he was the only witness to an exchange

5

between AUSA Blackburn and Stoeckley when, after Stoeckley made the same statement to Blackburn that she made to Britt, Blackburn threatened to indict her for first degree murder if she so testified. In this proposed motion, MacDonald contends that Britt's affidavit proves AUSA Blackburn's threat of prosecution intimidated Stoeckley into changing her intended trial testimony. MacDonald also asserts that Blackburn lied to Judge Dupree at trial the following day by representing that Stoeckley told the Government she had *not* been involved in the MacDonald murders, and could not remember where she had been on the night the crimes took place. MacDonald contends that Britt's withholding this evidence for almost 30 years must be attributed to the Government, and that its suppression of the facts revealed in the affidavit constitutes prosecutorial misconduct requiring that his conviction be vacated and set aside. In addition to the Britt affidavit, this motion incorporated numerous other exhibits, including the affidavits of three other witnesses swearing that Stoeckley's boyfriend at the time of the MacDonald murders, Greg Mitchell, had confessed to murdering the MacDonald family.

On March 22, 2006, after the results of the DNA testing became available, MacDonald filed a "Motion to Add an Additional Predicate to His Previously Filed Motion Under 28 U.S.C. § 2255" [DE-122], or what has become known as the "DNA claim." In this motion, MacDonald sought to add a new claim for relief to his proposed successive § 2255 motion, based on the newly discovered results of the mitochondrial DNA testing. Specifically, MacDonald sought to raise a freestanding actual innocence claim based on the DNA evidence, as well as having the court consider the DNA evidence as part of the "evidence as a whole" in assessing the Britt claim.

Just one day after MacDonald filed his DNA motion, he filed a "Motion, Pursuant to Rule 7 of the Rules Governing Section 2255 Proceedings, to Expand the Record to Include the Itemized

Authenticated Evidence Set Forth Herein" [DE-124]. MacDonald requested that the court expand the record to include specific authenticated evidence as part of the court's duty to assess his § 2255 motion viewing the evidence "as a whole." This itemized statement of evidence included, in part (1) evidence which was excluded at trial, which included the testimony of witnesses offered to impeach Stoeckley's testimony; (2) evidence which was submitted (and rejected) in connection with prior post-conviction motions, including evidence of blond synthetic hair-like fibers found at the crime scene, and (3) more recently discovered evidence, e.g., the DNA test results and the three affidavits detailing the confessions allegedly made by Mitchell. Thereafter, the Government filed a motion to strike the affidavits concerning the alleged Mitchell confessions.

Months later, MacDonald filed a "Motion to Supplement Applicant's Statement of Itemized Material Evidence" [DE-144]. Therein, he sought to add to the body of "evidence as a whole" by adding the March 31, 2007 affidavit of Helena Stoeckley's mother,[5] wherein she related that her daughter twice confessed to having been present during, and having participated in, the murders of MacDonald's family members.

In an order filed November 4, 2008 [DE-150], this court (1) allowed the government's motion to strike the Mitchell confession affidavits from the § 2255 motion; (2) denied the DNA motion; (3) denied MacDonald's motions to expand the record with itemized evidence and to supplement that evidence, and (4) denied MacDonald leave to file the § 2255 motion, i.e., the Britt claim.[6] See MacDonald X, 2008 WL 4809869. As to the Government's motion to strike the Mitchell

---

[5] Helena Stoeckley's mother also was named Helena Stoeckley. For this reason, the court will refer to her as the "elder Stoeckley."

[6] The Government subsequently filed a motion to publish and modify the Opinion on November 24, 2008. This court allowed for some minor revisions on "clerical, non-substantive matters." *United*

confession affidavits, the court agreed with the Government's assertion that such evidence should be excluded because (1) MacDonald's claims relating to Mitchell's confessions previously were considered and rejected in the court's earlier post-conviction orders, and (2) because the evidence was untimely. *Id.* at *11.

With regard to the DNA claim motion, as well as MacDonald's motion to supplement his proposed statement of itemized material evidence with the affidavit of the elder Stoeckley, this court viewed the motions as "seek[ing] to add discrete factual bases to" the § 2255 motion raising the Britt claim. *Id.* at *12. This court found that because "[t]he only grounds upon which MacDonald sought or obtained [pre-filing authorization] are contained in his [§ 2255 motion] concerning the Britt affidavit," MacDonald's "DNA and the elder Stoeckley affidavit motions are bootstrapping, 'piggybacking' attempts." *Id.* Accordingly, this court concluded that the claims in the DNA and the elder Stoeckley affidavit motions were "untimely, successive and independent, and this court lacks subject matter jurisdiction over them." *Id.* The court observed, however, that "MacDonald is free to seek authorization from the Fourth Circuit Court of Appeals to raise these grounds in yet another successive § 2255 motion." *Id.*

As to MacDonald's motion to expand the record, the court observed that MacDonald's apparent intent in the motion was " to assemble in one filing a relatively concise statement of his theory of the case," specifically, the "'Itemized Statement of Material Evidence' [DE-126] consist[ing] of 48 numbered paragraphs of text setting forth his version of what is proved by the universe of evidence he has compiled to date–old and new, admitted and rejected." *Id.* at *13. This court rejected MacDonald's "suggestion that this court is required, under the circumstances

_____

*States v. MacDonald*, No. 75-CR-26, slip op. at 2 (E.D.N.C. Jan. 9, 2009).

8

presented by the case, to expand the record and to consider every manner of supplementary material he deems supportive of his position, regardless of its source or competence." *Id.* Accordingly, the court denied the motion to expand the record.

Finally, this court considered MacDonald's proposed successive § 2255 motion concerning the Britt claim. In so doing, this court noted that "[a] movant must pass through two 'gates' before the merits of a successive § 2255 motion may be entertained in the district court." *Id.* at *15 (citing *Bennett v. United States*, 119 F.3d 468, 470 (7th Cir. 1997)). This court found that MacDonald had passed through the first gate – as to the Britt claim only – by having obtained pre-filing authorization from the Fourth Circuit Court of Appeals. *Id*. As to the second gate, this court observed that its role is to "examin[e] each claim of the proposed successive application without reaching the merits, and dismiss[] those that fail to satisfy the 'requirements for the filing of such a motion' under 28 U.S.C. § 2244(b)(4) or § 2255." *Id.* (citing Rule 4(b), Rules Governing § 2255 Proceedings). This examination is required to be thorough. *Id.*

In conducting this examination, this court determined that the applicable standard was that found in 28 U.S.C. § 2244(b)(2)(B). *Id*. Under § 2244(b)(2)(B), the movant must opens two "locks" to pass through the second gate. Specifically, the movant must show (1) that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," § 2244(b)(2)(B)(i), and (2) that "the facts of the underlying claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the [movant] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). As to the first lock, this court "afford[ed] MacDonald the assumption that he exercised due diligence in discovering Britt's assertions." *Id.* at * 17. This court

9

found, however, that MacDonald could not open the "second lock" because he failed to demonstrate "that the Britt affidavit, taken as true and accurate on its face and viewed in light of the evidence as a whole, could establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found MacDonald guilty of the murder of his wife and daughters." *Id.* at *28. Accordingly, MacDonald's motion for leave to file a successive § 2255 petition was denied.

On appeal, the Fourth Circuit vacated this court's November 4, 2008, Order. *See MacDonald XI*, 641 F.3d 596. In its opinion, the Fourth Circuit first concluded that this court erred by applying the standard set forth in 28 U.S.C. § 2244(b)(2)(B)(ii), as opposed to § 2255(h)(1), to the Britt claim. *Id.* at 609. The Fourth Circuit explained that § 2244(b)(2) is applicable to state prisoners, while § 2255(h) sets forth the standard applicable to those prisoners who are in federal custody. *Id.* Even so, the Fourth Circuit determined that the error in identifying the applicable standard was "probably harmless" because of the similarities between the standard in § 2244(b)(2)(B)(ii) and that set forth in § 2255(h)(1). *Id.* at 610.

The Fourth Circuit did conclude, however, that this court committed prejudicial error by taking an overly restrictive view of the "evidence as a whole," and denying MacDonald's motions to expand the record. According to the Fourth Circuit: "Simply put, the 'evidence as a whole' is exactly that: all the evidence put before the court at the time of its § 2244(b)(2)(B)(ii) or § 2255(h)(1) evaluation." *Id.* Interpreting "the evidence as a whole" standard, the Fourth Circuit further explained:

> [A] court must make its § 2244(b)(2)(B)(ii) or § 2255(h)(1) determination–unbounded by the rules of admissibility that would govern at trial–based on all the evidence, including that alleged to have been illegally admitted [and that] tenably claimed to have been wrongly excluded or to have been available only after the trial. Or, to say it another way, the court must consider all the evidence,

old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under [evidentiary rules].

*Id.* at 612 (internal quotations and citations omitted; alterations in original). Importantly, however, the Fourth Circuit qualified that although a district court must consider "all the evidence," this does not mean that a movant "is to be accorded the benefit of every doubt." *Id.* Rather, "the court must give due regard to the unreliability of the evidence . . . and may have to make some credibility assessments." *Id.* at 612-13 (internal quotations and citations omitted). Indeed, because such an evaluation "'involves evidence the trial jury did not have before it,'" a district court must "'assess how reasonable jurors would react to the overall, newly supplemented record.'" *Id.* at 613 (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)).

Because this court refused to consider an expanded record of the evidence, the Fourth Circuit remanded this matter "for a fresh analysis of whether the Britt claim satisfies the applicable standard of § 2255(h)(1)." *Id.* at 614. The Fourth Circuit instructed this court that any such assessment must include the DNA test results, the affidavit of the elder Stoeckley, evidence of blond synthetic hair-like fibers, and three affidavits describing confessions by Greg Mitchell, as well as "other evidence not mentioned, if it is part of the 'evidence as whole' properly put before the court." *Id.* That is, the court must consider "the proffered evidence – with due regard for the likely credibility and the probable reliability thereof . . . – to determine if it, in combination with the newly discovered Britt evidence, would be sufficient to establish that no reasonable juror would have found MacDonald guilty." *Id.* (internal quotations and citations omitted). "If so, MacDonald would merely pass the

procedural bar to having the Britt claim considered on its merits, and he would yet be obliged to prove the constitutional violation alleged in that claim before obtaining any § 2255 relief thereon." *Id.*

As to the issue of whether this court lacked jurisdiction over the freestanding DNA claim as a result of MacDonald's failure to receive pre-filing authorization, the Fourth Circuit concluded that this court erred in deeming itself to be without jurisdiction. *Id.* at 615. Specifically, the Fourth Circuit explained that "because we granted 28 U.S.C. § 2244(b)(3) pre-filing authorization for the § 2255 motion raising the Britt claim, the district court possessed jurisdiction over the separate DNA claim insofar as MacDonald had timely and appropriately sought to add it to the pending § 2255 motion." *Id.* at 615. Accordingly, where a prisoner seeks to assert additional claims after receiving a prefiling authorization from a circuit court of appeals, the district court must assess whether the proposed amendments to the § 2255 motion are proper under Federal Rule of Civil Procedure 15(a), which provides the standards for amending pleadings. *Id.* at 616. Because this court did not perform such an analysis, the Fourth Circuit vacated the denial of MacDonald's DNA claim and remanded for further proceedings. Rather than instructing this court "to conduct a belated Rule 15(a) assessment of MacDonald's request to add the DNA claim to the pending § 2255 motion, presumably to be followed by an evaluation of the DNA claim under the standard of § 2255(h)(1)," the Fourth Circuit found it to be "a more efficient use of judicial resources . . . to simply grant MacDonald prefiling authorization for the DNA claim so that [this court] may proceed directly to the § 2255(h)(1) evaluation." *Id.*

After the Fourth Circuit issued its mandate in this case, the court scheduled the matter for hearing. One day prior to the scheduled hearing, MacDonald filed a Motion Pursuant to the

Innocence Protection Act of 2004, 18 U.S.C. § 3600, for New Trial based on DNA Testing Results and Other Relief [DE-176].[7]

In September 2012, after a series of briefing and motions by the parties, the undersigned conducted an evidentiary hearing. At the hearing, the Government was represented by First Assistant United States Attorney John S. Bruce, Assistant United States Attorney Leslie K. Cooley, and Special Assistant United States Attorney Brian M. Murtagh. MacDonald was represented by M. Gordon Widenhouse, Jr., from Chapel Hill, North Carolina and Keith Williams, from Greenville, North Carolina. The evidentiary hearing lasted seven days, and the court heard testimony from 19 witnesses and received numerous exhibits as evidence. The evidence received by the court is more fully detailed later in this order. At the conclusion of the hearing, and with the parties' agreement, the court directed MacDonald to file his post-hearing memorandum within 60 days of the filing of the official transcript of the evidentiary hearing, and directed the Government to file its memorandum within 60 days thereafter [DE-305].

After extensions of time for both MacDonald and the Government, the parties' post-hearing briefing is now complete. MacDonald has filed a Post-Hearing Memorandum [DE-336], Substitute Post-Hearing Memorandum[8] [DE-343], and a Reply [DE-351]. The Government has filed a Post-Hearing Memorandum [DE-344] and a Sur-Reply [DE-352]. This matter is now ripe for disposition.

---

[7] The Innocence Protection Act motion is not addressed in this Order. A separate order ruling on that motion will be forthcoming.

[8] On April 1, 2013, MacDonald filed a Post-Hearing Memorandum [DE-336]. The court later granted MacDonald's Consent Motion to file a Substitute Post-Hearing Memorandum to correct what MacDonald's counsel characterized as a "sizable number of non-substantive technical, formatting, and grammatical errors and omissions in the pleading." [DE-341]

## STANDARD OF REVIEW

Title 28, United States Code Section 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by the law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside, or correct the sentence.

28 U.S.C. § 2255(a). A prisoner is limited, however, in the number of motions he may make under

§ 2255. Specifically, under 28 U.S.C. 2244, as amended by the Antiterrorism and Effective Death

Penalty Act of 1996, Pub. L. No. 104-134, tit. VIII, 110 Stat. 1321, 1321-66 (1996) ("AEDPA"):

> [n]o circuit or district judge shall be required to entertain an application for writ of habeas corpus to inquire into the detention of a person pursuant to a judgment of a court of the United States if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus, except as provided in section 2255.

28 U.S.C. § 2244(a); *see also In Re Vial,* 115 F.3d 1192, 1194 (4th Cir. 1997) ("Under the AEDPA,

an individual may not file a second or successive . . . § 2255 motion to vacate [his] sentence without

first receiving permission to do so from the appropriate circuit court of appeals."). Section 2255, in

turn, provides in pertinent part as follows:

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain-
> > (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
> > (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C § 2255(h).

As the court already has recounted, the Fourth Circuit has certified, pursuant to § 2244(b)(3), that MacDonald has made a prima facie showing that his Motion to Vacate [DE-111] meets the requirements for successive motion. The task on remand for this court, therefore, is to "conduct a more searching assessment of whether that motion satisfies" the standard set forth in § 2255(h). *MacDonald XI*, 641 F.3d at 604. The parties agree that only subsection (h)(1) is implicated in this case.

Accordingly, the court must determine whether MacDonald has proffered newly discovered evidence, that if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found MacDonald guilty. 28 U.S.C. § 2255(h)(1); *MacDonald*, 641 F.3d at 614. In making this assessment, the court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the [evidentiary rules]." *MacDonald XI*, 641 F.3d at 612 (internal quotations and citations omitted; alterations in original). In so doing, "the court must give due regard to the unreliability of the evidence . . . and may have to make some credibility assessments" and must "assess how reasonable jurors would react to the overall, newly supplemented record." *Id.* at 612-13 (internal citations and quotations omitted).

If the court determines that MacDonald has met his burden of proving, by clear and convincing evidence, that no reasonable juror would have found him guilty, then he will have cleared the procedural, gatekeeping bar set forth in § 2255(h), which will allow the court to consider his § 2255 claim(s) on the merits.

## EVIDENCE AS A WHOLE

Any attempt to capture in writing every piece of the evidence as a whole that the undersigned

15

has reviewed in this long-running case likely is a futile task. Nevertheless, the court will attempt, to the best of its ability, to highlight the portions of the evidence as a whole that are relied upon by the parties in making their arguments.

## A.     The Crime Scene

At approximately 3:45 a.m. on February 17, 1970, military police ("MP") were summoned to the apartment of Jeffrey MacDonald, then a Captain in the U.S. Army Medical Corps assigned to the Special Forces at Ft. Bragg, North Carolina. Ttr. 1254. Once arriving at 544 Castle Drive, the MPs found that the front door of the MacDonald residence was locked, but they were able to gain entrance through the unlocked utility room door at the rear of the ground-level apartment. Ttr. 1258-59. Upon entering the master bedroom, which was immediately adjacent to the utility room, MP Sergeant Richard Tevere and Specialist-Four Kenneth Mica observed Jeffrey MacDonald, clad only in his pajama bottoms, lying on the shag rug adjacent to, and partially covering, his wife's body. Ttr. 1260, 1274, 1281. Initially Specialist Mica thought MacDonald was dead Tr. 1406. After MacDonald regained consciousness, he repeatedly asked the MPs about his children, and in response to questions from the MPs, told them that intruders had come into his house; specifically, a band of four hippies, including a blond female wearing muddy boots and floppy hat and carrying a candle, two white males, and an African-American male wearing an Army field jacket with sergeant stripes. Ttr. 1270, 1323, 1500-01. MacDonald reported that the female said, "Acid is groovy; kill the pigs." Ttr. 1270, 1503-04. MacDonald reported that he had been stabbed, and that he may go into shock. The MPs began performing mouth-to-mouth resuscitation on him. Ttr. 1265.

The MPs also walked through the apartment to check on MacDonald's children. They found MacDonald's daughter Kimberly, age 5 ½, tucked into her bed in the front (or south) bedroom. Ttr.

16

1271, 1327-28. Kristen, age 2 ½, was found in the back (or north) bedroom. Ttr. 1272-73; 1337-38.

One of the MPs, Mica, while responding to the crime scene, had observed a woman standing outside in the rain or mist on a street corner approximately one-half mile from the MacDonald residence. The woman had shoulder-length hair and was wearing a wide-brimmed hat. Had he not been responding to an emergency, Mica would have stopped to investigate this woman. Ttr. 1450-54. In any event, upon hearing the description MacDonald gave of his alleged assailants, Mica advised his supervisors of the woman he had seen and suggested that a patrol be sent to find her. Ttr. 1598.

About ten minutes after the MPs arrived at the MacDonald residence, an ambulance came and transported MacDonald to Womack Army Medical Center. Ttr. 1285.

The investigation of the crime scene by Army Criminal Investigation Detachment ("CID") agents and the MPs, after MacDonald was removed from the scene, showed the following. Colette's chest was partially covered by MacDonald's blue pajama top, and her abdomen was partially covered by a Hilton Hotel bath mat. Ttr. 1613-14. Inside the master bedroom, the investigators observed blood splatter on the walls and the ceiling in Type A blood, the same as Colette.[9] GX 643, 645. The word "PIG" was written in blood, later determined to be Type A, on the headboard of the master bed. Ttr. 1268. The bottom sheet on the bed in the master bedroom had a large urine stain on the right-hand side, and was partially pulled up as if the bed were being changed. GXP 47. Lying adjacent to the doorway was a pile of bedding, consisting of the top sheet from the master bed and the bedspread inside the sheet, both bloodstained. Ttr. 1626-28, GXP 210-212. A pocket torn from MacDonald's pajama top was found on the upturned side of the multi-colored throw rug adjacent to Colette's left

---

[9] It is undisputed that each member of the MacDonald family had a different blood type: Colette=Type A, Jeffrey=Type B, Kimberly=Type AB, Kristen=Type O. Ttr 3382-3383.

foot. Ttr. 1683. The pocket was stained in what was revealed to be Type A blood, and later testing indicated that the staining occurred after the pocket was torn off, because the corresponding area of the pajama top from which the pocket had been ripped was soaked in blood, but the inner surface of the pajama pocket was not stained with blood. Ttr. 3606-14.

In Kristen's bedroom, they found blood splatters on the wall above her bed, a large soaking stain on the top sheet adjacent to her right hip, and a stain on the bottom sheet. All these stains were Type A blood. A knotted and broken thick green acrylic yarn, identical to those typically used by Colette to tie her hair, and stained with Type O blood (like Kristen's) was found on the throw rug. Ttr. 4611. A large pool of blood, also Type O blood, was found beside the bed. Additionally, MPs observed two bloody bare footprints on the door exiting Kristen's room. These prints were later determined to be in Type A blood, like Colette's, and a fingerprint examiner, Hilyard Medlin, identified them as having been made by MacDonald's bare left foot. Ttr. 3106, 3675-76.

CID agents also found dark threads both within and near Colette's body outline, which prompted a search of the entire crime scene for similar threads and yarns. Ttr 1689-90. Later examination of MacDonald's blue pajama top showed that it was made of polyester yarns, which were a blend of 65% polyester and 35% cotton fibers. The top was sewn at the seams with purple cotton "two ply Z twist" thread; and the white piping on the sleeve cuffs was sewn with a blue-black cotton thread. Ttr. 4089-91, 4095. His pajama top had been torn from the yoke of the "V" neck through the midline of the front panel, as well as through the left inseam, left shoulder, and left sleeve seams to the white piping on the left cuff. Ttr. 4069-70. The search of the scene for threads yielded the following findings.

In the master bedroom, seventy-nine pieces of material that could have originated from

MacDonald's pajama top were found: sixty-one sewing threads, seventeen blue polyester-cotton yarns from the fabric, and the bloodstained and torn pocket. Specifically, three purple sewing threads were found in the debris under Colette's head. Ttr. 4100. Twelve purple cotton sewing threads and one blue-black two ply Z twist sewing thread were found in the debris from the rug in the vicinity of the left hand and arm of Colette. Ttr. 4099. Fifteen purple cotton sewing threads and three blue polyester warp yarns were found in the debris from the rug within the body outline of the trunk and legs of Colette. Ttr. 4100. Three purple cotton sewing threads and four blue polyester-cotton warp yarns were found on the underside of the upturned throw rug adjacent to Colette's foot, and the torn, stained pocket was found on top of the throw rug. Ttr. 4099. Additionally, three matching purple cotton seam threads were found on the rug in the master bedroom, in the area near the largest bloodstain. Ttr. 4098. Located in the debris from the master bedroom rug, in the area of the north corner of the footboard of the master bed, were two matching purple cotton threads. Ttr. 4101. The debris from the bottom sheet on the master bed contained fifteen matching purple cotton threads and seven matching blue polyester cotton yarns. Ttr. 4101-02. The debris from the pillowcase on the master bed contained four matching purple cotton threads and two blue polyester cotton yarns. Ttr. 4103. In the debris located on the multi-colored bedspread found inside the sheet in the pile of bedding on the floor of the master bedroom, were two matching purple cotton seam threads and one matching blue polyester cotton yarn. Ttr. 4103. On the master bedroom floor, by the east wall, was one purple cotton sewing thread. Ttr. 4101.

In Kristen's bedroom, on the green bedspread, investigators located one purple cotton thread and one blue polyester cotton yarn that could have come from MacDonald's pajama top. Ttr. 4097.

In Kimberly's bedroom, nineteen pieces consistent with MacDonald's pajama top – fourteen

threads and five yarns – were found in or on Kimberly's bed. Specifically, in the debris from the bedding that had been pulled back, the search yielded two polyester cotton warp yarns and one purple cotton sewing thread, both matching MacDonald's pajama top. Ttr. 4094. In the debris from the bottom sheet, investigators found two matching purple cotton sewing threads. Ttr. 4094-95. Two matching blue polyester-cotton yarns and ten matching purple cotton sewing threads were found on Kimberly's purple bed cover. Ttr. 4095. Finally, in the debris removed from the north pillow of Kimberly's bed, investigators collected one matching purple sewing thread and one blue polyester-cotton yarn. Ttr. 4093.

Despite what investigators characterized as an "extensive search," they found "nothing of evidentiary value" in the living room. Ttr. 1727-28. Specifically, no fibers, threads, bloodstains or splinters were found. *Id.* CID agent Shaw did find, however, a bunch of tangled blue fibers at the south side of the hallway at the entrance to the living room. Ttr. 2410-12, 2480-81.

Once it started to get light outside, CID agents and MPs began to search the exterior perimeter of the quarters. Ttr. 2337-38. They did not find footprints, but they did find a piece of long wood lying on the ground with what looked like red stains, hair and fibers on it. Ttr. 2238-40. Subsequently, the club would be determined to have bloodstains in both Colette's (Type A) and Kimberly's (Type AB) blood groups. The club also bore two purple cotton seam threads like those in MacDonald's pajama top, numerous rayon fibers matching the composition of the throw rug in the master bedroom, and three matching purple cotton sewing threads. Ttr. 3534-37, 4097-98.

CIDs also found an "Old Hickory" brand paring knife and an icepick under a large bush at the corner of the quarters. Ttr. 2342-43. Inside the master bedroom, a "Geneva Forge" paring knife with a bent blade was found. Ttr. 2364.

No splinters were found in the living room where MacDonald said he was attacked; however, a large splinter, bearing Type A blood like Colette's, was found in the area where Colette's head had lain and where three matching purple cotton seam threads had also been found. Ttr. 1728, 3404-05, 3426-27, 3657-58, 4098. This same splinter was later fitted back into the club. Ttr. 3802-04. Another splinter, identical in composition to the club, was found in the debris from the rug where the trunk and legs of Colette had lain in the master bedroom. Ttr. 3806. Additionally, splinters identical in composition to the club were found in the debris removed from the bottom sheet of Kristen's bed, although there was no other evidence suggesting that Kristen was struck with the club. Ttr. 3806-07.

Deep soaking stains in Type AB blood, like Kimberly's, were found on the rug at the hall entrance to the master bedroom, spattered on the top sheet from the master bedroom, and on the front of MacDonald's pajama top. Ttr. 3648-50, 3664, 3668-69.

On the rug of the master bedroom, adjacent to the left elbow of Colette MacDonald, a piece of bloodstained latex was found. Ttr. 1729-30. A finger section of what appeared to be a latex glove, also stained with Type A blood, was found inside the sheet in the pile of bedding on the floor of the master bedroom. Ttr. 1730-31, 3667. Packages of Perry brand disposable latex surgeon's gloves were found in a cabinet below the kitchen sink. Ttr. 1743, 1760-61. Leading to this cabinet was a series of blood droplets in Type B blood like Jeffrey MacDonald's. Ttr. 3443, 3682-83.

Type B blood also was found on the sliding door of the linen closet, where a large quantity of medical supplies, including disposable scalpel blades and hypodermic syringes, were kept. Ttr. 3670. Type B blood also was found on the rim of the sink beneath the mirror in the hall bath. Ttr. 3670.

In the living room, blood was found on an *Esquire* magazine, and later testing revealed a

21

mixture of Types A and AB, Colette and Kimberly's blood types, respectively. MacDonald's eyeglasses were found lying on the floor near the living room window, with a red speck, believed to be blood, visible on the outer surface of one of the lenses. Ttr. 3133. A blood stain from the hall floor at the entrance to the living room was also found, and later testing indicated that it was either Type B or Type O blood. No other evidence of blood was found in the living room.

The scene also was processed for fingerprints. In total, forty-four useable latent fingerprints and twenty-nine useable palm prints were lifted from the scene. Ttr. 3116. Of these, twenty-six fingerprints and eleven palm prints were matched with MacDonald family members or other investigators or individuals whose prints were available for comparison. Ttr. 3141. A fingerprint that could not be matched with any known comparison print was found on a drinking glass located on a table directly at the head of the sofa. Ttr. 3132-33.

The physical evidence collected at the scene also included wax drippings taken from three different locations: the coffee table in the living room; the chair in Kimberley's bedroom, and the bedspread in Kimberley's bedroom. Ttr. 3838. None of these samples matched any of the candles found in the MacDonald home and submitted by investigators for comparison, nor did they match each other. Ttr. 3841-43. Hilyard Medlin, a CID examiner, testified that the three wax samples were brittle and dry, which indicated to him that the wax was at least several weeks old when he received it. Ttr. 3889-90. He received the samples approximately three weeks after the murders. Ttr. 3899.

## B.      Macdonald's treatment at the hospital

MacDonald was first seen in the Emergency Room of Womack Army Hospital by Michael Newman, a Senior Clinical Technician and combat medic. According to Newman, MacDonald's vital signs were stable, he had wounds on his right chest, upper left arm, and upper left abdomen.

22

Ttr. 2644-49. MacDonald had a lump or abrasion on his left forehead which was not bleeding, but seeping fluid. *Id.* Newman did not observe any wounds on MacDonald's back, or icepick wounds on any part of MacDonald's body. Ttr. 2649-50, 2661.

Further examination by a surgical resident and an X-ray revealed that MacDonald had a laceration type wound on the right side of his chest at the seventh intercostal space (between the 7th and 8th ribs). Ttr. 2858-59.

MacDonald also was attended in the Intensive Care Unit by Dr. Merril Bronstein, who found one bruise on MacDonald's head. Ttr. 2956. Dr. Bronstein described the wound on MacDonald's upper left abdomen as being "below his costal margin, below the edge of the ribs, maybe two inches down" with it being "about an inch and a half or two inches long, and it was through the skin and fat." Ttr. 2956. Dr. Bronstein explained that the wound "was not superficial, in that it went through the skin and through the subcutaneous tissue, but [it] was not through the fascia." Ttr. 2957.

MacDonald was treated for a punctured lung and other knife and stab wounds. He suffered at least a 20% and perhaps a 40% collapse of his right lung. MacDonald remained in the intensive care unit for several days and then in the hospital for nine days.

The first CID agent to interview MacDonald was Paul Connolly, who attempted to get a better description of the alleged intruders. Ttr. 2681. MacDonald told Connolly he had been attacked by four individuals in the living room, one of whom he said had struck him with a club. Ttr. 2684. MacDonald told Connolly the club was like a baseball bat, and when he reached to grab it, it was slippery like it had blood on it. *Id.*

On February 17, 1970, MacDonald was interviewed as a victim/witness by FBI Special Agent Robert Caverly. Ttr. 2885. MacDonald told Caverly that during his struggle with the four intruders,

he pushed the African-American intruder and a white male away from the couch into the hallway, and both of the men tore at his pajama top. Ttr. 2891. MacDonald reported that when he awoke from being unconscious, he was on the floor in the hallway with his pajama top torn, bloody, and twisted around his wrist. Ttr. 2891-92.

On February 18, 1970, Agent Caverly again interviewed MacDonald, who provided some additional information. Specifically, MacDonald told Caverly that he had not checked either the back or front door, and that he may have gone into the hall bath to stop his bleeding. Ttr. 2899-2900. He also thought that the shorter white male intruder, who was wielding an icepick, was wearing light weight gloves that may have been surgical gloves. *Id.*

C.     **Autopsies of Colette, Kimberly and Kristen**

Major (Dr.) George E. Gammel performed the autopsy on Colette on February 17, 1970. The autopsy revealed that, although the cause of death had been loss of blood due to stab wounds, she had also sustained massive blunt trauma injuries which, but for the subsequent stab wounds, she could have survived. Ttr. 2507-08. In Dr. Gammel's opinion, Colette's blunt trauma injuries, two broken arms, and at least five separate lacerations to her forehead and scalp, were consistent with a frontal assault and could have been caused by a blunt instrument such as the club. Ttr. 2491-98. Dr. Gammel characterized some of the injuries – the laceration to the back of the hands and the broken arms– as defensive wounds. Ttr. 2494-95. Colette also had a "pattern bruise" with "sharp margins and angulations" on her chest, resulting from blunt force, and consistent with the side or end of the club. Ttr. 2498-99. She sustained sixteen deep penetrating stab wounds to her neck and chest, which had been inflicted in a perpendicular manner while she was flat on her back. Ttr. 2500-02. Dr. Gammel opined that these stab wounds were caused by a single-edged sharp knife, and were

24

consistent with the Old Hickory paring knife found outside the rear of the quarters. Ttr. 2502-03. Additionally, Colette sustained twenty-one puncture wounds to her chest, inflicted in a perpendicular manner, such as would be caused by an icepick. Ttr. 2503-04.

Kimberly also sustained blunt trauma injuries consistent with the club, and lethal incisional stab wounds. She sustained at least two blows to her head, one on either side of her face. Ttr. 2565-67. The blow to the right side of her face fractured her skull. Ttr. 2567. Kimberley's eight to ten incisional wounds to her throat and neck could have been inflicted by the Old Hickory knife. Ttr. 2568.

Kristen did not sustain any blunt trauma injuries, but had five gaping incisional stab wounds to her chest and twelve incisional stab wounds to her back; some of the stab wounds penetrated her heart. Ttr. 2577-78. The stab wounds were consistent with having been inflicted by the Old Hickory knife. Ttr. 2589. Kristen also sustained approximately ten superficial puncture wounds to her chest, consistent with having been inflicted by the icepick. Ttr. 2576, 2589. Seven puncture wounds were found in the front of her undershirt and found in back of the undershirt, but none were found in her pajama top. This led investigators to conclude that Kristen's assailant had lifted her pajama top before inflicting the icepick wounds. Ttr. 4039-40, 4043-44, 4048-50. Kristen also sustained minor lacerations on both hands and a significant wound on her right hand, which the CID pathologist characterized as either "defensive wounds or these could be wounds incurred in the process of other types of wounds happening." Ttr. 2577.

D.     **MacDonald's pretrial statements**

On April 6, 1970, MacDonald appeared voluntarily at the Ft. Bragg CID Field Office, and waived his privilege against self-incrimination and his right to the presence of counsel. What he told

25

the CID during this interview was tape-recorded and later transcribed.

MacDonald told CID agents that on the evening of February 16, 1970, Colette returned home from a class she had attended, they watched television, and Colette retired to bed first. GX 1135 at 33-35. At approximately 2:00 a.m., he decided to retire and, upon entering the master bedroom, he found that his youngest daughter Kristen had gotten into bed with his wife and had wet his side of the bed. *Id* at 3. MacDonald returned Kristen to her own bed, and then went to sleep on the living room couch. *Id.* The next thing he knew, MacDonald heard Colette screaming, "Jeff, Jeff, why are they doing this to me?" and his daughter Kimberly screaming, "Daddy, Daddy, Daddy." *Id.* at 3, 48-49. MacDonald saw four individuals, one of whom was a girl, with a wavering light on her face, who was chanting, "acid is groovy; kill the pigs." *Id.* at 3-5. MacDonald also described his struggle in the living room, including the fact that his pajama top was removed from his body:

> Well, all I know is that when I was struggling– now after I had been hit the first time, I was struggling with these guys; and my – somehow, my pajama top – I don't know if it was ripped forward or pulled over my head. I don't think it was pulled over my head. I don't remember actually – like backing my head through it.
>
> But all of a sudden, it was around my hands and it was in my way. And I remember that I was holding this thing in my hand – the guy's hand –that I couldn't maneuver very well. My hands were kind of wrapped up in that thing.
>
> And as they were punching me, I was kind of using that a little bit, you know holding it – right exactly – cause this guy, I thought was really punching me in the chest, you know, and in the stomach 'cause I was getting hit across here (pointing to the mid-section of his body).
>
> So, in effect, I was blunting everything by, you know, holding this up; and I couldn't get my hands free out of this thing. And I remember I ended up, when I was laying on the floor – it was still around my hands and everything, and I took it off as I was going in the bedroom. And after I took this knife out of my wife's chest, I – you know, keeping her warm. You know, to treat shock, that would (inaudible) and keeping them warm.

GX 1135 at 12-13.

During the interview, MacDonald recounted his movements throughout the apartment. He

26

indicated that he lost consciousness after the struggle in the living room, and when he came to, he went the master bedroom where he found Colette, removed a knife from her chest, and performed artificial resuscitation on her and covered her with his pajama top. GX 1135 at 6-7. He checked on both his daughters, and then called an operator from the phone in the master bedroom. GX 1135 at 23-24. He then checked Colette and his daughters for a pulse, and then used the telephone again, this time in the kitchen. GX 1135 at 24. At some point during his movement throughout apartment, he washed his hands in the hall bath sink. GX 1135 at 80. He looked out the back door, which was open, once. GX 1135 at 84.

At one point in the interview, MacDonald was asked how the pocket from his pajama top found on the throw rug by Colette's feet had only a very minute amount of Colette's Type A blood on it, while the pajama top was soaked with her blood and also had Kimberly's blood on it. He answered:

> I laid it – I laid it over her. . . . I'm sure I had blood all over my hands from everyone, when I was checking for pulses and stuff. . . . I mean, I had blood all over me, you know. I mean I checked – I know I checked carotid pulses in everyone, and I'm sure I got some blood on me from everyone. And I went back in to see my wife again.

*Id.* at 69-70. He also hypothesized that the intruders tracked the pocket into the bedroom after his struggle with them. *Id.* at 74.

MacDonald denied recognizing the club, and stated his family did not have an icepick. GX 1135 at 45, 47. He also denied that his family owned a Geneva Forge knife or an Old Hickory paring knife. *Id.* at 41, 43, 45, 47. MacDonald himself learned during this interview that many threads and yarns identical to those of his pajama top were found in the master bedroom, including under

Colette's body. GX 1135 at 68. He also learned that investigators believed Kimberly had been struck in the master bedroom. GX 1135 at 95.

## E.     Article 32 Hearing

On May 1, 1970, the Army formally charged MacDonald with murder. On May 15, 1970, a formal investigation commenced pursuant to the requirements of Article 32, Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. § 830. The Government presented twenty-seven witnesses. MacDonald called twenty-nine witnesses in his defense and testified himself.

At the conclusion of the evidence, the investigating officer, Colonel Warren V. Rock, filed a 90-page report, summarizing more than 2,000 pages of transcript testimony, and recommending that the charges against MacDonald be dropped, and that the appropriate civilian authorities investigate Helena Stoeckley. DX 5076. In his report, Colonel Rock noted:

> There is conflicting evidence as to the degree the crime scene was preserved from the time the first MP arrived on the scene and until photographs were taken some minutes later. The controversy specifically relates to the fact of whether or not the white towel or blue pajama top were on Colette's body when first seen by the MPs, the location of the handset in the [master] bedroom, the relocation of the white flower pot holder in the living room by some unknown individual and the number (12 to 14) of military police, CID agents, and medical personnel initially in the apartment and their movements through the rooms with the chance of inadvertently altering the crime scene.

DX 5076 at 1674.

Following the dismissal of the charges under the UCMJ, MacDonald remained at Fort Bragg pending his hardship discharge from the Army in December 1970. Sometime prior to this discharge, MacDonald spoke to Alfred "Freddy" Kassab, Colette's step-father, by telephone. During this conversation and in subsequent letters, MacDonald told Kassab that he had caught one of the "assailants" in a bar in Fayetteville, dragged him out of the bar, beaten a confession out of him, and

28

then "terminated him with extreme prejudice." Ttr. 6700-10. MacDonald later admitted that this "was a lie of incredible proportions that I should never have told them, and I was doing it to try to give myself some space to rebuild my own life and to keep Freddie and Mildred[10] off my back." Ttr. 6710-11.

## F.     Post-hearing forensic evidence and additional MacDonald statements

After MacDonald's discharge, both the Army CID and FBI laboratories conducted additional examination of the physical evidence. The examinations revealed that one of the alleged weapons, the club, had once been part of a 2x4, which was later used as a bed slat for Kimberly's bed.

The Army CID lab also performed serology tests on the "Hilton" bath mat that MacDonald stated he placed on Colette's abdomen. The tests revealed the presence of blood stains in Type AB (the same type as Kimberly) on the bottom side and Type A (the same type as Colette) on the top side. Ttr. 3646-47. Later examination by the FBI Lab led the examiners to believe that the stain with the Type AB blood could have been caused by the Old Hickory knife. Ttr. 4118-23. The examiners also determined that another stained area on the mat had the general shape of the icepick, and the bloodstains resulted from the items either being placed on the bath mat or the bath mat being "used to wipe the items off." Ttr. 4124-25. Notably, when the Old Hickory knife and icepick were found, no blood was found on either blade or pick, but blood was detected underneath the handles of both weapons. Ttr. 3419.

In June 1971 the FBI Lab conducted examinations of the clothing of the MacDonald family in order to determine the number of cuts or punctures, and whether they could be associated with any of the knives or the icepick found at the crime scene. Ttr. 4031-33. Paul M Stombaugh of the FBI

---

[10] Mildred Kassab was Colette's mother.

29

Lab examined both knives found at the crime scene, and determined that the Geneve Forge knife, which MacDonald stated he pulled from Colette's chest, had a dull, bent blade. Ttr. 4033-34. He determined that the Old Hickory knife, however, had a very sharp blade. Ttr. 4034.

Stombaugh's examination of Colette's pajama top showed a total of thirty puncture holes in the front of the garment, which he found to be consistent with having been made with the icepick. Ttr. 4051-53. He also found a total of eighteen clean cuts on the front of the garment, which he determined were consistent with having been made by the Old Hickory knife. *Id.* Stombaugh opined that it was extremely doubtful that the Geneva Forge knife could have made the cuts in Colette's pajama top, given its dull blade. Ttr. 4054. As to MacDonald's pajama top, Stombaugh found two cuts, and opined that these cuts could have been made by the Geneva Forge knife because they were not clean cuts, but more or less tearing cuts. Ttr. 4063. Stombaugh also determined that MacDonald's pajama top had forty-eight puncture holes, with all but nine holes being in the back and right shoulder of the garment. Ttr. 4056-58. Stombaugh noted that none of the puncture holes were in the torn left panel or left sleeve. Ttr. 4062. All puncture holes were consistent with having been made by an icepick, although some varied in size. Ttr. 4058.

In 1974, Stombaugh was furnished photographs of the crime scene, as well as photographs taken at Colette's autopsy, and was asked to ascertain whether or not the puncture wounds to her chest could have been made through MacDonald's pajama top. Working with Physical Science Technician Shirley Green, Stombaugh determined that when MacDonald's pajama top was turned right-sleeve inside-out, and the left front panel is draped alongside – as both are depicted in the photo of Colette with the garment on her chest – twenty-one puncture holes were visible on the upper most layer of the pajama top. Ttr. 4185-87, 4192-93. Starting with the twenty-one puncture holes visible

30

on the top layer of MacDonald's pajama top, Green was able to insert simultaneously twenty-one probes through all forty-eight puncture holes in the top. Ttr. 4429-4431. A comparison of the Green's "reconstruction" of the probe through the puncture holes corresponded exactly to the pattern made by the twenty-one icepick wounds on Colette's chest depicted in the autopsy photo. Ttr. 4193-96. Accordingly, Stombaugh concluded that the puncture damage to Colette's chest could have been made through the pajama top while it was on her body. Ttr. 4197.

By consent, on August 14, 1974, MacDonald was photographed from the waist up by the FBI, in the presence of defense counsel. MacDonald would point to an area of his body with a felt tip pen, and would then describe an injury, how it was inflicted, and whether or not it had left a scar. One FBI agent would take notes, and another agent took "location shots" with one camera and close up shots with another camera. Ttr 2616-20. This procedure was utilized to document fourteen locations on MacDonald's body –but MacDonald did not indicate that he had suffered any injuries to his back. *See* "Subject Matter of Statements" [DE-132-21] at 37.

## G.     Trial

On January 24, 1975, the grand jury indicted MacDonald for the murders of his family. After a series of pretrial motions and interlocutory appeals, the seven-week trial commenced in July of 1979. In the Government's own words, its case-in-chief consisted of:

> evidence from the crime scene, the events at the hospital, MacDonald's pre-trial statements, and the results of the analysis of the physical evidence through the testimony of expert witnesses. . . . It was the Government's theory that MacDonald's account–that he was being attacked in the living room while his wife and children were being murdered in their respective bedrooms–was a false exculpatory statement evidencing consciousness of guilt. It was further the Government's theory that MacDonald's account of his movements throughout the crime scene after purportedly gaining consciousness, were in fact attempts to account for otherwise incriminating

31

physical evidence (e.g., his wife's blood on his pajama top), and to rearrange the crime scene so as to make it correspond to his false account.

Gov't Post-Hearing Mem. [DE-344] at 98. Much of the Government's evidence consisted of testimony the court already has recounted in this Order. As Judge Dupree later observed, "the prosecution . . . introduced an almost overwhelming amount of physical and circumstantial evidence in support of its theory of the case." *MacDonald III*, 640 F. Supp. at 310.[11] In summary, "[t]he government was able to prove through laboratory analysis and expert testimony that the club, two knives and icepick were the murder weapons," and although MacDonald denied any knowledge of the weapons, "the government offered evidence from which the jury could have found that the weapons came from the MacDonald home." *Id.* at 311; *see also* Gov't Post-Hearing Mem. [DE-344] at 99. The Government also proffered evidence, through the pajama demonstration and testimony about the pajama top pocket, that "supported the Government's theory that MacDonald had put the garment on his wife and then stabbed her with an icepick to make his account of the murders more believable." *MacDonald III*, 640 F. Supp. at 313. Proffering evidence that the pieces of latex glove found in the master bedroom were stained by blood of Colette's type and were similar to latex surgeon gloves found near the kitchen sink, the Government contended that "MacDonald had worn latex gloves while murdering his family to avoid fingerprints and had written the word "PIG" in his wife's blood on the master bed headboard while wearing the gloves since there were no ridge lines in the writing as there would have been had the writing been made by a bare finger." *Id.* The Government also introduce evidence about blood the same type of Kristen's being found on MacDonald's eyeglasses, MacDonald's footprint in blood outside of Kristen's bedroom, and

---

[11] The reader would be well-served to review Judge Dupree's meticulous summary of the trial.

extensive testimony regarding blood splatterings and the Government's reconstruction of the crime scene.

As Judge Dupree observed, the physical evidence collected by investigators at the apartment yielded little evidentiary support for MacDonald's account of events:

> There were no threads, yarns, splinters, or blood, except on the Esquire magazine, found in the living room, the area where MacDonald said he struggled with the intruders. Although approximately seventy different medicines were found in the hall linen closet, the "intruders" did not take any of the drugs nor did they ransack the family's closets because the clothes in these closets were undisturbed. Similarly, although MacDonald had claimed that he was attacked by club-wielding assailants who stabbed at him while his pajama top was wrapped about his hands, he sustained only very limited injuries and, most importantly, no head wounds nor icepick wounds on his hands. Furthermore, despite MacDonald's contention over the years that four people which he later identified in some detail had been the assailants on the night of the murders, none of their fingerprints were ever found in the apartment.

*Id.* at 314-15.

MacDonald's defense "consisted primarily of his own testimony, character witnesses, and impeachment of the integrity of the crime scene and evidence offered by the prosecution." *MacDonald III*, 640 F. Supp. at 290.

MacDonald also presented the testimony of James Milne, who resided across the street from the MacDonald family at the time of the crime. Milne testified that on the night of February 16, 1970, he was constructing model airplanes in his workshop, an unused bedroom in the front of his duplex. Ttr. 5451-53. Sometime between 11:45 p.m. and 12:15 a.m., he heard voices, and opened the rear door of the duplex to investigate. Ttr. 5453-55. He saw three Caucasian individuals – two males and one female – walking behind his residence. All were wearing white sheets, and were carrying lit candles. Ttr. 5454-55, 5474. The female had hair which "was slightly below shoulder-blade length in the middle of the back, straight" and a "light brown–almost to a blondish color." Ttr.

5457. He testified that the sheet the female was wearing resembled a choir robe with folds in the back. Ttr. 5473. None of the individuals were carrying weapons. Ttr. 5479. When Milne last saw the individuals, they were approximately 40 yards from the MacDonald residence. Ttr. 5456. Milne did not report what he saw to any authorities, even after learning of the crime at the MacDonald residence.

## 1.     Testimony of Helena Stoeckley

During the course of the trial, Judge Dupree issued a material witness warrant for Helena Stoeckley's arrest, and FBI Special Agents were able to locate her in South Carolina. Later in this order, the court will detail the evidence about the Stoeckley's arrest, transportation to Raleigh, and her communication with the prosecution, defense, and her own attorney during the trial. At this juncture, the court will simply note that Judge Dupree suspended the trial on Thursday, August 16, 1979, while Stoeckley was first interviewed by the MacDonald defense team in the Raleigh federal building for more than three hours. She then was interviewed by the prosecution.

Before Stoeckley was called by the defense to testify the next morning, AUSA Blackburn inquired of Judge Dupree whether an attorney should be present to represent Stoeckley's interests. Ttr. 5513. Defense counsel Smith responded, "We will do whatever Your Honor wishes to do – but I feel that we will just go ahead with her and see what happens." *Id*. Stoeckley did not have the benefit of counsel before or during her interviews by the parties or her testimony at trial, but was appointed counsel over the weekend, after she had completed her testimony. Ttr. 5980-81.

Defense counsel Bernie Segal began the examination of Stoeckley. During that examination, Segal showed Stoeckley photographs of the crime scene, repeatedly reminding her that he had discussed them with her the day before. *See, e.g.*, Ttr. 5532-34. The form of his questions concerning

34

the photographs plainly conveyed the message that Stoeckley's in-court responses were not consistent with what she had led the defense team to believe the day before, and were not what the defense wanted to hear.

During one bench conference at which Segal sought leave to question Stoeckley as a hostile witness, Judge Dupree responded, "I have detected nothing in the demeanor or answers or anything else in this witness to indicate any hostility whatever to your questioning." Ttr. 5538. He later commented, "You [Segal] are up here just to see if you may vary the form of the questioning, so that you may give her the answers in the question, and that is what I am precluding your doing right now under the present circumstances, so ask your question." Ttr. 5540.

Segal continued his direct examination of Stoeckley, during which she testified that around the time of the murders, she wore a blond wig as a joke at times. Ttr. 5588-89. She also testified that around February 17, 1970, she owned a pair of brown boots that went up to her knee, and a pair of white boots which went up to her thigh. Ttr. 5589-5590. She also testified that at that time she owned an old floppy hat, but it was stolen six or seven months later. Ttr. 5599, 5602. She got rid of the wig around February 19 or 20, 1970, because she felt the wig connected her to the murders. Ttr. 5602-03. She also testified that during the week of February 17th through 21st of 1970, she set up several funeral wreaths along a fence near her house. Ttr. 5633. She noted, however, that it was probably just a coincidence that she did so because she frequently picked up discarded wreaths and flowers from a florist located up the street. *Id.* at 5634.

Segal continued the direct examination, and after he thoroughly had established that Stoeckley had been addicted to heroin and opium, and was a heavy, regular user of all manner of hallucinogenic drugs during the period in question, and had quizzed Stoeckley about Charles

Manson, witchcraft, and the effects of her drug use, Segal sought another bench conference, detailed

below:

> MR. SEGAL: . . . .   I represent to the Court that during the interviews with me and with other persons present she stated that when she looked at the [photograph] she had a recollection of standing over a body holding a candle, seeing a man's body on the floor.

> I also may say, Your Honor, we are now down to the bottom five or six critical things that she revealed yesterday.  I have a feeling, based upon her answer to this one now, that when and if I ask her in direct fashion, that I may get negative answers.

> I had no anticipation of that, because yesterday throughout the time that she made these statements, we accepted them, did not expect contrary.

> We have not had any different statements from her and we feel that we are entitled to the plea of surprise as well as the fact, I think, at this point – the extent of her hostile relationship not in terms of manner but the hostility of her interest to the Defendant.

> I am going to tell Your Honor the other things that she has said. . . .

> . . . . .

> The photograph that I showed her of the bedroom of Kristen MacDonald: during the interview yesterday, she stated that she remembered riding the rocking horse when she looked at that picture.

> She also stated yesterday she remembered standing at the end of the sofa holding a candle.  She also said when she saw the body of Kristen MacDonald – the one when she was clothed, with the baby bottle – that that picture looked familiar to her.

> . . . . She also said when she was shown the photograph of Colette MacDonald – the same one I showed her today – that she said that the face in that picture looked familiar, except that the chin was broken and made it a little hard.

> She also stated . . . that she was standing of [sic] the corner of Honeycutt across from Melony Village.

36

She has a recollection of standing there during the early morning hours of February 17th, 1970. She further stated yesterday, and I intend to ask her now, that she has a recollection of standing outside the house looking at her hands and saying, "My God, the blood; oh my God, the blood."

She said that took place February 17, 1970. There are witnesses to each of these things. I must say, Your Honor, there were persons present the entire time this [interview] took place.

Ttr. 5614-16.

Segal went on to explain to Judge Dupree that he intended to question Stoeckley again on the

stand concerning each of these representations, and if she denied having made the representations to

him the previous day, he would impeach her "under the rules." Ttr. 5616. AUSA Blackburn spoke up:

MR. BLACKBURN: Of course, I was not there when she talked with the Defense yesterday, but in her interview with the Government none of those statements were made. She specifically told us –

THE COURT: (Interposing) Did you ask her any?

MR. BLACKBURN: Yes, sir. She specifically told us that she had been shown the photographs and we asked her, "Did you recognize any of the scenes in those photographs?"

The answer was no. I asked her, "Have you even been in that house?" She said no. I said, "Do you know anything about that?" "No." "Who do you think did it?" "Dr. MacDonald." You know, it just went one right after the other.

I discussed – I told [defense attorney] Mr. Smith last night what she told us. I was under the impression to this very moment that what she told us was essentially what she told them.

It is difficult for me – you know– I am not saying that they are not saying what she said. I just don't know what way it is, because she has not indicated anything to the Government.

[DEFENSE COUNSEL] MR. SMITH: Judge, here I think is where we are. Generally, she said to us the same thing and that is, "I don't remember." But in two or three or four instances – whatever the list would reveal – she says something which would give an interesting insight into her mind. . . .

37

. . . .

THE COURT: I am not going to cross the hostility thing until there is a reason shown to indicate it; but I am going to ask the witness a question myself.

(Bench conference terminated.)

Ttr. 5617-18. Among the questions Judge Dupree asked Stoeckley was, "Now, did you tell both sides the same story?" to which Stoeckley answered, "As far as I know, yes, sir." Ttr. 5619.

Upon further questioning by Segal, Stoeckley reiterated that she did not recognize the crime scene photographs, and denied stating that she had touched or used a rocking horse depicted in one of the photographs, commenting that it appeared in the photograph to be broken. She also denied having discussed the rocking horse with defense counsel. Ttr. 5621-27.

On cross examination by AUSA Blackburn, Stoeckley continued to claim failure of recollection, and testified consistently with her testimony on direct examination. She testified that she did not have the blond wig on when she was talking with her boyfriend, Greg Mitchell, in the driveway on February 16, 1970, because Mitchell did not like when she wore it. Ttr. 5645. She also testified that as a result of not having a recollection of her whereabouts the night of the murders, but after being questioned a number of times, she eventually became worried about her involvement in the murders. Ttr. 5659.

## 2.     The Stoeckley Witnesses

When Stoeckley was excused for the day, Segal sought to call a number of witnesses (hereinafter, the "Stoeckley Witnesses")[12] who Segal explained would impeach Stoeckley by relating that she had confessed some personal knowledge or belief to them at some time in the past. Some were

_____

[12]  The "Stoeckley Witnesses" were Jane Zillioux, James Gaddis, Charles ("Red") Underhill, Robert Bristentine, Jr., Prince E. Beasley, and William Posey.

38

persons who purportedly had attended the defense team's interview of Stoeckley the previous day. Segal argued that the Stoeckley Witnesses' hearsay testimony was admissible to impeach Stoeckley because it contained statements against her penal interests. Ttr 5780-85.

Judge Dupree excused the jury and permitted Segal to *voir dire* the six Stoeckley Witnesses, *see* Ttr. 5689-5774, concerning what Stoeckley had said about the MacDonald murders in the relatively distant past, then recessed for the weekend to consider whether to allow Segal to examine them in the presence of the jury. The pertinent portions of each Stoeckley Witness *voir dire* is set forth below.

### a. Jane Zillioux

The first to testify was Jane Zillioux, a neighbor of Helena Stoeckley in Nashville. Ttr. 5688-5703. Zillioux testified that in November 1970, when Stoeckley was suffering from hepatitis, Zillioux went to check on her. During Zillioux's visit, Stoeckley told her that she had been involved in "some murders" but that she didn't know whether she committed them or not, and that she had been a drug user for so long that she couldn't remember. Ttr. 5693-94. Stoeckley allegedly told Zillioux that she remembered being in the rain with three boys and being terrified. *Id.* Stoeckley had told her that she looked down and saw the blood on her hands and then went home and got rid of her clothing. Ttr. 5697. Zillioux also testified that Stoeckley had told her she was wearing her wig and white boots, and remembers both of them getting wet in the rain. Ttr. 5699. Zillioux detailed for Judge Dupree her conversation with another neighbor, Bonnie Hudgins, and how Bonnie had told her that she knew it was the Green Beret murders that Helena had been involved in. Ttr. 5695. On cross-examination, Zillioux admitted that Stoeckley was shaky and almost incoherent at times during their conversation, and that she never said she committed the murders, only that she was "involved." Ttr. 5701.

39

### b.    James Gaddis

The second of the "Stoeckley witnesses" to testify was James Gaddis, a Nashville narcotics detective. Ttr. 5704-5710. He told the court that Stoeckley had told him on different occasions both that she thought she had been there but had tripped out on mescaline and LSD, and also that she knew who had done it but wasn't there. Ttr. 5704. At times, when she gave him information about the MacDonald murders she was under the influence of drugs. Ttr. 5707. On cross-examination, Gaddis testified to inconsistencies in Stoeckley's statements to Gaddis; sometimes she said that she witnessed the murders but was not involved, sometimes she told him she knew who was involved but couldn't give him names, sometimes she said that she only had suspicions of who was involved, and sometimes she told him that Dr. MacDonald himself committed the murders. Ttr. 5708.

### c.    Red Underhill

Red Underhill knew Helena Stoeckley from her time in Nashville and testified about an interaction that he had with Helena when he went to her house one day in December, 1970. Ttr. 5711-15. He told the court that he had found Helena crying hysterically and all she could say to him was "they killed her and the two children." Ttr. 5712-13.

### d.    Robert Brisenstine

Robert A. Brisenstine was an Army Polygrapher who interviewed Stoeckley about the MacDonald murders twice in April of 1970. He testified that, during these interviews, Stoeckely vacillated between believing she was involved and denying any involvement. Ttr. 5715-37. He told Judge Dupree that during an interview on April 23, 1970, Stoeckley stated that:

> during a period of three to four months subsequent to the homicides in the MacDonald residence, she was convinced that she participated in the murder of Mrs. MacDonald and her two children; that she presently is of the opinion that she personally did not

40

actively participate in these homicides, but may have been physically present at the time of the murders; [and] that prior to the homicide she had heard the hippie element was angry with Captain MacDonald as he would not treat them by prescribing methadone for their addiction to drugs.

Ttr. at 5717. Stoeckley then retracted those statements and denied any knowledge of MacDonald, telling Brisenstine that she had been admitted to the hospital for drug addiction and "she was not always oriented as regards time, dates, and surroundings." Ttr. at 5718. She further went on to explain the dreams she had been having were caused, she believed, by the large quantity of drugs she was consuming. *Id*. These dreams included seeing the word "pig" on a bed headboard, and a vision of MacDonald pointing at her and holding an icepick that was dripping blood. Ttr. 5719-20. She told Brisenstine that she owned, at the time of the murders, a pair of white boots, a floppy hat, and a blond wig; and that she did display wreaths and wear black the week after the homicides. *Id*.

In another interview on April 24, 1970, she claimed to know the identities of the persons who killed the MacDonald family, and then later told him that she had been lying when she told him that because "four hippies could not have entered Captain MacDonald's home without being observed by neighbors or causing dogs to bark." Ttr. 5722. The individuals she named as potentially having been involved were Don Harris, Bruce Fowler, Janice Fowler, Joe Kelley, and a black man named Eddie. Ttr. 5721-22. Brisenstine testified that, at least during the interview on April 23, she was under the influence of drugs. Ttr. 5724-25. He told Judge Dupree that, during these interviews, Stoeckley never told him anything about the crime scene or murders that he didn't already know. Ttr. 5729. Brisenstine also told the court that "she honestly believed in her mind that what she was telling me was true." Ttr. 5737.

41

### e.    Prince Beasley

After Brisenstine, the Court heard from Prince Beasley, a retired Fayetteville narcotics detective. Ttr. 5738-5751.[13] Beasley went to Helena's apartment on the night after the MacDonald murders to ask her if she was involved. He told Judge Dupree that when he asked Helena whether or not she had participated in the crime she said to him, "in my mind, it seems that I saw this thing happen; but . . . I was heavy on mescaline." Ttr. 5742. He later went to Nashville to interview her again, at which time she told him "basically the same thing" that she had told him in Fayetteville. *Id*. at 5744. On cross-examination, however, the prosecution brought to Beasley's attention the statement that he had written after his Nashville visit. In this statement, dated March 1, 1971, Beasley wrote:

> She stated that she did not remember anything that happened on the night of the murders except that she did remember getting into a blue car she thought was a Mustang and it belonged to one Bruce Fowler . . . . She again told me she had no knowledge of this night after 12:30 a.m. and that she does not know for sure what happened. . . . It is my conviction that she is involved in the MacDonald case or at least she thinks she is or that she is doing this just to get all the attention she possibly can.

Ttr. 5747.

### f.    William Posey

The last of the Stoeckley Witnesses was William Posey, Helena's neighbor in Fayetteville. Ttr. 5751-5774. He told the court that, on the night of the MacDonald murders, he had seen her come home in a blue mustang; knew her to wear white boots, a floppy hat and a blond wig; and saw the funeral wreaths outside her apartment the week of the MacDonald funerals. *Id.* at 5753-5758. Approximately two days before his testimony at the Article 32 hearing he went to see Helena and she told him that all she did was "hold the light," and that she remembered a "kid's horse thing" that wouldn't "roll." *Id.*

---

[13]   It is undisputed that Stoeckley served as an informant for Beasley when he worked for the Fayetteville Police Department.  *MacDonald III*, 640 F. Supp. at 325.

at 5759-5760. She also told him that she was involved in witchcraft but that she was a "good witch." *Id*. at 5763. On cross-examination it was established that Posey had actually sought out Bernie Segal at his hotel during the Article 32 hearing. *Id.* at 5765-5766. After his Article 32 testimony, he was given $150.00 by MacDonald's army lawyer to help with his moving expenses when he felt unsafe after testifying at the hearing. *Id.* at 5771, 5773.

On Monday, August 20, 1979, having observed Stoeckley's testimony and that of the proffered Stoeckley Witnesses, Judge Dupree denied Segal's motion to introduce Stoeckley's out-of-court statements through the Stoeckley Witnesses under Rule 804(b)(3) ("statements against interest") because he concluded, "the defense failed to sufficiently show that [Stoeckley's statements] were trustworthy when made and the testimony would only have served to confuse the jury." *MacDonald III*, 640 F. Supp. at 318 (citing Ttr. 5806-10; Fed. R. Evid. 403 and 804(b)(3); *United States v. MacDonald* (*MacDonald I*), 485 F. Supp. 1087, 1091-94 (E.D.N.C. 1979), *aff'd MacDonald II*, 688 F.2d at 230-34, *cert. denied*, 459 U.S. 1103 (1983)). Three of the Stoeckley Witnesses – Prince Beasley, Jane Zillioux, and William Posey – later were permitted to testify in the presence of the jury concerning their prior relationships with Stoeckley, but were not permitted to repeat anything Stoeckley allegedly said to them concerning the MacDonald case. Nevertheless, the transcript reflects that the defense team was able to craft many of its questions to these witnesses so that the Government's objections were rendered useless. For instance, Segal asked Jane Zillioux:

| | |
|---|---|
| SEGAL: | Did Ms. Stoeckley say anything to you within the time that you were in the room – witness room with her – about having carried a lighted candle in February of 1970? |
| MR. BLACKBURN: | Objection. |
| THE COURT: | Sustained. |

Ttr. 5885-86.

Additionally, after Judge Dupree made his ruling about the Stoeckley Witnesses, he also heard additional *voir dire* testimony from Underhill and an attorney working as a law clerk for Segal, Wendy Rouder. The impetus for this *voir dire* testimony were statements Stoeckley had made over the course of August 18-19, 1979, during a weekend recess from the MacDonald trial.[14] The circumstances surrounding these statements are as follows.

After Stoeckley had completed her testimony on Friday, August 17th, the defense team served her with a subpoena so that she could be released from the bench warrant, and had provided her with the means to rent a motel room over the weekend, with the instruction that she return to court on Monday. Ttr. 5951. Mid-morning on Sunday, August 19, 1979, Segal dispatched Rouder to the Raleigh motel where Stoeckley was staying. Ttr. 5929. The motel management had complained of a disturbance involving Stoeckley and the complaint had gotten back to Segal. Rouder explained, "Mr. Segal had informed me that Ms. Stoeckley had been beaten and possibly had been subjected to a drowning. He asked me to check into her well-being. The rumor or the hearsay as you might say had been that her fiancé had inflicted this attack upon her and it would be best if in some way I could help separate them for her own safety." *Id*. Rouder drove to the motel with Underhill, *see id*., located and talked with Stoeckley, who had acquired a black eye and bloody nose since she had been in court.[15] Stoeckley

---

[14] In addition to making statements to Underhill and Rouder, Stoeckley also called Judge Dupree during the weekend recess. Judge Dupree informed the attorneys during a bench conference: "I want you to know that among others called by Helena, she called me twice Saturday night stating that she was living in mortal dread of physical harm by Bernard Segal, counsel for the Defendant, and that she wanted a lawyer to represent her." Ttr. 5980.

[15] Rouder believed Stoeckley had been assaulted by her then-boyfriend, Ernest Davis, who also was present at the original motel. Red Underhill also testified on voir dire that he observed the black eye and bloody nose. Ttr. 5907-08. Stoeckley had told him that an unknown person had approached her at the motel and punched her in the face, blackening her eye. Ttr. 5925. Stoeckley told both Underhill and

44

wanted her fiancé, Mr. Davis to leave, and she packed his suitcase. Ttr. 5930.

Rouder arranged for Stoeckley to relocate to the Hilton, and drove her and Underhill there. Ttr. 5929-30; 5935, 5943-44. Stoeckley told Rouder that she was afraid and wanted someone to stay with her.[16] Ttr. 5931; 5936. While the packing, driving and relocating took place, Rouder talked privately with Stoeckley about the substance of Stoeckley's trial testimony. Ttr. 5932-34, 5937; 5939-42.

According to Rouder's *voir dire* testimony in 1979, with the aid of her notes made at Segal's request, *see* Ttr. 5932, Stoeckley had said she still thought she "could have been there that night," *see* Ttr. 5932; 5938-39, because of the rocking horse, *see* Ttr. 5939; that when she saw the crime scene photographs of one of the children she "knew" she had seen her somewhere before, *see* Ttr. 5932; that she remembered being on that concrete driveway, *see id.*; and that she had a memory of "standing at the couch, holding a candle, only – you know – it wasn't dripping wax. It was dripping blood." Ttr. 5937, 5945. Rouder had remarked, "It must have been difficult living with the guilt all these years," to which Stoeckley allegedly responded, "yes . . . . Why do you think I've taken all those damned drugs"? Ttr. 5941. Rouder asked Stoeckley, "Isn't there anything you think you can do to help get rid of the guilt," to which Stoeckley allegedly suggested, "I just want to take sodium pentothol or hypnosis or something." Ttr. 5934. When Rouder asked Stoeckley why she didn't say this in court, Stoeckley responded: "I can't with those damn prosecutors sitting there." Ttr. 5937.

---

Rouder that she had fallen in the bathroom and bloodied her nose. Ttr. 5925, 5944.

[16]  Underhill related during *voir dire* that Stoeckley had wanted him to stay with her over the weekend because she was afraid. She had told him that, "her life would not be worth five cents out on the street, because, said [sic], 'They'll kill me for sure.'" *Id*. at Ttr 5922; *see also id.* at Ttr. 5913-22. Underhill also testified that Stoeckley was "deathly scared" of Allen Mazzarole, *id*. at Ttr. 5924*,* whose name had been tossed around during the trial suggesting he might have been one of the "hippies" who had committed the MacDonald murders.

Blackburn cross-examined both Underhill and Rouder, but neither he nor the defense team ever called Stoeckley back as a witness. Judge Dupree refused to permit either Rouder or Underhill to testify in the presence of the jury concerning the weekend's activities and Stoeckley's alleged statements. *See* Ttr. 5976-77.[17]

Closing arguments were heard by the jury on August 28 and 29, 1979. After six and a half hours of deliberation, the jury found MacDonald guilty of two counts of second degree murder and one count of first degree murder.

## H.    Evidence presented in 1984 new trial motion

MacDonald filed a series of motions in 1984, including a motion for new trial pursuant to Rule 33 of the Federal Criminal Rules of Procedure. The new trial motion was premised on alleged confessions made by Stoeckley to various individuals, including a series of confessions she gave to

---

[17] Specifically, Judge Dupree remarked:
I also remain of the opinion, gentlemen – let me say this: this Stoeckley girl I think is one of the most tragic figures that I have ever had to appear in court.

A girl coming out of high school at 15 years of age and going on into the drug culture, and absolutely burning her mind out with opium, heroin, mescaline, LSD, and marihuana, and having gone, now, what must 11 or 12 years in this –one of the most tragic figures that I have ever seen in a courtroom.

But the picture emerges, though, of a person whose mind is so far impaired and distorted by this drug addiction that she has become and remains in an almost constant state of hallucination.

That she is extremely paranoid about this particular thing, and that what she tells here in court and what she tells witnesses, lawyers in a motel room, simply cannot have attached to it any credibility at all in my opinion.

. . . . It is perhaps the most clearly untrustworthy evidence that I have had put before me.

. . .

I think this jury having heard her for the better part of a day would be in a good position now to evaluate her and her story, and everything about it, as they'll ever be if you brought not just these Friday's six witnesses, or these three who have testified today, but if you brought a wagon load of people–everybody that you ever talked to about this thing.

I still think this jury has got and should have a clear picture of this particular witness as they will ever have.
Ttr. 5975-77.

46

Prince Beasley and private investigator Ted Gunderson during the period of October 1980 to May 1982. MacDonald also proffered statements by Greg Mitchell and Cathy Perry, as well as affidavits of other witnesses which allegedly corroborate the involvement of Stoeckley, Mitchell, and Perry in the murders. Judge Dupree denied MacDonald's motion for new trial, reasoning that the new evidence would not produce a different result in a new trial. *MacDonald III*, 640 F. Supp. at 333. The evidence supporting the MacDonald's motion for a new trial is recounted below.

### 1.    Stoeckley's confessions

Judge Dupree summarized[18] the substance of Stoeckley's confessions,[19] in the light most favorable to MacDonald,[20] as follows:

> Stoeckley was a member of a satanic cult which was angry with military physicians, MacDonald among them, because they refused to help drug users with their problems. The leader of the cult decided to approach MacDonald in an attempt to obtain drugs from him and persuade him to treat drug addicts.
>     Stoeckley was assigned responsibility for determining the whereabouts of Colette MacDonald on the night of February 16, 1970 and made a pretext phone call to the MacDonald residence at about 6:30 p.m. that evening and learned that Colette would be attending school at a North Carolina State University Extension at Fort Bragg that evening. She and several other members of the cult later went to the North Carolina State University Extension and spoke with her in an unsuccessful attempt to persuade her to talk to her husband about the cult's concerns.

---

[18] The court reiterates that it has independently reviewed the record as whole. Given Judge Dupree's succinct and accurate summary of Stoeckley's statements, the court sees no reason to reinvent the wheel in laying out the record in this case.

[19] Judge Dupree was not presented with the recordings or transcripts of Stoeckley's statements; rather, MacDonald submitted the declaration of Beasley and the unsigned unsworn declaration of Gunderson.

[20] Judge Dupree noted that Stoeckley's statements "contain numerous inconsistencies rendering it almost impossible to reconcile them into one cohesive statement of events," but in order to give MacDonald "the benefit of all doubts" he chose "to recite in large part what MacDonald claims Stoeckley's statements prove occurred on the night of the murders and thereafter." *MacDonald III*, 640 F. Supp. at 321. n.22.

47

Later that evening, at approximately 10:30 p.m., Stoeckley, Greg Mitchell, Shelby Don Harris, Bruce Fowler, and Dwight Edwin Smith met at Stoeckley's apartment where they discussed their plans to go to MacDonald's apartment to seek his cooperation. Stoeckley thereafter took some mescaline offered to her by Greg Mitchell and the group went to two local restaurants where they stayed until the restaurants closed.

The Stoeckley group left a Dunkin Donuts restaurant at about 2:00 a.m. and drove to the MacDonald residence. Bruce Fowler then parked the car nearby and the group walked along the sidewalk to the rear of MacDonald's apartment and entered the home through a utility room door. It was dark inside the house and Stoeckley lit a candle to help the group find their way. They walked through the house and into the living room where they found MacDonald asleep on the living room couch with a book across his chest and a Valentine's Day card on the couch next to him. Stoeckley noticed that the television was on but there was no picture because there was no programming that late.

Some members of the group shook MacDonald to awaken him so that they could talk to him about drugs but upon awakening he became excited and began to fight with them. During the fight, Stoeckley chanted "acid is groovy; kill the pigs." When the group finally subdued MacDonald, they told him that they wanted drugs and he agreed to call a friend of his to see if he could get some. He went to a wall telephone in the kitchen but instead of calling a friend, he attempted to call the military police. The group overheard the conversation and again assaulted MacDonald, this time knocking him unconscious.

According to Stoeckley, things "got out of control" at this point and she heard Colette MacDonald calling to her husband for help from the master bedroom. Stoeckley went to the room where she saw Colette being assaulted by Greg Mitchell and another member of the group. She noted that one of the MacDonald children was in the master bedroom with her mother but appeared to be asleep. Stoeckley left the master bedroom and went into one of the children's bedrooms where she saw a record player, some books and a hobby horse which she noted was broken. She then heard the sound of running water in a bathroom and looked in to see Greg Mitchell washing his hands at the sink.

Stoeckley then heard a telephone ring and another member of the group told her to answer it. She answered the telephone and heard a soft voice ask for "Dr. MacDonald" whereupon she began to laugh until someone in the group ordered her to hang up the telephone. The group became scared and left in a hurry, leaving all of the murder weapons behind except for a pair of scissors.

After leaving MacDonald's apartment, the group went to a Dunkin Donuts where Stoeckley went inside and washed her hands. She was eventually taken home at about 4:30 a.m. When asked by her roommate a few days after the murders why she had participated in the crimes, Stoeckley told her roommate that the MacDonalds deserved to die. She disposed of her floppy hat which she had been wearing during the murders and gave her blood-stained clothes and boots ,which she had also worn, to a friend of

hers, Cathy Perry. She told Perry to dispose of all of these items. The members of her cult eventually moved away from the Fayetteville, North Carolina area and lost contact with each other.

       Called to testify at MacDonald's trial nine years later, Stoeckley perjured herself in order to escape prosecution. She eventually decided to confess to the crimes to clear her conscience.

*MacDonald III*, 640 F. Supp. at 321-22. Judge Dupree observed that Stoeckley's numerous statements were predominated by contradictions and inaccuracies, including: (1) varying the size and composition of the group of intruders from statement to statement; (2) changing whether the events took place at all depending on whether she was speaking to MacDonald's investigators or the FBI; (3) stating on several occasions that an individual, Allen Mazerolle, was with the group of intruders when prison records confirmed that he was in jail the three weeks before and after the murders; (4) claiming that the group talked with MacDonald for eight minutes after awakening him, which was inconsistent with MacDonald's own version of events; and (5) stating she had been in the apartment prior to the murders and had stolen jewelry. *Id.* at 322-23. Judge Dupree also took note of the conditions under which Stoeckley rendered her confessions to Beasley and Gunderson. *Id.* at 319 n. 20 (referencing evidence showing that "Gunderson and Beasley interviewed Stoeckley for hours upon hours, day after day" and observing that the "heavy-handed tactics . . . call into question the voluntariness and truth of Stoeckley's confessions despite her statements to the contrary").

    **2.**      **Greg Mitchell's statements**

    MacDonald also proffered the declarations of individuals who claimed that Greg Mitchell – someone Stoeckley implicated in her statements to Beasley and Gunderson – also confessed to the murders.

### a.    The Manor

The Manor was a ministry in Fayetteville, North Carolina, in the 1970s that provided counseling and help to young people who had problems with alcohol and drugs. Anne Sutton Cannady, who worked at the Manor, stated that a man fitting Greg Mitchell's description arrived at The Manor, on a Wednesday in the early part of March 1971. Several days after his arrival, the man attended a prayer session, where he said he was part of a cult in Fayetteville and had murdered people. Decl. of Anne Sutton Cannady, DX 5023. Reverend Randy Phillips, who worked at the Manor, stated in a declaration that he understood that the man "said something to the effect that he was partly responsible for the MacDonald slayings." Decl. of Randy Phillips, DX 5022. The man left the following day after having stolen clothes belonging to Phillips.

Following the man's departure, Phillips, Cannady and another individual went to a farmhouse owned by The Manor to make sure it was secure. Upon their arrival, they saw the man who had confessed run out the backdoor with another person and into a wooded area. Inside the house, Cannady saw the phrase "I killed MacDonald's wife and children" written on one of the bedroom walls in red paint. When Phillips and Cannady later returned to the farmhouse, someone had painted over the walls.

Anne Sutton Cannady later identified, from a photo array, a photograph of Greg Mitchell as showing the man who had confessed to the murders and painted on the farmhouse wall.

When ruling on the 1984 motion, Judge Dupree characterized this evidence as "at best speculative and circumstantial," noting that neither Cannady nor Phillips "personally knew Mitchell and only Cannaday [sic] heard the statement by a young man to the effect that he had 'murdered people.'" *MacDonald III*, 640 F. Supp. at 328. Judge Dupree declined to "accept this one statement to Cannaday [sic] over fourteen years ago by a man she did not know was evidence of any substance that

50

Greg Mitchell confessed to the MacDonald murders" and he also found the statement that "two unidentified men were seen running from a farmhouse which had been vandalized" to be "only weakly connected to Mitchell." *Id.*[21]

### b.      The Lanes

MacDonald also submitted the declarations of Norma and Bryant Lane, a couple Greg Mitchell befriended in Charlotte, North Carolina, in the 1970s. Both Norma and Bryant stated that they recalled a incident in 1977 where Mitchell was depressed and when they inquired about what was bothering him, Mitchell replied that he could not tell anyone because it was too horrible to talk about. Later, in 1982, Mitchell, visibly upset, visited the Lane's house, seeking money to leave the country because the FBI was after him. He told Norma Lane that he was guilty of a crime that happened a long time ago at Fort Bragg. DX 5024A, DX 5024B.

Judge Dupree found the Lane declarations to be unpersuasive "because Mitchell made no specific reference to having been involved in the MacDonald slayings and voluntarily appeared at the Charlotte, North Carolina office of the FBI in late 1981 where he denied any knowledge of the murders." *MacDonald III*, 640 F. Supp. at 328.

### 3.      Cathy Perry's statements

On November 17, 1984, Cathy Perry,[22] who was a resident of Fayetteville, North Carolina in the early 1970s, gave a statement to an FBI agent. At the time she gave the statement, she had been diagnosed as a schizophrenic and was under a doctor's care. In her statement, Perry said that on the

---

[21] Judge Dupree's characterization of the evidence before him and the rulings thereon are not now binding on the court.

[22] At the time she gave the statement, Cathy Perry was known as "Cathy Perry Williams." The court will refer to her as Cathy Perry in this Order.

51

evening of February 16, 1970, she was outside a "head shop" in Fayetteville when she was persuaded to get into a white stationwagon with two white females and five or six white males. The group broke into the front door of a house, where the group found a white male lying on the couch. Someone in the group shot the white male up with some sort of narcotic and the male collapsed. Perry was not permitted to leave, and she was forced to take a pill. She said that a male in the group said the man who lived in the house was a doctor and he turned people in who used drugs.

Perry told the FBI that everyone went upstairs, and some of the group started beating a baby in a blanket. Perry said she tried to hide another male child in a closet while the baby boy was killed in the bathroom. Perry also described trying to wake the mother of the children and persuade her to jump out a window to escape, but eventually being forced to kill the mother. Perry reported that after murdering the mother, she wrote in blood on the wall, "Fuck you pigs from all of us to you," along with the year. She reported being in the house from approximately 11 p.m until 4 or 5 a.m., and described the weather as being warm with no rain. *MacDonald III*, 640 F. Supp. at 329. *See also* DX 5034.[23]

### 4.    Additional statements

MacDonald also presented the declarations of more than 20 witnesses and offered testimony from several witnesses to corroborate the involvement of Stoeckley, Perry, and Mitchell in the murders. Of particular note, MacDonald offered the declarations of Keith Bowen, Mable Campbell, John Humphries, Frankie Bushey, Marion Campbell, Joan Sonderson, Addie Willis Johnstone, Edith Boushey, Carlos Torres, Dorothy Averitt, Prince Beasley, Jimmy Friar, Lynne Markstein and Richard Comisky.

---

[23] Judge Dupree observed that "[a]pparent from the most superficial reading of [Perry's] statement is that the facts retold by her are completely at odds with the known facts and those MacDonald claims were confessed to by Stoeckley." *Id.*.

### a.    Keith Bowen

In a declaration, Keith Bowen stated that Stoeckley associated with a group of people which included Cathy Perry, Shelby Don Harris, Greg Mitchell, Jackie Don Wolverton, and a black man who wore an Army jacket with E-6 stripes known as "Moses." According to Bowen, everyone in the group used LSD on a regular basis.  DX 5068.

### b.    Mable Campbell

Shortly before February 17, 1970, Mable Campbell was on her way to work when she observed four individuals – two white males, one black male, and one white female – standing next to a dark colored vehicle at a drive-in, in Fayetteville. The female was wearing a floppy hat and boots. Campbell later picked out a photograph of Greg Mitchell from a photo array as one of the men she had seen and said that a female in a floppy hat depicted in a police artist's sketch resembled the woman. DX 5070.

### c.    John Humphries

John Humphries, a former military policeman, owned a rock shop on Bragg Boulevard in Fayetteville. On the evening of February 16, 1970, between 6 and 7 p.m., three men –two white and one black – came into his shop. Humphries could tell the men were high. After Humphries displayed his gun, the group left his store and got into an eggshell white van parked outside. He saw a woman sitting in the van wearing a big white floppy hat. Humphries reported what he saw to both the FBI and the CID, but he received no response from either agency. DX 5067.

### d.    Frankie Bushey

At approximately 11:15 p.m. on February 16, 1970,Frankie Bushey and some friends stopped to eat at a Dunkin' Donuts. Around midnight, four "hippies"– a white female and three males – entered the restaurant. The female had blond hair and wore a light colored floppy hat and a light colored jacket.

She carried a large shoulder bag and appeared to be on drugs. A husky, unshaven, bushy-haired man was holding on to the woman. The second man had a dark complexion and slanted eyes, and the third was short, had a fair complexion, squinted eyes, and walked with a slouch. When Bushey left Dunkin' Donuts at approximately 12:55 a.m., the four people were seated in a booth behind her. DX 5046.

### e. Marion Campbell

Marion Campbell also was at the Fayetteville Dunkin' Donuts. She arrived with her husband at approximately 12:50 a.m. on February 17, 1970. While she and her husband were eating, she saw a group composed of a white man, black man, and white woman walking out the aisle. The woman wore a white mini-skirt and a white blouse with a light sweater, white boots which came to just below her knee that had clay-like stains on them, and a white straw-like hat with a floppy brim. The woman was blond, and appeared to be 19 years old and dazed. The white man also appeared to be dazed. The black man had on an olive drab field or fatigue jacket.

After the group left the restaurant, Campbell saw a black or blue van stopped parallel to the window near where she was sitting. The white woman was in the passenger seat, and the black man was driving. A white man on a black motorcycle pulled up near the van, and the black man said to him, "We'll see you there." The black van pulled out of the parking lot and headed in the direction toward Fort Bragg around 1:30 a.m. DX 5071.

### f. Joan Sonderson

Joan Sonderson worked as a waitress at a drive-in restaurant on Fort Bragg. When she arrived at work between 8:00 a.m. and 9:00 a.m. on the morning on February 17, 1970, she noticed a two-tone car parked in her service area, apparently passengerless. She later discovered that three individuals, including a white woman and a black male, had been sleeping in the car. The white woman had long

54

hair and wore a floppy hat and boots. The woman asked Sonderson if she knew that the MacDonalds had been murdered the previous night. While the woman was talking with Sonderson, the black male exited the vehicle to use the restroom. He wore an army fatigue jacket. DX 5020.

### g. Addie Willis Johnstone

MacDonald represents that Addie Willis Johnstone saw four individuals standing at the intersection of Hillsborough and Western Boulevards in Raleigh, North Carolina, at noon on February 17, 1970. The group included a white woman with stringy blond hair, wearing a beige floppy hat and boots; a black man in an Army fatigue jacket, and two white males.[24]

### h. Edith Boushey

In February 1970, Edith Boushey taught English and coordinated the Modern Languages program at the North Carolina State University Extension program at Fort Bragg. Boushey stated that at about 9:40 p.m. on February 16, 1970, she walked past a group of people near a stairwell of a building on campus and saw a man whom she identified as Greg Mitchell talking to a woman she identified as Colette MacDonald. As Boushey walked by, she heard Greg Mitchell say: "If you go along, I think it will be alright." She heard Colette reply, "I dread . . ." but could not hear the remainder of the response. Boushey stated that the group included at least three other women, including two wearing floppy hats. DX 5044.

Judge Dupree noted that Boushey's account was directly contradicted by the affidavit of Elizabeth Ramage, who accompanied Colette to class on the evening of February 16, 1970, and was with her at all times until Colette dropped Ramage off on the way home from class. Ramage stated that she and Colette left between 9:20 and 9:30 p.m. *MacDonald III*, 640 F. Supp. at 326. Judge Dupree

---

[24] No declaration or affidavit of Johnstone was submitted in the latest filings with the court.

55

also noted the inconsistencies between Stoeckley's version of the meeting with Colette and Boushey's declaration. Accordingly, the court found Boushey's statements to be "of no corroborative value." *Id.*

### i. Carlos Torres

As Judge Dupree recounted, Torres testified at the hearing on MacDonald's motion for new trial that

> he was stationed at Fort Bragg, North Carolina, in February of 1970 and was working part-time at the post NCO club. Torres left the club about 2:00 a.m. and proceeded up Bragg Boulevard until he stopped at a stoplight near Castle Drive. While stopped at the light, he noticed a blue 1962 or 1964 Volkswagen stationwagon parked on the side of the road. He observed one person in the van, one outside the van, and two other people walking toward the van from a wooded area but was unable to identify any of the four people.

*MacDonald III*, 640 F. Supp. at 326-27; *see also* September 19, 1984 Hearing Transcript [DE-136-4] 14-25. Judge Dupree found Torres' testimony to be not credible as corroboration of Stoeckley's confessions, noting that Stoeckley said her group was riding in a Ford Mustang, and not a Volkswagen van, on the night of the murders. Judge Dupree also noted that on cross-examination, Torres admitted that in early 1970 he had just returned from Vietnam, was in the process of a divorce, and "'wasn't in a condition to reveal this and get any more nervous and attention.'" *Id.* at 327.

### j. Dorothy Averitt

MacDonald also offered the testimony of Dorothy Averitt, who stated that on February 17, 1970, she drove to a grocery store at 4625 Murchison Road in Fayetteville. *See* September 19, 1984 Hearing Transcript [DE-136-3] at 25. When she pulled into the parking lot, she saw two men sitting in the backseat of a dark car parked outside the store. *Id.* at 26. Upon entering the store, Averitt saw a woman who was wearing a blond wig that was falling off and exposing her dark hair, a wide-brimmed weather hat, a light cream colored plastic coat, a dark skirt, and 3/4 length white boots

56

covered by a dark substance. *Id.* at 28-30. According to Averitt, the woman smelled like a "hog killing" and seemed to be in a fog. *Id.* at 31. When Averitt attempted to speak with her, a black man in an Army field jacket directed the woman to leave with him. *Id.* at 32-33.

### k.    Prince Beasley

In addition to offering Prince Beasley's testimony as to the substance of Helena Stoeckley's confessions, MacDonald also offered Beasley's testimony and statements to corroborate Stoeckley's confessions. Specifically, Beasley stated that on February 16, 1970, he was on duty as a Fayetteville police detective, and saw Stoeckley and a black male exit a blue Ford Mustang near the Village Shoppe restaurant around 10:50 p.m. He said that Stoeckley was wearing a blond wig, a floppy hat, and was carrying a light colored hand bag. He said the black male was wearing an Army jacket with E-6 insignia. Beasley also stated that he stopped Stoeckley and some male companions at approximately 2:15 a.m. on February 18, 1970, because he believed Stoeckley and her friends matched the description of the suspects. Beasley asserted he radioed the police department and asked them to call the Army CID and tell them he had located suspects in the MacDonald murders. After waiting an hour, he let Stoeckley and her companions go because they were threatening him. DX 5019. Beasley gave somewhat similar *voir dire* testimony at MacDonald's trial. *See* Ttr. 5741-42. MacDonald also proffered the declaration of Blane O'Brian, who was a Cumberland County deputy sheriff in February 1970. He stated that on February 18, 1970, at about 2:30 a.m., he heard Beasley call the Fayetteville police dispatcher regarding suspects in the MacDonald murders. O'Brian heard the dispatcher respond that he would inform Army CID. O'Brian also heard Beasley call the dispatcher again an hour later, and the dispatcher respond that no one from Fort Bragg could meet with Beasley. DX 5032.

With regard to Beasley's statements, Judge Dupree observed:

57

Former Fayetteville detective Prince Beasley figures prominently in MacDonald's motion for a new trial because of his relationship to Helena Stoeckley. Stoeckley worked for Beasley as an informant in Fayetteville in 1970 and their friendship appears to have lasted until the time of Stoeckley's death. The court's impression from the record is that Stoeckley looked up to Beasley and Beasley gave her the attention which she seems to have at times sought. At all stages of the case, the defense has obtained information from Stoeckley by using Beasley as its contact with her.

Beasley has given a series of statements, trial testimony and affidavits over the years which substantiate Stoeckley's involvement in the crimes. These statements have rarely been accurate. Upon hearing Beasley's *voir dire* testimony at trial to the effect that he had stopped Stoeckley and several of her male companions for about an hour on the morning of the murders and then let them go when CID agents did not arrive on the scene, this court noted that

> [i]f it is within the province of this court to pass on the trustworthiness of a witness who proposes to testify . . . this court would be constrained to hold Officer Beasley's testimony to be unreliable. It is simply incredible that any self-respecting, competent police officer who really thought that he had a substantial lead toward solving these sensational murders would allow the suspects to go after waiting only an hour for the Army investigators . . . .

[*MacDonald I*], 485 F. Supp. at 1092.

The court's evaluation of the trustworthiness of Beasley in 1979 is left unchanged by his most recent statements and the court's observation of the demeanor of this witness during the evidentiary hearing on the post-trial motions. While the court does not believe this seriously ill man to be lying, medical records introduced by the prosecutors clearly show that he cannot consistently distinguish fact from fiction.

*MacDonald III*, 640 F. Supp. at 325.

### l.     Ernest Davis

Ernest Davis was engaged to Stoeckley at the time of the MacDonald trial and the two married

the next year. In 1983, he signed a declaration stating that after the trial, Stoeckley told him she thought

she had been in the MacDonald home the night of the murders. DX 5018. Davis stated that Stoeckley

told him that she had gone into Dunkin' Donuts the night of the murders with blood on her hands and

58

washed them there. Davis also stated that Stoeckley told him she remembered: (1) "standing in her driveway the night of the murders and taking two hits of mescaline with Greg Mitchell"; (2) "going into a bedroom to keep the kids quiet" and that "[w]hen she came out, MacDonald was already stabbed and Colette MacDonald was screaming" and "[t]he next thing she remembered was standing in the living room, holding a candle" with "[b]lood dripping off her hand"; (3) that someone went in the MacDonalds' jewelry box and took some things out; and (4) leaving in a hurry and leaving all the weapons, other than a pair of scissors behind." She told Davis that "she acted confused at the trial in order to fool the judge." DX 5018.

### m. Greg Mitchell's left-handedness

MacDonald also proffered the declaration of Greg Mitchell's widow, Pat, who stated that Greg was left-handed. DX 5049. He also proffered the declaration of Ronald K. Wright, M.D., stating that he was of the opinion that

> based upon the location of the injuries suffered by Colette MacDonald and the nature of those injuries . . . the blow which fractured Colette MacDonald's skull was struck with a club that was in a left-handed swing by a person facing Mrs. MacDonald at the time she was standing [and because] the blow was very forceful I have concluded that it is consistent with someone who is left-handed.

DX 5049. Dr. Wright, however, later admitted on September 4, 1984, that

> [i]ndividuals intoxicated with psychomimetic drugs or enraged by their wife cannot be presumed to strike with their handed side. Therefore, while perhaps slightly more often forceful blows delivered from a deceased's right to left are delivered by lefthanded folk (adjusting for their minority status); it is certainly not unusual to see such a blow delivered by a righthanded individual.

*MacDonald III*, 640 F. Supp. at 328.

### n. Jimmy Friar

In a declaration dated July 25, 1983, Jimmy Friar stated that he was an in-patient at the Womack Army Hospital at Fort Bragg in February 1970. Prior to being treated at Womack, he had been a patient at Walter Reed Hospital in Washington, D.C., where he had been treated by Dr. Richard MacDonald. While there, Friar became friendly with Dr. Richard MacDonald. On a couple of occasions while he was being treated at Walter Reed, Friar had gotten drunk, and he would call Dr. Richard MacDonald for help in getting back to the hospital.

Friar stated that on the evening of February 16, 1970, he persuaded an orderly to let him leave the hospital so he could go to Fayetteville to drink and shoot pool. When Friar eventually decided to return to Fort Bragg, he had no money to use a taxi and the buses had stopped running. Friar, who stated he was disoriented at the time and thought he was still in Washington, D.C., decided to try to contact Dr. Richard MacDonald. He stated that while at the Wade Hampton Hotel he called the base operator, and represented himself as a doctor who was friends with "Dr. MacDonald." He did not specify Dr. MacDonald's first name. The operator gave him a number, which he called around 2:00 a.m. A woman, who was laughing, answered the phone, and Friar asked for Dr. MacDonald. Friar stated that he heard someone in the background say, "Hang up the God-damned phone" and the phone was disconnected. DX 5021.

### o. Lynne Markstein

On August 20, 1970, Lynne Markstein was in a traffic accident in Raleigh and taken to a hospital for treatment. DX 5017 ¶ 1. Markstein stated that while she was waiting in the x-ray waiting room, Stoeckley introduced herself and told Markstein she was in town to testify in the MacDonald trial. Stoeckley also told Markstein that she was at the MacDonald house when the murders occurred,

and she remembered standing over an uncovered bloody child in a bed. DX 5017 ¶ 3. Stoeckley asked Markstein: "Can you imagine someone like me doing that to those babies?" *Id.* She also told Markstein that she was under the influence of drugs at the time of the murder, and that she had been unable to remember any facts about the MacDonald murders until the time of trial. DX 5017 ¶ 4.

### p. Richard Comisky

MacDonald also proffered the declaration of Richard Comisky, a man who resided in Fayetteville in 1970 and knew Stoeckley. DX 5016. Comisky stated that sometime between August and October 1970, he had a conversation with Stoeckley and another young, white man in "Skag" Park in Fayetteville. During the course of the conversation, Stoeckley told Comisky that "we did the MacDonald thing," and when he asked what she meant, she replied, "we did the killings." DX 5016 ¶ 3. She told Comisky that when the police questioned her, she was wearing the same clothes she had worn during the murders, including a wig, a hat and boots, all of which she later burned. DX 5016 ¶ 4. Stoeckley also asked Comisky whether fingerprints could be obtained from wax; Comisky stated that he did not know. DX 5016 ¶ 6.

### I. Evidence underlying 1984 § 2255 motion

In 1984, MacDonald also moved pursuant to § 2255 to set aside his conviction, arguing the Government suppressed exculpatory evidence which, had it been introduced at trial, would have caused the jury to acquit him of the murders. The allegedly suppressed evidence included: "(1) a half-filled bloody syringe; (2) bloody clothes and boots claimed to have belonged to either Helena Stoeckley or Cathy Perry . . . ; (3) skin found under Colette MacDonald's fingernail; and (4) photographs of the letter "G" printed on the wall of Helena Stoeckley's apartment in Nashville, Tennessee." *MacDonald III*, 640 F. Supp. at 299. Judge Dupree denied this motion, concluding that the Government did not

deliberately suppress anything and had acted in good faith, and also finding that this evidence did not

meet the materiality requirements of *Brady v. Maryland*, 373 U.S. 83 (1963). *See MacDonald III*, 640

F. Supp. at 309. The evidence supporting this motion is recounted below.

   1.    **Syringe**

MacDonald proffered a document in which FBI agents summarized their debriefing of Robert

Shaw, who was in charge of the CID investigation, and Hilyard Medlin, who was in charge of the

United States Army Crime Laboratory Forces dispatched to help CID investigators process the

MacDonald crime scene. Both men were debriefed on February 21, 1970. The report included, in

pertinent part, the following:

> Mr. Medlin also advised that a half filled syringe that contained an as yet unknown fluid
> was located in a hall closet, which also contained some evidence of blood. In this
> connection, Medlin said that it appeared that someone with a bloody hand had reached
> into this cabinet containing medical supplies for some purpose.

DX 5079.

Noting that "[t]he only evidence that a 'half-filled bloody syringe' ever existed is contained in

Medlin's somewhat ambiguous statement to Agent Tool," Judge Dupree found that there was

insufficient evidence from which the court could conclude that a "half-filled bloody syringe" in fact

existed. *MacDonald III*, 640 F. Supp. at 301. Specifically, Judge Dupree observed that

> Medlin's affidavit indicates [that] when he made his statement to Agent Tool he was
> only summarizing the information provided to him by other members of the crime
> scene processing team. . . . He had no first-hand knowledge of the contents of the
> closet and denies ever seeing a half-filled syringe which bore blood stains. The
> implication of his statement and its second-hand nature is that Medlin misunderstood
> what the other investigators told him about the contents of the closet. In fact this is what
> must have occurred, for investigative agents with firsthand knowledge of the contents
> of the hall closet state, or would state if called to testify at trial, that no "bloody half-
> filled syringe" or other half-filled syringe was found in the closet. . . . Moreover, the
> chemist who processed the hall closet for blood stains, Craig Chamberlain, and the

62

agent who inventoried the medical supplies in the closet, Hagan Rossi, state without reservation that no syringe of any kind was found during the crime scene investigation.

*Id.* Accordingly, Judge Dupree found MacDonald's assertion that the half-filled syringe existed to be not plausible.

### 2. Bloody clothes and boots

MacDonald also asserted that in early 1971, the CID came into possession of bloody clothes or boots belonging either to Stoeckley or Cathy Perry. The evidence presented to Judge Dupree showed that in late 1970 or early 1971, Cathy Perry, after stabbing her roommate Jackie Don Wolverton, moved into Betty Garcia's home for a few days. *MacDonald III*, 640 F. Supp. at 302-03. Wolverton gave Garcia some of Perry's belongings that were in his apartment. When Perry was thereafter admitted to a mental hospital, Garcia asked Wolverton to collect the remainder of Perry's belongings. Wolverton then went to various places where Perry had stayed, and gathered items that he thought belonged to her, but also could have belonged to other people, and eventually gave them to Garcia. When going through clothing, Garcia found a pair of beige boots, and other non-specified items which led her to believe that Perry was involved in the MacDonald murders. *Id.* at 303.

Garcia provided all of Perry's possessions to her attorney, Charles Kirman, who in turn gave the items to James R. Nance, an attorney who had represented MacDonald in a civil action. On the afternoon of January 6, 1971, Nance went to the offices of Captain James Douthat, MacDonald's appointed military counsel at the Article 32 proceedings, and released the Perry items to CID agents William Ivory and Peter Kearns. Ivory prepared a Military Police Receipt for Property listing the items received by Nance, which was signed by Nance, Ivory and Douthat. No clothes were listed on the receipt, but the items did include a "Pair of Woman's boots, beige, w/tag THE GREAT BOOTS by

63

GOLD SEAL." *Id.* at 303. The receipt did not indicate that the boots, or any other items, were blood-stained. When routine laboratory analysis failed to provide any link between the boots and the MacDonald case, the boots and other items were returned to Garcia.

Judge Dupree concluded that "[t]here is no evidence from which the court can find that any items other than those listed on the military property receipt were given to CID Agents Ivory and Kearns." *Id.* Judge Dupree also found that the boots were not blood-stained, crediting the affidavits of Agents Kearns and Ivory and Kearns' sworn statement in April 1972 concerning the boots, especially when compared to the affidavits of Nance and Garcia regarding a possible brown stain on the boots. *Id.* at 304.[25]

### 3.        Skin found under Colette's fingernail

The evidence before Judge Dupree was that a small fragment of skin was found under one of Colette's fingernails during her autopsy, but that sometime between February 28, 1970, and December 19, 1970, the piece of skin was lost.

### 4.        Photographs of the letter "G"

MacDonald also proffered evidence showing that in December of 1970, CID photographer Frank M. Toledo took photographs of the walls of Stoeckley's former apartment in Nashville,

---

[25] The only other evidence before Judge Dupree concerning the existence of bloody clothing or boots was the declaration of Prince Beasley, wherein he stated that Garcia told him Perry asked her to hold a bundle of clothing for her because the police were after her. Garcia looked through the materials and saw some clothing and boots had blood on them. A few weeks later, Garcia received a phone call from Perry's parents asking her to destroy the materials. Garcia threw out the clothing, but kept the boots and other items, including a calendar with the date February 17, 1970, circled on it. DX 5019. Beasley's testimony before Judge Dupree was that Stoeckley knew that Perry had taken some clothes and given them to Garcia, but that Stoeckley did not specify to whom the clothes belonged. Transcript of Beasley's Hearing Testimony [DE-136-9] at 20.

Tennessee. *MacDonald III*, 640 F. Supp. at 308. Toledo had previously worked on the MacDonald case and saw the crime scene.

Stoeckley had put palm and fingerprints on the walls in paint, and also had written on the walls in paint. "As he was photographing the words written on the walls, Toledo had a 'flashback' to the MacDonald crime scene and thought the letter 'G' in words such as 'Good' and 'Gemini' on the walls resembled the letter 'G' in the word 'PIG' which was written in blood on the headboard in the master bedroom of the MacDonald apartment." *Id.* He wrote this observation down in his handwritten notes accompanying the exposures. *Id.*

In an affidavit prepared prior to the hearing before Judge Dupree, Toledo stated "that not only did the 'G's' on the walls resemble the 'G' on the headboard at the MacDonald apartment, they also looked like 'G's' which Toledo had seen in MacDonald's military course notebooks." *Id.* The Government also proffered evidence of FBI analysis finding that "the letters do not have sufficient distinguishing characteristics to enable the FBI or anyone else to determine whether they were made by the same hand." *Id.*

**J.      Evidence underlying the 1990 and 1997 § 2255 motions**

In 1990, MacDonald filed another petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255, arguing that "the prosecution failed to disclose prior statements of witnesses at trial, withheld laboratory notes written by government agents which would have aided the defense, and exploited the suppression of the prior statements and the lab notes by knowingly presenting a false and perjurious picture of the evidence and underlying facts." *MacDonald V*, 778 F. Supp. at 1344. Specifically, MacDonald's motion was premised, in part, upon his discovery of (1) laboratory bench notes from United States Army Criminal Investigation Laboratory ("USACIL") Chemist Janice Glisson indicating

65

that she had found three blond synthetic hairs, up to twenty-two inches in length, on a clear handled brush found in the MacDonald home, and (2) government scientists' handwritten notes showing they "had discovered the presence of one black wool fiber and one white wool fiber in the debris taken from the right biceps area of Colette's pajama top, two black wool fibers and one green wool fiber in the debris removed from the wooden club murder weapon, and two black wool fibers in the debris removed from the mouth area of Colette, none of which were matched to any known source in the MacDonald home." *MacDonald V*, 778 F. Supp. at 1348-49; *see also* DX 5025 ¶ 5; DX 5027 ¶¶ 5-8. MacDonald argued, in part, that the lab notes identifying the saran fibers and unsourced fibers corroborated his story of intruders murdering his wife and children.

In response to MacDonald's motion, the Government offered two affidavits of Michael P. Malone, then a senior examiner of the Hairs and Fibers Unit of the FBI Laboratory in Washington, D.C. Malone had examined the hairs and fibers at issue at the request of the Government in response to MacDonald's 1990 petition. With regard to the hairs, Malone stated in his original February 14, 1991, affidavit that it was likely that the saran fibers came from a doll and not from a wig. Specifically, he stated:

> All of these saran fibers . . . are consistent with the type of fibers normally used in the production of doll hair from the FBI laboratory reference collection . . . . These fibers . . . are not consistent with the types of fibers normally used in the manufacture of wigs, and based on my comparisons, are not like any of the known wig fibers currently in the FBI Laboratory reference collection. . . .
> ******
> [A] grey delustered modacrylic [modified acrylic] fiber, previously removed from the clear handled hairbrush . . . and exhibits the same microscopic and optical properties as the grey delustered modacrylic fibers found in the . . . [hair piece] previously owned by Colette MacDonald. . . .
> In connection with this matter I examined a blue handheld hairbrush . . . . I removed a grey delustered modacrylic fiber . . . from this item. This fiber . . . exhibits the same microscopic and optical properties as the grey delustered modacrylic fibers found in the

Case 3:75-cr-00026-F   Document 354   Filed 07/24/14   Page 66 of 169

composition of the previously mentioned . . . [hair piece] of Colette MacDonald, and accordingly, is consistent with having originated from the [hair piece].

DX 5025, Ex. 1, ¶¶ 12-13. In his May 21, 1991, supplemental affidavit, Malone stated:

4. . . . . [T]o the extent that petitioner contends that the "22-inch blond synthetic fibers" . . . are consistent with having originated from a cosmetic blond wig allegedly owned by Helena Stoeckley, there is no factual or scientific basis for this conclusion. I base my statement on the following facts and observations.

5. . . . . [O]ne [saran fiber] matched the FBI Laboratory's known saran doll hair reference exemplar . . . and did not match any wig exemplar in the reference collection.[26] Similar examinations performed on [another saran fiber] revealed a single light blond striated saran fiber, which was 22-inches in length, and also did not match any wig exemplar in the FBI reference collection. Lastly, similar examinations performed on [a third saran fiber] revealed a single grey, declustered, modacrylic fiber which was approximately 5-inches in length, and which matched modacrylic fibers removed from the . . . hair piece or "fall" worn by Colette MacDonald. Therefore, I can state that the only blond synthetic fibers which are 22-inches or longer and which were removed from Exhibit K, E-323 [the clear-handled hairbrush], are saran, which does not resemble human hair, and not modacrylic, which does resemble human hair.

6. In addition to performing physical examinations in this case, I have consulted numerous standard references (see Exhibits 1-6 attached to this affidavit) which are routinely used in the textile industry and as source material in the FBI Laboratory, concerning the industrial applications for fibers, including saran. None of these standard references reflect the use of saran fibers in cosmetic wigs; however, they do reflect the use of saran fibers for wigs for dolls and manikins, in addition to such uses as dust mops and patio screens.

7. Further, based upon my own investigation and research in this case, I can state that saran has the following physical characteristics which make it unsuitable for use in cosmetic wigs, in which the objective is to have the wig hair appear indistinguishable from natural human hair. Saran is very straight, is only manufactured as a continuous monofilament, does not lay down or drape like human hair, and is also too shiny to resemble human hair. Lastly, saran can not be manufactured as a "tow" fiber[27], which is essential to the cosmetic wig manufacturing process.

---

[26] [Affidavit Footnote] The FBI Laboratory's reference collection of fibers has been maintained for over forty years. Among other items, it contains numerous samples from wigs, all of which I have personally examined and none of which revealed a known wig exemplar of saran. Rather, all of the known wig exemplars are composes of polyvinyl chloride (PVS), modacrylic or human hair.

[27] [Affidavit Footnote] A "tow" is a large group of continuous filaments, without any definite twist, which is cut into definite lengths.

DX 5025, Ex. 2. (second footnote omitted in original).

With regard to the fiber evidence, Malone examined the relevant fibers and found that the source of most of the fibers was unknown, "due to the absence at this time of known standards for comparison." DX 5025, Ex. 1, ¶¶ 16-18. He found that the white wool fibers found on the right bicep area of Colette's pajama top and on the wooden club were consistent with having originated from a shag rug in the MacDonald's master bedroom. DX 5025, Ex. 1, ¶¶ 16-17.

The Government also proffered the affidavit of Shirley S. Green, an FBI physical science technician. *See* Aff. of Green [DE-138-11]. Therein, Green identified certain laboratory bench notes as "unequivocally" hers and not that of Kathy Bond, another laboratory technician. *Id.* ¶ 2. She also recounted that the Government requested that fibers and debris removed from the club (Q89) be compared to two throw rugs found in the MacDonald home. *Id.* ¶ 6. After receiving this directive, Green "made an additional slide of fibers from the Q-89 debris." *Id.* In her affidavit, she specifically clarified that "[i]t should be noted that this examination was in addition to the comparison of the debris from Q-89, with the known threads from Q-12 [MacDonald's pajama top] performed by Mr. Stombaugh in 1974." *Id.* With regard to the 1974 examination, Green's notes indicate that after receiving the vial of debris from the club on September 24, 1974, she placed 2 short pieces of purple cotton thread, like Q12, in a pillbox. She also stated:

Exam by PMS – notes + yn comp's
"          " MSC – notes + wood comp's
Results (10-17-74) to Charlotte
        2 pcs purp. cot. sew. thr like used in constr of Q12
                were found in Q89
Results (11-5-74) to Charl.
        Wood particle in Q89 could not be fitted into Q14, but may have come from
        Q14.

68

Evid. retained in Lab.

*See* Bench Notes [DE-138-13]. In 1974, Stombaugh examined the debris, identified two purple sewing threads, and later opined at trial that they could have originated from MacDonald's pajama top. Ttr. 4097-98*; see also* 1974 Report from Stombaugh [DE-138-8] at 6.

Judge Dupree denied MacDonald's 1990 petition, relying on three separate independent grounds. First, Judge Dupree found that the new evidence was not material. *MacDonald V*, 778 F. Supp. at 1350-51. Judge Dupree also found that the Government attorneys did not violate the mandates of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at 1353-54. Finally, Judge Dupree found the 1990 petition to be barred by the doctrine of the abuse of the writ. *Id.* at 1356-60.[28]

MacDonald appealed Judge Dupree's decision. The Fourth Circuit affirmed Judge Dupree's decision on the third ground, abuse of the writ, and did not reach the merits of MacDonald's 1990 petition. *MacDonald VI*, 966 F.2d at 856, *cert. denied*, 506 U.S. 1002 (1992).

On April 22, 1997, MacDonald file a motion to reopen the 1990 Petition, arguing that the affidavits of Malone were materially false and misleading. MacDonald also sought an order permitting new DNA testing of certain evidence that had been collected form the crime scene. In support of his motion, he submitted evidence that two standard reference texts on textiles stated that saran could be manufactured in "tow" form and was used in the manufacture of wigs. *See* DX 5025, Aff. of Cormier No. 1, ¶¶ 17-18. MacDonald also submitted evidence suggesting that the FBI reference library included these two standard reference texts. *Id.* ¶ 24. Additionally, MacDonald submitted evidence regarding

---

[28] Also in connection with the 1990 petition, MacDonald submitted a second declaration from Bryant Lane, executed on July 15, 1988 [DX 5033]. The court discusses this declaration in the context of the 2006 Britt Claim filings.

interviews the Government and the defense team conducted with a manufacturer of synthetic fibers and two employees of Mattel Toys, Inc.

With regard to the manufacturer, MacDonald submitted the FBI's interview summary ("Form 302") of its conversations with A. Edward Oberhaus, Jr., an executive of the Kanecka America Corporation, which was at the time the world's largest producer of modacrylic fibers. Aff. of Cormier No. 1, Ex. 12 [DE-48]. The Form 302 reflects that Oberhaus said he was familiar with the production and use of saran fibers, both at the time of the interview and prior to 1969-70. The FBI then drafted an affidavit consistent with the information in its 302 form, but Oberhaus refused to sign it, because he did not consider himself to be an expert on the uses of saran. Aff. of Cormier No. 1, Ex. 10 ¶ 9 [DE-48]. Oberhaus did, however, draft his own affidavit, which stated that wigs and hairpieces manufactured after 1960 "have most often been manufactured with human hair, modacrylic fibers, other fibers, or a combination of any of these filaments." Aff. of Cormier No. 1, Ex. 11 ¶ 8 [DE-48].

MacDonald also proffered affidavits of Judith Schizas and Mellie Phillips, two employees of Mattel, Inc., who were knowledgeable about dolls, along with the Form 302s summarizing the FBI's interviews with the women. Both women stated they were unaware of any Mattel doll having hair the length of 22 or 24 inches; Schizas, however, also told the FBI that it was possible – although not probable – that hair fiber that length came from a doll if the fiber was doubled over in the rooting process. Aff. of Cormier No. 1, Ex. 13 ¶¶ 7, 10; Ex. 14 ¶ 5 [DE-48]. Philips also told MacDonald's investigative team that she recalled telling the FBI that saran could be manufactured in tow form. Aff. of Cormier No. 1, Ex. 14 ¶ 4 [DE-48].

Additionally, MacDonald proffered evidence of what he characterized as a "pattern of deception" by Malone in other cases, in the form of excerpts from the Final Report of Department of

70

Justice Inspector General Michael R. Bromwich, *The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases*, and an April 16, 1997 article from the *Wall Street Journal*. Aff. of Cormier No. 2, Ex. 1, Ex. 3 [DE-49].

Finally, MacDonald presented affidavits from individuals in the fiber and wig manufacturing industries who stated that saran fibers were manufactured in tow form and were used in wigs prior to 1970. Aff. of Cormier No. 1, Exs, 15, 17, 18, 22, 23.

This court denied MacDonald's 1997 motion, insofar as it sought to reopen the 1990 petition, finding that MacDonald had not shown that Malone's testimony was material to the outcome of the litigation on the 1990 petition. *MacDonald VII*, 979 F. Supp. at 1063. This court also found that MacDonald had shown insufficient evidence of a fraud upon the court. *Id.* at 1064-67. The court also ruled that MacDonald's "claim that newly gathered evidence that saran fibers were in fact used in the manufacture of human wigs prior to 1970, added to the weight of previously amassed exculpatory evidence, demonstrates his factual innocence and that he is entitled to a new trial, is TRANSFERRED to the United States Court of Appeals for the Fourth Circuit." *Id.* at 1069.

With regard to the matters transferred, the Fourth Circuit ruled that "the motion with respect to DNA testing is granted and this issued is remanded to the district court" but that "[i]n all other respects, the motion to file a successive application is denied." *MacDonald VII*, No. 97-713 (4th Cir. Oct. 17, 1997). In a separate opinion, the Fourth Circuit affirmed this court's denial of the motion to reopen. *MacDonald IX*, 161 F.3d at 4. On remand, this court entered orders setting the parameters for DNA testing. It took nine years for the testing protocol to be agreed upon by the parties, the tests to be conducted, and the results submitted, which are discussed in more detail below.

**K.      Current § 2255 motion**

As this court has recounted, in 2006 MacDonald sought and received a pre-filing authorization from the Fourth Circuit, pursuant to 28 U.S.C. § 2244(b) and § 2255, permitting him to submit his proposed successive § 2255 motion to determine whether he meets the requirements for a successive § 2255 motion. MacDonald promptly filed his proposed successive § 2255 motion [DE-111] in this court on January 17, 2006, alleging that he had newly discovered evidence that proved a constitutional error occurred. Specifically, he argued that the evidence – the affidavit of former Deputy United States Marshal Jimmy Britt – showed that Stoeckley was prepared to testify at MacDonald's trial that she and her accomplices were responsible for the murders, but that prosecutor James Blackburn threatened her into changing her testimony and proceeded to misrepresent to both the court and defense counsel what Stoeckley said to him.

Shortly thereafter, MacDonald filed a motion to add an additional predicate to his proposed § 2255 motion, in what has become known as the "DNA claim" or "unsourced hairs claim." Relying on the March 10, 2006 mitochondrial DNA test results [DE-123-1], MacDonald sought to add a claim for relief to his proposed successive § 2255 motion, and also asked the court to consider the DNA results as part of the evidence as a whole. Finally, over a year later, MacDonald filed a motion asking the court to consider the affidavit of Helena Stoeckley's mother as part of the evidence as a whole.

The evidence MacDonald proffered for his current proposed § 2255 motion is summarized below.

**1.      November 3, 2005, Affidavit of Jimmy Britt**

The first piece of evidence attached to MacDonald's 2006 proposed § 2255 motion was the November 3, 2005 affidavit of Jimmy Britt. *See* November 2005 Aff. of Britt [DE-115-2] at 2-5; *see*

72

*also* DX 5058. Therein, Britt averred that he was one of the deputy marshals assigned to the proceedings of the MacDonald trial in 1979, and that as part of his duties he was assigned to travel to Greenville, South Carolina, to pick up Stoeckley. DX 5058 ¶¶ 6, 11. He stated that he picked up Stoeckley at the county jail in Greenville, and that Ms. Jerry Holden, another employee of the Marshal Service, accompanied Britt as he drove Stoeckley to Raleigh. DX 5058 ¶¶ 11, 13. Britt asserted that during the course of transporting Stoeckley to Raleigh, she brought up the MacDonald trial, and said that she, along with others, were in the MacDonald house on the night of the murders, and specifically mentioned a hobby horse. DX 5058 ¶ 15.

Britt also stated he was assigned to escort Stoeckley to the courthouse the day after she made these statements. Once there, he first took Stoeckley to meet with MacDonald's attorneys on the seventh floor of the building. DX 5058 ¶¶ 17-18. He then escorted her to the United States Attorney's office on the eighth floor. DX 5058 ¶ 18. Britt stated that James Blackburn asked Britt to remain in the room, and Britt did so. According to Britt, during Blackburn's interview of Stoeckley, she told Blackburn the same things she had said to Britt the day before. Namely, she mentioned the hobby horse and that she and others were inside MacDonald's home on the night of the murders. DX 5058 ¶¶ 20, 22. She also said the she had gone to the MacDonald house to acquire drugs. DX 5058 ¶ 22. Britt claimed that in response, Blackburn told Stoeckley: "If you testify before the jury as to what you have told me or said to me in this office, I will indict you for murder." DX 5058 ¶ 24.

Britt also stated that he previously told this information to two of his friends – and former employees of the Marshal Service – Cecil Goins and Lee Tart, but that he had refrained from coming forward to the court out of respect for the late Judge Dupree. DX 5058 ¶¶ 7, 10. Britt also took a polygraph examination regarding the matters he set forth in the affidavit, and MacDonald attached the

report stating that the examiner's opinion that Britt showed "no reactions indicative of deception." Davenport Report [DE-115-2] at 6-7.

### 2. Affidavit of Lee Tart

MacDonald also submitted the affidavit of Lee W. Tart, another former Deputy United States Marshal. Tart stated that in 2002, Britt told him about Stoeckley's statements that she had been in the MacDonald house on the night of the murders, and that she said the same to Blackburn. Tart also indicated that he thought Britt would tell nothing but the truth. Aff. of Tart [DE-115-2] at 9-10.

### 3. Affidavit of Wendy Rouder

MacDonald also proffered an affidavit from Wendy Rouder, the law clerk for Segal who gave *voir dire* testimony at the trial regarding Stoeckley's comments over a weekend recess. In the affidavit, Rouder averred that when she was contacted by MacDonald's present wife Kathryn about Jimmy Britt's November 2005 affidavit, "Helena Stoeckley's unexpected response to my questions in August of 1979 then made sense to me." Aff. of Rouder [DE-115-3] at 49-51. In her September 2005, affidavit, Rouder recalled that Stoeckley had admitted "her involvement in the MacDonald family murders – that she had seen a hobby horse in the MacDonald home, that she was there the night of the murders, and that she could name the people who killed Dr. MacDonald's family." *Id.*[29] Rouder recalled:

> I had asked her why she was making admissions to me in private when she had made public denials at the courthouse, and why she did not testify in court as to what she was telling me. She had then responded: "I can't. I'm afraid." I asked her what she was afraid of. I *fully expected* her to say that she was afraid of the people with whom she was involved the night of the MacDonald family murders, or the person or persons who the motel manager had reported as having assaulted her. Thus, I was very surprised

---

[29] Ms. Rouder did not testify in 1979 that Stoeckley told her that she could name MacDonald's killers. It was Red Underhill who repeatedly testified on *voir dire* that Stoeckley had said to him that she could "name three people," but would not do so because "I doubt if [sic] I live if I do." *See, e.g.*, Ttr. 5923.

when Ms. Stoeckley responded that she could not testify as to what she was sharing with me because of "*those damn prosecutors sitting there*." And she added words to the effect of "*They'll fry me.*"

*Id*. at 51, ¶ 10 (emphases in original); *see also* Ttr. 5928-50. Rouder added that while she was in the motel room talking with Stoeckley, "the phone rang and the hotel operator had asked for me specifically.  The call was from Judge Franklin Dupree. He addressed me by name, and asked me why I was there with Helena Stoeckely, and warned me not to ask her any questions." *Id*. ¶ 13.[30]

### 4. Affidavit of Everett Morse

Another affidavit filed with the proposed § 2255 motion was that of Everett Morse, who lived in the same apartment complex as Greg Mitchell during 1972-74. Morse stated that in the spring or summer of 1973, he mentioned to Mitchell that he needed golf balls. A few days later, Mitchell produced a case of new golf balls. When Morse refused to pay for them, Mitchell became angry and told Morse that if he did not take and pay for the golf balls, he would murder him as he had murdered Jeffrey MacDonald's family. According to Morse, Mitchell then said that if Morse ever mentioned Mitchell's involvement in the MacDonald murders, he would kill him. Aff. of Morse [DE-115-3] at 54-55.

### 5. Declaration and Affidavit of Bryant Lane

MacDonald also filed another affidavit of Bryant Lane.[31] *See* 2005 Aff. of Lane [DE-115-3] at 56-58. This was the third such document executed by Lane; the second, a declaration executed in 1988,

---

[30] Rouder had not included this detail in her *voir dire* testimony in 1979.

[31] As explained above, Mitchell befriended Lane and his wife when he was living in Charlotte in the 1970s.

was filed in connection with the 1990 § 2255 motion. *See* DX 5033. The court will review the contents of both documents.

The 1988 declaration provides much more detail about Greg Mitchell's statements than Lane's first declaration, which was filed in connection with MacDonald's 1984 motion for new trial. Specifically, Lane stated that soon after Mitchell quit his job at the Toledo Scale Company, Mitchell was "depressed and drinking" and "broke down in tears and said that he had killed the MacDonald family." DX 5033 ¶ 3. Lane stated that Mitchell said, "I personally know MacDonald is innocent, because I was the one that killed the MacDonald family." *Id.* Lane promised Mitchell that he would never tell anyone what he said. *Id.*

In a later conversation, Mitchell told Lane that he was being harassed by the FBI and he thought his phone was bugged. During another conversation where Lane's wife was present, she told Mitchell that he shouldn't have anything to worry about if he wasn't guilty, and Mitchell responded with tears in his eyes: "Well that's it. I did do it, I am guilty." DX 5033 ¶¶ 4-5. A few months before Mitchell passed away in 1982, he told Lane's wife that "[h]e was guilty of a crime he committed at Fort Bragg years ago, and he might have to go away to Haiti or somewhere to live." DX 5033 ¶ 11.

Lane asserted that his wife, after reading the novel *Fatal Vision*, called the FBI to report what Mitchell had said. After calling the FBI back twice and not getting a satisfactory response, Lane then contacted MacDonald's then-lawyer, who arranged for Ray Shedlick to take their statements. Lane noted that he only told Shedlick what Mitchell had said to his wife, because he was not comfortable telling strangers the whole story. DX 5033 ¶¶ 12-13. Thereafter, the FBI contacted Lane and his wife. Lane still did not tell the FBI everything that Mitchell had said, because he found the FBI agent to be sarcastic. DX 5033 ¶ 14.

The 2005 affidavit from Lane repeats many of the same statements he previously attributed to Mitchell in the 1988 declaration. DX 5033 ¶¶ 7, 10. Lane also, however, provided information about another statement from Mitchell. He said that approximately six months before he died, Mitchell told Lane that

> in 1970, he was addicted to heroin, and that "MacDonald could have helped him." Mitchell thought Macdonald knew an intermediary who could supply Mitchell with methadone, in order to kick hard drugs. Mitchell stated to me that he and his friends went to the MacDonald home on February 17, 1970, to "teach him a lesson" and intended to "whup 'em." Mitchell told me he was high on at least four drugs: Mescaline, angel dust, PCP and one other and said that "things got bad" and that "you don't realize what you're doing" when you are so high on drugs. Mitchell told me that Jeff MacDonald being alive was simply "lucky" because the group "didn't know what they were doing" and "didn't mean to kill anybody."

2005 Aff. of Lane [DE-115-3] at 57, ¶ 8. Lane also said that Mitchell claimed to have tried to turn himself in on numerous occasions. *Id.* at ¶ 9. Lane also said that Greg Mitchell's former business partner said that Mitchell "had confessed to his involvement in the MacDonald murders on many occasions." 2005 Aff. of Lane [DE-115-3] at 56, ¶ 7.

### 6. Affidavit of Donald Buffkin

MacDonald also offered the affidavit of Donald Buffkin, a man who frequented the Hull Bar in Charlotte, North Carolina, where he met Mitchell in 1980. Aff. of Buffkin [DE-115-3] at 59-61; DX 5031. Buffkin reported being at the Hull Bar at least once a month during the period of 1980-82, and speaking to Mitchell, who he characterized as a "definite alcoholic and pot smoker," each time he was there. DX 5031 ¶¶ 6-7. According to Buffkin, Mitchell told him on at least two occasions that he was "involved" and was there at the MacDonald murders. DX 5031¶ 6. According to Buffkin,

> Gregory Mitchell stated to me that "what they [the government] said about MacDonald isn't true. Gregory Mitchell also stated to me that his reason for being involved in the murders was that Jeffrey MacDonald "wouldn't do what they [Mitchell and his friends]

wanted." . . . Gregory Mitchell also stated that he was "mad" at Jeffrey MacDonald because he and some friends from Vietnam were involved in sending heroin back to the United States in bodybags and that he believed MacDonald was "on the receiving end." He went to the MacDonald home to demand money or "dope."

DX 5033 ¶ 6. Although Buffkin did not believe Mitchell at the time he made the statements, and believed the statements to be "bar talk," he eventually contacted MacDonald's attorneys in 2003, because after seeing television programs about the case, he began "to think that Mitchell's statements were true and worth reporting." DX 5033 ¶ 1.

### 7. Hamlet Hospital records

MacDonald also proffered an FBI report summarizing patients MacDonald had treated the day before the murders in the emergency room at a hospital in Hamlet, North Carolina. *See* Investigation Concerning Blood Types [DE-115-3] at 62-64; *see also* DX 5045. Those records indicated that MacDonald treated at least five patients who had Type O blood, including a patient he treated for a puncture wound to the left foot.

### 8. James Blackburn conviction

MacDonald filed the Judgment and Commitment Order for James Blackburn, arising out of his 1993 conviction for embezzlement and obstruction of justice. *See* Judgment and Commitment [DE-115-3] at 142-43.

### 9. FBI reports

MacDonald also proffered FBI reports, asserting that these reports showed Type B blood was present in the area where he said he struggled with his attackers. Specifically, he proffered the U.S. Army CID Preliminary Laboratory Report [DE-123-1] of April 6, 1970, which lists "Exhibit D-144 Portion of hall floor at west entrance bearing red-brown stains." *See* DX 5103 at 5. He also proffered

the U.S. Army CID Chart of Exhibit Findings with Chemical Analysis, which showed that serology

testing results for D-144 to be human blood that was indicated to either blood group type B (the same

as Jeffrey MacDonald) or O (the same as Kristen MacDonald). DX 5104 at 10.

**10.    Mitochondrial DNA test results**

In 2006, the Armed Forces Institute of Pathology's DNA Identification Laboratory ("AFDIL")

reported its DNA testing results. Of particular importance, AFDIL found that three specimens – 75A,

91A, and 58A(1) – could not be matched to any other sample tested. DX 5102 at 5. MacDonald's

arguments as to each of the three unsourced hairs were:

75A

> Thus, it is clear that this unidentified hair was found underneath where Colette's body lay at the crime scene, and that it was a full length body or pubic hair. The fact that it had both the root and follicular tissue attached is indicative that it was pulled from someone's skin and lends great weight to this specimen as probative that there were unknown intruders in the home with whom Colette struggled and from whom she extracted a hair.

Mem. in Supp. of Mot. to Add an Additional Predicate [DE-123] at 3-4.

91A

> Found with its root intact along with blood residue underneath the fingernail of three year old Kristen MacDonald, who at the crime scene was found murdered in her bed . . . and it is noted that chemical analysis of the hair indicated a finding of blood on the hair . . . . Thus, to find an unidentified hair, mixed with blood residue, with root intact, underneath one of her fingernails, strongly suggests that while she was defending herself against blows from an intruder she grabbed at or scratched back at the intruder such that as a result, the intruder's hair came to reside under her fingernail.

*Id.* [DE-123] at 1-3. MacDonald also proffered laboratory reports purporting to show that 91A was,

in fact, a human hair, with the hair root intact, found underneath the fingernail of Kristen MacDonald.

*See* DX 5103; DX 5104. With regard to the third hair, MacDonald argued:

79

58A(1)

> According to the [AFDIL] laboratory notes, it is a hair with root intact, and measured approx. 5mm in length. [Appendix 1, tab 5, (p.3).] Thus, this unidentified hair was found on the bedspread on the bed where Kristen MacDonald was found murdered.

Mem. in Supp. of Mot. to Add an Additional Predicate [DE-123] at 4.

**11.     Affidavit of the elder Stoeckley**

Finally, MacDonald proffered the affidavit of the elder Stoeckley [DE-143-2]. Therein, the elder Stoeckley stated that on two separate occasions, her daughter confided in her that she was present in the MacDonald house during the murders on February 17, 1970. Aff. of Elder Stoeckley [DE-143-2] ¶ 3. The first occasion was after the trial and prior to Helena Stoeckley moving to South Carolina. The second occasion was shortly before her death in 1983, when Helena Stoeckley knew she was dying. *Id.* ¶ 5. On the second occasion, Helena Stoeckley told her mother she was afraid to tell the truth because she was afraid of the prosecutor. *Id.* ¶ 11. The elder Stoeckley stated that Helena told her that she and Greg Mitchell, along with two of their friends, went to MacDonald apartment in the early morning hours of February 17, 1970, to intimidate MacDonald because they believed he was being too hard on drug users in the Fayetteville community. *Id.* ¶ 6. Although Helena told her mother that she and three other men were all high on drugs at the time, she still "absolutely knew" what was happening; she saw a hobby horse in a child's bedroom and saw one of the men stab MacDonald. Once Greg Mitchell and one of the other men "went out of their minds" and were killing the family, she and the other man fled. *Id.* ¶¶ 7-8. Helena also told her mother that she tried to tell the truth but that the FBI and other law enforcement officials told her to keep quiet. *Id.* ¶ 9.

80

**L.      September 2012 Evidentiary Hearing Testimony**

Following the remand from the Fourth Circuit, and after various motions practice and briefing

from the parties, the court held an evidentiary hearing in September 2012. MacDonald presented his

evidence first, followed by the evidence from the Government.

**1.      Wade Smith**

The first witness called to testify was Wade Smith, one of MacDonald's attorneys during the

trial. Htr. 21. Smith explained that the basic defense theory at trial was that MacDonald was in his

home sleeping on the couch when intruders came into house and killed his family and wounded him.

Htr. 22. Accordingly, any evidence supporting this theory was crucial to MacDonald's case. Htr. 23-24.

Smith testified that in January 2005, Jimmy Britt[32] called him and said "that something had

worried him and had been heavy on his mind and heart for all these years since the MacDonald case

and he needed to talk to me about it and sort of unload his soul." Htr. 25. Smith invited Britt to his

office, where Britt told Smith that during the MacDonald trial, he had been dispatched to South

Carolina to retrieve Stoeckley, and during her transport she voluntarily made statements that indicated

she was in the house when the murders occurred. Htr. 26. Britt also told Smith that he was present for

the Government's interview of Stoeckley, and that Stoeckley had told the prosecutor that she was in

the MacDonald house. Britt stated that the prosecutor informed Stoeckley that if she made such

statements in court, he would indict her for first degree murder. Htr. 26-27.[33]

---

[32] Britt died shortly before this court issued its 2008 ruling in this case.

[33]   After meeting with Smith, and prior to giving a statement under oath, Britt apparently
executed a "Statement of Facts" that was notarized by his friend and former deputy marshal, Lee Tart.
Therein, Britt said he was voluntarily submitting the Statement of Facts "regarding the irregularities I
observed during the trial of Jeffrey MacDonald." GX 2085. According to Britt, "[t]he specifics are too
numerous to list in this Statement of Facts" but he listed "the names of the people involved in the

81

Smith recognized the importance of what Britt told him, and subsequently engaged a court reporter and took a statement from him under oath. Htr. 27; DX 5055. In this statement, Britt said he waited to come forward about his concerns about the MacDonald trial out of respect for Judge Dupree, Rich Leonard, and John Edwards, all of whom he said were working for the court during the time of the MacDonald trial. DX 5055 at 9-10. Britt also stated that he was asked to travel to Charleston, South Carolina, to pick up Stoeckley, and he assumed custody of her at the United States Marshals Office in Charleston. DX 5055 at 12. He recounted that when he picked up Stoeckley, she was wearing a floppy hat, and he transported both Stoeckley and Ernest Davis to Raleigh, where he checked them into the Holiday Inn on Hillsborough Street in Raleigh. DX 5055 at 13-16. Britt said that he picked Davis and Stoeckley up at the hotel the following morning and transported them to court, where he escorted her to the defense interview, and then to Blackburn's office. DX 5055 at 16-17. Britt claimed that Blackburn was the United States Attorney at the time. DX 5055 at 17. According to Britt, Stoeckley told Blackburn that she was in the MacDonald home on the night of the murders to get drugs, and she mentioned a hobby horse. Britt stated that Blackburn told her that if she testified to that, he would indict her for murder. DX 5055 at 19-21. Following the interview with Blackburn, Britt took Stoeckley immediately to the courtroom, at which time he saw Blackburn going into Judge Dupree's chambers, and then approximately ten to fifteen minutes later, Blackburn and Judge Dupree returned to the courtroom. DX 5055 at 22-23.

Smith also asked Steve Davenport, who formerly worked for the State Bureau of Investigation, to conduct a polygraph examination of Britt. Htr. 40-44; DX 5057. Davenport opined that Britt showed

irregularities." *Id.* This list included "[t]he late Franklin Dupree, United States District Judge, . . . Rich Leonard and John Edwards, Law Clerks for Judge Dupree, and Jim Blackburn, United States Attorney, and the Foreman of the Jury."

no reactions indicative of deception. Htr. 44. Smith also testified that he was aware Davenport suffered a stroke sometime prior to 2006, did not have any record associated with the polygraph, and was now unavailable to answer questions about his conduct of the exam. Htr. 184-85.

Smith also obtained two affidavits from Britt; one was executed on October 26, 2005, the other in November 2005. Htr. 44-52; DX 5058; DX 5059. The October affidavit stated, in at least one paragraph, that Britt transported Stoeckley from Charleston to Raleigh; the November affidavit states that he transported her from Greenville to Raleigh. DX 5058 ¶ 15; DX 5059 ¶ 15; *see also* Htr. 40 ("Sometimes he said Charleston. Sometimes he said Greenville."). The October affidavit also mentions what Britt felt was unethical behavior – Judge Dupree accepting cakes made by jurors – during the MacDonald trial. DX 5058 ¶ 28.

In February 2006, Britt executed an addendum to his affidavit, which included more detail than his previous affidavits. Htr. 199; GX 2089.[34] Specifically, Britt stated that he and Holden transported Stoeckley to the courthouse on August 15, 1979, for her interviews with the parties. GX 2089. He also stated that the defense interview of Stoeckley concluded around noon, and he then escorted her to the U.S. Attorney's office. Britt again asserted that he was present during Stoeckley's interview with the Government, and quoted Blackburn as telling her: "If you go downstairs and testify that you were at Dr. Jeffrey MacDonald's house on the night of the murders, I will indict you as an accessory to murder." *Id.* Britt also stated that after Stoeckley testified on August 17, 1979, he took her to The Journey's End motel, and was later directed by Chief Deputy Marshal Eddie Sigmon on Sunday, August 19, 1979, to check Stoeckley out of that motel and to register her at the Holiday Inn. Britt

---

[34] Smith had not seen the addendum to the affidavit just before the September 2012 hearing. Htr. 199-200.

recounted that on Monday, August 20, 1979, Judge Dupree "stated as a matter of record that he was not going to permit Ms. Stoeckley to testify again, [and] that her brain was scrambled (like an egg)." According to Britt, Judge Dupree instructed the jurors not to consider the testimony Stoeckley had given on Friday, August 17th. Finally, Britt stated:

> Hugh Salter, U.S. Marshal, asked me to go to the U.S. Marshal's Office and see Ms. Reddick and that she would give me a check for four (4) days of subsistence. He asked me to cash the check and go to the bus station and purchase Ms. Stoeckley a one-way ticket to Charleston, SC, in which I did and for me to go to The Holiday Inn, Hillsborough Street, Raleigh, and check her out of the hotel and take her to the bus station and make sure she got on the bus and give the balance of her subsistence. This was on August 20, 1979, and I have not seen or heard from her since.

GX 2089.

Smith also testified as to his recollection of specific events in the MacDonald trial. Smith reviewed the portions of the trial transcript indicating that Stoeckley had been taken into custody pursuant to a material witness warrant, and that she was to make an initial appearance in South Carolina. Htr. 64-70. Smith noted that once Stoeckley was in Raleigh, he and Segal interviewed her, in the presence of Joe McGinniss, who was embedded as part of the defense team during the trial, in order to later write a book. Htr. 59, 77. Smith testified that Stoeckley made no indication that she was ever in the MacDonald house, and did not vary her answers even in response to Segal adjusting his interviewing tactics. Htr. 79-80. Segal told Stoeckley that the statute of limitations had run, and also confronted Stoeckley with crime scene photographs and the "Stoeckley witnesses" who all claimed that she had made inculpatory statements to them over the years. Htr. 80-90. Stoeckley did not change her response. Smith also reviewed portions of the trial transcript detailing a conference held before Judge Dupree, indicating that MacDonald was a non-indigent defendant, and once Stoeckley was released from her material witness custody, she would be placed under subpoena by the defense. Htr. 100.

Smith also recalled bumping into Blackburn in the federal building following the prosecution's interview of Stoeckley. Blackburn told Smith that Stoeckley had not said anything meaningful in his interview, and Smith said much the same thing. Htr. 102-03. The following day, Stoeckley took the stand. When Smith was questioned about Segal's representations to Judge Dupree during a bench conference regarding Segal's account of what Stoeckley had told the defense team and his request to treat her as a hostile witness, Smith said:

> It was – It was certainly – let me just put it his way, I was absolutely devoted to this case and upheld my role as counsel and I'm still devoted to this case, but I did not hear Helena Stoeckley say useful things for us. It is certainly possible. And I mentioned [a] while ago, maybe I was out of the room. I do not know the answer. But I can only speak for myself and that is that when I was present she did not say things that helped us.

Htr. 114.

Smith also testified about his recollection of conversations he had with Jerry Leonard, the attorney appointed to represent Stoeckley during the MacDonald trial. He clarified that his knowledge of Stoeckley's comments that seemingly tied her to the case came from Wendy Rouder, and not Leonard. Htr. 153-54. Smith also testified that Leonard has never told him anything that Stoeckley said to Leonard. Htr. 154.

### 2. Mary Britt

MacDonald's second witness was Mary Britt, the former wife of Jimmy Britt. Mary married Jimmy in 1957, and for most of their marriage he worked as a deputy United States Marshal. Mary remembered that Jimmy worked the MacDonald trial, and she specifically recalled that he came home one day during the trial and said the following day he would be traveling to South Carolina to pick up a witness. Htr. 223, 242. When he got home after transporting the witness from South Carolina, he was "very excited . . . because he felt the woman talked in the car coming back about her involvement, that

he said, in his words, she described the inside of the apartment where the MacDonalds lived . . . to a T[,] even to the fact of a child's hobby horse that was broken." Htr. 223.

Mary testified that she was anxious for Jimmy to return home the next day because she wanted to know what happened during the trial. Htr. 225. Jimmy told her that "they can't use her testimony because her brain is fried from the use of drugs." *Id.* Jimmy also told Mary that during the trial, he arrived at the hotel where Stoeckley was staying and found that she had been "beaten . . . to a pulp" by her boyfriend," and that he was upset with Stoeckley's boyfriend for doing so. Htr. 245-46. Jimmy also expressed his displeasure with the fact that some jurors brought in cakes for Judge Dupree. Htr. 247. Although Jimmy told Mary that Stoeckley had been interviewed, he never told her that Blackburn threatened Stoeckley. Htr. 248. Later, after MacDonald was found guilty, Jimmy told her that he refused to take MacDonald into custody. Htr. 226.

Mary and Jimmy eventually separated and divorced. During their separation, Mary saw the mini-series *Fatal Vision*, and later asked Jimmy if he had seen it. According to Mary, Jimmy answered through gritted teeth: "It's not accurate. They had me standing in the hall. I was in that room. I heard every word that was said." Htr. 227. He still did not, however, mention any threat from Blackburn.

### 3. Gene Stoeckley

Gene Stoeckley, the youngest brother of Helena Stoeckley, was called as MacDonald's third witness. Gene testified that he was approximately ten or eleven years old at the time of the MacDonald family murders, and that his sister's ties to the case had an impact on both him and his family. Htr 268-70. He was harassed at school, and his family received threatening phone calls. Gene testified that he held his sister accountable for much of the harassment he encountered, and eventually when he was in high school he confronted her about it when she had returned to the house for a visit. Htr. 270-71.

86

Gene said that her response was to tell him "to be careful because she had certain friends" and that "she also had an ice pick." Htr. 271.

Gene stated that his family did not talk about the MacDonald case, although he knew that his parents were in Raleigh for the trial. Htr. 272-73.

He testified that his sister Helena died in January 1983, and that he did not have much contact with her between the time of the trial in 1979 until her death. Htr. 274. He did, however, recall seeing his sister in the fall of 1982 when both he and Helena came to their parents' house for a visit at the same time. Htr. 274-75. She had brought her infant son with her. Helena passed away a few months later, but at the time of her visit she did not appear to be sickly to Gene, although she was jaundiced. Htr. 275-76.

Gene's father passed away in 2002. His mother, the elder Helena Stoeckley, eventually moved to an assisted living facility in Fayetteville, North Carolina, due to health problems. Htr. 279. Gene, who lived in Fuquay-Varina, North Carolina, oversaw her financial and medical needs and saw her about once a week. Htr. 280. Near the end of the summer of 2006, she became seriously ill and was admitted to the hospital, at which time Gene was told that she wasn't going to survive. Htr. 281. However, she recovered, and moved back into the assisted living facility. *Id.*

Gene began having intimate discussions with his mother about their family, and specifically questioned his mother about his sister's involvement in the MacDonald case. Htr. 283. Gene testified that his mother said that "Helena was there that night" and that "Helena had confided in her during that visit in Fayetteville when she had brought David to see her." *Id.* His mother said she thought Helena confided in her during that visit because she knew she was dying, and that MacDonald was not guilty of the crimes. Htr. 284.

87

Gene stated that his mother's comments

> weighed heavily on my mind. I didn't really know what to do with the knowledge. It was something I considered carefully. The last thing I wanted to do was draw attention to the remaining family members, but, by the same token, I felt somehow morally obligated to tell somebody.
>
> So, I discussed it in more detail with my mother, asked her if she cared to divulge this information to somebody outside the family. . . .
>
> She said that if there was someone who would listen and that where she thought it might do some good, she would be willing to do so.

Htr. 284-85.

After thinking about it for several weeks, Gene eventually went on the internet, found a website maintained by MacDonald's wife, Kathryn, and contacted her. Htr. 286. Kathryn immediately came down to North Carolina, and met with Gene at a restaurant in Fuquay-Varina on March 31, 2007. Htr. 287, 307. Gene set forth ground rules for talking with his mother, which included that if at any time his mother did not want to go forward, he would stop it. Htr. 287-88.

Kathryn and Gene then traveled to the facility in Fayetteville, arriving around 3:00 or 4:00 p.m. Htr. 320. His mother appeared to be having a physically good day, and agreed to meet with Kathryn. Gene also testified that his mother's mental state was "always sharp" and he had no problem communicating with her on the day Kathryn MacDonald came. Htr. 289-90. His mother told Kathryn that his sister had been in the MacDonald house on the night of the murders, and Kathryn then asked if MacDonald's then-attorney, Hart Miles, could be involved. Kathryn called Miles, and he and his paralegal, Laura Redd, came to the facility, arriving "well into the early evening." Htr. 292-93; 322.

The elder Stoeckley again related that her daughter had said she present on the night of the murders, and also said that her daughter had been intimidated. The elder Stoeckley "said an FBI agent had contacted them directly and told them to find a way to keep Helena's mouth shut and to keep her

88

out of – her nose out of the business." Htr. 294. Redd and Kathryn MacDonald used a computer in a small office adjoining the nurse's station to compose the affidavit, and Gene then read the affidavit to his mother. Htr. 295. A few corrections, "mainly just the verbiage," were made. Htr. 296. The elder Stoeckley then signed the affidavit, after Gene read it to her word for word. Htr. 296-97; DX 5051. Gene testified that he was very much confident that his mother knew what was in the affidavit when she signed it. Htr. 344.

Gene then was contacted by the FBI, and Agent Cheroke met with Gene, his mother, and his wife on April 25, 2007, at the facility. Htr. 328. During the interview, the elder Stoeckley told Agent Cheroke that someone from the FBI called her and said to tell her daughter to stop calling the FBI. Htr. 335. She also indicated in the interview that she had struggled with the issue of MacDonald's guilt. Htr. 331.[35]

### 4.    Wendy Rouder

MacDonald also called as a witness Wendy Rouder, now a practicing attorney in California, who served on the defense team during the MacDonald trial. She testified to answering a phone call that came into the defense team office on a weekend morning during the trial. Htr. 346. The manager of The Journey's End motel had called asking that Stoeckley be removed from the motel. Htr. 346-47. Segal instructed her to go to the motel and find out what was going on. Htr. 346.

Rouder and Red Underhill arrived at The Journey's End and were escorted to Stoeckley's room, where they found her with a bleeding nose, yelling at Ernie Davis. Htr. 347. Davis left, and Stoeckley

---

[35]  It is unclear from the record what, exactly, the elder Stoeckley told Agent Cheroke during the April 25, 2007, interview. Although on cross-examination the Government asked Gene Stoeckley if he recalled his mother stating various things during the interview, he generally answered that he did not recall his mother making such statements. Htr. 329-36. No other evidence was presented as to the substance of Agent Cheroke's interview of the elder Stoeckley.

89

then asked Rouder to stay with her. Rouder spent the next several hours with her. Htr. 348. Rouder testified that every once in a while, Stoeckley would raise issues with her involvement with the MacDonald murders, saying that she thought she was there, she felt guilty, and that she wished she could purge her guilt. Htr. 348. Stoeckley also remembered there being a rocking horse. Htr. 349.

Stoeckley had been asked to leave The Journey's End, so Rouder made arrangements for her to stay at the Hilton. Stoeckley continued to make comments about her involvement, and Rouder asked her why she failed to testify on the stand as to what she was telling Rouder. Htr. 350. Rouder testified that Stoeckley answered, "I can't with those damn prosecutors sitting there." Htr. 350-51. Rouder also testified that she believed Stoeckley said that "they'll burn me, fry me, hang me" or other words to that effect. Htr. 351. Rouder admitted that she did not include that statement regarding "burn me" or "fry me" when she testified on *voir dire* during the MacDonald trial, but that she remembered those words when she was contacted by Kathryn MacDonald in 2005. Htr. 357. She also admitted that the trial transcript reflects the fact that she made notes of her conversation with Stoeckley. Htr. 388.

Rouder testified that Kathryn contacted her in August 2005, and told her that a United States Marshal had come forward with information about statements that Stoeckley had made to him, which were similar to the statements Stoeckley had made to Rouder in 1979. Kathryn also told Rouder about the marshal's allegation that Blackburn had threatened to indict Stoeckley for murder if she made admissions about her role in the MacDonald murders while testifying. Htr. 353-54. According to Rouder, this information "rang a bell" for her. "The bell that ran was, ah-ha, that's why she said she can't testify with those damn prosecutors sitting there." Htr. 354. After speaking with Kathryn, Rouder was sent an affidavit which she signed. Htr. 351; DX 5080. In addition to the details about what Stoeckley told her, Rouder also stated that while she was staying with Stoeckley, Judge Dupree called

90

the room, asked for Rouder specifically, and warned her not to ask her any questions. DX 5080 ¶ 13. Rouder stated: "For years afterward, I had wondered how Judge Dupree came to know that I had arrived on a weekend to see about Ms. Stoeckley's well-being, and why he was concerned about what she might be saying or being asked. Now, in August of 2005, hearing of Mr. Britt's statement, this bizarre occurrence made sense to me." *Id.*

### 5.     Laura Redd

Laura Redd, the paralegal for Hart Miles who notarized the elder Stoeckley's affidavit, testified next. She testified that on the afternoon of Saturday, March 31, 2007, she received a call from Miles asking her to ride with him to Fayetteville to take and notarize an affidavit from the elder Stoeckley. Htr. 401. When she arrived with Miles, and talked to the elder Stoeckley, she found her to be "very sharp." Htr. 402.

Someone originally composed the elder Stoeckley's affidavit on a laptop, but the laptop was not compatible with the printer at the assisted living facility. Htr. 403-04. Consequently, Redd and the others had to re-type the affidavit on the facility's computer to be able to print it. Htr. 404. Redd testified that they "had a really hard time and it took a long time." *Id.* Redd testified that from the time she received the phone call from Miles until the time the affidavit was signed and notarized was about six or seven hours. Htr. 416.

### 6.     Sara McMann

MacDonald's next witness was Sara McMann, who testified that she and her husband invited Stoeckley and her infant son to live with them from October 1982 until December 1982. Htr. 420-21. Shortly after meeting Stoeckley, McMann realized that she was Helena Stoeckley from the MacDonald case. Htr. 422. When McMann told Stoeckley that she knew who she was, Stoeckley told McMann that

three other men went to rough up MacDonald, and they asked her to go along. In exchange for going with them, Stoeckley was to become a wizard in an occult group. Htr. 423, 435-36. Stoeckley told McMann that the men murdered the MacDonald family members, and she ran out of the MacDonald home screaming. Htr. 423. McMann stated that both she and Stoeckley knew MacDonald was innocent and wanted him freed. Htr. 424. After Stoeckley died in January 1983, McMann and her husband became legal guardians of her infant son. Htr. 426.

### 7. Bench conference regarding Jerry Leonard

At the conclusion of McMann's testimony, MacDonald called Jerry Leonard, the attorney appointed to represent Stoeckley during the trial. A bench conference was then held, at which MacDonald's counsel informed the court that he anticipated that Leonard would assert the attorney-client privilege. Leonard's counsel was present at the conference. The court recessed the hearing for the evening to review the relevant caselaw. Htr. 443-62. At the start of the hearing the next day, the court ruled that based on *Swidler & Berlin v. United States*, 524 U.S. 399 (1998), the attorney-client privilege survived Stoeckley's death. MacDonald then rested, and the Government commenced its presentation of evidence.

### 8. Frank Mills

The Government's first witness was Frank Mills, a retired Special Agent for the FBI. At the time of the MacDonald trial in 1979, he was assigned to the Greenville, South Carolina office. Htr. 470. On August 13, 1979, he received a phone call from the U.S. Attorney's Office in Raleigh, followed by a teletype from the FBI, informing him of the bench warrant issued for Helena Stoeckley. Htr. 471; GX 2001. On August 14, 1979, Mills and Special Agent Tom Donohue located Stoeckley at a trailer near Walhalla, South Carolina, and transported her to the Pickens County Jail. Htr. 474-76.

Mills testified that they did not take her to Greenville to be housed because, at the time, Greenville was not a federally approved facility for prisoners. Htr. 479-80.

Per the instructions he received in the FBI teletype, Mills interviewed Stoeckley on the way to Pickens. Htr. 480. Mills testified that Stoeckley told him that she had been a heavy drug user for a number of years, and she remembered the night of the murder because of newspaper articles the next day. Htr. 480. She also said she not only used drugs, but she also sold them, and some of her buyers were doctors in the Fayetteville area, but MacDonald was not one of them. Htr. 480. According to Mills, Stoeckley said on the night of the murders, as every other night, she was using drugs. Htr. 481. Shortly before midnight she met with Greg Mitchell, who gave her a hit of mescaline, and she did not remember anything after that until the following morning. Htr. 481. Stoeckley said that Prince Beasley had contacted her in the following days about the murders, and she told him that she just could not remember what happened that night. Htr. 481.

Mills and Donohue booked Stoeckley in the Pickens County Jail, where she was held overnight. Htr. 484-87; GX 2006, 2007, 2064. Mills relayed the news of Stoeckley's arrest via a return teletype, and a phone call to the U.S. Attorney's office on August 15, 1979. Mills testified that Stoeckley was picked up the next day by Vernoy Kennedy, a tall black man he knew to be a deputy U.S. Marshal. Htr. 488, GX 2066.

Shortly thereafter, Mills summarized his interview with Stoeckley in an Form 302. In addition to what he already testified to, his summary in the Form 302 noted that Stoeckley said that "she could never figure out how any band of hippies as alleged by Dr. MacDonald, could have walked through an Officers Barracks section of Fort Bragg, inasmuch as there are numerous Military Police Patrols patrolling the area regularly." GX 2002. He also noted that Stoeckley told him that at the time of the

93

murders, she and her friends were involved in witchcraft. GX 2002. Stoeckley told Mills that when

Beasley interrogated her shortly after the murders, she gave him "a number of different stories as to

where she was during the time of the murder," because "she felt that a lie would be more believable

than if she was to tell the truth which was that she simply was so high on drugs she had no recollection

of where she was or what she was doing." GX 2002. Mills further summarized:

> Stoeckley advised that she honestly does not know what she did that night and
> therefore, could not categorically state that she was not involved in the murder. She
> stated that she has had a recurring dream since the murder in which she is pictured as
> being dressed in black with a candle in her hand with the words appearing on a wall of
> whatever room she is in with the inscription, "Acid is Groovie, Kill the Pigs." She
> stated in this dream, she does not specifically see bodies or anyone being killed or
> anything of this nature. She stated that this dream could very well be based upon
> information that she has read in newspaper accounts of the murder.

GX 2002.

Mills also testified that he interviewed Stoeckley on September 10, 1981, along with Special

Agent Butch Madden. Htr. 496. Mills talked with Stoeckley about the interviews she had given to

Prince Beasley and Ted Gunderson. Htr. 496-97. Stoeckley told Mills she was unhappy with Beasley

and Gunderson because they were harassing her. Htr. 497-98.

Finally, Mills testified about the investigation into Stoeckley's death in 1983. Htr. 498. In 1983,

Mills contacted a detective in Seneca, South Carolina, who told him that Stoeckley had died in early

January 1983, and she had been in her apartment for several days before anyone found her. Htr. 499-

500. At the time her body was found, her infant son was found, alive, underneath his crib. Htr. 499.

Stoeckley's cause of death was pneumonia with cirrhosis of the liver as a contributing factor. Htr. 500.

### 9.    Vernoy Kennedy

Over MacDonald's objection, the Government next read into the record the sworn statement

of former Deputy U.S. Marshal Vernoy Kennedy, who died on June 11, 2007. In his sworn statement,

Kennedy said he transported Stoeckley from the Pickens County Jail to a meeting spot in Charlotte, North Carolina. GX 2010.9. Kennedy also identified his signature on Stoeckley's release form from the Pickens County Jail on August 15, 1979. *Id.* He stated that he, along with a female guard, transported Stoeckley to the intersection of Interstate 85 and Interstate 77 in Charlotte, North Carolina, where he met a deputy U.S. Marshal from the Eastern District of North Carolina and made the prisoner transfer. GX 2010.9-.10, .12. Kennedy also stated that he did not interview Stoeckley. GX 2010.13-.14.

### 10. Dennis Meehan

The Government's next witness was Dennis Meehan, a former Deputy U.S. Marshal. Meehan testified that on August 15, 1979, he was tasked by Chief Deputy Eddie Sigmon to travel to Charlotte, North Carolina, to pick up Stoeckley and transport her to Raleigh. Htr. 518-20. Because he was transporting a female inmate, he had to take a guard matron with him. Htr. 520. His office did not employ any female deputies, so Meehan's wife, Janice, was hired as a guard matron for the transport. Htr. 520.

Meehan drove to the pre-arranged meeting spot near the intersection of Interstate 85 and Interstate 77. Htr. 519, 521. Meehan testified that he could not remember the name of the deputy marshal from whom he received Stoeckley, but he did remember that he was tall black man. Htr. 522. Meehan than drove Stoeckley directly to the Wake County Jail via Salisbury Street and drove into the underground parking area, arriving around 4:30 to 5:00 p.m. Htr. 523-25. The news media were present, and Meehan recalled seeing footage of himself and his wife booking Stoeckley on the local news. Htr. 525. Meehan also recalled that the next morning, August 16, 1979, Jimmy Britt and Geraldine Holden transported Stoeckley from the Wake County Jail to the Federal Building, a trip of about six blocks. Htr. 526-27. Meehan opined that a picture of Stoeckley, Ernest Davis, and Jimmy

95

Britt published in the *News & Observer* on August 17, 1979, depicted them exiting the Federal Building on August 16, 1979, because he highly doubted that Stoeckley was at the Federal Building on August 15. Htr. 528-31, GX 2074. Meehan also testified that he never sat in an interview of a witness by an Assistant United States Attorney. Htr. 532.

### 11. Janice Meehan

Janice Meehan, Dennis Meehan's former wife, was the next witness called by the Government. She testified that she rode with her husband to pick up Stoeckley and that they picked her up from another deputy U.S. Marshal in a parking lot that was located approximately two to three hours from Raleigh. Htr. 538. She remembered a black male and a white male being with Stoeckley when they met her. Htr. 541. She said that on the way to Raleigh, Stoeckley mumbled, but Janice couldn't really hear her. Htr. 539. Janice also remembered media being present when Stoeckley was booked in jail, and seeing footage of herself later that evening. Htr. 539-40.

### 12. Eddie Sigmon

Eddie Sigmon, former Chief Deputy United States Marshal for the Eastern District of North Carolina, next testified for the Government. Htr. 543. Sigmon served as Chief Deputy during the MacDonald trial, and was responsible for handing out assignments to the deputy marshals. Htr. 546. He explained that at the time of the MacDonald trial, there was a policy that a female matron must be present when a marshal was transporting a female prisoner. Htr. 547. His office did not employ any female deputies at the time, so if possible, he would choose a deputy who had a wife available to transport a female prisoner. Htr. 547-48. He testified that, when transporting a female prisoner, if he had to choose between sending a deputy and a female clerical employee, or a deputy and his wife, he would choose the deputy who had a wife because he needed his clerical staff in the office to perform

96

their duties. Htr. 548. Sigmon also testified that if one of his deputies overheard a confession of someone in connection with a murder trial, he would hope that the deputy would tell him about it. Htr. 549. No such confession of Stoeckley was reported to him. Htr. 549. Sigmon also characterized Jimmy Britt as "an attention seeker." Htr. 550.

Sigmon also testified that once a material witness is released from custody and becomes a witness under subpoena, the United States Marshal no longer handled transportation of the witness. Htr. 557. He also testified that he did not call Jimmy Britt on August 19, 1979, and instruct him to get Stoeckley from The Journey's End Motel, noting he would not have authority to do so. Htr. 557. He also offered his opinion that former United States Marshal Salter did not instruct Jimmy Britt to deliver a subsistence check and purchase a bus ticket for Stoeckley, because it would be outside Marshal Service regulations. Htr. 558-59.

### 13. William Berryhill

William "Bill" Berryhill, former United States Marshal for the Eastern District, testified that he supervised Jimmy Britt during his tenure. Htr. 563-64. When asked to describe Britt as an employee, he said: "I would say he was a very marginal employee. I found Jimmy Britt to be rather large in ego and rather small when it came to veracity." Htr. 564.

### 14. Maddie Reddick

The Government's next witness was Maddie Reddick, who worked for the United States Marshal Service for 30 years as Supervisor Administrative Assistant of Office Work. Htr. 571-72. In that capacity, she was the disbursing officer for the Marshal Service, and was tasked with writing checks for the salaries for federal employees, as well as checks for jurors and witnesses. Htr. 572.

97

Reddick testified that she did not remember writing a subsistence check for Stoeckley, and she said for her to have done so would have been highly unusual because she would need a discharge form from the U.S. Attorney's office first. Htr. 573. She also testified that material witnesses who were housed in jail did not get pay, because the fee would have been disbursed to the jail providing housing and food. Htr. 574. Reddick said that she would not have been tasked with issuing checks to a defense witness, unless the defendant was indigent. Htr. 575, 578.

Reddick also testified that sometime around 2004, she received a phone call from Jimmy Britt, asking if Reddick knew where Gerry Holder was living. Htr. 577. Reddick told Britt what she knew, and testified she was surprised to have heard from Britt. Htr. 577.

### 15. J. Rich Leonard

J. Rich Leonard, who at the time of the hearing was a United States Bankruptcy Judge for the Eastern District of North Carolina, was called next by the Government. He testified that he served as a law clerk for Judge Dupree from 1976 to 1978. Htr. 586. During the second year of his clerkship, his co-clerk was John Edwards. Both of their clerkships ended at the same time. *Id.*

Leonard had taken the position as Clerk of Court just prior to the MacDonald trial. Htr. 587. Judge Dupree's law clerks during the trial were Steve Coggins, William Pappas, and Jeffrey Howard. Htr. 587. Leonard testified that during a recess during the MacDonald trial, the courtroom would have been locked to maintain chain of custody on the large number of exhibits in the trial. Htr. 589.

### 16. James Blackburn

James Blackburn, one of the prosecuting attorneys during the MacDonald trial, testified next. Blackburn stated that the prosecution began their interview of Stoeckley around 2:00 p.m. on August 16, 1979. Htr. 604, 605. The interview took place in the office of George Anderson, then the United

States Attorney for the Eastern District of North Carolina. Htr. 607. According to Blackburn, he, Anderson, Assistant United States Attorney Jack Crawley, and Assistant United States Attorney Brian Murtagh were the only people present for the interview with Stoeckley. Htr. 607-08. Blackburn testified that he asked Helena "words to the effect, Helena, are you involved in this case? Were you there? Did you participate in these murders?" and she said to him "very clearly, 'no I did not. I was not there.'" Htr. 610. She also asked Blackburn if the Government had evidence that she was there, and he responded that they did not, other than statements she had made over the years. Htr. 610. Blackburn maintains that he did not threaten to prosecute Stoeckley for the murders of the MacDonald family members. Htr. 611.

There was no other court session in the case for the remainder of the day on August 16, 1979. Htr. 611. After the conclusion of the Government's interview with Stoeckley, which lasted about an hour, Blackburn ran into Wade Smith in the Federal Building. Htr. 611-12. He does not recall Smith telling him anything about the defense interview, but he does remember telling Smith that Stoeckley had told the Government that she was not present in the MacDonald apartment and she did not participate in the murders. Htr. 612. He also testified that Jimmy Britt was not present during the interview with Stoeckley, and that Britt never approached him with any concerns about the trial. Htr. 640-41.

Blackburn also testified that he had no idea of what Stoeckley was going to testify to when called by the defense, and he noted that the trial transcript reflects that when court began on August 17, 1979, he brought up the issue of whether an attorney should be appointed to represent Stoeckley. Htr. 613-14. The defense wanted to proceed without one. Htr. 614. He also testified that he first learned

99

during court on August 17 of Stoeckley's various weekend activities, including her contacting Judge Dupree. Htr. 626-28.

Blackburn also was questioned about his actions which led to his 1993 disbarment and convictions for embezzlement, obstruction of justice, and forgery, among other crimes. Htr. 634-38; 653-81. In summary, approximately twelve years after the MacDonald trial, while he was in private practice, Blackburn made numerous misrepresentations to clients, including that he had filed actions on their behalf and/or was continuing to prosecute civil actions on their behalf. In the course of doing so, he forged judges' signatures to purported orders from the court to show the clients. He also misappropriated funds from his law firm's trust account to make payments to various clients, and forged one of his client's signatures to a promissory note. *Id.*, DX 5014A, 5014B, 5014C. Blackburn also testified about a promissory note he executed in 2001, promising to repay $50,000 advanced to him if he did not complete a book on the MacDonald trial. Htr. 688-89. Blackburn never completed the book, and has not repaid the money. Htr. 689-90.

Wade Smith was one of the attorneys who represented Blackburn in his state court criminal proceedings. In 2005, Smith contacted Blackburn, letting him know about some of the general updates in the MacDonald case. Blackburn agreed to execute a waiver of any conflict of interest, but made clear that he was not agreeing with the suggestion he ever said anything improper to Stoeckley. Htr. 643-47; GX 2013. The day after Blackburn signed the waiver, he was invited to Smith's office to review the Britt affidavit and some supporting documents. Htr. 645. When Blackburn read the affidavit, he had what he characterized as a heated discussion with Smith regarding what he viewed as the falsity of Britt's statements. Htr. 645. Blackburn also accused Smith of standing by while his co-counsel Segal made misrepresentations about Stoeckley's statements at trial. Htr. 646. A few hours later, Smith called

100

Blackburn to say that he was withdrawing from representing MacDonald. Blackburn later consented to one of Smith's law partners, Hill Allen, representing MacDonald. Htr. 646-47.

### 17. Jack Crawley

Jack Crawley, who served as an Assistant United States Attorney during the MacDonald trial, also testified for the Government. His role during the trial was to serve as an advisor on trial procedure and evidence, because of his previous trial experience. Htr. 714. Crawley testified that he was present for the interview with Stoeckley, along with Brian Murtagh, Jim Blackburn, and George Anderson. Htr. 721. He does not remember anyone else being present during the interview, and specifically he did not recall any deputy marshal, including Jimmy Britt, being there. Htr. 721. Accordingly to Crawley, Stoeckley told the prosecution team that she was not involved with or present at the MacDonald murders. Htr. 722. He also noted that if she had so confessed, he along with the other members of the prosecution team would have had a duty to disclose that information under *Brady v. Maryland*, 373 U.S. 83 (1963).

Crawley also testified to the fact that when he was in private practice in the mid-1990s, he had a grievance filed against him with the state bar, resulting in the bar filing a complaint against him charging that he failed to act with reasonable diligence with regard to two cases. A disciplinary hearing panel found that he had in fact failed to act with reasonable diligence, in violation of the rules of professional responsibility. Htr. 730. His license to practice law was suspended, and eventually he was found to be disabled to practice law, and was transferred to disability inactive status in 1997. Htr. 731.

### 18. Bill Ivory

The next Government witness was William "Bill" Ivory, the original Army CID Investigator assigned to the case. Htr. 759. Ivory testified about the crime scene search and the collection of

evidence at the MacDonald residence. He identified a great number of photographs of the crime scene, and described the evidence collected and noted by investigators. *See generally* Htr. 766-804. Ivory noted that during the crime scene search, investigating agents focused extensively on the area around the couch in the MacDonald living room, looking for debris and signs of a struggle, because that is where MacDonald claimed he was attacked. Htr. 775-77. Ivory testified that nothing was found in the carpeting in that area, particularly none of the blue threads that were found in other rooms throughout the house, and he also noted that the lamp in the room was upright and the pictures were hanging straight on the wall. *Id.* Ivory explained that investigators were able to "date" when the fibers consistent with MacDonald's pajama top were shed in the house, because of MacDonald's own statements and the blood. Htr. 878. Ivory also testified that several of the crime scene photographs show a rocking horse in Kristen's bedroom, but none of the springs of the rocking horse appear to be broken in any picture. Htr. 797, 823-32.

Ivory also testified about the ongoing investigation after the crime scene search. He stated that when he interviewed Greg Mitchell on May 25, 1971, Mitchell denied any involvement with the MacDonald murders and said that he didn't think Stoeckley, his girlfriend at the time, was involved either. Htr. 804-09; GX 2199. Ivory also testified about the use of polygraphs in the investigation, and how he felt it was not only the results of a polygraph that were important, but also how those results were used in a post-polygraph interview to obtain admissions from a person. Htr. 810. With regard to Mitchell, Ivory testified that Robert Brisenstine conducted a polygraph examination of Mitchell, and he concluded that Mitchell was being truthful when he denied involvement in the MacDonald murders and denied knowing the identify of the perpetrator(s). Htr. 813-816, GX 2200. Ivory also testified that Brisenstine also conducted a polygraph examination of William Posey, one of the Stoeckley Witnesses,

and concluded that Posey was not truthful when he denied giving false information in the Article 32 proceeding, and when he made statements to CID investigators. Brisenstine also concluded that Posey was not truthful when he said he thought his residence was broken into following his testimony in the Article 32 hearing. Htr. 817-22; GX 2331. During Posey's post-polygraph interview, he admitted that he did not observe Stoeckley dismount from an automobile on the morning of February 17, 1970, and only observed her walking from an automobile to her residence. GX 2331. Furthermore, he was not positive that the morning he observed Stoeckley walking to her residence was the same date of the murders. *Id.*

With regard to the crime scene, Ivory testified that at least six people were inside the MacDonald residence by the time he arrived on the scene. Htr. 834. He also stated that candle wax was found on the coffee table, the bedspread in Kimberley's bedroom, and the arms of a chair in Kimberley's room. Htr. 838-39. The candle wax found in those locations did not match any other candle found in the house, and all three differed from each other. Htr. 847-50. He noted, however, that the candle wax found throughout the house had been set for quite a while, and had household debris in it. Htr. 874. In Ivory's opinion, "it was not like the candles were just burnt that night." *Id.* Ivory also stated that when the *Esquire* magazine was examined, it showed the fingerprints from at least two investigators, as well as an unidentified finger print. Htr. 856-58. Ivory also recognized that the processing of the crime scene yielded 17 unidentified fingerprints and 14 unidentified palm prints. Htr. 860. None of the unidentified prints matched Mitchell's prints. Htr. 878.

### 19.  Butch Madden

After Ivory, the Government called former FBI Special Agent Raymond "Butch" Madden to testify. Madden explained that he was tasked with investigating information given to the FBI by the

103

MacDonald defense team during post-conviction proceedings. Htr. 881. This mainly involved investigating the various statements of Helena Stoeckley naming individuals who may have participated in the MacDonald murders – Greg Mitchell, Dwight Edwin Smith, Shelby Don Harris, Bruce Johnny Fowler, and Allen Mazerolle. Htr. 882-83.

Madden testified that he also interviewed both Helena Stoeckley and her mother, the elder Helena Stoeckley, as well as defense investigators Ted Gunderson and Prince Beasley. Htr. 883, 917. The interviews with Helena Stoeckley occurred over a two-day period in September of 1981. Htr. 884. During the first interview, Stoeckley told Madden, along with SA Frank Mills, that Beasley had arrested her fiancé Ernest Davis in South Carolina and taken him to Fayetteville, and that he had promised to help out Davis if Stoeckley would go with him to Ted Gunderson's office in Los Angeles and give a statement. Htr. 887-88. He also promised her that they would relocate Stoeckley and Davis to California and help them find employment, financing, and new identities. Htr. 888. Madden testified that Stoeckley told him she was interviewed in California for a period of three to four days from the early morning into the late evening for sometimes twelve to fifteen hours a day, and that the questioning seemed non-stop. Htr. 889. Madden opined, as an experienced FBI agent, that this type of interrogation would be considered unethical and possibly illegal. *Id.* At the conclusion of this first interview with Madden, Stoeckley signed a statement in which she said that the statements she previously signed for Gunderson and Beasley were "basically accurate." Htr. 892. She went on to clarify: "However, the statements and the facts of the statements are what I think happened or dreamed and are not a positive recollection of events of February 16th-17th, 1970." *Id.* She also said, "The fact remains and the truth of the matter is that I do not actually know where I was during the early morning

hours of February 17th, 1970, and I do not know if I was present or participated in the MacDonald murders." *Id.*

The next day, Stoeckley gave Madden a second interview, stating she wanted to make corrections to her first statement. Htr. 911. In her second statement, she told Madden that Beasley brought Fred Bost to see her in South Carolina in January 1981. Bost was writing a book about the MacDonald murders, and Beasley asked that Stoeckley submit to an interview by Bost. Stoeckley told Madden that Beasley told her she should deal specifically through Beasley, and not through Gunderson or Bost. Beasley also told Stoeckley not to talk to the FBI, the Department of Justice, or anyone else involved with the MacDonald case. Htr. 910. Madden also testified that Stoeckley told him that she and Beasley were each supposed to receive 20% of the profits from Bost's book, with the remainder of the profits being split between Bost and the publisher. Htr. 910-11. She also told Madden that she remembered seeing MacDonald at some point prior to the trial, and that she was unsure what she did the evening of the MacDonald murders or the next morning. Htr. 912. Stoeckley reported feeling used by both Gunderson and Beasley, and stated that Gunderson coerced a confession out of her. Htr. 912-13. Stoeckley gave Madden a copy of a letter she wrote to Gunderson telling him she felt he had used her as a pawn. Htr. 913-15.

Madden also conducted an interview, audio-recorded and later transcribed, of Ted Gunderson and Prince Beasley regarding the statement they took from Helena Stoeckley. HTr. 917. Madden testified that Gunderson admitted to spending a day and a half with Stoeckley before she would agree to give him a written statement, and that she started talking at around 9 p.m. to 10 p.m., and he decided to continue with her until he was finished with the statement at 2:00 or 3:00 a.m. Htr. 920. When he reviewed the statement the next day, it was disorganized and disjointed. Accordingly, he reorganized

and retyped the statement and Stoeckley then signed the 53-page statement. Htr.921-22. Gunderson told Madden that he had contacted several individuals about a book or movie deal regarding the MacDonald murders, although he said that was not his primary goal. Htr. 935-36. Madden testified that he also talked to Beasley about the book deal with Fred Bost that Helena had told him about, and Beasley confirmed the percentage split that Helena had quoted. Htr. 937. The interview Madden conducted with Beasley and Gunderson was seventy-eight transcribed pages, but at no time during that interview did either of them mention that Helena had reported any threat to her by Jim Blackburn. Htr. 940.

Gunderson had given Madden the names of individuals Helena had implicated in the MacDonald murders (Bruce Fowler, Greg Mitchell, Don Harris and Allen Mazerolle) but told him that he had not run down those leads because he had not been paid to do so. Htr. 926. Madden testified that he then conducted an independent investigation into the possibility of these individuals being involved and was able to learn that during the MacDonald murders Allen Mazerolle was in jail. Htr. 926-29. With regards to Dwight Edwin Smith, Madden was able to interview him and he denied any involvement in the murders and stated that he did not know the other named individuals. Htr. 929-31. Madden testified that Shelby Don Harris was interviewed and said that he knew Helena Stoeckley, but that he had nothing to do with the murders and volunteered to take a polygraph examination. Htr. 932-34.

Madden also had occasion to interview the elder Helena Stoeckley on July 19, 1984, after the death of her daughter, Helena. Htr. 940, 942-43; GX 2332, 2333, 2334. He testified that the elder Stoeckley told him that the younger Helena told her and her husband that she did not know anything about the murders. Htr. 943-44; GX 2332. Mrs. Stoeckley believed that Helena could not have been present during the murders because she was nonviolent and loved children. She also believed her

106

daughter was not treated fairly by Gunderson and Beasley. *Id.* The elder Stoeckley told Madden that Helena's mind was "gone," especially when she was under the influence of drugs, and that when doing drugs she thought about the case. She reiterated, however, that she did not believe her daughter was involved. Htr. 945; GX 2332. Mrs. Stoeckley said that she saved all the newspaper clippings regarding the trial and allowed Helena to read them. *Id.* She also believed that Helena enjoyed all the attention from the MacDonald case and that when she asked her why she gave a statement to defense investigators, Helena told Mrs. Stoeckley that she thought she was at the murder scene. Htr. 945-46; GX 2332. Madden testified that, at the time of the interview, Mrs. Stoeckley was in good health, living at home, and appeared to have all her faculties. Htr. 946. At no time during their conversation did Mrs. Stoeckley ever mention a threat to Helena by Jim Blackburn. Htr. 947.

### 20. Joe McGinniss

The last witness for the Government was Joe McGinniss, author of *Fatal Vision*, a 1984 "true crime" book about the MacDonald trial. McGinniss testified that he was approached by MacDonald to come to the trial and write about it, in exchange for MacDonald receiving a percentage of the royalties. Htr. 954-55. He was given "unfettered access to any incidents, characters, dialogues, action scenes and situations that [he] desired in connection with the publication of the book." Htr. 955-56. He lived with a  majority of the trial team in a fraternity house in Raleigh during the trial. Htr. 956.

McGinniss testified that he was present for interviews of some witnesses and potential witnesses, including Helena Stoeckley's parents. Htr. 956, 961. According to McGinniss's book, which he testified was accurate, during this interview Stoeckley's parents said that they did not know where their daughter was, but when they had last seen her in early June 1979, she had said she had planned to move to Walhalla, South Carolina, to live with a man she met at a rehabilitation center. Htr. 962,

107

GX 2201.2. The elder Helena Stoeckley also told defense attorneys that even if they could find her daughter, she didn't think it would be likely that she could contribute anything of value to the trial. Htr. 963; GX 2201.3. Specifically, the elder Stoeckley said of her daughter:

> "She called up, must have been a year and a half ago, four o'clock in the morning, all befuddled. She said somebody was chasing her and had taken her car keys. Then it turned out she'd had a stroke. We got her home, she was like a vegetable. She couldn't talk, couldn't eat, her face quivered, saliva would run out of her mouth. We put her on a strict diet and let her rest and after about three weeks she was improved, but still she was not quite right."
> . . .
> "She's had her gall bladder removed . . . she's had three liver biopsies, and she's been spitting up blood and passing blood in her stools for years. She's not at all like she used to be. She's a physical and mental wreck. She's not even a human being anymore. You find her now, sure she'll talk. She'll always talk. But I'm telling you, she's gonna talk all kinds of nonsense."

Htr. 963-64; GX 2201.3. The elder Stoeckley also described her daughter's reaction to the MacDonald murders, including her daughter's comment that "not a hippie around here" would do that. Htr. 964; GX 2201.3. The elder Stoeckley also blamed Prince Beasley for putting the idea that she was involved in the murders into her daughter's head:

> "Beasley was her Daddy image. He had a terrific amount of influence over her. She told me he had been up to talk to her right after it had happened and then she said, 'Yeah, I've been thinking, and I don't really know where I was that night. I might have been there.' And I knew right then that Daddy Beasley had talked her into it."

Htr. 964; GX 2201.3

McGinniss testified that he was present for the defense interview of Stoeckley. Htr. 965. According to McGinniss, Stoeckley maintained, even in the face of each "Stoeckley witness" being brought in the room to confront her, that she had no memory of being present during the murders. Htr. 969-77, GX 2201.3-.4. He also stated that Stoeckley's testimony on the stand the following day was consistent with what she said during her interview with the defense. Htr. 982.

108

McGinniss reviewed the transcript from the bench conference during Stoeckley's testimony where Bernie Segal told Judge Dupree about the things that Stoeckley allegedly said during the defense interview. Htr. 982-87. McGinniss said he "absolutely" did not hear Stoeckley make any statements that Segal represented she made. Htr. 987. He also indicated that Segal had provided him with a copy of the trial transcript, including the allegedly full volume of bench conferences, but this particular bench conference was omitted from the materials. Htr. 989-90. McGinniss also testified that he talked to Wade Smith after the trial, and that Smith said he had been between a rock and a hard place because he could not undermine his co-counsel, but he also could not participate in a fabrication. Htr. 990.

Following MacDonald's conviction, McGinniss continued to work on the book, and MacDonald invited him to stay in his condominium in southern California, near where MacDonald was imprisoned, and gave McGinniss permission to go through all of his files in the condo. Htr. 993-94. In the materials in the condo, McGinniss found the handwritten notes that MacDonald had made for his military lawyer during the Article 32 hearing in 1970. Htr. 995, GX 4000. In these notes, MacDonald wrote that on the evening of the murders he had possibly taken one diet pill when he had dinner with his family. Htr. 998; GX 4000. He indicated in his notes that in the three to four weeks preceding the murders, he had lost 12-15 pounds using 3-5 capsules of Eskratole Spansule, which consisted of 15 milligrams of dextroamphetamine and 7.5 milligrams of prochchlorperazine. Htr. 998, GX 4000. The notes did not specify over what time period MacDonald had taken 3-5 capsules; in other words, there is no indication whether he had taken 3-5 per day, or over the course of the entire preceding 3 to 4 weeks, or some other time period. GX 4000; Htr. 1008. McGinniss also wrote in *Fatal Vision* that MacDonald stated the following in his hand-written notes:

> The CID knows nothing about the possible diet pill . . . . If I did take the pill, it is conceivable that my urine and blood 11:30 A.M. Tues. would still have some residue.

109

We would have to research the breakdown and excretion of what was in the pill. We would also have to find out if the excretion products are definitely different than normal breakdown products of adrenaline from the body, which would be increased in the excitement of the attack, etc. Right now, I don't know if it is definitely possible to identify Dextramphetamine from pills in the blood and the urine. I think I told the CID had the only pills I usually took were aspirin, occas. cold pills, and Tetracycline (antibiotic). . . . Dr. Henry Ashton, now living in Salt Lake City, Utah, was the group surgeon before I arrived in Sept. 1969. If he remembers, he can testify that the bottle of Eskatrol from my house (with only a few missing) was left in the desk I took over when he left. If necessary, we can then contact the Smith Kline & French representative near hear who can testify that I never received another large bottle of sample Eskatrol. He did give me some small sample bottles for use in the weight control program. Colette had some diet pills of her own (used before she was pregnant). I think I threw them all out because they made her nervous, but possibly there was an old container left in the medicine cabinet. . . .

GX 4002.2; Htr. 998-99.[36]

### 21.    Jerry Leonard

As already recounted, prior to the Government's presentation of its evidence, this court ruled that the attorney-client privilege survived Stoeckley's death, based on the Supreme Court's decision in *Swidler & Berlin v. United States*, 524 U.S. 399 (1998). Htr. 468. Subsequently, the Government asked the court to reconsider the matter of waiver of attorney-client privilege with regard to Leonard's testimony, in light of a footnote in *Swidler*. Htr. 706-07; 524 U.S. at 409 n.3 (recognizing that "exceptional circumstances implicating a criminal defendant's constitutional rights might warrant breaching the [attorney-client] privilege"). The court directed Leonard to prepare an affidavit and submit it for *in camera* review. Htr. 708-09.

---

[36]   GX 4000, the copy of MacDonald's notes, does not include this quoted language. The court assumes this was an oversight on the part of the Government, and this language was not fabricated by McGinniss. The court makes this assumption based on defense counsel's cross-examination of McGinniss, which focused, in part, on language McGinniss omitted from MacDonald's notes when quoting them in *Fatal Vision*. The court can only assume that defense counsel would have similarly questioned McGinniss about the above-quoted language if it was not accurate. *See* Htr. 1020-21.

After receiving and reviewing Leonard's affidavit [DE-302], the court informed the parties on September 20, 2012, that the privilege would be breached and Leonard could testify. Htr. 899. Accordingly, when the Government rested on September 24, 2012, MacDonald called Leonard to testify. Leonard's counsel made the request that the court conduct Leonard's examination *in camera*, which the court denied. Htr. 1106.

Leonard, an attorney in Raleigh, testified that he served as a law clerk to Judge Dupree after graduating from law school in 1971. Htr. 1106-07. He then went into private practice, about 30% of which involved criminal cases. Htr. 1107-08. Leonard testified that during the MacDonald trial, he received a phone call from Judge Dupree's law clerk asking if he would represent Stoeckley as a material witness in the case. Htr. 1108; 1118.[37] He agreed. Leonard testified that when he was appointed, "I had understood that she had been arrested as a material witness, that she had testified, that she was subject to recall, and I was being appointed and I needed to have her at court each and every day that court was in session." Htr. 1109. Although Leonard knew she had testified under oath, he cannot remember if he thought she had testified before the jury or on *voir dire*. Htr. 1147. As recently as the past 10 years, he thought she had testified to the judge under oath and outside the presence of the jury. Htr. 1157.

According to Leonard, he picked up Stoeckley, possibly at the Federal Building, late Sunday afternoon. Htr. 1109. He felt that he had to build trust with Stoeckley, and he also was worried about where she would stay and securing lodging for her. Htr. 1109. Leonard took her to his home where they

---

[37] Leonard stated in his affidavit that to the best of his recollection, he was appointed on Sunday, August 19, 1979. Aff. of Leonard [DE-302] ¶ 3. He admitted on cross-examination that when he was interviewed by the Government in preparation for the evidentiary hearing, he stated he thought he was first contacted by Judge Dupree's law clerk on Saturday night. Htr. 1140.

111

talked, and Stoeckley spent the night on his recliner. Htr. 1110. According to Leonard, the next day, he checked her into the Hilton before taking her to court. Htr. 1110.

At the courthouse, Leonard and Stoeckley had a room on the seventh floor to themselves. Htr. 1111. He explained to Stoeckley that his role as her attorney was to help her, and that anything she said was between him and her. Htr. 1111. They also talked about the statute of limitations, and Leonard told her he really didn't know the answer. Htr. 1112. He asked Stoeckley what her testimony would be if she was called to the stand again. Htr. 1112. Stoeckley told him she did not remember anything about the evening of the murders. Htr. 1113.

Leonard questioned how she knew she couldn't remember a particular night, and Stoeckley explained that everybody knew of the murders right after they happened. Htr. 1113. Stoeckley said she had spoken with investigators very soon after the murders, and that is how she knew she had no recollection of the night of the murders. Htr. 1113. Leonard testified that "that was it as far as I was concerned." Htr. 1113.

That afternoon, however, Stoeckley asked Leonard, "What would you do if I was there?" Htr. 1114. Leonard responded that he would still represent her, and that he needed to know the truth. Htr. 1114. Stoeckley then told Leonard she was there, and told him the story of what happened that evening. Htr. 1114. According to Stoeckley, she was there but did not participate in the actual murders. Htr. 1115. Stoeckley said she did not hurt anyone, nor did she anticipate that any of the MacDonalds would be hurt. She explained that at the time of the murders, she belonged to a cult, which had a core group of followers that engaged in rituals and believed in witches. Aff. of Leonard [DE-302] ¶ 13; Htr. 1191. Stoeckley told Leonard that the cult associated newborn babies with the devil. Htr. 1192. She also said that one of the members of the core group wanted to confront MacDonald about his discrimination

112

against heroin users in a drug treatment program, because heroin users were recommended for court marshal or discharge, while other drug users received more favorable treatment. Aff. of Leonard [DE-302] ¶ 14; Htr. 1191, 1198. This man talked the rest of the group into going. The end result, according to Stoeckley, was that things got out of hand and the people she was with committed the murders. Aff. of Leonard [DE-302] ¶ 14; Htr. 1191. Leonard told her that she could not take the stand again and testify, and that he would help her to assert her Fifth Amendment right against self-incrimination. Htr. 1114.

Leonard said that during the remainder of the week, Stoeckley would initiate conversations about the murders and offer additional random details. For example, she said that while she was in the MacDonald home, the phone rang, and she picked it up. One of the people she was with told her to put the phone down and hang up. Htr. 1115; 1194. She also, apparently out of context, spoke about a broken hobby horse in the MacDonald home, and remarked that the parents had not fixed it. Htr. 1189.

On cross-examination, Leonard was asked to read portions of the trial transcript detailing how Rouder and Underhill met Stoeckley at The Journey's End on Sunday, August 19, 1979, and secured her new lodging at the Hilton that day. Htr. 1167-77. He also reviewed the Government's notes of an FBI interview with him in 2006, where he told them that he paid for Stoeckley's first night at the Hilton out of his pocket, but was subsequently reimbursed by the court. Htr. 1164-65. He admitted that based on the information contained in the trial transcripts, it sounded like he would have had no need to secure lodging for Stoeckley on Sunday evening, but he nevertheless had the memory of having to do so. Htr. 1175-78. He also stated that while representing Stoeckley, he saw crime scene photographs, including one that showed the hobby horse. Htr. 1190.

113

Leonard was also questioned on cross-examination about statements he made to Errol Morris, who has authored a book about the MacDonald case. Specifically, he said that it was possible he told Morris that Judge Dupree would not let Stoeckley testify because of her past drug use. Htr. 1150, 1152. Leonard candidly stated, "I could have. You know, what happens is you find out stuff later and then you confuse that with what actually you knew at a particular time." Htr. 1152. Leonard was also questioned about his apparent statement to Morris that, at the time of his appointment, he did not know Stoeckley had testified at all:

> Q. All right. So, at the time that you were speaking to Errol Morris in 2012, you seem to be wondering whether you knew she had testified at all, whether you knew in 1979 that she had testified at all.
>
> A. I don't – I can't testify to you that I knew then that she had testified.
>
> Q. All right.
>
> A. My – and then you hear things and obviously I heard that she had testified and I was thinking surely she did not testify before the jury. And Judge Dupree's statements could have been – well, I'm making explanations, but just because it was said at a bench conference where there were as many lawyers as you have here or maybe as many, that I heard it. I mean, I could have been sitting over where the clerk sits, you know.
>
> Q. So, as I understand your testimony, you're saying that it's sometimes difficult to distinguish what you learned in 1979, and what you've learned since?
>
> A. Yeah, and that's the danger. And I haven't talked to – I've tried real hard not to talk to people about this. I've tried real hard not to – I mean, I'm talking about the trial in general, although I have obviously. And what happens is you hear stuff at a later date and it all becomes part of what you know and it's hard to peel away the context that you heard one thing from the other.

Htr. 1159-60.

Leonard does not remember talking to anyone, including Wade Smith, about the case. Htr. 1207. He did send a poem written by Stoeckley to Blackburn, although he apparently did not remember doing so. Htr. 1227-28. He also did not remember hearing anything about Stoeckley being threatened or intimidated by either the Government or the defense, and nor did he remember Jim Britt ever telling him that Stoeckley had been threatened by Blackburn. Htr. 1127. He also did not receive any

114

information that Britt had sat in on Stoeckley's interview with the Government. Htr. 1128. He explained that he did not feel a need to contact the State Bar to ascertain what his duty was with regard to reporting what Stoeckley told him:

> She told me two different things and so my – to me, it was my duty – I didn't see a duty to go and say, hey, this witness who I didn't represent is now saying such and such because she was – part of it seemed to be what she had testified to before Judge Dupree or the jury. And so – she had a history, as I understood, of telling people she was there and then apparently on the witness stand she didn't incriminate herself.

Htr. 1231.

The Government also introduced, as part of the evidence as a whole, a 1995 North Carolina Supreme Court opinion censuring Leonard for conduct prejudicial to the administration of justice that brings the judicial office into disrepute. GX 7010.

**M.    DNA or "Unsourced Hairs" evidence and arguments**

As the court already has detailed, the Fourth Circuit has directed this court to consider DNA test results evidence from AFDIL, both as part of the evidence as a whole in assessing the Britt claim, and in support of a freestanding claim itself. At the September 2012 evidentiary hearing, MacDonald did not call any fact or expert witnesses with regard to the DNA evidence, nor did the Government. The parties did, however, agree to certain stipulations with regard to the DNA evidence, which were filed as Exhibit 1 to the parties' Corrected Joint Pre-Hearing Order [DE-306]. In pertinent part, the parties stipulated to the following:

115

- AFDIL performed mtDNA and/or nuclear DNA (STR)[38] testing on 29 questioned hair and vial contents specimens;[39]
- AFDIL'S DNA test results, subject to certain qualifications;[40] and
- the photographic and digital images generated by Master Sergeant Grant D. Graham, Sr., in the identification process of the specimens.[41]

The parties also designated a large number of exhibits and affidavits pertinent to the DNA evidence in the Corrected Joint Pre-Hearing Order [DE-307]. The parties relied upon the Stipulations, the designated exhibits, and other evidence in the record in making their arguments regarding the unsourced hairs at the evidentiary hearing.

At the outset, the court observes that the record shows that the parties agree upon the following:

---

[38] "MtDNA" is shorthand for mitochondrial deoxribonucleic acid, and "STR" is short hand for short tandem repeats. "Generally speaking, every cell contains two types of DNA: nuclear DNA, which is found in the nucleus of the cell, and mitochondrial DNA, which is found on the outside of the nucleus in the mitochondrion." *United States v. Beverly*, 369 F.3d 516, 528 (6th Cir. 2004). "MtDNA . . . is inherited only from the mother and thus all maternal relatives will share the same mtDNA profile, unless a mutation has occurred." *Id.* at 529. With nuclear DNA, however, "half is inherited from the mother and half from the father, and each individual, with the exception of identical twins, almost certainly has a unique profile." *Id.* Accordingly, mtDNA has been said to be a test of exclusion, rather than one of identification, like nuclear DNA testing. *Id.* That being said, mtDNA "has some advantages over nuclear DNA analysis in certain situations." *Id.* Because there are a vast number of mitochondria in each cell, as opposed to just one nucleus, a significantly greater amount of mtDNA usually can be extracted by a lab technician as opposed to nuclear DNA; accordingly, mtDNA testing is "very useful for minute samples or ancient and degraded samples." *Id.* Additionally, mitochondrial DNA can be extracted from sources that do not have a nucleus, like bone samples or a hair without a root segment. *United States v. Coleman*, 202 F. Supp. 2d 962, 965 (E.D. Mo. 2002).

[39] The specimens were identified as follows: 46A, 48A, 51A(2), 58A(1), 58A(2), 71A(1), 71A(2), 71A(3), 75A, 91A, 93A, 97A(1), 98A, 101A(1), 101A(2), 104A(1), 104A(2), 112A(1), 112A(2), 112A(3), 112A(4), 112A(5), 112A(6), 112A(7), 112A(8), 112A(9), 112B(2), and 113A. *See* Stipulations [DE-306] ¶ 22.

[40] *See* Stipulations [DE-306] ¶ 29. Of note, one of the qualifications was that "[n]either party may rely on any statement in the AFDIL Report of March 10, 2006, filed by the Government . . . for any assertion with respect to the identity and provenance of any item examined, or tests performed or not performed by the Army CID or FBI laboratories prior to delivery of said item(s) to the AFID on May 17, 1999, except as reflected in Exhibit 1 to this Stipulation . . . ."

[41] *See* Stipulations [DE-306] ¶¶ 5, 9-11.

116

- A hair found on Kristen's bedspread (58A(1)), a hair from the rug within the body outline of Colette (75A), and another specimen designated as 91A, did not originate from a common source, from Helena Stoeckley, from Greg Mitchell, or from any member of the MacDonald family. These are referred to by the parties as "the unsourced hairs."[42]
- The hair found in Collete's left hand (51A(2)), an additional hair from Kristen's bedspread (58A(2)), and one of the hairs removed from the bedspread on the floor of the master bedroom (112A(3)) are consistent with each other and originated from Jeffrey MacDonald.[43]
- A forcibly removed hair adhering to the top sheet in the pile of bedding on the master bedroom floor (46A) is consistent with originating from Colette, and Kimberly and Kristen are excluded as sources of this hair.[44]
- The blond hair found in Colette's right hand (52A), and the hair found adhering to the bedspread on the master bedroom floor (112A(5)) have the same mtDNA sequence as Colette, Kimberly, and Kristen.[45]

The parties disagree, however, as to the import of these findings. More importantly, the parties disagree as to where one unsourced hair, specimen 91A, was collected.

### 1. Specimen 91A

The evidence referencing specimen 91A, and relied upon by the parties at the evidentiary hearing and in their briefing, is as follows.

#### a. MacDonald's contentions

MacDonald has noted that Dr. William Franklin Hancock, Jr., testified at trial that he conducted the autopsies on Kimberly and Kristen. Ttr. 2562. He participated directly in taking fingernail scrapings from both bodies, and gave those to CID agents who were in the autopsy suite at Womack Army Hospital. Ttr. 2601-02. One of the CID agents there was Bennie Hawkins, who testified at trial that he

---

[42] *See* Stipulations [DE-306] ¶¶ 28, 35, 36, 37.

[43] *See* Stipulations [DE-306] ¶ 26.

[44] *See* Stipulations [DE-306] ¶ 27.

[45] *See* Stipulations [DE-306] ¶ 25.

117

collected, among other things, fingernail scrapings of the victims at the morgue in Womack Army Hospital. Ttr 3042. On cross-examination, Hawkins testified that the pathologist had collected items from the bodies and placed them in plastic vials. Ttr 3049-50. He explained, "I took possession of vials containing what the doctor told me it contained at that point." Ttr 3050. He specifically stated that he received the collected items from Dr. Hancock. Ttr 3050. He marked each vial with the following notation, "BJH, 17 February '70." Ttr 3051.

MacDonald next referenced the July 27, 1970, bench notes of Janice Glisson [DE-217-3]. The first page of the notes state that she received 13 plastic vials containing fingernail scrapings, hair samples, fibers and vaginal smears taken from the victims at Womack Army Hospital. The notes state that the vials were marked on the bottom with the notation "17 Feb 70 BHJ." The notes show that Glisson labeled each vial, and listed their contents. With regard to Vial number 7, Glisson stated:

> fingernail scrapings, left hand smaller female MacDonald (not labeled by Browning)
>
> 1 hair? – 2 fragments

Bench Notes [DE-217-3] at 1. The notes also indicated that after microscopically examining the contents of the vials, Glisson wrote that Vial number 7 contained fibers and "one light brown narrow hair, no medulla . . . intact root . . . ." *Id.* at 2. MacDonald's counsel asserted at the hearing, and in the post-hearing briefing, that the hair from Vial number 7 becomes hair number seven, which was later marked 91A by AFDIL. Htr. 1256; MacDonald's Post-Hearing Reply [DE-351] at 31; *see also* Stipulations [DE-306] ¶ 37.[46]

---

[46] Paragraph 37 provides:
The hair removed from the unnumbered pill vial on July 27, 1970, by USACIL Chemist Janice Glisson, a vial which she marked "#7 JSG" and subsequently mounted on a glass microscope slide, which she numbered to correspond to the vial as "#7 fibers Hair," is the same hair on the same slide the FBI marked as Q137, and AFDIL subsequently marked and tested as AFDIL Specimen 91A.

118

MacDonald also highlighted the trial testimony of Dr. Hancock, who testified that some of Kristen's wounds could be "defined as defensive wounds or these could be wounds incurred in the process of other types of wounds happening." Ttr. 2577.

Based on the foregoing, MacDonald's counsel argued at the hearing that Specimen 91A constitutes positive circumstantial evidence of intruders. Specifically, he argued that the chain of custody establishes that Specimen 91A was a hair that came from fingernail scrapings of Kristen MacDonald, and tests show that it is an unsourced hair. When coupled with Kristen's defensive wounds, according to MacDonald, the hair is evidence that an intruder inflicted harm upon Kristen. Htr. 1258.

### b.      Government's contentions

The Government highlighted the following evidence with regard to Specimen 91A. First, the Government noted the testimony of Drs. Gammel and Hancock in 1970 in the Article 32 proceedings. Their testimony showed that Dr. Gammel collected the fingernail scrapings from all the victims prior to the autopsy of Kristen, and Dr. Hancock assisted in the process by putting slips of paper in the vials identifying the origin of the scrapings. GX 3053.9; GX 3055.16-.17.

Next, the Government referenced the trial testimony of Dr. Hancock. As previously noted, Dr. Hancock testified that some of Kristen's wounds could have been defined as defensive wounds. A larger portion of trial transcript puts Dr. Hancock's testimony in better context:

Q.      With respect to the hands of Kristen MacDonald, what, if any, did you observe there, sir?

A.      There was multiple minor lacerations – cuts basically – on both hands if I recall from reading my protocol and, in addition, there was a more significant wound. I think it was on the right hand–the right hand on either the ring or middle finger. There was a fairly large – it looked like a incised or cut wound – approximately an inch and a half or so on the side of the finger. But the hand

119

> also had some minor cuts on it in other places which basically did not cause any
> bleeding, but the large wound that I described was down basically to the bone.
>
> Q.     Do you have an opinion, sir, satisfactory to yourself, as to the type or
> classification of the wound that was on her finger?
>
> A.     I would say as a general reference these could be defined as defensive wounds
> . . . .

Ttr. 2576-77; *see also* Ttr. 2587 (identifying GXP 778 as showing Kristen's hand); GX 5035.22

(testifying at the Article 32 hearing that he did not have a photo of the left hand). The Government also

noted that CID Agent Bennie Hawkins did not testify that he was present during the autopsies of the

victims.

     The Government next noted GX 6001, which was a copy of a military property receipt. This

shows that Bennie Hawkins relinquished custody of the autopsy items on February 21, 1970, to chemist

Craig S. Chamberlain for transportation to USACIL for analysis. GX 6001; *see also* Supp. Aff. of

Chamberlain [DE-213] ¶ 11. This same receipt also shows an entry for a "[p]lastic container containing

hair samples of 3 year old victim, Christine McDonald, marked BJH, 17 Feb 70." GX 6001; Supp. Aff

of Chamberlain [DE-213] ¶ 12, Ex. 1. Chamberlain has stated in an affidavit that at USACIL at Fort

Gordon, Georgia, he was responsible for distributing the various items for testing. Supp. Aff of

Chamberlain [DE-213] ¶ 13. For purposes of note taking and report listing, suspected blood stains were

given the prefix "D" followed by a number. *Id.* ¶ 15. Hairs and fibers that were not being subject to

serological testing were given the prefix "E" followed by a number. *Id.* ¶ 16.

     On February 26, 1970, Chamberlain made an inventory of the items in his custody that he was

going to distribute to other chemists at USACIL. Supp. Aff. of Chamberlain [DE-213] ¶ 17; GX 6002.

In that inventory, he included the following: "D-237: Vial c/ fingernail scrapings marked 'L. Hand

Chris.'" GX 6002. In his supplemental affidavit, Chamberlain explained:

> The use of quotation marks, and the word "marked" indicates that something bore the
> writing "L. Hand Chris", which contained the fingernail scrapings of Christine (sic)

MacDonald. That exhibit D-237 was not described as a vial marked *fingernail scrapings L. Hand Chris*, but rather the exhibit was described as a Vial c/ fingernail scrapings marked "L. Hand Chris" indicates that the words "L. Hand Chris" were written on some surface (possibly a piece of paper) that was associated with the plastic pill vial.

Supp. Aff. of Chamberlain [DE-213] ¶ 19. Chamberlain further averred that his notes indicate that Glisson conducted any possible blood testing on D-237. *Id.* ¶ 22. He stated he has no personal knowledge of what constituted D-237, beyond what is reflected in his notes, and does not have knowledge of the serological or chemical analysis conducted on D-237, other than what is in his charts. *Id.* ¶¶ 22-23.

The Government next noted the bench notes of both Glisson and USACIL Chemist Dillard O. Browning. For his part, Browning was assigned to complete examination of the trace evidence. Aff. of Browning [DE-215] ¶ 4. His bench notes show that on March 9, 1970, he examined D-237, and observed:

-Fingernail scrapings from ~~Kimberly's~~ Christine's left hand – vial contains <u>one microscopic piece of multi strand polyester/cotton fiber identical to the pajama top material</u> Bloodstained but washed.

Aff. of Browning [DE-215] ¶ 8; Ex. 3 [DE-215-3]. Browning testified to this identification before the grand jury in 1974. Aff. of Browning [DE-215] ¶ 9; Ex. 4 [DE-215-4]. Browning stated in his affidavit that "[t]here is no question in my mind . . . that what I removed from the bloody fingernail scrapings of Exhibit # 237 was a fiber, not a hair." Aff. of Browing [DE-215] ¶ 10. After microscopically comparing the fiber to MacDonald's pajama top, Browning did not return the fiber to the pill vial, and recollects that it was "consumed in the course of further examinations." *Id.* ¶ 11. Browning then turned over the residual fingernail scrapings to Glisson so she could type the blood. *Id.* ¶ 12.

121

Glisson's affidavit, and accompanying bench notes and other exhibits [DE-217], show that she conducted serology tests on materials from Kristin's left hand. Aff. of Glisson [DE-217] ¶¶ 9-13; Ex. 1 [DE-217-2]. Although she observed blood on the materials, Glisson's notes do not reflect that she identified the presence of a hair in the materials or that she performed any chemical analysis on any hair, and she stated that she would have recorded any such finding or testing in her notes. Aff. of Glisson [DE-217] ¶ 13. Glisson also explained in her affidavit that she did not use "D-237" in her notes, and that someone later added that designation, most likely Chamberlain. *Id.* ¶ 10.

Further, Glisson stated that during the course of the Article 32 hearings, due to the temporary unavailability of Browning, she was assigned to compare the known hair exemplars of Jeffrey MacDonald with hairs recovered from Colette's hands. As part of this process, she received from the Fort Bragg CID, on July 27, 1970, thirteen plastic vials reported to contain fingernail scrapings, hair samples, and other items collected from the MacDonald victims at autopsy. Aff. of Glisson [DE-217] ¶ 16; Ex. 2 [DE-217-3]. She explained that she numbered the vials, which were otherwise unmarked except for "17Feb70 BJH" on the bottom" and marked them with her initials "JSG" on the cap. After conducting a macroscopic inventory of the contents of the vials, she made notes about their contents and their origin. Aff. of Glisson [DE-217] ¶ 16. As noted by MacDonald, with regard to Vial 7 she stated:

> fingernail scrapings, left hand smaller female MacDonald (not labeled by Browning)
>
> 1 hair? – 2 fragments

Bench Notes [DE-217-3] at 1. Glisson observed in her affidavit that the description in her notes corresponds exactly with the words written on the piece of ruled paper depicted in GPS Photo No. 314. Aff. of Glisson [DE-217] ¶ 17; Ex. 7 [DE-217-8]. She also notes that she did not record in her notes

the contents or origin of this vial as being from "L. Hand Chris," "237" or "D-237." *Id.* Based on this she concluded that she had not previously examined the contents of this vial as presented on July 27, 1970. She also concluded that the container that Craig Chamberlain had described on February 26, 1970 as fingernail scrapings marked "L. Hand Chris", the contents of which she had previously subjected to serology tests, was not present on July 27, 1970. *Id.*

Glisson mounted the hair on a glass microscope slide, examined it, and recorded her observations. Aff. of Glisson [DE-217] ¶ 19. In her affidavit, she stated:

> I have no basis to believe that prior to July 27, 1970 I had ever seen this hair before. From the absence of any mention in my notes of suspected blood stains, or red brown stains, I conclude that I observed nothing on the hair under the microscope which indicated that this hair was, or had been, bloodstained. In any case, prior to mounting this hair on a slide #7, I performed no chemical analysis for the presence of blood. Nor did I wash this hair. Had I observed any indication of blood I would have recorded this in my notes, as I did in the case of the long "bloody" head hair (E-3) in vial #1, the debris around the mouth of Colette MacDonald, the "bloody" hair (E-4) from vial # 10, "R. Hand Mother" and the "bloody" hair (E-5) from vial #13, "left hand Mother."

*Id.*; Ex. 2 [DE-217-3]. She also stated that her use of the term "intact root" in relation to this hair was not meant to imply that the hair was pulled or otherwise forcibly removed. Aff. of Glisson [DE-217] ¶ 20.

The Government next noted that the hair on slide #7 came to be known as Specimen 91A, and expert analysis showed it to be a naturally shed hair. *See* Aff. of Fram [DE-219] ¶¶ 9-11.

Based on the foregoing, the Government argued that MacDonald had not, in fact, shown that Specimen 91A came from Kristen's left hand, let alone from under her fingernail. Nor, according to the Government, did MacDonald show that Speciman 91A was bloody or forcibly removed. The Government asserts that the provenance of the hair in Vial #7 was unknown prior to July 27, 1970, when Glisson first recorded her observations of it. Moreover, given that no blood was observed on

Specimen 91A, the Government argues that it is much more likely that the hair constitutes an artifact or debris, rather than a hair that was found in Kristen's hands which were covered in blood.

## 2.      Specimen 58(A)(1)

The parties have stipulated that a hair found on Kristen's bedspread (58A(1)) is an unsourced hair. At the hearing, MacDonald argued that regardless of whether the hair was naturally shed or forcibly removed, it could have been shed by an intruder while that intruder was attacking Kristen in her bedroom, and is therefore positive, circumstantial evidence of his theory of intruders. Htr. 1258-59.

The Government, for its part, noted that Specimen 58A(1) was one of two hairs collected from Kristen's bedspread. FBI examiners determined that both hairs were of Caucasian origin, and that both hairs had "club" roots, indicating that they were naturally shed. Htr. 1319; Aff. of Robert Fram [DE-219] ¶¶ 19-21. As the court has noted, Specimen 58A(1) is one of the unsourced hairs. Specimen 58A(2), however, has a mtDNA sequence consistent with that of Jeffrey MacDonald. Htr. 1319; Stipulations [DE-306] ¶ 26. The Government argued that the presence of Specimen 58A(1), an unsourced, naturally shed hair, is no more probative than the presence of Specimen 58A(2), Jeffrey MacDonald's naturally shed hair, because there is no evidence as to when either hair was shed. Htr. 1320. The Government argued that this was especially the case, given the presence of numerous other unsourced fibers and unsourced black dog hairs. Htr. 1320-22.

## 3.      Specimen 75A

The parties also have stipulated that a hair found on the rug in the master bedroom within the body outline of Colette (75A) is unsourced. MacDonald asserted in his post-hearing memorandum that "[t]he hair had both root and follicular tissue attached, indicative that it was pulled from someone's skin." Def. Post-Hearing Mem. [DE-343] at 37. Regardless, MacDonald argues that whether this hair

124

is naturally shed or forcibly removed, it is a piece of evidence that an intruder could have shed while attacking Colette. Htr. 1259.

The Government noted that Specimen 75A was collected almost a month after the murders. Htr. 1324; Aff. of Browning [DE-215] ¶¶ 3-6. The Government also noted an FBI examiner explained that naturally shed pubic hairs frequently have some follicular tissue attached, so the presence of follicular tissue does not mean that the hair was forcibly removed. Aff. of Fram [DE-219] ¶ 18. This same examiner opined that the pubic hair was naturally shed. *Id.* The Government posited that other debris was found on the rug, and that – other than the threads and yarns that are consistent with MacDonald's pajama top, which was indisputably torn on February 17, 1970 – there is no way to determine when Specimen 75A or the other debris were deposited on the rug. Htr. 1325-26.

**4. Sourced hairs**

The Government also argued that the DNA testing results regarding the "sourced" hairs strengthens the case against MacDonald.

First, the Government observed that DNA testing showed that Specimen 52A, a hair found in Colette's right hand, showed an mtDNA sequence identical to Colette, Kristen and Kimberly, who all share the same maternal mtDNA sequence. Stipulations [DE-306] ¶ 25. The Government asserted that this confirms earlier testimony that a microscopic comparison indicated this hair belonged to Colette. Htr. 1332.

Second, the Government noted that a previously uncomparable hair found in Colette's left hand, which MacDonald's trial counsel had pointed to as proof of intruders (and now designated as 51A(2)), was shown to have Jeffrey MacDonald's mtDNA sequence. Htr. 1332-33; Stipulations [DE-306] ¶ 26; Ttr. 3846-48, 7266. The Government noted that bench notes described the hair as having a rounded tip

125

and broken end, and noted that the hair bore tissue that appeared to be blood as well as unknown debris. The hair also had a fiber fragment along the shaft. *See* Bench Notes Graham [DE-123-4] at 8.

Third, the Government observed that Specimen 46A, a hair found adhering to the bedsheet on the floor in the master bedroom, was consistent with having originated from Colette, and Kimberly and Kristen were excluded as contributors. Stipulations [DE-306] ¶¶ 25, 27; AFDIL Laboratory Summary [DE-123-2] at 6. The Government also observed that an FBI examiner had determined that because of the presence of the root with sheath and follicular tag and attached tissue, this hair was consistent with having been forcibly removed. Htr. 1335; Aff. of Fram [DE-219] ¶¶ 22-24. The Government also noted that MacDonald had previously argued to the Fourth Circuit Court of Appeals that this hair could be highly persuasive evidence of MacDonald's innocence because the hair more than likely was deposited as a result of a struggle between the victims and the person who committed the murders.

Finally, the Government observed that a hair found adhering to the bedspread in the master bedroom (Specimen Q112A(5)) had the same mtDNA sequence as Kimberly, Kristen, and Colette, but the hair microscopically matched Kimberly's known exemplar. Htr. 1336; Aff. of Fram [DE-219] ¶¶ 26, 29. An FBI examiner also opined that this hair had been forcibly removed. Aff. of Fram [DE-219] ¶ 31. The Government posited that this result is notable because according to MacDonald's account, Kimberly should not have had contact with the bedspread in the master bedroom, and MacDonald also asserted that he had no contact with the bedspread or sheet. Htr. 1336.

N.      **Post-hearing submissions**

Each side submitted post-hearing briefing. In connection with their memoranda, the parties filed additional exhibits.

126

### 1.  MacDonald's filings

Specifically, MacDonald filed four periodical articles. The first was one authored by his former attorney, Harvey Silverglate, offered as support for MacDonald's assertion that the Government failed to disclose significant exculpatory or favorable evidence to MacDonald prior his trial. *See* DX 5114, Harvey Silvergate, *Reflections on the Jeffrey MacDonald Case*, THE CHAMPION, May 2013, at 52. Two other articles touch upon Michael Malone's testimony and suggest "Malone has engaged in misconduct." *See* DX 5119, Ruth Shalit, *Fatal Revision*, THE NEW REPUBLIC, May 26, 1997, at 18; DX 5120, Laurie P. Cohen, *Strand of Evidence: FBI Crime-Lab Work Emerges as New Issue in Famed Murder Case – Jeffrey MacDonald's Lawyer Alleges Fraud by Agent with History of Problems –Mystery of Blond Fibers*, WALL STREET JOURNAL, Apr. 16, 1997, at A1. The remaining article appears to cover MacDonald's 2005 filing regarding his Britt claim allegations. *See* DX 5118, Laurie P. Cohen, *Fatal Revision: The Plot Thickens in Famed Murder Case; Dr. MacDonald Pins Hope on U.S. Marshal's Account of What a Suspect Said*, WALL STREET JOURNAL, Dec. 14 2005, at A1.

MacDonald also filed the affidavits of two of his former attorneys, Hart Miles and Wade Smith, along with the affidavit of Robert L. Saddoff, M.D., a psychiatrist who examined MacDonald in 1970 and testified at the Article 32 hearing. Miles' affidavit concerns his recollection of how the elder Stoeckley's affidavit came about, and specifically states that the elder Stoeckley's participated voluntarily and with understanding as to what she was doing. DX 5115. Smith's affidavit seeks to clarify the record, and states, in part, that he does not think that Britt would have used him to perpetrate a fraud on the court. DX 5116. Sadoff's affidavit is offered in response to the hearing testimony of McGinniss; specifically, McGinniss's testimony that Sadoff stated that his opinion about MacDonald would have been very different had he known about MacDonald's possible use of drugs on the night

127

of the murders. Sadoff states that he has no recollection of making any such statement to McGinniss, and that his opinion has not changed throughout the case. DX 5117.

## 2. Government's filings

The Government also attached numerous exhibits to its sur-reply, some of which already were in the record of the case.

One such exhibit was the report of private investigator John Dolan Myers, regarding his January 23, 1980, interview of Jerry Leonard. In pertinent part, the report states:

> Mr. Leonard stated that he received permission from Ms. Stoeckley to discuss the things she told him with attorney Wade Smith. Mr. Leonard stated that he had a conference with Mr. Smith and told him what Helena had told him. He stated that he also gave Mr. Smith some insight as to his impressions of Ms. Stoeckley. He stated that he did not have permission from Ms. Stoeckley to discuss these matters with anyone else.

Myers Report [DE-352-4].

The Government also filed the affidavit of Myers, which was filed in support of MacDonald's motion for writ of habeas corpus testicandum for Jimmy Friar on August 16, 1979 [DE-352-9]. In response to the writ, Friar was interviewed by the FBI on August 17, 1979, at the McDowell County Prison Unit in South Carolina. The Government has filed the report of Special Agent Stephen P. White, FBI, summarizing the interview [DE-352-10]. The Government also filed an article that was printed in the August 22, 1979 issue of the *News & Observer* [DE-352-7], which described the filing of the writ to obtained Friar's testimony and quoted the Myers affidavit. The Government also filed the affidavit of Butch Madden [DE-352-11], regarding his March 23, 1983, interview of Friar at the Psychiatric Unit of the South Carolina Department of Corrections facility.

128

**ANALYSIS**

Having recounted the highlights of the "evidence of the whole," the court turns to its gatekeeping duty of assessing whether MacDonald's claims satisfy the applicable standard of § 2255(h)(1). At the outset, the court notes that the Fourth Circuit's opinion explicitly remanded this case "for further consideration of both the Britt claim and the DNA claim." *MacDonald XI*, 641 F.3d at 599. Again, MacDonald's original claim under § 2255 – the Britt claim – asserted that the allegations of Jim Britt showed that his Fifth and Sixth Amendment rights had been violated. The DNA claim, or "unsourced hairs" claim, asserted a freestanding actual innocence claim. Additionally, buried in a footnote in his post-hearing Reply memorandum, MacDonald appears to try to resurrect a claim he asserted in 1990. *See* Deft. Post-Hearing Reply [DE-351] at 9 n.6 (asserting that he has shown a constitutional violation because "the government failed to disclose significant exculpatory or favorable evidence to MacDonald before his trial"); *see also MacDonald V*, 778 F. Supp. at 1342 (denying MacDonald's 1990 § 2255 petition premised upon the Government's alleged suppression of exculpatory and favorable evidence). Out of an abundance of caution, the court will construe Macdonald's assertion – argued for the first time since the remand of this matter in a single sentence in a footnote in a reply memorandum – to be a motion to amend to assert a third § 2255 claim. Pursuant to Rule 15(a), the court ALLOWS MacDonald's motion to amend to assert this claim.

Notwithstanding the Fourth Circuit's lengthy opinion instructing this court to conduct "a more searching § 2255(h)(1) evaluation" of both the Britt and unsourced hairs claim, the parties still disagree as to how this court should go about applying § 2255(h)(1). Moreover, assuming that any of MacDonald's claims survive the more searching § 2255(h)(1) inquiry, the parties also disagree as to how the court should assess the claims on the merits.

The Government seemingly contends that each of MacDonald's claims must be evaluated, for gatekeeping purposes, separately, although the evidence underlying each is considered as part of the evidence as a whole. In other words, the Government argues that for purposes of the § 2255(h)(1) analysis, the "newly discovered evidence" is the evidence underlying each § 2255 claim. *See* Gov't Post-Hearing Mem. [DE-344] at 183-85; 191-93. Moreover, the Government asserts that as to the merits, MacDonald is tasked with proving that a constitutional violation underlies *each* of his claims. *See* Gov't Post-Hearing Mem. [DE-344] at 193-95; Gov't Post-Hearing Reply [DE-346] at 50-52.

MacDonald, however, relying on the plain language of § 2255(h)(1) and authorities interpreting the statute, contends that all the newly discovered evidence – the evidence surrounding Britt's allegations, evidence of Stoeckley's statements to her mother and to Leonard, along with the evidence of the unsourced hairs – must be examined for gatekeeping purposes, untethered to any particular claim. Def. Post-Hearing Mem. [DE-343] at 8-10. MacDonald contends that this new evidence, after being considered against the backdrop of the evidence as a whole, serves to propel his § 2255 claims through the second gate. Furthermore, seizing upon the undersigned's comments at the evidentiary hearing that gatekeeping and merits assessments were conflated, MacDonald argues that to succeed on the merits, he need only make the identical showing required by the gatekeeping process. In other words, MacDonald argues that he need not prove a constitutional violation to succeed on the merits of any of his claims.

For the reasons more fully set out below, the court agrees with MacDonald regarding the standard of review, for gatekeeping purposes, under § 2255(h)(1). Nevertheless, the court concludes that MacDonald has failed to meet that standard for any of his claims. In other words, the court concludes that MacDonald has not demonstrated that the newly discovered evidence, viewed in light

of the evidence as a whole, is sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found MacDonald guilty of the murders of his wife and daughters. Moreover, even if the court assumes that MacDonald's claims survive the § 2255(h)(1) inquiry, the court concludes that the claims fail on the merits.

## A.     28 U.S.C. § 2255(h)(1)

As MacDonald observes, § 2255(h)(1) provides the starting point for this court's analysis at the gatekeeping stage. He also observes that to some extent, the language of the statute tracks the same procedure for a successive § 2255 motion as exists for a successive petition filed under § 2254 by a prisoner who was convicted in state court. Indeed, this court originally conducted the gatekeeping analysis under 28 U.S.C. § 2244(b)(2)(B)(ii), and although the Fourth Circuit concluded that this court erred, it also observed that the error was "probably harmless" because of the similarities between the two provisions. Notwithstanding the Fourth Circuit's characterization of the two provisions as "materially identical," *see MacDonald XI*, 641 F.3d at 610, MacDonald posits that crucial differences exist between the statutes, and these differences impact the court's gatekeeping analysis. The court agrees.[47]

As the Tenth Circuit Court of Appeals has observed, § 2255(h)(1) and § 2244(b)(2)(B)(ii) differ in at least two ways. "First, § 2255(h)(1) refers to 'newly discovered evidence,' whereas subparagraph (B)(ii) refers to 'the facts underlying the claim.'" *Case v. Hatch*, 731 F.3d 1015, 1035 (10th Cir. 2013). "[S]econd, § 2255(h)(1) omits the phrase 'but for constitutional error,' which appears in subparagraph (B)(ii)." *Id.* Accordingly, for gatekeeping purposes, § 2255(h)(1) allows "'newly discovered evidence'

---

[47] As discussed later in the order, the court does not, however, agree with MacDonald's argument that § 2255(h)(1) ultimately alters his burden on the merits.

to 'establish' a petitioner's innocence and omits any requirement that the new evidence be rooted in constitutional error at trial." *Id.* (contrasting § 2244(b)(2)(B)(ii) which "requires the '*facts underlying the claim*' to 'establish' a petitioner's innocence, and requires those facts to be attributable to some 'constitutional error' in the underlying trial proceedings") (emphasis in original); *see also Ferranti v. United States*, 480 F. App'x 634, 637 (2nd Cir. 2012) ("The district court thus imposed on Ferranti the additional requirement, not applicable to successive petitioners under § 2255, of demonstrating that the exclusion of exculpatory evidence from his trial was the result of constitutional error."); 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE, § 41.7 (6th ed. 2011) (observing that § 2255(h) "appears to adopt the same *procedure* for section 2255 cases as applies to successive state-prisoner habeas corpus petitions" but "adopts a *standard* for section 2255 cases that is significantly different from the comparable provision for state-prisoner successive petitions") (emphasis in original).

In applying this standard, the court sees no need to assess, for gatekeeping purposes, MacDonald's claims separately. Indeed, MacDonald himself does not attempt to assess his claims separately. Rather, he asks the court to consider all four categories of the newly discovered evidence (the Britt allegations, the alleged confessions to the elder Stoeckley and Leonard, and the unsourced hairs) in tandem, along with the rest of the evidence as a whole. *See* Def. Post-Hearing Reply [DE-351] at 10. Moreover, given that the new evidence proffered in support of each claim must also be evaluated as part of the evidence as a whole, distinguishing the claims for gatekeeping purposes makes little sense.[48] The court, accordingly, will assess whether all the newly discovered evidence, viewed in light

---

[48] Additionally, it appears that MacDonald is effectively seeking to amend his two claims to include evidence regarding Stoeckley's alleged confessions to her mother and Leonard. *See* Deft. Post-Hearing Reply [DE-351] at 7 (explaining that "the Britt claim" "label was adopted before Jerry Leonard

of the evidence as a whole, is sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found him guilty of the murders of his wife and daughters.

**B.    MacDonald has not met his burden under § 2255(h)(1)**

MacDonald has proffered four categories of new evidence in support of his § 2255 claims: (1) the three unsourced hairs; (2) Britt's allegations; (3) Stoeckley's alleged confession to her mother; and (4) Stoeckley's alleged confession to Leonard. None of the new evidence, considered against the whole panoply of evidence that MacDonald has marshaled over the past forty-plus years as well as the evidence presented at trial, would preclude a reasonable juror from finding him guilty.

**1.    The unsourced hairs evidence**

Although MacDonald characterizes the DNA test results as "highly exculpatory," the court cannot agree. Looking at the actual evidence – as opposed to unsupported assertions in motions and memoranda – the DNA test results show the presence of three unsourced hairs: 58A(1) (found on Kristen's bedspread); 75A (found on the rug in Colette's body outline) and 91A (a hair found in a vial on July 27, 1970, containing fingernail scrapings from Kristen). A careful review of the evidence in the record shows that none of these hairs were forcibly removed, nor were they bloody. *See supra* pp. 120-26. Indeed, despite MacDonald's latest arguments to the contrary in his post-hearing memoranda,

---

revealed what Stoeckley told him while he represented her during the MacDonald trial" and asserting that "[t]he important determination is what Stoeckley would have said if she had been called as a witness, free of any fear of subjecting herself to criminal liability in these homicides"); *id.* at 35 ("[A] jury hearing the newly discovered evidence from Jerry Leonard, Gene Stoeckley, Mary Britt and Wade Smith, as well as the DNA evidence of the unsourced hairs, would undoubtedly acquit MacDonald based on this evidence alone."). The court is, of course, cognizant of the Fourth Circuit's observation that this court previously has erred by viewing items of evidence proffered by MacDonald "as being submitted in support of claims separate and distinct from the Britt claim and each other." *MacDonald XI*, 641 F.3d at 614. Still, out of an abundance of caution, the court construes MacDonald's latest arguments as seeking to amend the two § 2255 claims. Pursuant to Rule 15(a), the court ALLOWS MacDonald's request to amend his § 2255 claims to include allegations relating to Stoeckley's confessions to her mother and Leonard.

his counsel conceded as much at the hearing in this matter.[49] To be sure, as MacDonald's counsel

argues, the presence of an unsourced hair – even if it is naturally shed, and not bloody – could be

considered as evidence of an intruder by a juror. It would be equally as easy for a juror to reach the

conclusion, however, that the unsourced hairs were mere artifacts or debris, and not indicative of

intruders. This is especially the case here, where the trial jury was presented with evidence MacDonald

argued was supportive of his testimony that he and his family were attacked by intruders – other

unsourced hairs; unsourced fingerprints and palm prints; unsourced wax; and the existence of a pink

fiber in MacDonald's eyeglasses – and found him guilty anyway. *See* Ttr. 7266-68. Moreover, a juror

---

[49] Defense counsel's concession occurred during the parties' closing arguments on September 25, 2012:

Mr. Widenhouse: . . . . So, if there are unsourced hairs that are present at the crime scene that is some circumstantial evidence of intruders that was not available at trial.

The Court: Well, excuse me. I understood the Government's discussion - - Mr. Murtagh's discussion of the unsourced hairs to be that they weren't as probative as they would be if they had been demonstratively forcibly removed and had blood on them.

Mr. Widenhouse: Well, certainly, if they were forcibly removed they're more probative than they would be if they're not.

The Court: All right. Do you say that the evidence still supports that?

Mr. Widenhouse: Yes. The evidence supports that they're an unsourced - -

The Court: You have read the affidavits attached - -

Mr. Widenhouse: I'm not saying they're forcibly removed.

The Court: Well, that's what I'm asking you.

Mr. Widenhouse: No. I'm saying that the evidence from the DNA - -

The Court: I'm asking you whether they have blood on them.

Mr. Widenhouse: No, they don't seem to have blood on them.

Htr. 1396-97.

134

also would consider that the DNA results revealed that a hair found in Colette's left hand, which MacDonald's trial counsel had pointed to as proof of intruders, was shown to have Jeffrey MacDonald's mtDNA sequence. Htr. 1332-33; Stipulations [DE-306] ¶ 26; Ttr. 3846-48, 7266. Although MacDonald argues that the presence of this hair is not inculpatory, because his hair could have been discarded into Colette's hand during his efforts to save her life, a juror could reject that argument. A juror also could consider that the DNA tests showed that none of the tested hairs were consistent with coming from Stoeckley or Mitchell – two of the individuals MacDonald contends were involved in the murders of his family. In sum, the unsourced hairs evidence is not necessarily exculpatory scientific evidence. Furthermore, this evidence – even when considered against the record as a whole – is far from clear and convincing of MacDonald's actual innocence.

In this regard, the unsourced hairs evidence is similar in value to the other evidence of intruders proffered by MacDonald over the years; namely, unsourced fibers, saran fibers, and the alleged presence of a bloody syringe. For example, MacDonald has argued that the presence of black wool fibers found on the club and near Colette's mouth is evidence of intruders, because the fibers did not match any known exemplar from the MacDonald home. As indicated by previous findings by Judge Dupree and the Fourth Circuit, however, a juror could easily find the fiber evidence to constitute another example of household debris. *See MacDonald V*, 778 F. Supp. at 1351 (observing that "no two of these fibers appear to be from the same source" which diminishes the significance of the fibers, and that the fibers are unmatched "in part due to the fact that the MacDonald family's possessions are no longer available for forensic comparisons"), *aff'd MacDonald VI*, 966 F.2d at 854 ("The most that can be said about the evidence is that it raises speculation concerning its origins. . . . [T]he origins of the

hair and fiber evidence have several likely explanations other than intruders.").[50] Furthermore, the cumulative evidence regarding the saran fibers found in Colette's hairbrush can be viewed as "equivocal" as to whether the fibers originated from a wig or a doll. *MacDonald VI*, 1998 WL 637184, at *4. Ultimately, the saran fiber evidence engenders speculation as to the origin of the fibers; it by no means compels a conclusion that the three blond saran fibers are a product of Stoeckley brushing her wig with Colette's hair brush. Finally, the court, much like Judge Dupree before it, finds that there is little reliable evidence supporting the proposition that a "half-filled, bloody syringe" was recovered from the crime scene. *See supra* pp. 62-63. Like the unsourced fibers, saran fibers, and alleged presence of the bloody syringe, the presence of three unsourced hairs at the crime scene, even when considered in light of all the other evidence of intruders MacDonald has marshaled over the years, does not sufficiently rebut the Government's evidence of guilt. A juror presented with the evidence of the unsourced hairs and who considers the entire record in the case, could draw a number of reasonable, non-exculpatory inferences from the fact that three unsourced hairs were found at the scene.

In sum, the court finds that the unsourced hairs evidence does not constitute exculpatory scientific evidence. Moreover, even if it did, and even if it was considered against the entire record of evidence in this case, it does not serve to establish that no reasonable juror could find MacDonald guilty of the murders of his family.

---

[50] Presumably it would not be lost on a juror that a possible reason that these fibers did not match any known exemplar from the MacDonald home is because the MacDonald family possessions were no longer available for comparison, having been returned to Jeffrey MacDonald and disposed of by him.

### 2. The alleged confessions of Stoeckley

The other new evidence MacDonald largely relies upon are the confessions Stoeckley allegedly made to Britt, Leonard, and her mother. The court finds that none of the proffered evidence constitutes reliable, credible evidence which would support the conclusion that no reasonable factfinder would have found MacDonald guilty of the murders of his wife and daughters.

### a. Confession to Britt

As part of his new evidence, MacDonald proffers Britt's sworn statements that while he was transporting Stoeckley from South Carolina to Raleigh for the MacDonald trial she told him that she and others were in the MacDonald house on the night of the murders and that she mentioned that there was a hobby horse at the MacDonald home. After considering the various sworn statements of Britt, along with other evidence and testimony proffered at the September 2012 hearing, the court finds Britt's statements to be neither probably reliable nor likely credible.

First, the court notes that Britt's sworn statements contain material inconsistencies. For example, in the November 3, 2005 affidavit, Britt states that he was assigned to go to Greenville, South Carolina to pick up Helena Stoeckley, and in fact did pick her up at the County Jail in Greenville. DX 5059 ¶ 11. In his sworn interview on February 24, 2005, however, he stated that he went to Charleston, South Carolina, and assumed custody of her at the United States Marshal's Office there. DX 5055 at 12. Additionally, in his February 2005 sworn interview, he stated that upon arriving in Raleigh, he checked Stoeckley – who had been arrested on a material witness warrant – into the Holiday Inn on Hillsborough Street. DX 5055 at 16. In his February 2006 addendum to his affidavits, however, he stated that he committed her to the custody of the Wake County Jail. DX 5056. Perhaps the first inconsistency – Britt's assertions as to where he picked up Stoeckley – can be attributed to the fading

memories of Britt. The second inconsistency, however, between whether he committed Stoeckley to the custody of the Wake County Jail or whether he checked her into a hotel, calls into question the validity of any of Britt's memories, given that she had been arrested on a material witness warrant.

In addition to the inconsistencies between his own statements, Britt's various statements are also contradicted by a host of other evidence before this court. The testimony of Frank Mills establishes that he arrested Stoeckley on August 14, 1979, and committed her to the Pickens County Jail. Htr. 474-75. His testimony was supported by documentary evidence. *See* GX 2008 (booking report and materials from Pickens County Jail); GX 2064 (commitment form). The documentary evidence also showed that Stoeckley was released the next day to Deputy United States Marshal Vernoy Kennedy. GX 2066 (release form). Kennedy confirmed this fact in his August 23, 2006, sworn statement. GX 2010. Additionally, Kennedy stated that he and a female guard then transported Stoeckley to a prearranged spot at the intersection of Interstate 85 and Interstate 77 in Charlotte, where he turned Stoeckley over to a Deputy Marshal for the Eastern District of North Carolina. GX 2010 at 12-13. This evidence, which the court finds a reasonable juror would credit as credible and reliable, directly contradicts Britt's assertions that he traveled to South Carolina to transport Stoeckley to the trial.

The testimony of former Deputy Marshal Dennis Meehan and his former wife, Janice Meehan, also directly contradict Britt's assertions. Dennis Meehan testified that he and his wife, who was acting as a matron, were tasked with picking up Stoeckley in Charlotte and transporting her to Raleigh. He testified that he picked Helena up at a prearranged stop at the intersection of Interstate 85 and Interstate 77 in Charlotte from another deputy marshal, whom he described as a tall, black man. He then transported Stoeckley directly to the Wake County Jail. Janice Meehan confirmed this same version of events in her testimony. The Meehans' testimony, which the court perceives to be credible and

138

reliable, greatly discredits the idea that Stoeckley confessed to Britt during a long transport from South Carolina to Raleigh.

Additionally, the record as a whole establishes the high unlikelihood of other events Britt mentions in his sworn statements. In his Addendum to his affidavit, Britt states that on Sunday, August 19, 1979, he checked Stoeckley out of The Journey's End motel and then registered her at the Holiday Inn. DX 5056. This conflicts with the testimony of Wendy Rouder, who testified that she and Red Underhill retrieved Stoeckley from The Journey's End and subsequently checked her into the Hilton. Britt also asserted that on August 20, 1979, he was tasked with obtaining a subsistence check for Stoeckley from a Marshals Office administrator, cashing the check, and checking Stoeckley out of the Holiday Inn. Britt stated he did so, and followed his instructions to purchase a one-way bus ticket to Charleston for Stoeckley. DX 5056. The rest of the record reflects, however, that Stoeckley stayed in Raleigh through at least August 24, 1979, meaning that Britt could not have placed her on a one-way bus to Charleston on August 20, 1979. Additionally, testimony from Marshals Office employees establishes that it was highly unlikely that the government would be responsible for a subsistence check where Stoeckley, after August 17, 1979, was under a subpoena from MacDonald, a non-indigent defendant. Htr. 559, 572-75. Attributing these major inconsistencies to fading memories is extraordinarily difficult; rather, it is more likely that these details are fabrications or confused memories, which in turn render all of Britt's statements incredible and unreliable.

### b.    Confession to Leonard

Similarly, the court is constrained to find Leonard's testimony regarding Stoeckley's confession to be unreliable. Again, Leonard was appointed to represent Stoeckley after she had testified in front of the jury, and after a series of bizarre events over a weekend, including Stoeckley calling Judge

Dupree and telling him she was in fear of defense attorney Segal and requesting an attorney. Leonard testified that on August 20, 1979, Stoeckley originally told him that she could not remember the events of the early morning hours of February 17, 1970, but later that afternoon she changed her story, telling Leonard that she was present in the MacDonald home during the murders but did not participate. During the week she waited at the federal courthouse under subpoena from MacDonald, she offered up other details to Leonard, including that there was a broken hobby horse in the MacDonald home, and that while she was in the MacDonald home, she answered a ringing telephone, but hung up when one of the people she was with told her to do so.

Like Britt's statements about Stoeckley's confession, Leonard's recitation of the events surrounding his representation of Stoeckley is contradicted by other matters in the record. For example, he testified that he remembers picking Stoeckley up on a late Sunday afternoon, possibly at the federal courthouse, and taking her to his house. He spoke with her for several hours, and she eventually fell asleep on a recliner at his house. Leonard testified that he was responsible for her lodging, so he checked her into the Hilton prior to taking her to the courthouse on Monday morning. Htr. 1109-11. The record indicates, however, that Stoeckley spent most of Sunday, August 19, 1979, in the company of Rouder and Underhill, who arrived at The Journey's End motel around 11:00 or 11:30 a.m. Rouder spent several hours with Stoeckley at The Journey's End, and then drove her to the Hilton where Stoeckley and Underhill checked in. Stoeckley then accompanied Rouder and Underhill to the The Downtowner Hotel so Underhill could retrieve his belongings. Shortly after Underhill and Stoeckley returned to the Hilton, Rouder was summoned to transport Stoeckley to the hospital, for treatment for her nose. Underhill spent the night in an adjoining room, and Stoeckley spoke to Underhill on both Sunday evening and Monday morning. Ttr. 5897-5949. Leonard's version of his initial contact with

140

Stoeckley cannot be reconciled with the *voir dire* testimony at trial from Underhill and Rouder, or Rouder's hearing testimony in this matter. As was the case with Britt's allegation, Leonard's assertions as to something that seemingly did not happen calls into question the reliability of all of his testimony.

Similarly, Leonard testified that after Stoeckley told him that she was present in the home during the MacDonald murders, he instructed her to plead the Fifth Amendment if she was recalled to testify. He also stated that he did not discuss what Stoeckley told him with anyone, including Wade Smith. Ttr. 1206-07, 1211. Evidence in the record, however, calls into question this account. In open court discussions with Judge Dupree, Smith stated that he had talked with Leonard at length on the morning of August 23, 1979, regarding the defense's need to keep Stoeckley under subpoena because she continued to "say things that tie her to this case." Ttr. 6647. Additionally, on January 23, 1980, shortly after MacDonald's trial, Leonard spoke with John Dolan Myers, a defense team investigator. According to Myers' memorandum of the interview, Leonard said that with Stoeckley's permission, he had a conference with Smith during which Leonard told Smith what Stoeckley had told him. He also gave Smith insight into his impressions of Stoeckley. *See* Report of Myers Interview of Leonard [DE-352-4]. Again, these differing statements are hard to reconcile, and result in great questions about the overall reliability and credibility of Leonard's testimony.

This is the case, even though Leonard's account of Stoeckley's confession seemingly is corroborated by the July 25, 1983 declaration of Jimmy Friar. Therein, Friar stated that around 2:00 a.m. on February 17, 1970, he called the Fort Bragg base operator from a payphone at the Wade Hampton Hotel, in Fayetteville, attempting to get in contact with a Dr. Richard MacDonald, a doctor who had treated him while he was a patient at Walter Reed Hospital in Washington, D.C. He asked for "Dr. MacDonald" without specifying the first name. The base operator gave him a number, which he

141

called. Friar stated that a laughing woman answered the phone, and he heard someone say "Hang up the Goddamned phone." DX 5021. Friar's account corresponds to what Stoeckley allegedly told Leonard; namely, that during the time she was in the MacDonald house she answered the phone and hung it up when told to do so by one of the others with her.

The problem, however, is that Friar's declaration is neither likely credible nor probably reliable. As Friar himself sets forth in his declaration, he was disoriented on the night of the alleged phone call, having drunk alcohol and played pool in Fayetteville after persuading an orderly to let him sneak out from Womack Army Hospital at Fort Bragg. DX 5021 ¶¶ 3, 5, 6, 8. Indeed, in an interview with the FBI during the MacDonald trial, Friar stated that he had consumed quite a bit of alcohol during the day, in addition to taking prescribed medications for a mental condition. *See* Form 302 of Aug. 17, 1979, Interview of Friar [DE-352-10]. Moreover, in this interview Friar stated that he had undergone psychiatric treatment in various prison units, and, during the time of the MacDonald murders, he was being held in a special barracks at Fort Bragg, apparently as a result of being absent without leave from Walter Reed Army Hospital. *Id.* In a later interview with the FBI, however, he denied receiving any mental treatment, and stated he was only receiving treatment for shrapnel wounds and grand mal epilepsy. Subsequently, Friar admitted in correspondence with the FBI to being a frequent patient in the mental wards of numerous hospitals. *See* Aff. of Madden [DE-352-11]. He also described himself as a "con man and manipulator" to the FBI, and admitted to a criminal history that included convictions for fraud. *See* Form 302 [DE-352-10]; Aff. of Madden [DE-352-11]. Friar's history of mental illness, criminal convictions, and inconsistent statements, in addition to his admitted intoxication and

disorientation during this alleged phone call, makes him an inherently unreliable and incredible witness.[51]

Additionally, as Leonard candidly admitted during his testimony, "what happens is you hear stuff at a later date and it all becomes part of what you know and it's hard to peel away the context that you heard one thing from the other." Htr. 1159. Information about the Friar phone call has been known to the public since Wednesday, August 22, 1979, and has been recounted in an opinion from the Fourth Circuit. *See* Ginny Carroll, *Witnesses Attest to MacDonald's Trust, Compassion*, NEWS & OBSERVER, Aug. 22, 1979 at 25 [DE-352-7];[52] *MacDonald VI*, 966 F.2d at 855 n.7. Given Leonard's seemingly poor memory about the events of August 1979, the court finds it entirely plausible that he is "remembering" information he learned at a later date. In sum, the court respectfully finds that Leonard's testimony is not likely credible nor probably reliable.

---

[51] Additionally, the court agrees with the Government's assertion that Friar related a "belated tale of improbable coincidences, that is riddled with contradictions and uncorroborated by any reliable or credible evidence." Gov't Post-Hearing Sur-Reply [DE-352] p. 38. It is telling that MacDonald ultimately chose not to call Friar as a witness at the 1979 trial.

[52] The article stated, in relevant part:
[T]he defense attorneys also filed a request Tuesday to secure testimony from James E. Friar, 30, an inmate serving an 10-year sentence for fraud at the medium-custody state prison unit in McDowell County.
Friar was convicted April 6, 1977, in Richmond County of writing a check with a fake name and address for men's clothing. Superior Court Judge William Z. Wood, who sentenced Friar, recommended that he receive psychiatric treatment.
Friar told an investigator for MacDonald that about 3 a.m. on the morning of February 17, 1970, he was in Fayetteville. He said he telephoned the MacDonald house by mistake, looking for another doctor named MacDonald.
According to an affidavit by defense investigator John Myers, a woman answered the phone and began laughing when Friar asked for Dr. MacDonald. A male voice in the background said, "Hang the damn phone up," according to the affidavit.
*Id.*

### c.     The reliability and credibility of Helena Stoeckley

Moreover, even if the court could find the statements of Britt and Leonard regarding Stoeckley's confessions to be credible and reliable, and if the court assumes that the elder Stoeckley's sworn statements are likely credible and probably reliable,[53] at bottom they are repeating the statements of Helena Stoeckley herself. As this court observed in 2008, with regard to Stoeckley's confessions, the relative credibility of Britt – or anyone else repeating Stoeckley's statements – is not especially relevant. *MacDonald X*, 2008 WL 4809869, at *17. "Regardless of the credentials of the person relating them, however, Stoeckley's 'confessions' were untrustworthy in 1970, in 1979, in 1990, and in 2005, and they remain so [today]." *Id.* "Neither the passage of time nor the identity of the hearsay witness improves the reliability of what Stoeckley said or believed about the night of February 17, 1970." *Id.*

Judge Dupree, who had the opportunity to observe Stoeckley during the trial, wrote in 1985:

> Helena Stoeckley testified before the court at trial and the court has reviewed her statements, the affidavits relating to her, and the videotape supplied by MacDonald of a television program featuring her, all of which lead to the conclusion that this woman is not reliable.
>
> The court's conclusion that Stoeckley is not a reliable confessor should not be construed to mean necessarily that she was not telling what she believed to be the truth when she confessed to the MacDonald murders. From the very beginning, she said that she could not remember what she had done on that night because she had taken so many drugs. Based upon MacDonald's account of the murders, the Fayetteville police, military police and the FBI investigated members of the drug culture in Fayetteville and Stoeckley, quite understandably, became anxious because she could not recall where she was during the crimes. This anxiety, her drug-induced state of confusion, and the

---

[53] The court recognizes that the Government challenges whether the elder Stoeckley's 2007 statements are likely credible or probably reliable. It is true that the elder Stoeckley's failure to tell the FBI in 1984 about her daughter's confessions raises questions about the credibility of her 2007 statements. Her daughter had already died at the time of the September 1984 interview, and therefore the elder Stoeckley would not have had the motivation to shield her daughter from criminal liability. Nevertheless, the court will assume that a reasonable juror could find the elder Stoeckley's 2007 statements credible and reliable.

observations of her friends and Detective Beasley that she met the description of the woman involved in the murders led Stoeckley to believe that she might have participated in them but had a mental block about the night which prevented her from recalling details.

Stoeckley's uncertainty and the relentless attention the case focused upon her undoubtedly tortured her over the years. Her drug abuse of the late 1960's and early 1970's gave way to alcohol abuse in the late 1970's which contributed to her premature death in 1983. The confluence of her drug and alcohol abuse and uncertainty over her role in the crimes appears to have ultimately led her to believe that she was involved and to piece together her fragmented memory of 1970 into an explanation which MacDonald says amounts to a confession. Whether this was done innocently or by design to gain the attention which she craved is unclear from the record. What is clear is that considering all of the circumstances, neither Stoeckley nor her "confessions" are reliable. Thus, although the inconsistencies in Stoeckley's confessions and contradictions of the statements by the facts of the case and the affidavits of other witnesses would be more than enough to lead the court to conclude that the confessions are untrue, Stoeckley's unreliability adds even greater force to this conclusion.

*MacDonald III*, 640 F. Supp. at 324. The court does not see how the fact that Stoeckley also allegedly confessed to a marshal, her attorney, and her mother (prior to Stoeckley's death)[54] changes the utter unreliability of Stoeckley herself.[55] Indeed, it reinforces earlier conclusions by this court that Stoeckley's statements, being "all over the lot" lacked any measure of trustworthiness. Ttr. 5808. Accordingly, any "confessions" from Stoeckley cannot constitute credible, reliable evidence to support the conclusion that no reasonable juror would find MacDonald guilty.

Nor does the consideration of the affidavits and declarations from numerous other witnesses about Stoeckley's activities around the time of the murders change this conclusion. Although Judge Dupree's findings and conclusions are not now binding, the court nevertheless agrees with his

---

[54] It appears that with regard to the confessions to Leonard and her mother, Stoeckley was in fact recanting earlier versions of the stories she had told these individuals.

[55] For the same reason, Stoeckley's confession to Sara McMann fails to constitute credible, reliable evidence.

assessment that the statements of the witnesses "suffer from either factual inaccuracies or contradictions which render them of no use to MacDonald in proving that Stoeckley and her group committed the murders," or serve only "to place Stoeckley and her friends in Fayetteville at locations close to where she and other members of the group lived in 1970." *MacDonald III*, 640 F. Supp. at 325-27.

As to the latest affidavits relating the confessions of Greg Mitchell, the court cannot find the confessions themselves to be probably reliable or likely credible. Years prior to making these confessions, Mitchell had given a sworn statement to CID investigators disavowing any involvement in the murders, and had subsequently passed a polygraph examination. Most of the confessions that occurred years later came when Mitchell was under the heavy influence of alcohol, marijuana, or both. The court cannot find Mitchell's confessions to be reliable, due to his alcohol dependency, nor credible, given its contradiction to earlier sworn statements.

### 3. The alleged threat to Stoeckley and fraud on the court

The last category of evidence upon which MacDonald relies is Britt's assertions that (1) Stoeckley confessed her involvement in the murders to prosecutor Blackburn; (2) in response, Blackburn threatened to indict her for murder if she so testified; and (3) Blackburn subsequently misrepresented to the court and defense counsel what Stoeckley said to him. As the court already has observed, Britt's various sworn statements are replete with major inconsistencies and contradictions with the rest of the record, in such a manner that almost all of Britt's statements – including those regarding what Stoeckley said to prosecutor Blackburn and what he said in response to her – are rendered likely incredible and probably unreliable. Additionally, his assertions regarding the interview and threat are contradicted by two other witnesses who were present during the interview: prosecutors

146

Blackburn and Crawley. Although MacDonald attacks the relative credibility of Blackburn and Crawley, neither witness is inherently more incredible than Britt. Blackburn admittedly has engaged in fraudulent acts in the past, including forging orders of a court to present to clients, and ultimately lost his license to practice law. The record shows, however, that Britt likely submitted a fraudulent document to a court; namely an affidavit in a 2000 divorce proceeding stating, under oath, that he and his then-wife, Nancy, were no longer compatible, could no longer live together as husband and wife, and there was no possibility that they could reconcile. GX 2017. Other documents in the record, however, indicate that he and Nancy continued to live together through at least 2005. *See* GX 2123 (Jimmy Britt's 2005 Bankruptcy Petition listing Nancy's address as 616 Wimberly Road in Apex, NC); GX 2086 (Jimmy Britt's 2005 sworn statement, wherein he states that he lived at 616 Wimberly Road in Apex).[56]

Furthermore, according to Britt, at the conclusion of Stoeckley's interview with the prosecution on the eighth floor of the Terry Sanford Federal Building, he escorted her to the courtroom on the seventh floor. GX 2086 at 22. He stated, under oath, that at the same time he was taking Stoeckley into the courtroom, Blackburn was entering Judge Dupree's chambers, and stayed in the chambers for 10 to 15 minutes, while MacDonald's attorneys remained in the courtroom. GX 2086 at 22-23. The record reflects, however, that on the day of the Stoeckley interviews, Judge Dupree recessed court at 1:17 p.m. in order to allow time for the completion of the defense interview and to allow the prosecution to interview her. Judge Dupree ordered that court would resume at 9 a.m., the following day. Ttr. 5498-

---

[56] The Government suggests that Britt was motivated to move to Nevada for six weeks to obtain the divorce from Nancy because of a provision in the will of Nancy's mother, which provided that a large amount of land would be held in trust for the benefit of Nancy until one of two conditions were satisfied: Nancy's death, or her divorce from Jimmy Britt. GX 2023.

99, 5506. Both Smith and Blackburn testified that, in fact, neither side returned to court that afternoon because of the adjournment. Htr. 103; 610. Accordingly, again the court is presented with assertions from Britt of events that appear to never have happened. And, again, whether these assertions were a product of a faulty memory or of a nefarious motive, the end result is that the court cannot find any of Britt's statements to be likely credible or probably reliable.

### 4. The new unreliable evidence against the record as a whole

Neither the unsourced hairs evidence, nor the evidence regarding Stoeckley's confessions, given its likely incredibility and probable unreliability, are sufficient to show by clear and convincing evidence that no reasonable factfinder would have found MacDonald guilty – even when this new evidence is considered in light of all the evidence that MacDonald has marshaled to date that intruders were responsible for the murders. This is especially so when it is considered in the context of the evidence presented by both the Government and MacDonald at trial.

Again, at trial "[t]he government's theory of the case was that MacDonald and his wife were having marital problems and began arguing on the night of the murders over their youngest daughter's bedwetting." *MacDonald III*, 640 F. Supp. at 210. "Already fatigued from long hours at work, MacDonald flew into a rage and killed his wife and oldest daughter." *Id.* The Government argued that MacDonald "attempted to avoid prosecution and punishment by killing his youngest daughter and staging the crime scene to make it appear as if the murders had been committed by intruders." *Id.*

First, the Government presented evidence showing that the Old Hickory brand steel paring knife, the icepick, and a blood-stained piece of wood – all found outside the utility room door at the rear of the MacDonald apartment – along with a Geneva Forge Company paring knife, were the murder

148

weapons. Although MacDonald denied knowledge of the murder weapons,[57] the Government offered evidence from which the jury could have found that the weapons in fact came from within the MacDonald home.

The Government also offered evidence it argued showed that MacDonald's account of the attack, and his actions thereafter, were false. Specifically, the Government offered evidence showing that numerous threads and yarns consistent with MacDonald's pajama top were found throughout the home, even though MacDonald maintained that he took off his pajama top upon entering the master bedroom and finding his wife. Very few threads or yarns – if any – were found in the living room where MacDonald said he was attacked. The Government also proffered evidence, through the pajama top demonstration and testimony about the pajama top pocket, that "supported the Government's theory that MacDonald had put the garment on his wife and then stabbed her with an icepick to make his account of the murders more believable." *Id.* at 312-13.

MacDonald countered this evidence by noting that fibers of some sort were found in the living room, and thoroughly assailing the CID's processing of the crime scene and subsequent examinations. *See* Ttr. 7172 (arguing that the ineptitude of the CID "unalterably and forever prevented this crime scene from serving as the basis for all the invention and hypothesis and invention of theories and speculation by government counsel"), 7176 (arguing that it would be wrong to conclude that the numerous MPs did not disturb or move fibers during their initial efforts on the scene), 7180 (arguing that if the top were ripped where there was no seam, there would be very few fibers shed, and also noting that fibers were found near the south edge of the hallway), 7181-83 (arguing that the gurney and

---

[57] *See* Ttr. 7268-73 (arguing that the alleged murder weapons were consistent with MacDonald's theory of intruders, and that the evidence did not support the conclusion that the weapons came from the MacDonald home).

feet of the ambulance drivers had the potential to disturb any fibers), 7189 (arguing the CID "didn't understand that the living room was an important part of the crime scene and they didn't understand how to protect it and preserve the physical evidence and trace evidence in that room" and therefore "the inferences or conclusion that the Government asks you draw from it are simply unjustified and unfounded"), 7210-11 (arguing that it was reasonable to find that MacDonald had fibers on his body from the pajama top that were distributed in rooms other than the master bedroom and that it would be reasonable to find that his pajama bottoms were the source of the fibers), 7238-46 (criticizing the "pseudoscience" of the pajama top demonstration).

The Government also proffered evidence that the pieces of a latex glove found in the master bedroom were stained by blood of Colette's type and were similar to latex surgeon gloves found near the kitchen sink, arguing that "MacDonald had worn latex gloves while murdering his family to avoid fingerprints and had written the word 'PIG' in his wife's blood on the master bed headboard while wearing the gloves since there were no ridge lines in the writing as there would have been had the writing been made by a bare finger." *MacDonald III*, 640 F. Supp. at 313. MacDonald attacked the Government witnesses' findings and conclusions as to the latex glove, and also the lack of processing for fingerprints on the headboard. Ttr. 7223-24, 7266 (arguing that MacDonald's expert witness – "the world's leading authority on the use of neutron activation analysis in forensic matters" – testified that it was unlikely the samples of gloves found in the house were made from the same batch found in the bedroom); 7232-33 (criticizing how the headboard where "PIG" was written was processed for prints).

Evidence also was offered regarding a footprint – which MacDonald conceded was his and probably stained in his wife's blood – that was found leading out from Kristen's bedroom. The Government noted that no prints were shown entering Kristen's bedroom, and argued that

150

inconsistency was support for its theory that Colette had been assaulted in Kristen's room and carried back to the master bedroom. The Government also offered extensive testimony regarding blood splatterings and the Government's reconstruction of the crime scene were also presented. MacDonald attacked all of the Government's theories. Ttr. 7235, 7278.

The Government also highlighted that no splinters from the wooden club or blood were found in the living room, where MacDonald said he was attacked, with the exception of a stain on an *Esquire* magazine. That blood was a mixture of Colette and Kimberly's blood types. The magazine contained an article about the Charles Manson murders, and the Government hypothesized that MacDonald had probably read the article before the murders and perhaps had referred to it on that night to stage the crime scene such that it would appear that a crazed cult had murdered his family. In addition to attacking this theory, MacDonald also attacked the idea that no blood was found in the living room. Ttr. 7217 (arguing that the CID's failure to properly process the crime scene prevented a reliable finding that there were no blood splatterings in the living room). Specifically, the defense noted that his spectacles were found with a blood spot on them, which they contended could have been a product of the struggle he had in the living room. Ttr. 7217-18. The defense specifically rejected the idea that the blood could have come from MacDonald's activities as an emergency room doctor, arguing: "If anything you have learned physically about Dr. MacDonald is what – is he a sloppy man? Is he a man likely to walk around with a blood spot on his reading glasses having to read for several hours?" Ttr. 7217.[58]

_____

[58] The Government argued that the inference to be drawn was that the blood – which was Type O like Kristen's – came on the glasses during MacDonald's attack on his family.

In addition to attacking the CID's handling of the crime scene, the Government's evaluation and testing of the evidence and the Government's theories in general, MacDonald offered his own testimony, including his assertion that intruders, including a blond woman, murdered his family. His defense also highlighted what it considered to be evidence of the intruders: (1) the existence of a pink fiber found on MacDonald's glasses; (2) unsourced hairs; (3) unidentified fingerprints; and (4) unsourced candlewax. Ttr. 7266-68. MacDonald also called Stoeckley as a defense witness. Her testimony established that at the time of the crimes, she owned a blond wig, a floppy hat and boots. Her testimony also established that she had been an addict and continual user of all manner of drugs around the time of the MacDonald murders, and indeed on February 16, 1970, she had injected herself six or seven times with heroin and opium, and also smoked marijuana "all day." Ttr. 5553-54. Her last memory was standing in her driveway with Greg Mitchell around midnight, when she took a hit of mescaline and Greg left. *Id.* She testified that her next memory was being dropped off at her apartment by two to three soldiers, in a blue car, around 4:30 to 5:00 a.m. Although she testified that to her knowledge, she was not involved in the MacDonald murders, she also testified that because of her lack of memory and lack of alibi, she was concerned. Ttr. 5648-49; 5652-53.

Presented with that evidence, the jury found MacDonald guilty.

Against this trial evidence, and considered against the entire record of this long-running case, the court cannot find that any of the new evidence, given its unreliability and incredibility, is sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found MacDonald guilty of the murders of his wife and daughters. Accordingly, MacDonald has not met his burden under § 2255(h)(1)'s procedural gatekeeping bar.

**C.     MacDonald's claims fail on the merits**

Even if the court could somehow find that MacDonald has met his burden of passing through § 2255(h)(1)'s gate, thereby allowing the court to consider his claims on the merits, the court nevertheless finds that MacDonald has failed to prove any of his claims.

In so finding, the court rejects MacDonald's argument that by satisfying § 2255(h)(1)'s procedural gatekeeping requirements, he thereby automatically succeeds on the merits of his claims. As the Fourth Circuit stated in its 2011 opinion, § 2255(h)(1) is merely a procedural bar; if MacDonald can pass through the bar, he is entitled to have his clams "considered on [their] merits." *MacDonald XI*, 641 F.3d at 614. Indeed, as to the Britt claim, the Fourth Circuit specifically stated that as to the merits, MacDonald "would yet be obliged to prove the constitutional violation alleged in that claim before obtaining any § 2255 relief thereon." *Id.* ("We emphasize, however, that today's decision is not intended to signal any belief that the Britt claim passes muster under § 2255(h)(1) *or ultimately entitles MacDonald to habeas relief.*") (emphasis added). MacDonald discounts this language as dicta, and cites authorities which point out the difference between the gatekeeping statute for federal prisoners (§ 2255(h)(1)) and the one for state prisoners (28 U.S.C. § 2244(b)(2)(B)(ii)). As the court already has stated, it agrees with MacDonald that there are notable differences in the gatekeeping statutes. The court does not discern from the authorities cited by MacDonald, however, how these differences in the *gatekeeping* statutes translate into a different showing on the *merits. See Hatch*, 731 F.3d at 1034 (explaining that § 2255(h)(1) "*permits* a successive petition" if satisfied); *Ferranti,* 480 Fed. App'x at 636-37 (explaining that § 2255(h)(1), and not § 2244(b)(2)(B)(ii), was the proper "gatekeeping provision" to apply to see if a claim presented in a successive § 2255 motion must be dismissed); HERTZ & LIEBMAN § 41.7 (explaining that the standard for gatekeeping of § 2255 and § 2254 claims

are different). MacDonald has pointed to no persuasive authority that for successive § 2255 claims, the gatekeeping analysis and the merits analysis should always be collapsed into one inquiry.[59] The court declines to make the logical leap advocated by MacDonald, and will instead follow the directive of the Fourth Circuit. In so doing, the court finds that he has failed to establish either of his constitutional claims by a preponderance of the evidence. *See Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958) (per curiam) ("Because the proceeding under 28 U.S.C. § 2255 is a civil collateral attack upon the judgment of conviction, the burden of proof is upon petitioner to establish [his claim] by a preponderance of evidence."). He also has failed to meet the high burden required to establish his freestanding actual innocence claim.

1.      **The Britt Claim**

As MacDonald's latest briefing indicates, the "Britt Claim" is premised on the idea that "Blackburn, (1) heard Helena Stoeckley admit she was in the MacDonald house when several people with her killed his family, but falsely told the district court that he had not, and (2) told Helena Stoeckley he would indict her for murder if she testified she was in the MacDonald House." Deft. Post-Hearing Mem. [DE-343] at 9 n.6. According to MacDonald, "[t]hese actions–a failure to disclose material evidence and a threat leading a witness to perjure herself–constitute independent constitutional

_____

[59] It appears to the court that the only time the inquiry would be "virtually identical" is where a petitioner asserts a freestanding actual innocence claim, as discussed later in this order. MacDonald has done so in this case, leading to the court's observation that the inquiries were somewhat conflated. *See In re Davis*, No. CV409-130, 2010 WL 3385081, at *45 (S.D. Ga. Aug. 24, 2010) (concluding that for a freestanding actual innocence claim, a petitioner "must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence"); *see also Hunt v. McDade*, 205 F.3d 1333, 2000 WL 219755, at *2 (4th Cir. Feb. 25, 2000) (per curiam) (suggesting that "'[t]o be entitled to relief, . . . petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could [find] proof of guilt beyond a reasonable doubt.'") (quoting *Herrara v. Collins*, 506 U.S. 390, 429 (1993) (White, J., concurring)).

154

violations." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 432-34 (1995) and *United States v. Golding*, 168 F.3d 700, 703 (4th Cir. 1999)). Specifically, MacDonald contends that his Fifth and Sixth Amendment rights were violated.

With regard to his Fifth Amendment rights, in *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. In order to prove a *Brady* violation, a defendant must meet three requirements: (1) the evidence must be favorable to the accused, (2) the government must have suppressed it, and (3) the defendant must suffer prejudice. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Wilson*, 624 F.3d 640, 660-61 (4th Cir. 2010).

As to his Sixth Amendment rights, as this court has previously recognized, a defendant's constitutional right "to present a defense [is] violated if [the] Government intimidates a defense witness into changing her testimony or refusing to testify." *MacDonald X*, 2008 WL 4809869, at *21 (also recognizing that it would be a violation of a defendant's Fifth Amendment due process rights); *see United States v. Golding*, 168 F.3d 700, 703 (4th Cir. 1999) ("The authorities are uniform that threatening a witness with prosecution and comment about the absence of a witness who has a privilege not to testify are a violation of the Sixth Amendment right of a defendant to obtain witnesses in his favor."). The intimidation of a witness may violate a defendant's rights if it amounts to "substantial government interference with a defense witness' free and unhampered choice to testify." *United States v. Saunders*, 943 F.3d 388, 392 (4th Cir. 1991) (internal quotations omitted). Importantly, a defendant must make "a plausible showing that an act by the government caused the loss or erosion of testimony that was both material and favorable to the defense." *Griffin v. Davies*, 929 F.2d 550, 553 (10th Cir.

155

1991). If "a defendant is able to establish a substantial government interference, the inquiry moves to the question of whether it was prejudicial or harmless error." *Saunders,* 942 F.3d at 392; *Golding,* 168 F.3d at 703-05.

The court concludes that MacDonald has not shown that either his Fifth or Sixth Amendment rights were violated, because he has failed to show, by a preponderance of the evidence, that Stoeckley confessed to Blackburn, or that Blackburn intimidated her into changing her testimony. For the reasons already detailed in this order, the court finds Britt's sworn statements, as a whole, to be unreliable and incredible, and specifically finds his assertions as to Stoeckley's confession to Blackburn and Blackburn's threat to be untrue.

Nor does the court find the testimony of Rouder or the affidavit of the elder Stoeckley to provide support for the idea that Blackburn intimidated Stoeckley into altering her trial testimony. *See* Htr. 355 (testifying that Stoeckley told her she couldn't tell the truth at trial because of "those damn prosecutors sitting there" and stating that "they'll fry me"); DX 5051 ¶ 11 ("She told me she was afraid to tell the truth because she was afraid of the prosecutor."). The elder Stoeckley's affidavit lacks any context showing precisely why Stoeckley allegedly was afraid of the prosecutors – whether her fear was the result of a "threat" from Blackburn, or the realization on her own account that she could be subject to prosecution. The same holds true for Rouder's testimony. Both only allow for speculation that Stoeckley falsely testified *because* Blackburn threatened her.

Gene Stoeckley's testimony comes the closest to showing that Stoeckley told her mother she did not testify truthfully because of a threat from the prosecutor. Htr. 331 ("What my mother would say along those lines was that they wouldn't let her testify, she wanted to testify, but she was threatened with prosecution for murder."). Notably, however, the elder Stoeckley allegedly told Gene that Helena

was not "allowed" to testify at trial, not that Helena lied on the stand because of a threat. Htr. 331-32 ("Q. Regardless of the threat, the statement was that your sister was not allowed to testify at the trial? A. Correct."). Helena Stoeckley, of course, *did* testify at trial; no one prevented her testimony. Nevertheless, assuming that Helena Stoeckley did in fact tell her mother that she was not "allowed" to testify, this only serves to highlight what this court already has observed: Helena Stoeckley herself was not credible or reliable. The court cannot find, based on this hearsay statement from the unreliable Stoeckley, that she was in fact threatened by Blackburn and therefore induced to testify falsely.

The court also agrees with the Government that it is telling that, other than her mother, "no person to whom Stoeckley spoke, or allegedly spoke about this subject, from the completion of the prosecution interview on August 16, 1979 to her death in 1983, reported that Stoeckley told him or her about a threat from Blackburn and its supposed impact on her trial testimony." Gov't Post-Hearing Mem. [DE-344] at 186. This list includes Judge Dupree, Red Underhill, Lynn Markstein, Jerry Leonard, Kay Reibold, Ted Gunderson, Prince Beasley, Homer Young, Butch Madden, Ernest Davis and Sara McMann.[60]

Having found that MacDonald has failed to show that Stoeckley confessed to Blackburn, the court also finds that MacDonald has not shown that Blackburn misrepresented to the court the substance of the prosecution's interview with Stoeckley. Additionally, as the court observed in its 2008 Order, this "fraud upon the court" theory "depends on the truth of Segal's representations to Judge

---

[60]  In contrast, and as this court noted in 2008, the trial transcript reveals that over the weekend of August 18-19, 1979, Stoeckley had expressed her mortal fear of an unknown person who had punched her in the face at the motel, the "damn prosecutors," defense counsel Bernard Segal, unidentified persons who rendered her life "not worth five cents on the street," Allen Mazzarole, and possibly her fiancé, Ernest Davis.

*MacDonald X*, 2008 WL 4809869, at *27 n.28.

Dupree that Stoeckley essentially had cleared MacDonald of the crimes by her admissions during the defense team's interview in the presence of half a dozen or more witnesses the day before." *MacDonald X*, 2008 WL 4809869, at *20. The record, fully supplemented by the September 2012 evidentiary hearing, indicates that Stoeckley made no such statements during the defense interview. *See* Ttr. 5617 (Smith informing Judge Dupree, "Generally, she said to us the same thing and this, 'I don't remember.' But in two or three or four instances – whatever the list would reveal – she says something which would give an interesting insight into her mind."); Htr. 114 (Smith testifying: "I was absolutely devoted to this case and upheld my role as counsel and I'm still devoted to this case, but I did not hear Helena Stoeckley say useful things for us. It is certainly possible. And I mentioned [a] while ago, maybe I was out of the room. I do not know the answer. But I can only speak for myself and that is that when I was present she did not say things that helped us."); Htr. 969-77 (McGinniss testifying that Stoeckley maintained throughout the defense interview that she had no memory of being present during the murders).

In sum, MacDonald has failed to show, by a preponderance of the evidence, that (1) Stoeckley confessed to Britt; (2) Stoeckley confessed to Blackburn; (3) Blackburn threatened Stoeckley such that she was intimidated into altering her testimony; or (4) Blackburn misled the defense and the court as to the prosecution's interview of Stoeckley. Accordingly, as to the merits, the "Britt claim" is DENIED.

## 2.     The Footnote Claim

As this court has observed, MacDonald argues, in a footnote in his post-hearing Reply memorandum, that he has shown a constitutional violation because "the government failed to disclose significant exculpatory or favorable evidence to MacDonald before his trial." *See* Post-Hearing Reply [DE-351] at 9 n.6. The sole support for this assertion is a citation to an article written by one of

MacDonald's former attorneys. *See id.* (citing Harvey Silverglate, *Reflections on the Jeffrey MacDonald Case*, THE CHAMPION, May 2013 at 52). This article raises essentially the same points MacDonald argued in his petition for habeas corpus filed pursuant to § 2255 in 1990; namely, that the Government "withheld laboratory bench notes written by government agents which would have aided the defense, and exploited the suppression of . . . the lab notes by knowingly presenting a false and perjurious picture of the evidence and underlying facts." *MacDonald V*, 778 F. Supp. at 1344; *compare* Silverglate, at 54-55 (arguing that "[a]s a result of the failure of the prosecution to turn over *Brady* material in a format and at a time when it could be useful to the defense at trial, some enormously potent exculpatory evidence was not available for use by MacDonald's lawyers at his trial," including the bench notes of Glisson identifying the presence of long blond synthetic hairs in a brush at the crime scene and the report of a government examiner showing the presence of black wool fibers on the club and Colette).

The court will assume, without deciding, that MacDonald is not otherwise barred from raising this successive claim.[61] Nevertheless, the court finds that MacDonald has not shown that he is entitled to relief thereon, and this claim is DENIED on the merits.

Again, MacDonald raised a seemingly identical claim in his § 2255 petition filed in 1990, arguing that the government suppressed exculpatory evidence in violation of *Brady* and also presented its case in a manner intentionally designed to conceal the exculpatory evidence, which also violated his due process rights. The exculpatory evidence "consist[ed] of government forensic lab notes describing (1) three blond synthetic hairs found in a hairbrush located in the MacDonald home and (2) black and green wool fibers, not matched to any source in the MacDonald home, found on the murder weapon and on Colette MacDonald's body." *MacDonald V*, 966 F.2d at 856-57 (footnote omitted).

---

[61] It is well settled that 28 U.S.C. § 2244(b)(1) bars claims raised by a state prisoner in a second or successive § 2254 petition that were previously presented in a prior application. *See* 28 U.S.C. § 2244(b)(1) ("A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed."); *see also United States v. Winestock*, 340 F.3d 202, 204-05 (4th Cir. 2003). What is unsettled, however, is whether § 2244(b)(1) applies to § 2255 motions filed by federal prisoners, like MacDonald. Section 2255's provision applicable to second or successive motions does not contain the same language found in § 2244(b)(1), leading some commentators to conclude that "[r]ead literally, § 2255(f) provides that a second or successive motion may be filed, regardless of whether a claim was presented in a prior motion, so long as the motion is certified by the court of appeals to satisfy one of two exceptions for newly discovered evidence or new rules of constitutional law." BRIAN R. MEANS, POSTCONVICTION REMEDIES § 27:4. Nevertheless, some courts have held that the term "prior application" in § 2244(b)(1) encompasses a motion under § 2255. *See White v. United States*, 371 F.3d 900, 901 (7th Cir. 2004) ("It would be odd if Congress had intended that a federal prisoner could refile the same motion over and over again without encountering a bar similar to that of section 2244(b)(1), and we have therefore held that 'prior application' in that section includes a prior motion under section 2255."); *see also Green v. United States*, 397 F.3d 101, 102 n.1 (2d Cir. 2005) (per curiam); *Charles v. Chandler*, 180 F.3d 753, 758 (6th Cir. 1999) ("Charles is not entitled to file a successive § 2255 motion to vacate because he seeks permission to file the same claims that have already been denied on the merits." (citing § 2244(b)(1))). The Fourth Circuit Court of Appeals has yet to weigh in on the issue. *See Winestock*, 340 F.3d at 205 ("Although [§ 2244(b)(1)] is limited by its terms to § 2254 applications, some courts have also applied it to § 2255 applications. . . . We need not decide here whether to follow this approach."); *see also MacDonald XI*, 641 F. 3d at 614 n.9 ("[I]t is an open issue in this Circuit – one we need not resolve today – whether § 2244(b)(1) applies to successive claims presented in second or successive § 2255 applications.").

160

Judge Dupree denied the petition, for several alternative reasons. First, Judge Dupree determined that the allegedly suppressed evidence was not material; i.e., he had not shown either a reasonable probability or any reasonable likelihood "of a different result had MacDonald been given access to the lab notes at trial." *MacDonald V*, 778 F. Supp. at 1351-53. Alternatively, Judge Dupree found that the Government's attorneys had not violated *Brady* because they allowed MacDonald the opportunity to examine and test all of the physical evidence, including the actual fibers, and because the Government attorneys had not read the lab notes regarding the fibers and were not aware of any potentially exculpatory materials therein. *Id.* at 1353-54. Finally, Judge Dupree found the 1990 petition to be procedurally barred under the then-applicable doctrine of abuse of the writ. *Id.* at 1356-60.

Assuming that the article by Mr. Silverglate – again, the sole support for MacDonald's successive claim – can constitute some sort of evidence or argument in support of MacDonald's claim, nothing therein dictates a different result from the one reached by Judge Dupree. The court has reviewed the transcript of the motion hearing held before Judge Dupree on June 26, 1991, and Silverglate's recent article reiterates the same arguments he made in open court on that date. Even if the court assumes – and it does not– that the additional evidence MacDonald has compiled since 1990 could change Judge Dupree's finding on materiality, Judge Dupree also denied the petition on the basis that the prosecution complied with its duties under *Brady* by affording MacDonald an opportunity to examine and test any of the physical evidence, irrespective of tendering the lab notes. *See MacDonald V*, 778 F. Supp. at 1353 (citing *United States v. Wolf*, 839 F.2d 1387, 1391 (10th Cir. 1988) ("If the means of obtaining the exculpatory evidence has been provided to the defense, however, a *Brady* claim fails, even if the prosecution does not physically deliver the evidence requested."); *United States v. Page*, 828 F.2d 1476, 1479 (10th Cir. 1987) ("[A] new trial is not warranted by evidence which, with

reasonable diligence, could have been discovered and produced at trial."); *United States v. Ramirez*, 810 F.2d 1338, 1343 (5th Cir. 1987) ("[A] *Brady* violation does not arise if, with reasonable diligence, [a defendant] could have obtained the information.")). Judge Dupree also found that MacDonald had presented no evidence showing that the prosecution attorneys were aware of the contents of the lab notes at issue. *See id.* at 1354, 1355. The court does not make different findings or reach an opposite conclusion because of Silverglate's article.

Accordingly, to the extent that MacDonald asserts a separate claim in footnote 6 of his post-hearing Reply memorandum, that claim is DENIED on the merits.

### 3.    The Unsourced Hairs Claim

MacDonald's unsourced hairs claim is an "actual innocence" claim; that is, he argues that he is entitled to habeas corpus relief solely because he is actually innocent of the murders of his family members. The United States Supreme Court has never explicitly recognized a freestanding actual innocence claim,[62] although it has recognized the *possibility* of such a claim, "assum[ing], for the sake of argument . . ., that in a capital case a truly persuasive demonstration of 'actual innocence' made after

---

[62] As one commentator has observed:
Critical to understanding freestanding claims of actual innocence is the distinction between actual innocence and legal innocence. A defendant seeking relief based on legal innocence, or "legal insufficiency," contends that the prosecutor has failed to produce sufficient evidence at a criminal trial to establish guilt beyond a reasonable doubt. Conversely, a defendant seeking relief based on actual innocence contends that he or she did not commit the crime alleged, regardless of the judge or jury's finding of legal innocence. Unlike [] legal innocence, actual innocence focuses entirely on the factual predicate of the offense. . . .
. . . .When a defendant claims actual innocence independent and unaccompanied by any other [constitutional] claim . . . it is referred to as a "freestanding" actual innocence claim. For claims of freestanding actual innocence, a prisoner seeks only to rebut the factual findings of the crime for which he was convicted.
Matthew Aglialoro, Note, *A Case for Actual Innocence*, 23 CORNELL J.L. & PUB. POL'Y 635, 639-40 (2014) (footnotes and citations omitted).

162

trial would render the execution of a defendant unconstitutional." *Herrara v. Collins*, 506 U.S. 390, 417 (1993). In *Herrara*, the Court explained that "the threshold showing for such an assumed right would necessarily be extraordinarily high," and found that the petitioner's evidence was "far short of that which would have to be made in order to trigger the sort of constitutional claim which we have assumed, *arguendo*, to exist." *Id.* at 417, 418-19. Whether a freestanding actual innocence claim is cognizable remains an open question. *McQuiggin v. Perkins*, ___ U.S. ___, 133 S.Ct. 1924, 1931 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 71 (2009) (recognizing that the Court has assumed, *arguendo*, that there is a federal constitutional right to be released upon proof of "actual innocence" but also "noting the difficult questions such a right would pose and the high standard any claimant would have to meet"); *House v. Bell*, 547 U.S. 518, 554-55 (2006) (declining to resolve the issue of whether a freestanding actual innocence claim is cognizable). Similarly, although the Fourth Circuit has in the past stated that precedent prevents it from recognizing freestanding actual innocence claims, *see Royal v. Taylor*, 188 F.3d 239, 243 (4th Cir. 1999),[63] in later cases the court appears to have assumed, without deciding, that such claims are cognizable. *See Teleguz v. Pearson*, 689 F.3d 322, 328 n.2 (4th Cir. 2012) (stating in

---

[63] The *Royal* court stated:

> Royal maintains that his actual innocence in and of itself renders his conviction and execution violative of the Eighth and Fourteenth Amendments. Precedent prevents us from granting Royal's habeas writ on this basis alone. Because federal habeas relief exists to correct constitutional defects, not factual errors, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state proceeding."

188 F.3d at 243 (quoting *Herrera*, 506 U.S. at 400). The *Royal* court also observed that as in *Herrera*, the petitioner had a forum in the State – an executive clemency process – to pursue a claim of actual innocence, and, accordingly, it could not grant him "habeas relief based simply on his assertion of actual innocence due to newly discovered evidence." *Id.*

dicta that "[a] petitioner may also raise a freestanding innocence claim in a federal habeas petition");

*MacDonald XI*, 641 F.3d at 616-17 (observing that the Supreme Court "has yet to come across any prisoner who could make the 'extraordinarily high' threshold showing for such an assumed right");

*Hunt*, 2000 WL 219755, at *2 ("Even granting Hunt all necessary analytical assumptions to overcome the procedural bars imposed by *Herrara*, his claim that the PCR/DNA test results exonerate him of the murder of Mrs. Sykes cannot survive *Herrara*'s stringent evidentiary standard."). *See also* Kathleen Callahan, Note, *In Limbo: In re Davis and the Future of Herrera Innocence Claims in Federal Habeas Proceedings*, 53 ARIZ. L. REV. 629, 636 n.41 (2011) ("The Fourth Circuit has used somewhat contradictory language in describing the cognizability of *Herrera* innocence claims, in one case noting that the *Herrera* decision held "that claims of actual innocence are not grounds for habeas relief even in a capital case," *Rouse v. Lee*, 339 F.3d 238, 255 (4th Cir. 2003), and in other cases treating *Herrera* claims as if they could, possibly, be cognizable in capital habeas proceedings, *Wilson v. Greene*, 155 F.3d 396, 404-05 (4th Cir. 1998)).

Like the Supreme Court and the Fourth Circuit, this court will assume, *arguendo*, that a freestanding actual innocence claim is cognizable. The court nevertheless finds that MacDonald has not met the "extraordinarily high" burden required for this court to grant the relief he requests. This raises the question, of course, as to exactly what the "extraordinarily high" burden entails. The Supreme Court has not yet articulated the burden. *See Teleguz*, 689 F.3d at 328 n.2 ("The Supreme Court has not articulated the standard under which these claims should be evaluated, but has made clear that the threshold for any hypothetical freestanding innocence claim [is] extraordinarily high.") (internal quotation marks omitted). The Fourth Circuit, for its part, appears to have used a standard that is *at least* as rigorous as the "clear and convincing" gatekeeping standard under § 2255(h)(1). In *Hunt v.*

164

*McDade*, the Fourth Circuit stated that "[t]o be entitled to relief, . . . petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, 'no rational trier of fact could [find] proof of guilt beyond a reasonable doubt.'" 2000 WL 219755, at \*2 (quoting *Herrera*, 506 U.S. at 429 (White, J., concurring) (quoting *Jackson*, 443 U.S. at 324 (1979));[64] *see also Hazel v. United States*, 303 F. Supp. 2d 753, 760 n.13 (E.D.Va. 2004) (observing that the standard used in *Hunt* is "essentially similar to that prescribed in § 2244 for successive petitions," and observing the similarities between § 2244(b)(2)(B) and § 2255(h)). Indeed, one would expect that to prove the merits of a freestanding actual innocence claim, a movant would have to satisfy a more demanding burden of proof than that set forth in the gatekeeping statute.

Nevertheless, even if the court assumes that the standard for evaluating a freestanding actual innocence claim is identical to the standard employed in the court's gatekeeping duties under § 2255(h)(1), for the reasons the court already has discussed, MacDonald has failed to meet this "extraordinarily high" burden. Although the court has viewed the evidence in the record as a whole, it is worth noting that the new evidence upon which MacDonald most heavily relies is (1) the unsourced hairs; (2) the saran fiber evidence; and (3) the alleged confessions of Stoeckley and Mitchell. It bears repeating that neither the unsourced hairs evidence, nor the saran fiber evidence, are as exculpatory as MacDonald contends. The saran fiber evidence ultimately just invites speculation as to the source of the fibers, and by no means compels a conclusion that the fibers came from a wig worn by Stoeckley. As to the unsourced hairs, it is true that the presence of naturally shed, non-bloody

---

[64] In *Hunt*, the Fourth Circuit evaluated newly discovered DNA test results, "along with the entirety of the evidence introduced at both trials," and was "unable to conclude that no rational jury would have convicted Hunt of the murder." *Hunt*, 2000 WL 219755, at \*3.

165

unsourced hairs *could* be evidence of intruders; it also could be like other random household debris, and not indicative of intruders. In this manner, the unsourced hairs evidence is similar to evidence that MacDonald argued at trial was indicative of intruders: other unsourced hairs, unsourced fingerprints and palm prints, unsourced wax, and the existence of a pink fiber in his eyeglasses. The presence of three additional naturally shed unsourced hairs is of minimal additional probative value.

That leaves, of course, the alleged confessions of Stoeckley and Mitchell. Even if the court accepts, as credible and reliable, the live testimony and affidavit testimony of the individuals who allegedly heard these confessions, the court cannot, on the record before it, consider Stoeckley or Mitchell to be credible or reliable themselves. Stoeckley's credibility and reliability problems have been exhaustively detailed in numerous opinions over the years; again, the fact that she may have confessed to her mother or attorney (presumably after telling them earlier, conflicting stories) does nothing to bolster her credibility or reliability. Nor can the court find Mitchell to be credible and reliable, in light of his previous sworn statements that contradict his late-in-life hearsay confessions. Even when the court considers, as a body, all of the evidence marshaled by MacDonald throughout the history of the case, the court cannot conclude that MacDonald has shown, by clear and convincing evidence, that no reasonable juror would have found him guilty.

Comparing the instant case to the record before the Supreme Court in *House v. Bell* reinforces this conclusion. In that case, House faced the death penalty for killing Carolyn Muncey, whose body was discovered in underbrush on an embankment up the road from her driveway in rural Tennessee. 547 U.S. at 522. Key pieces of evidence offered against House included testimony that blood found on jeans he wore the night of the crime was consistent with Muncey's blood and that it was "impossible" that the blood was House's. *Id.* at 528-29. Evidence also was presented indicating that

166

semen found on the victim's nightgown and underwear appeared to be consistent with House. *Id.* at 529. The prosecutor argued at trial and sentencing that House, who had a previous conviction for sexual assault, committed the murder during a sexual assault on the victim. *Id.* at 532-33.

After failing to obtain relief in the state court of appeals, House filed an untimely federal habeas petition, bringing forward new evidence showing that semen found on the victim's clothing belonged to her husband, and not him. House also presented testimony showing that blood evidence used against him appeared to have been deposited on the victim's clothing after the autopsy, and not when the victim was alive, which raised "substantial questions about the blood's origin." *Id.* at 542-48. House also presented evidence from "multiple sources" that Muncey's husband regularly abused his wife, testimony from two witnesses who said Muncey's husband had confessed to the crime, and testimony from another witness indicating that the husband attempted to construct a false alibi the morning after the crime. *Id.* at 548-53. The Supreme Court found that this new showing of evidence was enough to satisfy the lower standard[65] to enter the gateway for federal review of his otherwise barred claims, but it was *not* enough to establish "whatever burden a hypothetical freestanding innocence claim would require." *Id.* at 555.

MacDonald's evidence in this case is less compelling than the evidence presented in *House*. Unlike in *House*, where new DNA evidence contradicted the "only forensic evidence at the scene that would link House to the murder," *id.* at 541, in this case MacDonald's new forensic evidence serves to only create additional speculative questions as to the possible origins of the unsourced hairs and

_____

[65] In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court held that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of the new evidence, "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." *Id.* at 327.

saran fibers. While the evidence undoubtedly has some probative value, it does not do much to bolster the argument, originally presented at trial, that intruders committed the murders. It also does nothing to exclude MacDonald as the perpetrator of the crime, nor does it strongly suggest that some other specific individual was the perpetrator. It follows, accordingly, that if the new evidence in *House*, which included significant evidence calling into question "the central forensic proof connecting House to the crime" in addition to confessions by another suspect, was not enough to establish actual innocence, then the additional equivocal forensic evidence in this case, combined with the confessions of Stoeckley and Mitchell, are not enough to do so, even when considered against the other evidence proffered by the parties. Again, because MacDonald has not established, by clear and convincing evidence, that no reasonable juror would find him guilty of the murders of his family, his actual innocence claim is DENIED on the merits.

## CONCLUSION

For the foregoing reasons, the court finds that MacDonald has not established, by clear and convincing evidence, that no reasonable factfinder would have found him guilty of the murder of his wife and two daughters, and therefore he has failed to satisfy the gatekeeping standard set forth in 28 U.S.C. § 2255(h)(1). Alternatively, assuming that MacDonald can satisfy the gatekeeping standard, the court finds that he has failed to establish any of his constitutional claims by a preponderance of the evidence, and has failed to establish any assumed actual innocence claim. His Motion to Vacate [DE-111] is therefore DENIED.

Having denied MacDonald's motion, the court must determine if he has made a sufficient showing to entitle him to a certificate of appealability. A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). When

the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller–El v. Cockrell*, 537 U.S. 322, 336–38 (2003). However, when a district court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484-85. Here, Macdonald has not made the requisite showing, and therefore, a certificate of appealability is DENIED.

SO ORDERED.

This the 2⅟ day of July, 2014.

_____

James C. Fox
Senior United States District Judge

169