| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| JEFFREY R. MacDONALD, | ) | |
| Movant. | ) | |
| | ) | |

This matter is before the court on Jeffrey MacDonald's Motion Pursuant to the Innocence Protection Act of 2004, 18 U.S.C. § 3600, for New Trial Based on DNA Testing Results and Other Relief [DE-176] ("the IPA motion"). For the reasons set forth below, the motion is DENIED.

## RELEVANT PROCEDURAL HISTORY[1]

In 1997, MacDonald filed a motion, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, to reopen the proceedings on his second post-conviction motion which was filed in 1990. In the motion, MacDonald alleged fraud by the Government concerning his 1990 motion, and sought an order permitting new DNA testing of certain evidence that had been collected from the crime scene. Specifically, MacDonald proffered an affidavit from one of his then-attorneys, Philip G. Cormier, through which he sought "access to all of the physical evidence that has been examined by [Special] Agent [Michael] Malone for the purpose of ascertaining whether or not Malone's examinations were properly conducted and his conclusions were reliable, accurate and truthful." Aff. of Cormier No. 2 [DE-49] ¶ 6. MacDonald also sought "other unsourced hairs, skin and blood . . .

---

[1] This order presumes familiarity with the long-running history of this case and with the court's July 24, 2010 Order [DE-355] denying MacDonald's Motion to Vacate, Set Aside or Correct pursuant to 28 U.S.C. § 2255 [DE-111].

found in critical locations at the crime scene" for examination and DNA testing. *Id.* This court denied the motion insofar as it sought to reopen the 1990 motion, and transferred the remaining matters to the Fourth Circuit Court of Appeals for consideration as a petition for leave to file a successive § 2255 motion. *See United States v. MacDonald*, 979 F. Supp. 1057, 1059 (E.D.N.C. 1997).

In one of his appeals from this court's 1997 order, MacDonald sought authorization to file a successive § 2255 motion. He specifically stated the following:

> Further, MacDonald has requested that the District Court order the government to give him access to certain items of physical evidence in the case which, if analyzed properly, would demonstrate his actual innocence. These items, which are documented in the handwritten laboratory bench notes of the Army and FBI Lab examiners, consist primarily of hairs and blood debris found in extraordinarily telling locations – *namely under the fingernails of the victims, on their hands, on their bodies, or on their bedding*. The lab notes reveal that the government's lab examiners had attempted to source these hairs by comparing them to known hairs taken from the victims and from Dr. MacDonald, *but they were never able to match these hairs to any member of the MacDonald family*, resulting in the obvious and highly exculpatory conclusion that these strategically-located hairs came from outsiders, thus corroborating MacDonald's account. With respect to certain blood debris found under the fingernails or hands of the victims, the government was able to determine the blood type in some instances but not others. *See* Affidavit of Philip G. Cormier No. 2 – Request for Access to Evidence to Conduct Laboratory Examinations – in Support of Jeffrey R. MacDonald's Motion to Reopen 28 U.S.C. § 2255 Proceedings and for Discovery . . . which describes these hairs and blood debris in detail.
>
> MacDonald has sought access to this highly specific and crucial category of physical evidence for the purpose of subjecting these unsourced hairs and blood debris to DNA testing in an effort to establish MacDonald's innocence by demonstrating definitively that these items did not originate from any MacDonald family member nor from MacDonald himself, but instead originated from one or more of the intruders whom MacDonald described seeing in his home on the night of the murders.

Mem. in Supp. of Jeffrey MacDonald's Motion for an Order Authorizing the District Court for the Eastern District of North Carolina to Consider a Successive Application for Relief Under 28 U.S.C.

2

§ 2255, at 6-7 (Sept. 17, 1997) (emphasis in original). The Fourth Circuit denied MacDonald authorization to file a successive § 2255 motion, but remanded the matter to this court to oversee DNA testing. *See In re MacDonald*, No. 97-713 (4th Cir. Oct. 17, 1997) (unpublished). The full text of the Fourth Circuit's order provided:

> Upon consideration of the motion of Jeffrey R. MacDonald, filed pursuant to 28 U.S.C. § 2244
>
> IT IS ADJUDGED AND ORDERED that the motion with respect to DNA testing is granted and this issued is remanded to the district court.
>
> In all other respects, the motion to file a successive application is denied.

*Id.*

On remand, MacDonald filed his Motion for an Order to Compel the Government to Provide Access to the [sic] All Biological Evidence for Examination and DNA Testing by his Experts [DE-73]. Therein, MacDonald contended that the Fourth Circuit Court of Appeals' mandate entitled him to the "full universe of exhibits that contain biological evidence – hairs, bloodstains, tissue and body fluids – collected from the crime scene to which the government has full access." Mem. in Supp. of MacDonald's Motion for an Order to Compel the Government to Provide Access to All Biological Evidence [DE-74] at 2. He attached three spreadsheets detailing the various items to which he sought access, and clarified in a footnote:

> Without waiving his right to have access to the full universe of biological evidence that was collected from the crime scene, MacDonald has particularized for the government and the Court those exhibits, to which he initially seeks access in three spreadsheets . . . . [T]he process of assessing which of the presently known items are relevant to Dr. MacDonald's factual innocence claim is a dynamic one in which evidence not previously believed to be relevant may subsequently prove relevant. For this reason, MacDonald seeks an order requiring the government to make available to his experts all of the biological evidence that was collected from the crime scene. In the event that the court initially allows access only to the items listed on the

3

> spreadsheets, MacDonald reserves his right to move in the future for access to additional exhibits which contain biological evidence based on the results of the initial testing.

*Id.* at 2 n.1. The Government opposed MacDonald's motion, arguing that the Fourth Circuit's mandate limited MacDonald's access to only those items of biological evidence specifically identified in his motions papers before that court.

In response to the parties' dispute, the court ordered the following:

> The court has examined carefully the parties' respective arguments in light of the context of the appellate court's order, and concludes that the Fourth Circuit Court of Appeals has mandated that the Government provide to MacDonald's experts access to the existent and known unsourced hairs, blood stains, blood debris, tissue and body fluids specifically identified in the April 22, 1997 Affidavit of Philip G. Cormier No. 2 – Request for Access to Evidence to Conduct Laboratory Examinations – in Support of Jeffrey R. MacDonald's Motion to Reopen 28 U.S.C. § 2255 Proceedings and for Discovery, for non-destructive DNA testing in all current and existing forms including, without limitation, both nuclear and mitochondrial testing.
> Accordingly, it hereby is ORDERED that the United States produce and make available to MacDonald's experts within sixty (60) days of the date of this order the biological evidence described in the preceding paragraph so that such experts may conduct any appropriate non-destructive DNA examinations thereof. All testing of such items shall be completed prior to September 1, 1999.
> MacDonald's request for further discovery is DENIED as beyond the mandate of the Court of Appeals.

December 11, 1998 Order [DE-86] at 3.

The court issued additional orders setting the parameters for DNA testing, and it commenced. On May 17, 1999, the FBI delivered almost 200 items (AFDIL Specimens 1-188) to the Armed Forces DNA Identification Laboratory ("AFDIL") for evaluation of DNA Testing. This transfer included many items in addition to the items specifically identified in Cormier Affidavit No. 2. *Compare* Cormier Affidavit No. 2 ¶¶ 21-62 *with* AFDIL Report [DE-123-2] at 10-14.

4

While the testing was in progress, the Innocence Protection Act of 2004 ("the IPA") came into effect on October 30, 2004. The IPA "allows federal prisoners to move for court-ordered DNA testing under certain specified conditions." *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 63 (2009). In correspondence between MacDonald's then-defense attorney and prosecutors in late 2004 and early 2005, the parties agreed to the following:

> c.	The defendant agrees not to file any other motion for DNA testing, ~~pending~~ *prior to* the completion of the instant testing, and the filing of the report with the District Court by AFDIL reflecting the results of that testing;
>
> *With the further clarification by the Government that this provision does not preclude the defense from ever filing a motion for DNA testing under the Innocence Protection Act (IPA), the defense agrees to this condition. By this clarification the Government makes no concession with respect to the merits of any future motion which may be filed under the IPA.*

January 14, 2005 Letter [DE-212-1] at 13 (strikethrough and italics in original).

The DNA report from the Department of Defense Armed Forces Institute of Pathology was issued on March 10, 2006. As the court already has exhaustively detailed in its July 24, 2014 Order [DE-354], just prior to the DNA report being issued, MacDonald filed a proposed successive § 2255 motion. On March 22, 2006, he filed a motion to add an additional predicate to his § 2255 motion, namely a "DNA claim" or "unsourced hairs" claim. The court eventually denied MacDonald's various motions. *See United States v. MacDonald*, Nos. 75-CR-26-3, 5:06-CV-24-F, 2008 WL 4809869 (E.D.N.C. Nov. 4, 2008). On appeal, the Fourth Circuit vacated this court's order, and remanded the case for further consideration of MacDonald's proposed § 2255 claims. *See United States v. MacDonald*, 641 F.3d 596 (4th Cir. 2011).

Following the Fourth Circuit's issuance of the mandate in this case, the court scheduled a status conference, which was later continued at MacDonald's request, to September 21, 2011. On

5

the eve of the status conference, MacDonald through separate counsel, Christine Mumma, Director of the North Carolina Center on Actual Innocence, filed the IPA motion. Therein, MacDonald sought an order authorizing his "inspection (including microscopic inspection) of the physical evidence to identify biological evidence, and to conduct further and expeditious DNA testing of additional biological evidence that the defendant will identify after inspection of the physical evidence." IPA Mot. [DE-176] ¶ 9.[2] MacDonald's request for additional DNA testing was premised on "recent advances in DNA testing [that] have resulted in new methods and/or technology." *Id.* ¶ 8. MacDonald's counsel, Mumma, submitted an affidavit discussing "Y-STR" testing and "Touch" DNA. *See* Aff. of Christina Mumma [DE-176-1] ¶ 8 ("Provided the evidence in the Jeffrey MacDonald case has been properly preserved and a chain of custody has been maintained, DNA testing such as Y-STR testing and Touch DNA testing of evidence collected from the investigation of the murders could be very probative."). Mumma submitted that "[i]tems collected into evidence which would be significant for testing include the weapons used to commit the MacDonald murders . . . ; fingernail scrapings taken from the victims; pieces of a surgical glove presumably worn by the

---

[2] In the IPA motion, MacDonald originally sought a new trial or alternatively, an order permitting him to conduct additional DNA testing. Specifically, he moved for a new trial pursuant to 18 U.S.C. § 3600(g), which allows an applicant to move for a new trial "if DNA test results obtained under this section exclude the applicant as the source of the DNA evidence." By the plain terms of the statute, only DNA test results obtained from testing conducted pursuant to the statute – that is, pursuant to testing ordered by a court under § 3600(a) – can form the basis for the motion for new trial. Initially, MacDonald argued that his 1997 motion for DNA testing [DE-46], which ultimately produced the 2006 AFDIL test results [DE-119], should be considered as his timely IPA motion under § 3600(a). *See* Motion [DE-176], ¶ 5 ("Defendant's 1997 request for DNA testing (while the [AFDIL/AFIP] testing was being conducted in 2004) constitutes a request for relief under the IPA."). Of course, the IPA was not even enacted until 2004, and MacDonald now concedes that "his 1997 Motion for DNA Testing did not constitute a request for testing under the IPA." IPA New Trial Reply [DE-237] at 6. In light of this concession, to the extent his IPA motion [DE-176] sought a new trial, it is DENIED.

perpetrator; and blood drops and smears taken from areas where it appears the perpetrator touched things or may have bled while moving through the home." *Id.* ¶ 9.

At the previously-scheduled status conference the next day, the court directed MacDonald to provide the Government within 14 days with a list of exhibits he wished to subject to additional DNA testing. *See* 2011 Hearing Transcript [DE-193] at 40. On October 10, 2011, MacDonald filed his List of Trial Exhibits for Additional DNA Testing Pursuant to the IPA [DE-189], and attached a list captioned "MacDonald-Recommendations for Additional DNA testing-miniSTR and/or Y-STR testing" [DE-189] containing at least 79 items. As the caption indicates, MacDonald for the first time raised the issue of miniSTR testing, but did not mention "Touch" DNA. The list does not mention "Touch" DNA.

## TYPES OF DNA TESTING

With respect to the evidence previously tested by the AFDIL, "DNA was extracted, amplified, and analyzed for autosomal Short Tandem Repeats (STRs) and mitochondrial DNA [mtDNA]." [DE-119-2] at 1. "Generally speaking, every cell contains two types of DNA: nuclear DNA, which is found in the nucleus of the cell, and mitochondrial DNA, which is found on the outside of the nucleus in the mitochondrion." *United States v. Beverly*, 369 F.3d 516, 528 (6th Cir. 2004). "MtDNA . . . is inherited only from the mother and thus all maternal relatives will share the same mtDNA profile, unless a mutation has occurred." *Id.* at 529. With nuclear DNA, however, "half is inherited from the mother and half from the father, and each individual, with the exception of identical twins, almost certainly has a unique profile." *Id.* Accordingly, mtDNA has been said to be a test of exclusion, as opposed to nuclear DNA testing, which is one of identification. *Id.* That being said, mtDNA "has some advantages over nuclear DNA analysis in certain situations." *Id.* Because

7

there are a vast number of mitochondria in each cell, as opposed to just one nucleus, a significantly greater amount of mtDNA usually can be extracted by a lab technician as opposed to nuclear DNA; accordingly, mtDNA testing is "very useful for minute samples or ancient and degraded samples." *Id.* Additionally, mitochondrial DNA can be extracted from sources that do not have a nucleus, like bone samples or a hair without a root segment. *United States v. Coleman*, 202 F. Supp. 2d 962, 965 (E.D. Mo. 2002).

> Both STR testing (or nuclear) and mtDNA testing follow the same four-step process:
>
> The first step is extraction. During extraction, the DNA sample is purified from any other substances contained in the sample. The second step is polymerase chain reaction ("PCR") amplification, which makes copies of the DNA for analysis. Third, sequencing is accomplished to identify the order of [nucleotide bases] in the sample. The same analysis – extraction, amplification, and sequencing – is completed on both the known and unknown samples, adhering to certain safeguards to prevent the contamination of the unknown sample. Finally the sequencing of the unknown sample is compared to the sequencing of a known sample.

*Id.* at 966; *see also* Aff. of Terry Melton [DE-75] ¶¶ 6-8 (describing mtDNA testing); Aff. of Tina Delgado [DE-228] ¶ 4 (describing STR testing).

MiniSTR analysis, which was mentioned by MacDonald for the first time in his list of recommendations for additional testing, "is a methodology that may be used on degraded DNA samples to help recover information lost during conventional STR analysis." Aff. of Tina Delgado [DE-228] ¶ 12. As Tina Delgado, the Biometrics Analysis Section DNA Technical Leader of the FBI, explains:

> Degraded DNA can occur due to sample age, humidity, bacteria, chemicals, and/or environmental insults that affect the quality of the DNA. Degraded DNA often does not amplify during the PCR process, resulting in no results. MiniSTR analysis amplifies the same locations, however utilizes smaller PCR products which enhances the recovery of the information from the sample.

8

> MiniSTR analysis should only be used when samples have been subject to degradation or the quality is poor. The DNA profiles obtained from properly preserved samples from miniSTR and conventional STR analysis will be the same. Therefore, there is no additional benefit in using miniSTR analysis over conventional methodologies.

*Id.* ¶¶12-13. Although the use of miniSTR methodology apparently began in 1994, a commercial kit,[3] called MiniFiler, first became available in March 2007. *See* Aff. of Meghan E. Clement [DE-238-21] ¶ 5; Timeline of Events Surrounding Development and Use of miniSTR Loci for Forensic DNA Typing, http://www.cstl.nist.gov/biotech/strbase/miniSTR/timeline.htm (last visited Aug. 8, 2014) (also available at [DE-265-9]).

The second type of testing referenced by MacDonald in his list of recommendations is Y-STR analysis. According to Delgado, "Y-STR analysis is a methodology that amplifies DNA from the male Y chromosome." Aff. of Tina Delgado [DE-228] ¶ 14; *see also* Aff. of Christine Mumma [DE-176-1] ¶ 5 ("Y-STR testing allows for the specific identification of Y-chromosome (male) markers."). Because the Y chromosome is passed down from father to son with little or no change, "all individuals within a male lineage will have the same Y-STR profile, thus limiting its discriminatory power." *Id.*[4] Y-STR analysis is useful where there is potential for a mixture of male and female DNA in a sample. Aff. of Christine Mumma [DE-176-1] ¶ 5. For example, it is extremely

---

[3] A commercial DNA kit has been likened to a chemistry set: it "include[s] all of the materials used in DNA testing and detailed instructions on how to produce results." Jennifer N. Mellon, Note, *Manufacturing Convictions: Why Defendants are Entitled to the Data Underlying Forensic DNA Kits*, 51 Duke L.J. 1097, 1098 (2001). Courts have viewed kits as applications of a particular scientific methodology. *See United States v. McCluskey*, 954 F. Supp. 2d 1224, 1258-59 (D.N.M. 2013) (compiling cases where courts viewed a party's challenge to a new kit as constituting a challenge to the application of STR methodology and not a challenge to the methodology itself).

[4] Accordingly, some commentators have observed that "Y-STR typing is in many respects the twin of mtDNA typing, which has the same strengths, and same weaknesses, for matrilineal assessments." DAVID L. FAIGMAN, ET AL. 4 MODERN SCIENTIFIC EVIDENCE § 31.30 (2013-14 ed.).

useful in cases of sexual assault, where typically "the overwhelming amounts of female DNA prevent the detection of male DNA in lower concentration." Aff. of Tina Delgado [DE-228] ¶ 14. It also may be useful in excluding a known suspect. JUSTICE MING W. CHIN, ET AL. FORENSIC DNA EVIDENCE: SCIENCE AND THE LAW § 1:2 ("[A] Y-STR match means that neither the suspect who supplied the tested sample nor any of his paternally related male relatives may be excluded as the potential source of the male DNA collected from the victim or the crime scene."). Y-STR kits have been available since at least 2003. J.M. BUTLER, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, RECENT DEVELOPMENTS IN Y-SHORT TANDEM REPEAT AND Y-SINGLE NUCLEOTIDE POLYMORPHISM ANALYSIS 100 (2003).

"Touch" DNA also was referenced in Mumma's affidavit filed in support of MacDonald's IPA motion. Mumma asserts that while testing previously was typically only conducted on visible stains, now testing can be conducted even if a stain is not visible, because "[t]he transfer of just a few skin cells can now result in a detectable profile." Aff. of Christine Mumma [DE-176-1] ¶ 7. The Government contends that any testing for "Touch DNA" would necessarily involve Low Copy Number ("LCN") analysis. According to Delgado, LCN analysis "is an enhancement strategy used for items of evidence potentially containing 'touch DNA.'" Aff. of Delgado [DE-228] ¶ 8. She explains:

> LCN analysis utilizes the same techniques as conventional STR analysis with modifications to increase test sensitivity including the increase of amplification cycles in PCR and post amplification purification of the DNA samples. . . . LCN analysis generally increases the risk of DNA typing inaccuracies and is not permitted in the [National DNA Index System (NDIS)]. Studies have shown that LCN analysis can profoundly alter the performance characteristics of the PCR and result in demonstrable losses of fidelity and reproducibility.

10

*Id.* She explains other weaknesses with LCN testing, including that "results typically exhibit a combination of various individuals who have handled an item, not exclusively those involved in a criminal act." *Id.* ¶ 10. Because of the various issues with LCN analysis, including the lack of national guidelines or technical standards governing it, the FBI Laboratory does not conduct that type of testing. *Id.* ¶ 11.

MacDonald proffers the affidavit of Meghan E. Clement, the Technical Director in the Forensic Identity Laboratory at Laboratory Corporation of America, Holdings (LabCorp), who does not take issue with most of Ms. Delgado's assertions. She submits, however, that because newer kits like MiniFiler and Y-Filer have become available, the ability to develop a profile from old or degraded material has greatly increased, and it may not be necessary to use LCN analysis. Aff. of Meghan Clement [DE-238-21] ¶ 5.

## ANALYSIS

Under the Innocence Protection Act, a person imprisoned under a federal criminal judgment is entitled to DNA testing of specific evidence related to that conviction if ten prerequisites are met. 18 U.S.C. § 3600(a).[5] As to almost every prerequisite, the parties dispute whether MacDonald has

---

[5] These requirements include that (1) the applicant assert under penalty of perjury that he is actually innocent of a federal crime, § 3600(a)(1); (2) the specific evidence to be tested was secured in relation to the investigation or prosecution of the federal crime, § 3600(a)(2); (3) the specific evidence to be tested was not previously subjected to testing, and the applicant did not knowingly fail to request DNA testing of that evidence in a prior motion for postconviction DNA testing, or if the specific evidence was previously subjected to DNA testing, the applicant is requesting DNA testing using a new method or technology that is substantially more probative than the prior DNA testing, § 3600(a)(3); (4) the specific evidence to be tested is in the possession of the Government and has been retained under conditions sufficient to ensure that such evidence has not been contaminated or altered in any respect material to the proposed DNA testing, § 3600(a)(4); (5) the proposed DNA testing is reasonable in scope, uses scientifically sound methods, and is consistent with accepted forensic practices, § 3600(a)(5); (6) the applicant identifies a theory of defense that is not inconsistent with a theory of defense presented at trial and that would establish his actual innocence, § 3600(a)(6); (7) the identity of the perpetrator was an issue at the trial of the applicant, § 3600(a)(7); (8) the proposed DNA testing may produce new material

11

met his burden. The court, for its part, finds that MacDonald's IPA motion is untimely under the statute, and it is therefore DENIED.

In addition to nine other prerequisites, the IPA requires that a motion for order of DNA testing of evidence be "made in a timely fashion." 18 U.S.C. § 3600(a)(10). Any motion not made within 60 months of the enactment of the Justice for All Act of 2004 (the IPA) or within 36 months of the defendant's conviction is presumed to be untimely. *Id.* That presumption can be rebutted if a court finds:

> (i) that the applicant was or is incompetent and such incompetence substantially contributed to the delay in the applicant's motion for a DNA test;
> (ii) the evidence to be tested is newly discovered DNA evidence;
> (iii) that the applicant's motion is not based solely upon the applicant's own assertion of innocence and, after considering all the relevant facts and circumstances surrounding the motion, a denial would result in manifest injustice, or
> (iv) upon good cause shown.

18 U.S.C. § 3600(a)(10)(B).

Here, it is undisputed that MacDonald's motion is presumed to be untimely. He filed the motion on September 20, 2011, which was 82 months after the enactment of the Justice for All Act of 2004.[6] Moreover, even though the parties agreed that MacDonald would not file a motion for DNA testing prior to the filing of the AFDIL report with this court, that report was filed on March 10, 2006 [DE-119] – meaning that MacDonald waited 66 months to file the instant IPA motion.

---

evidence that would support the theory of defense and raise a reasonable probability that the applicant did not commit the offense, § 3600(a)(8); (9) the applicant certifies he will provide a DNA sample for comparison, § 3600(a)(9); and (10) the motion is made in a timely fashion, § 3600(a)(10).

[6] The IPA took effect on October 30, 2004.

Having conceded that his motion is presumed untimely, MacDonald contends that he has nonetheless rebutted that presumption. Specifically, he argues that (1) he has shown good cause; (2) the evidence he seeks to have tested is newly discovered DNA evidence; and (3) the denial of the motion would result in manifest injustice. The court does not agree.

MacDonald's good cause argument appears to be premised upon the agreement he reached with prosecutors during DNA testing in 2005. To reiterate, correspondence between prosecutors and MacDonald's then-legal counsel shows that the parties agreed to the following:

> c. The defendant agrees not to file any other motion for DNA testing, ~~pending~~ *prior to* the completion of the instant testing, and the filing of the report with the District Court by AFDIL reflecting the results of that testing;
>
> *With the further clarification by the Government that this provision does not preclude the defense from ever filing a motion for DNA testing under the Innocence Protection Act (IPA), the defense agrees to this condition. By this clarification the Government makes no concession with respect to the merits of any future motion which may be filed under the IPA.*

January 14, 2005 Letter [DE-212-1] at 13 (emphasis in original). Based on this agreement, MacDonald attempts to cast blame for his delay on the Government, and characterizes the Government's position as "disingenuous." *See* IPA Additional Testing Reply [DE-238] ¶ 50 ("MacDonald's motion should be considered timely because the delay in filing the motion was at the request of the Government. . . . In light of [the January 2005] correspondence, the Government's stance that MacDonald's IPA motion is untimely is disingenuous."). Respectfully, the court finds that MacDonald is the party who has taken the disingenuous stance.

Although MacDonald tries to extrapolate from his agreement that any IPA motion he files should be deemed timely so long as litigation surrounding his § 2255 unsourced hairs claim remains pending, the plain language of the correspondence shows that MacDonald agreed not to file any other

13

motion for DNA testing prior to the filing of the AFDIL report. That report was filed in March 2006; MacDonald's IPA motion was not filed until 66 months later. There is no mention in the correspondence between the Government and MacDonald of the defense refraining from filing a motion for DNA testing while he pursued § 2255 litigation based on the AFDIL report. Indeed, the IPA itself provides that any motion under the statute "shall not be considered to be a motion under section 2255." § 3600(h)(3). Accordingly, MacDonald's attempt to attribute his inaction to the fact that the § 2255 proceeding was still ongoing is misplaced. Moreover, the Government explicitly qualified in the agreement that it was not conceding the merits of any future IPA motion filed by MacDonald. Filing a motion under the statute in a timely fashion is one of the ten prerequisites for securing DNA testing under the IPA. Reserving the right to challenge the merits of any future IPA motion, accordingly, includes the right to contest its timeliness. Consequently, the court cannot find that MacDonald has shown good cause for his delay in filing the IPA motion.

Nor can the court find that MacDonald has rebutted the presumption of untimeliness because he is seeking to test "newly discovered DNA evidence." MacDonald correctly observes that the IPA does not define the phrase "newly discovered DNA evidence." MacDonald argues, however, that when § 3600(a)(10)(b)(ii) is read in conjunction with § 3600(a)(2) – which requires the evidence to be secured in relation to the investigation or prosecution – it is evident that newly discovered DNA evidence "could only logically be describing a newer, more accurate method of DNA testing than was available in the past." IPA Additional Testing Reply [DE-238] ¶ 47. MacDonald then argues that because Minifiler kits were not available until the fall of 2006, and Y-Filer kits were not available until 2006, he is seeking a form of testing not previously available either at the time of his 1979 trial or when the prior testing was conducted. According to MacDonald, this means that the evidence he

14

seeks to have tested is "newly discovered DNA evidence." *Id.*

Even if the court accepts MacDonald's interpretation that "newly discovered DNA evidence" under the IPA means "a newer, more accurate method of DNA testing than was available in the past, the court still cannot find that MacDonald has rebutted the presumption of untimeliness. First, Y-STR testing has been available since 2003. J.M. BUTLER, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, RECENT DEVELOPMENTS IN Y-SHORT TANDEM REPEAT AND Y-SINGLE NUCLEOTIDE POLYMORPHISM ANALYSIS 100 (2003). Thus, the methodology has been available since the time the 2006 AFDIL report was filed, and MacDonald did not seek to utilize it until 66 months later. MiniSTR testing has been available since March 2007 – well before MacDonald filed the instant IPA motion.

More importantly, the record shows that Y-STR and miniSTR testing and analysis are useful mainly where conventional STR testing cannot or does not yield accurate results. *See* Aff. of Delgado [DE-228] ¶¶ 12-13 (explaining that "MiniSTR analysis should only be used when samples have been subject to degradation or the quality is poor" and that because "[t]he DNA profiles obtained from properly preserved samples from miniSTR and conventional STR analysis will be the same . . . there is no additional benefit in using miniSTR analysis over conventional methodologies"); ¶ 14 ("Y-STR analysis does provide valuable information when the overwhelming amounts of female DNA prevent the detection of male DNA in lower concentration, typically in cases of sexual assault."); ¶ 15 ("[T]he applications of [miniSTR and Y-STR] methodologies are quite specific and don't replace conventional STR typing."). Out of the at least 79 exhibits that

15

MacDonald now seeks to test, approximately only 23 of them were previously examined by AFDIL.[7] *Compare* Recommendations for DNA testing–miniSTR and/or Y-STR testing [DE-189-1] *with* Government Schedule A [DE-227-5]. The 56 remaining items have never been subjected to conventional STR analysis. Given that neither miniSTR nor Y-STR testing are meant to replace conventional STR analysis, it is difficult to attribute MacDonald's delay in filing his IPA motion to advancements in those methodologies. Indeed, MacDonald himself posits that until samples of DNA are extracted from the various items, "it is not appropriate to determine specifically which kit is most suitable to use in order to develop a DNA profile for any particular item of evidence." Reply [DE-238] ¶ 28. This leads the court to observe that conventional STR testing may prove appropriate for many of the items MacDonald seeks to have tested. The belated nature of MacDonald's IPA motion does not, therefore, appear to be caused by the advancements in DNA testing. The court accordingly concludes that the fact that fact that MacDonald now seeks miniSTR and Y-STR testing does not rebut the presumption of untimeliness, pursuant to § 3600(a)(10)(B)(ii).

Finally, the court does not find that the denial of MacDonald's motion would result in "manifest injustice." The term "manifest" is defined under the IPA to mean "that which is unmistakable, clear, plain or indisputable and requires that the opposite conclusion be clearly evident." § 3600(a)(10)(C)(ii). MacDonald asserts he has shown that a denial of his IPA motion for further testing will result in "manifest injustice – a life sentence for an innocent man who has not been given a chance to conclusively prove his innocence in a court of law." IPA Additional Testing

---

[7] For at least six of these items, DNA testing results were not available because when AFDIL examined the items, the vials appeared to be empty. *See* July 28, 1999 AFDIL Correspondence [DE-227-8] at 2 (listing D233, D234, D236, D237, D238, and E4 as vials that appeared to be empty). It is unclear how miniSTR or Y-STR would be useful as to those exhibits.

Reply [DE-238] ¶ 48. It is unclear how, in this aspect, MacDonald differs from any other IPA applicant. Presumably any applicant who has untimely filed a motion under the IPA, along with some other evidence other than his own assertion of innocence, would argue the same thing – that the denial of the motion results in his loss of opportunity to prove his innocence conclusively. If that is all that is required to rebut the presumption of untimeliness, however, then the presumption is meaningless. Moreover, after examining all the facts and circumstances, as this court must under the IPA, the court observes that it already has found the bulk of the "exculpatory evidence" relied upon by MacDonald to bolster his assertion of innocence to be not reliable or credible. *Compare* IPA Additional Testing Reply [DE-238] ¶ 48 ("MacDonald's motion is not based solely upon his own assertion of innocence, but rather, is coupled with an abundance of exculpatory evidence gathered since the time of trial[,] . . . includ[ing] . . . the Britt Claim, the results of the previous round of DNA testing, the affidavit of the elder Helena Stoeckley, the affidavits regarding Greg Mitchell's repeated confessions, and the blond synthetic hair-like fibers found at the crime scene.") *with* July 24, 2014 Order [DE-354] at 136-48, 154-58 (finding MacDonald's evidence regarding Stoeckley and Mitchell's alleged confessions to be not reliable or credible).

MacDonald has had the benefit of numerous talented and dedicated attorneys over the course of this case. MacDonald and his legal team have repeatedly sought relief from his convictions over the years, often with unreliable and specious evidence. MacDonald, and his team, were aware since at least 2005 of the potential need to file an IPA motion, yet he failed to seek relief under the IPA until 2012. Given the unreliable and equivocal nature of the evidence MacDonald has proffered in the past in assertion of his innocence, the court does not find that he has shown that the denial of his motion will result in manifest injustice.

17

Case 3:75-cr-00026-F   Document 356   Filed 08/08/14   Page 17 of 18

MacDonald's motion is presumed to be untimely under the IPA, and he has failed to rebut the presumption of untimeliness. The motion, therefore, is DENIED.

## CONCLUSION

For the foregoing reasons, MacDonald's Motion Pursuant to the Innocence Protection Act of 2004, 18 U.S.C. § 3600, for New Trial Based on DNA Testing Results and Other Relief [DE-176] is DENIED.

SO ORDERED.

This the 8' day of August, 2014.

*James C. Fox*
James C. Fox
Senior United States District Judge