UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 3:75-CR-00026-F
No. 5:06-CV-00024-F

UNITED STATES OF AMERICA,      )
                               )
            v.                 )            O R D E R
                               )
JEFFREY R. MacDONALD,          )


This matter is before the court on the Motion to Alter or Amend Judgment [DE-357] filed

by Jeffrey MacDonald. The matter has been fully briefed and is ripe for ruling. For the reasons

stated below, the motion [DE-357][1] is DENIED.

## I. BACKGROUND

This order presumes some familiarity with the court's July 24, 2014 Order [DE-353] denying

Jeffrey MacDonald's Motion to Vacate under 28 U.S.C. § 2255 [DE-354] which is the basis for the

Judgment [DE-355] MacDonald seeks to alter or amend. In summary, the court found that

MacDonald failed to meet his burden under the procedural gatekeeping bar set forth in § 2255(h)(1)

because he did not proffer new evidence that was sufficient to establish by clear and convincing

evidence that no reasonable factfinder would have found him guilty of the murders of his wife and

daughters. The court alternatively assumed that MacDonald could satisfy the gatekeeping burden

under § 2255(h), but found that he had failed to prove any of his claims on the merits.

---

[1] For purposes of this Order, "DE" designates the docket entry on the court's official Docket
Sheet. "Ttr." refers to the transcript from the trial. "GX" and "DX" refer to exhibits offered by the
Government and MacDonald, respectively, at the September 2012 evidentiary hearing. References in
this order to page numbers are to those page numbers assigned by CM/ECF in the instant proceeding as
opposed to page numbers in the original documents.

Specifically, as to MacDonald's first claim, the court concluded that he failed to show, by a preponderance of the evidence that Helena Stoeckley confessed to Assistant United States Attorney Jim Blackburn, or that Blackburn intimidated her into changing her testimony, and therefore MacDonald had not established a violation of his Fifth or Sixth Amendment rights. As to the second claim, the court also concluded that MacDonald had failed to show a Fifth Amendment *Brady*[2] violation with respect to the Government's alleged suppression of government forensic lab notes describing (1) three blond synthetic hairs found in a hairbrush located in the MacDonald home and (2) black and green wool fibers, not matched to any source in the MacDonald home, found on the murder weapon and on Colette MacDonald's body. Specifically, the court found that the prosecution complied with its duties under *Brady* by affording MacDonald an opportunity to examine and test any of the physical evidence, irrespective of tendering the lab notes. The court also found that there was no evidence showing that prosecution attorneys were aware of the contents of the lab notes at issue. As to MacDonald's third claim, the court assumed, *arguendo*, that a freestanding actual innocence claim is cognizable, but nevertheless found that MacDonald failed to establish, by clear and convincing evidence, that no reasonable juror would find him guilty of the murders of his family. Finally, the court concluded that MacDonald failed to make the requisite showing which would entitle him to a certificate of appealability.

On August 21, 2014, MacDonald filed the instant Motion to Alter or Amend Judgment [DE-357]. Therein, MacDonald argues that the judgment should be amended to reflect new evidence regarding Michael Malone, a Federal Bureau of Investigation ("FBI") Agent who submitted affidavits in response to MacDonald's 1990 § 2255 petition. Specifically, MacDonald argued that

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

a report entitled *An Assessment of the 1996 Department of Justice Task Force Review of the FBI Laboratory* [DE-357-1], issued by the Department of Justice, Office of the Inspector General in July 2014 (the "2014 OIG Report"), should be considered by the court, and that such evidence supports the vacating of his convictions. Alternatively, MacDonald argues that the court should amend the judgment to issue him a certificate of appealability.

The Government responded in opposition [DE-358]. Days before MacDonald's reply was due, the Government filed a Notice of Filing Relating to Movant's Pending Rule 59(e) Motion [DE-363]. Attached to the Notice was a letter from Norman Wong, Special Counsel to the United States Department of Justice ("DOJ"). *See* September 17, 2014 Letter [DE-363-2]. In the letter, Mr. Wong advised that the DOJ and the FBI had reviewed "laboratory reports and testimony by FBI Laboratory examiners in cases involving microscopic hair comparison analysis." *Id.* at 1. Mr. Wong further advised:

> We have determined that the microscopic hair comparison analysis testimony or laboratory report presented in this case included statements that exceeded the limits of science and were, therefore invalid: (1) the examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others – this type of testimony exceeded the limits of science; (2) the examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association – this type of testimony exceeded the limits of science. (A copy of the documents upon which our determination is based is enclosed.) We take no position regarding the materiality of the error in this case.

*Id.* at 2 (footnote omitted).

Enclosed with the letter was a document entitled "Microscopic Hair Comparison Analysis: Result of Review" [DE-363-3]. This report reflects the conclusion of the FBI lab review team, with

3

the concurrence of the Innocence Project ("IP"). Based on its review of the lab reports and trial testimony in the MacDonald case, the FBI/IP identified three errors:

1. A lab report by Michael Malone, dated 2/4/1991, contained an "Inappropriate Statement" on page 2 (". . . consistent with having originated from Jeffrey MacDonald.").

2. A lab report by Robert Fram, dated 5/19/1999 contained an "Inappropriate Statement" on TEU 1 (". . . consistent with having originated from KIMBERLY MACDONALD.").

3. The trial testimony of Paul Stombaugh on August 7-9, 1979, contained "Inappropriate Statements," found in Trial Transcript 4294, Lines 1-6:

```
1    A.    Sir, the only conclusion on the hair
2          examination that I was going to make was its origin.
3    Q.    That is pretty serious about whose hair it
4          is.  That is a fundamental question you were being
5          asked.
6    A.    That is correct.
```

[DE-363-3] at 5-6; Ttr. 4294 [DE-363-8].

Two days later, MacDonald filed a Reply [DE-364], arguing that new information contained in the report attached to Wong's letter justifies amending the judgment, or alternatively, requires new briefing. The court thereafter ordered supplemental briefing from the parties.

In MacDonald's supplemental briefing, he argues that the"revelations of misfeasance and malfeasance by Michael Malone, Paul Stombaugh and Robert Fram in this litigation are 'new evidence'" justifying amending the judgment. Supplemental Mem. [DE-379] at 8. MacDonald also argues that "their unacceptable behavior in this litigation, under the auspices of the federal government and the Department of Justice, must be rectified to prevent 'manifest injustice.'" *Id.* In its supplemental response [DE-382], the Government states that it has no objection to the court considering any of the new evidence, but it asserts that the new evidence should not change the

4

court's previous findings as to MacDonald's showing as to the gatekeeping or the merits of his claims.

## II. STANDARD OF REVIEW

Rule 59(e) permits a court to alter or amend a judgment. Fed. R. Civ. P. 59(e). Although the rule itself does not set forth any guidelines as to when such a motion should be allowed, the Fourth Circuit has recognized three grounds for an amending a judgment pursuant to Rule 59(e): "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available [previously]; or (3) to correct a clear error of law or prevent manifest injustice." *Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 386 n.2 (4th Cir. 2010) (alteration added & citation omitted). "It is an extraordinary remedy which should be applied sparingly." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012). A "district court has considerable discretion in deciding whether to modify or amend a judgment." *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 241 n.8 (4th Cir. 2008).

## III. EVIDENCE UNDERLYING THE MOTION TO ALTER OR AMEND

As the court has recounted above, the new evidence upon which MacDonald relies is the 2014 OIG Report and the "Microscopic Hair Comparison Analysis: Result of Review."

The 2014 OIG Report addresses:

how the Criminal Division Task Force (Task Force), created by the [DOJ] in 1996 and whose mission was redefined in 1997, managed the identification, review, and follow-up of cases involving the use of scientifically unsupportable analysis and overstated testimony by FBI Lab examiners in criminal prosecutions. We analyzed the Task Force's review of cases involving 13 FBI examiners the Task Force determined had been criticized in the 1997 OIG report. We included in our review a close examination of cases handled by 1 of the 13 examiners, Michael Malone, the Lab's Hairs and Fibers Unit examiner whose conduct was particularly problematic.

5

2014 OIG Report [DE-357-1] at 2. In the portion of the Report concerning the close examination of cases handled by Malone, the OIG stated that Malone "repeatedly created scientifically unsupportable lab reports and provided false, misleading, or inaccurate testimony at criminal trials." *Id.* at 45. The OIG's purpose in closely examining Malone's work was "to illustrate the significance of the problems that became known to the Task Force about Malone's work and testimony in criminal cases" and to highlight "the lack of a corresponding response by the [DOJ], the Task Force, or the FBI . . . ." *Id.* Other than the statement that "Malone became well known to many judges and law enforcement community because of his forensic work on several high profile cases, including those of Jeffrey MacDonald, a Green Beret Army surgeon convicted of murdering his wife and children at Fort Bragg, North Carolina" there is no other mention of Malone's work in the instant case. *Id.*

The "Microscopic Hair Comparison Analysis: Result of Review" does, however, specifically reference evidence and testimony introduced throughout the 40-plus-year history of the instant case, and identifies three statements, detailed above, that the reviewers deemed invalid because the statements exceeded the limits of science. It bears repeating that the task before this court when it issued the July 2014 Order was determining, for gate-keeping purposes, whether MacDonald had proffered newly discovered evidence, that if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found MacDonald guilty of the murder of his wife and two daughters. In making this assessment, the court had to consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the [evidentiary rules]." *United States v. MacDonald*, 641 F.3d 596, 612 (4th Cir. 2011) (internal quotations and citations omitted;

alterations in original). Given that the task before the court was to evaluate MacDonald's newly discovered evidence in light of "the evidence as a whole," the court finds it necessary to briefly recount the role the evidence underlying the three invalid statements has played in this litigation.

**A.    Inappropriate statement in the 2/4/1991 Lab Report of Michael Malone**

The first inappropriate statement identified in the "Microscopic Hair Comparison Analysis: Result of Reviw" is contained in the February 4, 1991, Lab Report of Malone [DE-363-6]. Malone first became involved in this litigation after MacDonald filed his 1990 Petition for Post Conviction Relief Pursuant to 28 U.S.C. Section 2255. In the 1990 Petition, MacDonald alleged the Government suppressed exculpatory evidence in the form of laboratory bench notes, which he argued showed the presence of unsourced hairs and fibers. One of the unsourced hairs was the Q79/E303 hair from within the body outline of Colette MacDonald. This hair would later come to be known as AFDIL[3] specimen 75A. In response to the 1990 Petition, the Government offered evidence of Malone's 1990-91 examination of the actual hairs and fibers.

In the February 4, 1991, Lab Report regarding the Q79 hair, Malone stated:

> This hair [Q79] was compared to the pubic hair sample of JEFFREY MACDONAL (specimen K22). This hair exhibits the same individual microscopic characteristics as the pubic hairs of JEFFREY MACDONALD, and accordingly is consistent with having originated from JEFFREY MACDONALD.

[DE-363-6] at 3. Malone also qualified that "hair comparisons do not constitute a basis for absolute personal identification. *Id.*  The "Microscopic Hair Comparison Analysis: Result of Review" states that Malone's assertion that Q79 "exhibits the same individual characteristics as the pubic hairs of [MacDonald], and accordingly is consistent with having originated from [MacDonald]" was invalid

---

[3]  Armed Forces Institute of Pathology's DNA Identification Laboratory.

7

because it "assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source . . . ."September 17, 2014 Letter [DE-363-2] at 3; "Microscopic Hair Comparison Analysis: Result of Review" [DE-363-3].[4]

As the court recounted in the July 24, 2014, Order, the 1990 Petition was denied. Eventually, the Q79 specimen was subjected to DNA testing, and was identified as AFDIL specimen 75A. The results of the DNA testing showed that the specimen was "not consistent with any other sample tested," and therefore did not belong to Jeffrey MacDonald. Accordingly, the DNA testing rendered Malone's 1991 observations irrelevant. The Q79/AFDIL Specimen 75A was one of the three "unsourced hairs" MacDonald relied on in asserting his actual innocence claim.

**B        Inappropriate Statement in 5/19/1999 Lab Report by Robert Fram**

The second inappropriate statement identified in the "Microscopic Hair Comparison Analysis: Result of Review" is found in the lab report by Robert Fram, dated 5/19/1999. Fram was an examiner in the FBI Lab Hairs and Fiber Unit, and tasked with generating still photographs of the entire inventory of materials that were to undergo DNA examination at the AFDIL lab pursuant to this court's order, as well as photographing the unpackaging and mounting process. Prior to this assignment, Fram had no involvement in this case. Aff. of Fram [DE-219] ¶ 7.

In preparing the evidence for transfer to the AFDIL lab, Fram documented the contents of the slides, including whether hair was present and, if it was, what the observable characteristics of the hairs were. *Id.* During this process, Fram examined a glass microscope slide marked for identification "19 ½ L2082 Q96 PMS," which contained four hairs. *Id.* ¶ 26. He observed that one

---

[4] Malone's December 31, 1990 Lab Report also was reviewed, but no inappropriate statements were identified in it.

of hairs was a Caucasian head hair with what he observed to be a forcibly removed root. *Id.* He compared this to the known sample from Kimberly MacDonald, and documented the results of the examination in his May 19, 1999 Lab Report:

> A forcibly removed Caucasian head hair found on one of the Q96 resubmitted glass microscope slides, (labeled "19 ½" on the slide), exhibits the same microscopic characteristics as hairs in the K2 specimen. Accordingly, this hair is consistent with having originated from KIMBERLY MACDONALD, the identified source of the K2 specimen.

May 19, 1999 Lab Report [DE-363-7] at 7. The statement that the hair is consistent with having originated from Kimberly MacDonald is the one identified as being invalid. Fram later stated in the report that "[h]air comparisons are not a basis for personal identification." *Id.*

After Fram's examination, the Q96 "19 ½'" slide was submitted to AFDIL for DNA testing, and AFDIL designated this slide as 112A. Stipulations, Ex. 2 [DE-306-2] at 24. In the process of removing the slip cover from the 112A slide, the four hairs therein were broken into nine fragments and had to be remounted at AFDIL as 112A(1) through 112A(9). *See* Aff. of Fram [DE-219] ¶ 28. Before these samples were tested for DNA, they were resubmitted to Fram to determine if he could tell if any of the nine hair fragments could be associated with the Q96 "19 ½'" hair with root. *Id.* Fram issued a second report on November 1, 2001, regarding this re-examination in which he concluded that Q96.5 (AFDIL 112A(5)), contained a light brown Caucasian head hair with a forcibly removed root, and is the same hair as the original Q96 "19 ½'" hair with root that he had previously examined. *Id.* ¶ 29. AFDIL testing of Specimen 112A(5) confirmed that this hair had the same mtDNA sequence as Colette, Kimberly and Kristen. AFDIL DNA Report [DE-119-3] at 3.

The May 19, 1999 report of Fram was first introduced in this case in 2011, when the Government attached it as an exhibit to Fram's affidavit filed as a part of its response to

MacDonald's Motion for a New Trial Pursuant to 18 U.S.C. 3600. Prior to the 2012 evidentiary hearing, MacDonald and the Government stipulated that the Q96 "19½'" hair with root was the same as that later designated Q96.5 by Fram and 112A(5) by AFDIL, and had the mtDNA sequence of Colette, Kimberly and Kristen. *See* Stipulations [DE-306] ¶¶ 15, 25. This hair was *not* one of the unsourced hairs underlying MacDonald's actual innocence claim.

## C. The trial testimony of Paul Stombaugh found in Trial Transcript 4294, Lines 1-6.

The third invalid statement identified in the "Microscopic Hair Comparison Analysis: Result of Review" is found in six lines of Paul Stombaugh's trial testimony, and concerns a hair collected from a bedspread found on the floor of the master bedroom and identified by the FBI as "Q96 H(from thread)."

This hair, which was entangled with a purple cotton thread matching those of MacDonald's pajama top, was discovered in 1974 by Shirley Green, a Physical Science Technician with the FBI Lab. *See* Gov't Response to Def's Petition for Post-Conviction Relief [DE-10], Attachment 5, Appendix at 221. Green's bench notes reflect that she soaked the thread in water to remove the hair, which she then mounted on a slide marked "Q96 H (from thread)." *Id.*; Aff. of Fram, Ex. 46 [DE-225-2].

Stombaugh, who was then a FBI special agent in charge of the Chemistry Branch of the Chemistry and Physics Section of the FBI crime laboratory, eventually examined the Q96 thread and hair, and issued laboratory reports. In a report dated November 5, 1974, Stombaugh included the results of his hair comparison of Q96 H (from thread). He stated:

> Light brown to blond head hairs that microscopically match the K1 head hairs of
> COLETTE MACDONALD were found in specimens . . . Q96 . . . . The Q96 hair

was found entangled around a purple cotton sewing thread like that used in the construction of the Q12 pajama top. Further, this hair had bloodlike deposits along its shaft.

November 5, 1974, Lab Report [DE-363-4] at 3.[5]

Stombaugh later testified at MacDonald's trial, from August 7, 1979 to August 9, 1979. Judge Dupree qualified Stombaugh as an expert on hairs and fiber identification, with no objection from MacDonald. Ttr. at 4025-31. MacDonald did object, however to Stombaugh being qualified as an expert in fabric damage, stains, and fabric impressions, which Judge Dupree overruled. Ttr. at 4029.

Stombaugh testified to, among other things, his examination of 18 vials of debris collected from the crime scene and from items seized as a result of the crime scene search. With regard to Q96 H (from thread), Stombaugh testified that he examined debris from the bedspread on the floor in the master bedroom and found that it consisted of one yarn fragment and two purple sewing threads, and opined that the threads and yarns could have originated from MacDonald's pajama top. Ttr. 4103-04. He also testified that he found a hair present in Q96, specifically, "one head hair wrapped around a sewing thread–tangled." Ttr. 4109. He stated that "this hair—in conducting a comparison examination with the comparison microscope, microscopically matched the head hairs of Colette MacDonald." Ttr. 4110.

Stombaugh testified to other matters, which the court will partially recount below. He also was subject to cross-examination by MacDonald's counsel, Bernard Segal. With regard to Q96H (from thread), Segal questioned Stombaugh about how or why the hair would be wrapped around

---

[5] This report was reviewed by the FBI in 2014 and no error was found. *See* Microscopic Hair Comparison Analysis: Result of Review [DE-363-3] at 5.

a thread during Stombaugh's 1974 examination, when it was collected in 1970 and had been in the custody of the CID Laboratory at Fort Gordon, Georgia. Ttr. 4290-93. Stombaugh confirmed that although he was aware that the CID Laboratory had done prior hair examinations in their investigation of the MacDonald family murders, he did not ask anyone whether someone at the lab had previously examined the hair found in Q96. Ttr. 4292. He confirmed that he had no knowledge of what had happened to the item between being collected in 1970, and the day he opened the vial in 1974. Segal and Stombaugh then had the following exchange:

```
6       Q.      And you, of course, expressed no curiosity
7       of how they were still wrapped around together after four
8       years of having been in the laboratory custody?
9       A.      I was curious about why they were wrapped
10      entwined around each other, but as to how it took
11      place, you can only report the condition of items
12      as they are received in the laboratory. You have no
13      control over what happened to them before.
14.     Q.      Doesn't it make a difference to you to find
15      out what treatment or handling a hair would
16      have had before you examined it in the laboratory?
17      A       The hair was not mounted sir, as were
18      many other ones in this submission. We opened the vials
19      up and identified what was inside. If they were
20      hairs, we would mount it on a slide and then they were compared.
```

Ttr. 4293. Segal then asked, "Mr. Stombaugh, the question was: weren't you concerned with what might have been done to that hair that might possibly lead you to a wrong conclusion unless you found out what they had done with it?" *Id.* Stombaugh's answer to this question and Segal's follow-up question, set forth below, are the testimony that the FBI identified as inappropriate in the Microscopic Hair Comparison Review:

```
1       A.      Sir, the only conclusion on the hair
2       examination that I was going to make was its origin.
3       Q.      That is pretty serious about whose hair it
4       is. That is a fundamental question you were being
```

12

5          asked.
6          A.          That is correct.

Ttr. 4294.

Post-trial, the Q96 H(from thread) specimen was one of the pieces evidence subject to this

court's order regarding DNA testing. AFDIL gave it the designation of AFDIL specimen number

113A. The DNA results for AFDIL 113A were found to be inconclusive. Stipulations [DE-306] ¶

23(e). MacDonald did not include it in his unsourced hairs claim.

**D.          Evidence regarding the pajama top demonstration**

Although neither the 2014 OIG Report nor the "Microscopic Hair Comparison Analysis:

Result of Review" discuss the pajama top demonstration that was presented to the jury at trial, the

parties both discuss it extensively in their briefing. Consequently, the court will recount the

necessary facts.

In 1971, pursuant to a request from the Commanding Officer of the U.S. Army CID Agency,

the FBI Laboratory conducted examinations of several items, including MacDonald's pajama top.

*See* June 7, 1971 Letter [DE-382-3]. Stombaugh conducted the examinations. *See* July 2, 1971

Report [DE-382-4].[6] In a July 2, 1971, report, Stombaugh concluded that 48 puncture holes were

located in the pajama top, although they were not necessarily made from 48 different thrusts. *Id.* at

2. He opined that the "puncture holes were made by a sharp pointed object such as an ice pick like

specimen Q3; however, the holes do not contain enough individual characteristics to be associated

with a particular instrument." *Id.* at 3. Stombaugh stated that "[t]he apparent frequent handling [of

---

[6]  MacDonald states in his briefing that Green took part in the 1971 examinations; however, the
record evidence shows that she was not involved in the MacDonald case until 1974. *See* Aff. of Shirley
Green ¶ 2 [DE-10, Attachment 5].

the garments he examined] has caused the yarns surrounding the holes to return for the most part, to their original positions thus preventing a definite conclusion to be made as to whether each hole is an 'entry' or an 'exit' hole." *Id.* He nevertheless reported that "based upon a microscopic examination . . . six holes in [MacDonald's pajama top] had the general appearance of being 'entry' holes and five holes had the general appearance of being 'exit' holes." *Id*. He did not designate in his report which of the holes had the appearance of being entry or exit holes. A June 10, 1971 laboratory worksheet prepared by Stombaugh, however, designates the "entry" and "exit" holes. *See* June 10, 1971 Laboratory Work Sheet [DE-382-5] at 3-4.

During the grand jury investigation in 1974, additional items were submitted to the FBI testing, along with the pajama top and other items for re-examination. Stombaugh also was supplied with photographs of the crime scene, which he did not have in 1971. Ttr. at 4182. Some of the photographs showed MacDonald's pajama top on top of Colette's body. Ttr. at 4185. He was asked to determine whether the puncture wounds to Colette could have been made through MacDonald's pajama top, if it were in fact on top of Colette's body. Ttr. at 4187. He used the photograph and worked with technician Green "to fold the pajama top as near as possible to the way it was folded on top of the body at the time these photographs were taken." Ttr. at 4187-88. After a lengthy period of time, Green was able to fold the pajama top so that all 48 holes in the pajama top roughly corresponded to the 21 puncture wounds in Colette's chest. Ttr. at 4192-4194; GX 3060 at 4-6 (October 17, 1974 Laboratory Report).

Both Stombaugh and Green testified at the trial. On direct examination, Stombaugh opined that the "puncture damage to [Colette's] chest could have been made through this pajama top while it was on her body." Ttr. at 4197. Stombaugh qualified, however, that in the photographs he was

14

provided "the pajama top is lower down on the chest and it appears to have been moved. If it was in the exact location, then you would be a little more assured that this happened. The pajama top is not—it appeared from the photographs to have been moved more down towards the abdomen." *Id.*

On cross-examination, MacDonald's attorney established that Stombaugh did not attempt to line up the stab wounds in Colette's chest with the two cuts in MacDonald's pajama top, and that he had counted 18 cuts in Colette's pajama top in addition to 30 puncture holes. Ttr 4357-61. Stombaugh agreed that there were other combinations by which the 48 puncture holes in MacDonald's pajama top could be lined up with the 21 puncture wounds in Colette's chest, but he had no idea how many combinations there could be:

> All I'm saying is that we used up all 48 holes with 21 thrusts, and we're just saying that it can be done. We are not saying this actually took place. We are saying this can be done. It could have taken place, and that's all this demonstration represents.

Ttr. 4371. He admitted that he "never experimented or attempted to compute in any way the number of possible combinations in which the same thing could be done[.]" Ttr. 4372. MacDonald's counsel also thoroughly established that Stombaugh and Green did not account for differences between the sizes of holes in MacDonald's pajama top and the size of wounds on Colette's chest. Ttr. 4372-84.

On direct examination, Green identified a photo enlargement depicting the pajama top reconstruction with the probes, and the actual probes themselves. Ttr 4430. She stated that she had done the reconstruction herself. Ttr 4431. Green described the pajama top reconstruction process, and indicated which holes corresponded to a single thrust, and how she color-coded them to reflect as much when the pajama top was unfolded. Ttr 4431-35. She also testified that she was never able to align the 21 probes through the pajama top in any other way, and that it had taken over a week to find this one "solution." Ttr. 4458. Green also testified regarding a series of photographs taken in

1978-1979 of the grouping patterns reflected on graph paper of the holes in both the pajama top reconstruction and the autopsy photos, created by inserting push pins into each that resulted in groupings of holes on graph paper. Ttr 4461-4474; GX 798-98, 1070, 1143. Green testified that graph paper showed similar left and right patterns in the graph paper for both the pajama top and Colette's body. *Id.*

During Green's cross-examination, she testified that she did not attempt to line up the two cuts in MacDonald's pajama top with any cuts to Colette's body. Ttr. 4476-77. When asked why she did not attempt to match the knife cuts, Green responded that she had not been asked to do so. Ttr. 4482. Green also testified that she had not seen the pajama top in 1971, and that in 1974, she did not examine the pajama top holes before she began the reconstruction process, but that Stombaugh had examined the holes. Ttr. 4483. According to Green, once she identified the "solution," she did not attempt to figure out other possible combinations, but she admitted there "could possibly be more; it could possibly be less; but it can be 21 holes exactly and come out into the same pattern as the pattern of the punctures on the victim." Ttr. 4498. She also testified that she did not attempt to line up the holes in MacDonald's pajama top with those present in Colette's pajama top. Ttr. 4501-02.

Green told the jury that while she was working on the pajama top reconstruction, she did not know which holes were entry holes and which holes were exit holes. Ttr. 4568. She knew that Stombaugh had previously reported that some holes may be entry or exit holes, but she did not have a copy of that report. Ttr. 4570. She recalled "there were possibly five exit and six entrance or vice-versa." *Id.* She recalled holes number 6, 14 and 20 were exit holes, but she did not make any notes about accommodating any other holes. Ttr. 4572.

16

During the time when Stombaugh testified, MacDonald requested, and was provided, a copy of the notes that Stombaugh had been using to testify. Ttr. 4254-55. Those notes included the June 10, 1971 Laboratory Work Sheet on which Stombaugh designated "entry" and "exit" holes in the pajama top. *See* 1990 Section 2255 Petition [DE-1], Vol 5, Aff. of John I. Thornton at ¶ 17, Ex. 16.

With regard to the pajama top, MacDonald offered his own expert witness, Dr. John I. Thornton, a Professor of Forensic Science at the University of California at Berkley. Dr. Thornton testified that he disagreed with Stombaugh's opinion that the pajama top was likely stationary when the puncture holes were made. Ttr. 5151-52. He also testified that, in his opinion, it was not possible for "Green, using the information that she had, to have made the reconstruction of the pajama top as she did." Ttr. 5218. Dr. Thornton examined the 1971 worksheet of Stombaugh that identified "entry" and "exit" holes, as well as a sheet prepared by Green, in which the "Victim Ice Pick Hole #s" are juxtaposed to "Hole #s in Q12 Shirt." After the examining the sheets, Dr. Thornton determined that Green's reconstruction had at least six discrepancies with Stombaugh's notes regarding the direction of the holes. Ttr. 5312-18. In other words, holes that Stombaugh had designated as an exit hole, were designated as entrance holes in Green's reconstruction, and vice-versa. *Id*.

On cross-examination, Dr. Thornton agreed with the Government's attorney that whether the pajama top had been right side out or inside out when the holes were inflicted would affect the determination as to which way the threads pointed. Ttr. 5333-34. He also agreed that by 1974 the yarns in the pajama top would have returned to their normal position, and thus any determination as to directionality made by Stombaugh in 1971 could not be confirmed in 1974. Ttr. 5325.

In closing, Segal argued that the pajama top reconstruction was "sheer fakery" and "not scientific evidence," noting that "no scientific criminal investigator" asked the question of whether the 48 puncture holes could be lined up to 21 puncture wounds; instead, it was a question posed by prosecutors. Ttr. 7239-40. Segal also argued:

> Stombaugh testified—contrary to my recollection of what the Government said—Stombaugh testified that he identified a certain number of holes as being exit holes in the pajama top and a certain number of holes as being entry holes. John Thornton testified and the Government never called Stombaugh or Shirley Green back to deny it that when they did—that was following Shirley Green's notes—that she used exit holes and entry holes and exit holes and entry holes and totally disregarded the principal finding that he made. Yes, Stombaugh did not identify every hole as entry or exit holes, but a dozen of them, he did.
> Shirley Green did not follow his findings. How in the name of heaven and rationality or justice are we supposed to say that you should draw any kind of inference from a demonstration that demonstrated nothing in the first instance and in the second instance, to state that it is false on its own terms. It doesn't do what it says it does. . . .
> . . . .
> On every basis you can think of, it is a fake. Now those are not easy words, but you ought to draw a conclusion. They did not in any way come back in here and say, "John Thornton made a mistake. John Thornton did not understand what Shirley Green did." They did not because they couldn't. This piece of evidence strikes me as the clearest singular example of the distortion in the name of pseudo-science done by the Government. It is an example of a demonstration which no scientist says could prove anything valid. . . .

Ttr. 7240-42.

## IV. ANALYSIS

MacDonald proffers two reasons why this court should allow his motion to alter its judgment and allow his motion to vacate his conviction. First, he contends that new evidence supports altering the judgment. Second, he contends that altering the judgment is necessarily to "prevent manifest injustice."

18

**A.     The new evidence does not support altering or amending the judgment**

Having reviewed the 2014 OIG Report and the "Microscopic Hair Comparison Analysis: Result of Review", the court concludes that MacDonald still has not met his gatekeeping burden under § 2255(h)(1). Additionally, and alternatively, the court concludes that MacDonald still has failed to adequately establish the merits of any of his claims.

First, none of the new evidence changes this court's conclusion that MacDonald failed to establish, by clear and convincing evidence, that no reasonable factfinder would have found him guilty of the murder of his wife and daughters. The 2014 OIG Report, while calling into question Malone's overall credibility, does not reference any of Malone's statements in the instant litigation. Additionally, when the court ruled in July 2014, it already had similar evidence which was unfavorable to Malone's credibility, offered by MacDonald to show a "pattern of deception" by Malone in other cases, in the form of excerpts of the Final Report of Department of Justice Inspector General Michael R. Bromwich, *The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases*, and an April 16, 1997 article from the *Wall Street Journal. See* July 24, 2014, Order [DE-354] at 70-71 (citing Aff. of Cormier No. 2, Ex. 1, Ex. 3 [DE-49]). Moreover, as the court noted in the July 2014 Order, even if the court accepts MacDonald's invitation to find Malone to be a wholly incredible witness, and therefore find that Malone falsely testified regarding the saran fiber evidence, the remaining evidence in the record "ultimately engenders speculation as to the origin of the fibers; it by no means compels a conclusion that the three blond saran fibers are a product of Stoeckley brushing her wig with Colette's hair brush." *Id.* at 136. Accordingly, the 2014 OIG Report does not, as MacDonald argues, "casts serious

19

doubt on a large portion of the government's theory of Dr. MacDonald's guilt." Suppl. Mem. [DE-379] at 13.

Similarly, the portion of the "Microscopic Hair Comparison Analysis: Result of Review" finding that Malone erred in his 1991 lab report when he stated that the Q79 hair "exhibits the same individual characteristics as the pubic hairs of [MacDonald], and accordingly is consistent with having originated from [MacDonald]" does nothing to impact the court's gatekeeping analysis.  As this court has detailed, the Q79 hair was eventually the subject of DNA testing, which (1) revealed that it was "not consistent with any other sample tested," and therefore did not belong to Jeffrey MacDonald, and (2) rendered Malone's prior opinion irrelevant. The Q79 hair, later denominated AFDIL 75A for DNA testing, was one of the three unsourced hairs the court considered when it issued the July 2014 Order. The fact that Malone's prior, irrelevant opinion was invalid does nothing to alter the court's finding that the unsourced hairs evidence (1) does not constitute exculpatory evidence and (2) does not serve to establish that no reasonable juror could find MacDonald guilty of the murders of his family.  July 24, 2014 Order [DE-354] at 136 ("A juror presented with the evidence of the unsourced hairs and who considers the entire record in the case, could draw a number of reasonable, non-exculpatory inferences from the fact that three unsourced hairs were found at the scene.").

The evidence regarding Fram's invalid statement in this 1999 lab report—that the Q96 hair with root was consistent with the hair of Kimberly MacDonald—similarly has no effect on the court's previous gatekeeping analysis.  As this court has recounted, AFDIL testing of the hair revealed that it had the same mtDNA sequence of Colette, Kimberly and Kristen. *See* AFDIL DNA Report [DE-119-3] at 3. Thus, while MacDonald is correct that the Q96 hair was part of "pivotal"

20

DNA testing before this court when it issued its July 2014, Order, *see* Suppl. Mem. [DE-379] at 19, the court does not discern how Fram's 1999 conclusion, in light of the later superseding DNA testing revealing that it was consistent with slain MacDonald family members, has any impact on the conclusion that MacDonald failed to establish, by clear and convincing evidence, that no reasonable juror could find him guilty of the murder of his family.

MacDonald's arguments about Stombaugh's invalid statement, made in six lines of cross-examination testimony, also does not alter the court's gatekeeping analysis. MacDonald's own briefing, wherein he devotes little time discussing the actual invalid testimony, demonstrates the minimal importance the testimony has on the court's assessment of the "evidence as a whole." Instead, he attempts to connect the improper cross-examination testimony to the evidence regarding the pajama top reconstruction, arguing:

> The impact of this new evidence on Stombaugh's credibility would have been devastating to the government, as he was the architect of the experiment regarding the pajama top, which the government has consistently touted as the seminal evidence against Dr. MacDonald. . . . Indeed, the materials incorporated into the recent DoJ and FBI report reference tree days of trial that encompassed Stombaugh's testimony. . . . This testimony was largely devoted to the pajama top. Had the jury known of Stombaugh's misfeasance and malfeasance, particularly his proclivity to overstate the reliability of his purportedly scientific findings, including the creation of laboratory reports that exceeded the limits of science, it likely would have disregarded all of his testimony. If so, the pajama top experiment–the lynchpin of the government's circumstantial case–would have crumbled and been disregarded.

Suppl. Mem. [DE-379] at 16-17.

MacDonald's argument overstates the impact of Stombaugh's invalid statement. First, six lines of testimony concerning a response to a cross-examination question does not a "proclivity" make. Second, there is no evidence in the record that Stombaugh created laboratory reports that exceeded the limits of science; rather, the only evidence is that his brief response on cross-

examination to a question concerning a single hair did so. Third, it is by no means clear that had jury known that the six lines of testimony on cross-examination exceeded the limits of science, it would have correspondingly rejected all of Stombaugh's testimony. As the Government notes, the thrust of the cross-examination question on the hair was to question how it became entangled with the pajama top thread prior to examination in the lab, and was not directed to the microscopic comparison of the hair. The court agrees with the Government that given the FBI found there were no other errors in Stombaugh's testimony with regard to hair comparison, it is unlikely that a reasonable juror would find the brief response on cross-examination to render all of Stombaugh's testimony as unreliable or unbelievable.

Finally, the court observes that it was Green, and not Stombaugh, who ultimately identified the "solution" to the pajama top reconstruction. Moreover, Segal thoroughly attacked the methodology used by Green and Stombaugh. *See* Ttr. 4357-61 (establishing on cross-examination that Stombaugh did not attempt to line up the stab wounds in Colette's chest with two cuts on MacDonald's pajama top); Ttr. 4372 (Stombaugh admitting on cross-examination that he never attempted to compute the number of possible combinations that 48 holes in the pajama top could fit into 21 holes); Ttr. 4378 (Stombaugh admitting that they did not attempt to account for the differences between the sizes of the holes in MacDonald's pajama top and the size of the wounds in Colette's chest); Ttr. 4476-76 (Green admitting that she did not attempt to line up the two cuts in MacDonald's pajama top with any stab wounds in Colette's body); Ttr. 4498 (Green admitting that she did not attempt to determine other "solutions"); Ttr. 4051-02 (Green testifying that she did not attempt to line up the holes in MacDonald's pajama top with those present in Colette's top); Ttr. 5218, 5312-18 (MacDonald's expert, Dr. Thornton, testifying that it Green's reconstruction was "not

possible" because she did not take into account Stombaugh's 1971 observations of the directionality of the holes); Ttr. 7239-40 (in closing arguments, MacDonald's attorney argued"Did you hear anybody who was a scientist in criminal cases–forensic scientist or criminal—say to you that it would be a valid way of determining whether or not Mrs. MacDonald was stabbed through the pajama top to line up the fabric over the holes of the body and come up with 48 to 21? No"); Ttr. 7240-41 (defense counsel arguing that Green did not follow Stombaugh's 1971 findings on directionality). This new evidence regarding Stombaugh's invalid statement, solicited on cross-examination and regarding a hair, adds little to nothing to the analysis of the pajama top

reconstruction.[7] In sum, MacDonald still has not shown, by clear and convincing evidence, that no reasonable juror would find him guilty of the murder of his wife and children.

Nor can the court say that any of the new evidence—the 2014 OIG Report or the Microscopic Hair Comparison Analysis: Result of Review—alters any of the court's findings and conclusions as to the merits of his § 2255 claims. The new evidence is either irrelevant to the determination of the merits of MacDonald's claims, or of minimal additional probative value.

In sum, the new evidence neither alters the court's earlier conclusion that MacDonald failed to meet the gatekeeping burden, nor does it alter the court's determination as to the merits of his §

---

[7] For similar reasons, the court finds MacDonald's assertions regarding Janice Glisson's alleged 1971 attempt to "reconstruct" the pajama top to be unavailing. Specifically, MacDonald asserts that in 1971, after receiving the directionality data from Stombaugh, Glisson attempted to fold the pajama top so that all its ice pick holes would align over the puncture wounds in Colette's chest. Suppl. Mem. [DE-379] at 14. According to MacDonald, Glisson abandoned the exercise because she was unable to adjust the folds that the thrust holes remained compatible with Stombaugh's findings on directionality. *Id.* MacDonald's sole citation in support of this assertion is to the book *Fatal Justice*. *Id.* at 14-15. In a endnote, the authors of *Fatal Justice* state that "Glisson's failed experiment was disclosed in a CID laboratory note discovered by defense investigators at the CID Records Holding Facility in Baltimore, Maryland, on May 7, 1990." *See* Jeffrey Allen Potter & Fred Bost, *Fatal Justice* 421-22 n.12 (1995). The authors of *Fatal Justice* provide no citation to the laboratory note. Nor has MacDonald ever referenced such a discovery in any other filing before this court, including when he filed the 1990 Petition based on defense investigators' discovery of laboratory bench notes regarding the discovery of synthetic hairs and fibers. The affidavit of John J. Murphy offered in support of MacDonald's 1990 Petition explained that Murphy, defense investigator Fred Bost (one of the authors of *Fatal Justice*), and an attorney visited the United States Army Criminal Investigations Records Division on May 7, 1990. Murphy's affidavit details his review of laboratory bench notes and his conclusion that certain exculpatory information had been withheld. Mr. Murphy did not mention *any* laboratory notes regarding the pajama top reconstruction in his affidavit. Rather, he detailed bench notes regarding synthetic hairs and fibers. *See* 1990 Section 2255 Petition [DE-1], Vol. 3, Aff. of John J. Murphy.

Accepting as true that Glisson did attempt to fold the pajama top in 1971 (and that defense investigators found notes indicating as much in 1990 yet MacDonald did not act on it for almost 25 years), it does not alter this court's conclusion as to MacDonald's gatekeeping burden. Again, MacDonald offered evidence and thorough argument at his trial that Green ignored Stombaugh's 1971 findings regarding directionality when she found the "solution" to the pajama top reconstruction. Any additional evidence regarding Glisson's alleged unsuccessful attempt therefore adds little to the court's assessment of the evidence as whole.

2255 claims. Accordingly, the new evidence does not support altering or amending the judgment pursuant to Rule 59(e).

**B.      Altering or amending the judgment is not necessary to prevent manifest injustice**

MacDonald also argues that the "unacceptable behavior [of Malone, Stombaugh, and Fram] in this litigation, under the auspices of the federal government and the Department of Justice, must be rectified to 'prevent manifest injustice.'" Suppl. Mem. [DE-379] at 8.  As the court has explored in the preceding analysis, however, the three invalid statements of Malone, Stombaugh, and Fram have little to no impact on the court's analysis of MacDonald's § 2255 claims, so it cannot be said that allowing the court's July 24, 2014 judgment to stand would work a manifest injustice.

To the extent that MacDonald argues that his motion to alter or amend the judgment be allowed because the court committed "clear error" in denying a certificate of appealability, his motion fails. In a similar context, the Fourth Circuit has explained that a prior decision does not qualify as clearly erroneous or working manifest injustice "by being 'just maybe or probably wrong; it must . . . strike us as wrong with the force of five week-old, unrefrigerated dead fish.' . . . It must be 'dead wrong.'" *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (citations omitted) (discussing the "clear error or work a manifest injustice" standard in the context of the law-of-the-case doctrine); *Fontell v. Hassett*, 891 F. Supp. 2d 739, 742 (D. Md. 2012) (applying the "dead wrong" standard to a Rule 59(e) motion). The court stands by its initial decision to deny the certificate of appealability, and therefore cannot say that it is "dead wrong."  Consequently, MacDonald has failed to establish "clear error" or "manifest injustice."

## V. CONCLUSION

For the foregoing reasons, the court finds that MacDonald has failed to show that the new evidence justifies altering or amending the court's July 24, 2014 Judgment, or that the Judgment was the result of clear error or will work a manifest injustice. Accordingly, his Motion to Alter or Amend Judgment [DE-357] is DENIED.

SO ORDERED.

This the _18_ day of May, 2015.

_James C. Fox_
James C. Fox
Senior United States District Judge