UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 3:75-CR-00026-F

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JEFFREY MACDONALD | MOTION FOR COMPASSIONATE RELEASE AND MEMORANDUM IN SUPPORT |

**INTRODUCTION**

Defendant, Dr. Jeffrey MacDonald, through counsel, hereby submits this Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A), and respectfully moves this Court to reduce his sentence to time served.

As amended by the First Step Act, the compassionate release statute allows the court to reduce an otherwise final term of imprisonment if it determines that extraordinary and compelling reasons warrant such a reduction or the defendant is at least 70 years of age and has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c).

Dr. MacDonald's underlying medical conditions which place him among those at the highest risk of severe illness or death from COVID-19, constitute extraordinary and compelling reasons for a sentence reduction. These extraordinary and compelling reasons combined with Dr. MacDonald's age and time served, warrant an immediate sentence reduction to time served pursuant to 18 U.S.C. § 3582(c)(1)(A).

## RELEVANT FACTS AND PROCEDURE

The current life expectancy in the United States is 78.6 years.[1] Dr. MacDonald is 77 years old. Statistically, Dr. MacDonald only has one year of his life remaining. He has spent more than 39 years of his life in the custody of the BOP. *See* Exhibit 1, Progress Report.

While in the custody of the BOP, Dr. MacDonald has experienced a remarkable deterioration in his physical health attributed both to the aging process and to serious underlying medical conditions including chronic kidney disease, skin cancer, and hypertension. *See* Exhibit 2, BOP Medical Records. According to recent guidance issued by the CDC, these medical conditions, in addition to Dr. MacDonald's age, make him extremely vulnerable to severe illness or death if he were to contract COVID-19. *See generally* CDC.gov. [2]

In light of his heightened risk of severe illness or death from COVID-19, Dr. MacDonald requested compassionate release from the Warden of FCI Cumberland on April 10, 2020, which request was denied on April 24, 2020. *See* Exhibit 3, BP-8 and Exhibit 4, Response to BP-8. In denying his request, the Warden acknowledged Dr. MacDonald's "medical concerns," but found that because he was "able to function in correctional settings," his request for compassionate release was not appropriate at that time. Exhibit 4.

Dr. MacDonald then requested reconsideration of his request for compassionate release on May 13, 2020 but his request was again denied on June 3, 2020 because he "provided no new information that warrant[ed] further investigation," and thus, "the decision rendered remain[ed]

[1] CDC, Life Expectancy, available at https://www.cdc.gov/nchs/fastats/life-expectancy.htm (last accessed October 19, 2020).
[2] CDC, Coronavirus Disease 2019 (COVID-19), People Who Are at Higher Risk for Severe Illness, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed October 26, 2020).

unchanged." *See* Exhibit 5, BP-9. Dr. MacDonald immediately appealed to the Regional Director on June 9, 2020 but his appeal was denied on September 10, 2020.

After the Regional Director denied his appeal, Dr. MacDonald continued to pursue his request and again appealed to the General Counsel on October 8, 2020 thereby exhausting his administrative remedies. *See* Exhibit 6, BP-10, and Exhibit 7, BP-11.

Dr. MacDonald, through counsel, now files the instant Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A).

## ARGUMENT

### I. The Court has Authority to Grant the Requested Relief.

Although the compassionate release statute formerly permitted sentence reductions only upon motion of the Director of the BOP, Congress expanded the statute with the passage of the First Step Act of 2018. See Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, 18 U.S.C. § 3582(c)(1)(A) "eliminated the BOP Director's role as the exclusive channel through which a sentence reduction could be considered by courts" and permitted courts to consider motions filed by the defendant in response to the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 1:97-CR-00006-AHT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020).

Specifically, 18 U.S.C. § 3582(c)(1)(A) as amended provides:

(1) in any case --

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised

> release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>> (i) extraordinary and compelling reasons warrant such a reduction; or
>>
>> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

Thus, the statutory requirements for a sentence reduction are that the court (1) determine Dr. MacDonald has exhausted his administrative remedies; (2) find either extraordinary and compelling reasons warrant a reduction or in the alternative, that Dr. MacDonald is at least 70 years of age and has served at least 30 years in prison; (3) consider the relevant factors set forth in § 3553(a); and (4) ensure any reduction is consistent with applicable policy statements issued by the Sentencing Commission.

## II. Dr. MacDonald Has Exhausted His Administrative Remedies.

The compassionate release statute allows the court to consider a motion of the defendant for a sentence reduction when it finds either "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A).

The exhaustion requirement under 18 U.S.C. § 3582(c) may also be waived under the following circumstances: "(1) the relief sought would be futile upon exhaustion; (2) exhaustion via the agency review process would result in inadequate relief; or (3) pursuit of agency review

would subject the petitioner to undue prejudice." *United States v. Johnson*, 4:18-CR-00064-BO, Order [D.E.] 95 at 4 (E.D.N.C. June 10, 2020) (citing *Casey v. United States*, No. 4:18-CR-4, 2020 WL 2297184, at *1 (E.D. Va. May 6, 2020). A number of courts have found that the exigencies created by the COVID-19 pandemic implicate each of the foregoing circumstances. *See id*. (citing *United States v. Pomante*, No. 19-20316, 2020 WL 2513095, at *3-4 (E.D. Mich. May 15, 2020) and *United States v. Zukerman*, No. 16 CR. 194, 2020 WL 1659880, at *2-3 (S.D.N.Y. Apr. 3, 2020)); *see also United States v. Ferebee*, 2:10-cr-4-BO-1, Order [D.E.] 96 at 3 (E.D.N.C. Jul. 29, 2020).

In the instant case, Dr. MacDonald has exhausted his administrative remedies through the Federal Bureau of Prisons (FBOP) Administrative Remedy Program.

Dr. MacDonald submitted an informal request for compassionate release (BP-8) to the Warden at FCI Cumberland on April 10, 2020, *see* Exhibit 3, BP-8, which request was denied on April 24, 2020. *See* Exhibit 4, Response to BP-8.

Dr. MacDonald then filed a formal Request for Administrative Remedy (BP-9) on May 13, 2020, *see* Exhibit 5, BP-9, but his request was again denied on June 3, 2020.

Shortly thereafter, on June 9, 2020, Dr. MacDonald filed a Regional Administrative Remedy Appeal (BP-10). *See* Exhibit 6, BP-10.

On September 10, 2020, Dr. MacDonald received a response to his Regional Administrative Remedy Appeal (BP-10) informing him that his appeal was denied. *See* Exhibit 8, Regional Administrative Remedy Appeal Part B – Response. In his response, the Regional Director acknowledged Dr. MacDonald's "medical concerns," but nonetheless, denied his appeal based on Dr. MacDonald's classification as "Simple Chronic Care" despite the existence

of medical records suggesting he is in Stage 4 of chronic kidney disease or the stage immediately preceding kidney failure. *See* Exhibit 2, BOP Medical Records.

After his appeal to the Regional Director was denied, Dr. MacDonald continued to pursue his request for compassionate release and submitted an appeal to the General Counsel in Central Office (BP-11) on October 8, 2020 exhausting his administrative remedies. *See* Exhibit 7, BP-11.

Because more than 30 days has lapsed since Dr. MacDonald submitted his request for compassionate release to the Warden of FCI Cumberland and because Dr. MacDonald has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the his behalf, Dr. MacDonald respectfully asks this Court to exercise its authority and grant the instant Motion for Compassionate Release.

## III. Dr. MacDonald's Circumstances Present an Extraordinary and Compelling Basis for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)(i).

As the CDC explained in its guidance issued to correctional facilities, the potential for COVID-19 to spread within such facilities is heightened because, among other factors, "[i]ncarcerated . . . persons live, work, eat, study, and recreate within congregate environments," access to soap and paper towels is often limited while hand sanitizer and disinfectants are often considered contraband, and inmates "may hesitate to report symptoms . . . or seek medical care due to co-pay requirements and fear of isolation."[3]

In addition, prison and jail populations have "much higher rate[s] of chronic illness and infectious disease" than the general population.[4] The novel coronavirus disease has been a

[3] CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020), http://cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

[4] *See, e.g.*, Jonathan Edwards, Aiming to Prevent Jailhouse Coronavirus Outbreak, Norfolk Frees Hundreds of Inmates, The Virginian-Pilot (Mar. 29, 2020), https://www.pilotonline.com/news/crime/vp-nw-coronavirus-jail-inmates-released-20200329-ba2hcadexzabdfw3vukvaaipxe-story.html

challenge to prisons because of the close confinement, limited access to personal protective equipment, and elevated burden of cardiac and respiratory conditions that exacerbate COVID-19 risk among inmates.[5] Mass testing in select prisons nationwide revealed widespread COVID-19 outbreaks, with infection rates exceeding 65 percent in several facilities.[6] COVID-19 cases in United States prisons and jails are more than five times higher and the death rates three times higher than in the general population.[7] Additionally, the mean daily growth rate in confirmed cases of COVID-19 among state and federal prisons in the United States between March 31, 2020 and June 6, 2020 was 8.3 percent per day compared to 3.4 percent per day in the general population.[8] As cases continue to increase in the general population[9], the reality is that the virus will continue to be introduced into and spread throughout prison populations, making it highly likely that inmates will continue to be exposed over the ensuing months until a vaccine exists and becomes widely available.

Moreover, the statistics indicate that BOP is struggling to contain COVID-19. Currently, there are 1,809 federal inmates and 884 BOP staff with confirmed positive test results for COVID-19 nationwide.[10] As of October 29, 2020, 15,651 inmates and 1,334 staff have been infected with COVID-19 and an additional 129 federal inmates and two BOP staff members have died from the disease.[11]

---

[5] PhD Saloner, Brendan, MA Parish, Kalind, MN, RN, Ward, Julie, *COVID-19 Cases and Deaths in Federal and State Prisons* (Jul. 8, 2020), available at https://jamanetwork.com/journals/jama/fullarticle/2768249
[6] *Id*.
[7] *Id*.
[8] *Id*.
[9] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Cases in the U.S., available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed October 29, 2020)
[10] COVID-19 Cases, Federal Bureau of Prisons, available at https://www.bop.gov/coronavirus/ (last accessed November 4, 2020).
[11] *See id*.

BOP's efforts at containment are struggling largely because BOP facilities are ill-equipped to handle the disease. Members of the congressional delegation in Maryland wrote to Attorney General Barr "urg[ing] the Department of Justice to take action in order to halt the spread of COVID-19 in federal correctional facilities" after "receiv[ing] troubling reports about conditions for prison guards, health staff, and incarcerated individuals at the medium-security FCI Cumberland in Western Maryland"[12] where Dr. MacDonald is housed. These reports "highlight staff shortages; inadequate personal protective equipment (PPE) and medical services for guard, staff, and incarcerated individuals; and a failure to follow Centers for Disease Control (CDC) guidelines for containing the virus.

Further, press reports indicate that incarcerated individuals working in a Unicor factory at this facility had to continue making license plates even after several factory workers tested positive for the virus, in order to avoid interruptions to shipments."[13] In fact, Dr. MacDonald was one of the incarcerated individuals working in the Unicor factory who had to continue making license plates after other workers tested positive, and as a result, Dr. MacDonald was placed in quarantine on April 7, 2020 after his potential exposure to one of these infected workers. *See* Exhibit 9, Restrictive Housing Mental Health Screening.

Because Dr. MacDonald is among the most medically vulnerable and elderly incarcerated individuals in the custody of the BOP in the midst of an unprecedented global health crisis created by the COVID-19 pandemic that has spread throughout the United States and into our correctional facilities at an alarming speed infecting nearly nine million Americans and resulting

[12] Maryland Congressional Delegations Urges Attorney General Barr to Prevent the Spread of COVID-19 in Federal Correctional Facilities, May 5, 2020, available at https://www.vanhollen.senate.gov/news/press-releases/maryland-congressional-delegation-urges-attorney-general-barr-to-prevent-the-spread-of-covid-19-in-federal-correctional-facilities (last accessed October 29, 2020).
[13] *Id*.

in the death of more than 228,000[14] of those infected, Dr. MacDonald's circumstances present an extraordinary and compelling basis for compassionate release.

**a. Dr. MacDonald's Vulnerability to COVID-19 is an Extraordinary and Compelling Reason for Compassionate Release.**

While inmates in any state or federal prison are particularly vulnerable to infection from COVID-19, Dr. MacDonald is exceptionally vulnerable because of his underlying medical conditions and because he is one of the roughly 2.8 percent of federal inmates over the age of 65 in the custody of the BOP.[15] According to the CDC, "people in their 60s or 70s are, in general, at higher risk for severe illness."[16] The CDC defines severe illness to mean "that the person with COVID-19 may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die."[17] Because the risk of severe illness associated with COVID-19 increases with age, 8 out of 10 COVID-19-related deaths reported in the United States have been among adults aged 65 years and older.[18] Because Dr. MacDonald is 77 years old, his age, particularly when combined with his deteriorating health largely attributed to the aging process and undoubtedly exacerbated by the conditions of confinement, is an "extraordinary and compelling" reason for compassionate release.[19]

---

[14] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Cases in the U.S., available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed October 29, 2020)
[15] Inmate Age, Statistics, Federal Bureau of Prisons, available at https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last accessed October 29, 2020).
[16] CDC, COVID-19, Older Adults, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html
[17] *Id*.
[18] *Id*.
[19] *United States v. Regas*, No. 391CR00057MMDNA1, 2020 WL 2926457, at *3 (D. Nev. June 3, 2020) (granting compassionate release for 77 year old at facility with no confirmed COVID-19 cases); *United States v. Ebbers*, 432 F. Supp. 3d 421, 431 (S.D.N.Y. 2020) ("Ebbers has carried his burden of demonstrating that his deteriorating health amounts to extraordinary and compelling circumstances as defined by the Age of Defendant Note, thus qualifying him to be considered for compassionate release.");*United States v. Hansen*, No. 07-CR-00520(KAM), 2020 WL 1703672, at *7 (E.D.N.Y. Apr. 8, 2020) ("Mr. Hansen is over 65 years old, has served more than 10 years of his sentence, and based on the court's review of Mr. Hansen's medical records, is experiencing a serious, age-related deterioration in his physical and mental health."); *United States v. Nazzal*, No. 10-20392, 2020 WL 3077948, at *4 (E.D. Mich. June 10, 2020) ("Moreover, it is beyond dispute that the defendant's age places him at serious risk

In addition to his increased vulnerability to COVID-19 based upon his age, Dr. MacDonald also suffers from several serious medical conditions that increase his risk of severe illness or death from COVID-19 according to criteria set forth by the CDC including chronic kidney disease, hypertension, and cancer.[20] *See, e.g.*, Exhibit 2, BOP Medical Records, Exhibit 10, Dermatology Records, and Exhibit 11, Nephrology Records. Dr. MacDonald also has a history of upper respiratory infections and a history of "chronic cough" while in the custody of the BOP and thus a heightened susceptibility to infections such as that caused by the novel coronavirus disease. *See* Exhibit 2, BOP Medical Records. While these medical conditions individually place him at a high risk, collectively they make Dr. MacDonald extremely vulnerable to severe illness or death if he were to contract COVID-19. This vulnerability constitutes an "extraordinary and compelling reason" to grant a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A) in this case.

According to the CDC, "[h]aving chronic kidney disease of any stage increases your risk for severe illness from COVID-19."[21] Researchers have found that those with chronic kidney disease are "at risk for more severe outcomes—such as kidney function decline—during infection."[22] Because of this increased risk of kidney function decline during COVID-19

according to the CDC guidelines, and his risk is aggravated by other serious conditions including a history of heart disease, essential hypertension, type 2 diabetes, and asthma from which he evidently suffers daily and for which he takes medication.").

[20] People at Increased Risk of Severe Illness, CDC, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed October 29, 2020).

[21] *Supra*, note 26.

[22] *Kidney Disease and COVID-19: What are the Risks?*, Massachusetts General Hospital, available at https://www.massgeneral.org/news/coronavirus/kidney-disease-and-covid-19 (last accessed October 30, 2020).

infection, renal failure was a documented comorbidity present in 19,022 Americans who have died from COVID-19 as of October 28, 2020.[23]

In fact, approximately "one in every three people who are admitted to the hospital for COVID-19 will develop acute kidney injury (AKI)—a sudden decline in kidney function—even if they have never had kidney disease before. This rate of injury increases to more than half for those who become critically ill and need intensive care. In most cases, these patients will require emergency dialysis."[24] For those previously diagnosed with chronic kidney disease prior to infection, nephrologists are concerned that while available "treatments appear to improve survival, [ ] it is not known if these treatments improve kidney function," and as a result, "there may be long-term effects on kidney function, and that some people with chronic kidney disease may experience a big setback."[25] Because of the risk of complications associated with COVID-19 for those diagnosed with kidney disease such as Dr. MacDonald, and the need for "supportive care and dialysis to help them survive[,]"[26] courts have recognized kidney disease as an extraordinary and compelling reason for compassionate release.[27]

---

[23] Weekly Updates by Select Demographic and Geographic Characteristics, Provisional Death Counts for Coronavirus Disease 2019 (COVID-19), CDC, available at https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#Comorbidities (last accessed October 30, 2020).
[24] *Id*.
[25] *Id*.
[26] *Id*.
[27] *See, e.g.*, *United States v. Pomante*, No. 19-20316, 2020 WL 2513095 (E.D. Mich. May 15, 2020); *United States v. Cassidy*, No. 1:17-cr-00116-WMS-MJR, 2020 WL 2465078 (W.D.N.Y. May 13, 2020); *United States v. Howard*, No. 4:15-cr-00018-BR-2, 2020 WL 2200855 (E.D.N.C. May 6, 2020); *United States v. Norris*, No. 7:19-cr-00036-BO-2, 2020 WL 2110640 (E.D.N.C. Apr. 30, 2020); *United States v. Saad*, No. 16-20197, 2020 WL 2251808 (E.D. Mich. May 5, 2020); *United States v. Bertrand*, No. 3:00-cr-00012-LC-1, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020); *United States v. Musumeci*, No. 1:07-cr-00402-RMB-1, Dkt. No. 58 (S.D. N.Y. Apr. 28, 2020); *United States v. Sanchez*, No. 1:95-cr-00421-MGC-1, Dkt. No. 290 (S.D. Fla. Apr. 27, 2020); *United States v. Williams*, No. 3:17-CR-121-(VAB)-1, 2020 WL 1974372 (D. Conn. Apr. 24, 2020); *United States v. Jackson*, No. 4:14-CR-00576, 2020 WL 1955402 (S.D. Tex. Apr. 23, 2020); *United States v. McGraw*, 2019 WL 2059488, at *1–2 (S.D. Ind. May 9, 2019) (granting compassionate release to 72 year-old inmate with limited mobility, diabetes, kidney disease, Hepatitis C, and other issues); *United States v. Cotinola*, No. 13-CR-03890-MV, 2020 WL 2526717, at *3 (D.N.M. May 18, 2020))"Specifically, the Court finds that Mr. Cotinola's dialysis-dependent end-stage kidney failure falls within the Commission's definition of a qualifying "terminal illness."); *United States v. Spencer Harris*, No. 06-CR-30058, 2020 WL 3483559, at *3 (C.D. Ill. June 26, 2020)("Mr. Harris has been diagnosed with chronic kidney

In addition, cancer, another serious medical condition that Dr. MacDonald has been diagnosed with, also "increases your risk of severe illness from COVID-19" according to guidance issued by the CDC.[28] As the American Cancer Society explains, "People who have cancer or who are getting cancer treatment often have a higher risk of getting an infection, and infections can be more serious than in people who don't have cancer."[29] This higher risk of infection can be attributed to "changes in the immune system that control their body's defense systems."[30]

Because of the uncertainty surrounding the spread of COVID-19, the American Cancer Society warns that "the skin is your body's largest organ and an important barrier against infections" making it "your first line of defense in protecting internal tissues from harmful germs", and consequently, "when there's a break in your skin, it's easier for germs to get into your body and cause infection."[31] This risk of infection in those with cancer is particularly severe for someone such as Dr. MacDonald who has been diagnosed with skin cancer, specifically basal and squamous cell carcinoma, and has undergone numerous examinations for abnormal skin lesions and has had several biopsies taken from various areas of the body as extensive pathology and dermatology records show, and is therefore, more susceptible to infections entering through these post-operative wounds. *See* Exhibit 10, Dermatology Records.

---

disease and kidney failure, as well as obesity and hypertension."); *United States v. Champagne*, No. 4:97-CR-089, 2020 WL 3472911, at *5 (D.N.D. June 25, 2020)("He has been diagnosed with chronic osteomyelitis, type 2 diabetes, hypertension, disease of the esophagus, and acute kidney failure. Individually, each is sufficiently serious to warrant compassionate release.").

[28] *Supra*, note 26.

[29] *Why People with Cancer are More Likely to Get Infections*, American Cancer Society, available at https://www.cancer.org/treatment/treatments-and-side-effects/physical-side-effects/low-blood-counts/infections/why-people-with-cancer-are-at-risk.html (last accessed October 30, 2020).

[30] *Id*.

[31] *Id*.

This heightened risk of infection from COVID-19 among those with cancer, as is the case here, is an extraordinary and compelling reason for compassionate release.[32]

Thus, a fulsome review of Dr. MacDonald's medical records establishes that he is currently diagnosed with serious underlying medical conditions that place him at an increased risk of severe illness from COVID-19 according to guidelines issued by the Centers for Disease Control and Prevention (CDC)[33], and therefore, Dr. MacDonald has presented an extraordinary and compelling basis for relief in this case consistent with the directive issued by the Department of Justice. Indeed, on July 28, 2020, DOJ "issued a directive that the government shall concede that an inmate, who has one of the risk factors listed by the Centers for Disease Control and Prevention (CDC) for greater risk of severe illness from COVID-19, presents an 'extraordinary and compelling' reason warranting eligibility for compassionate release."[34] Accordingly, United States Attorney's Offices throughout the country have conceded and courts have recognized that DOJ policy requires the government to acknowledge that such conditions establish extraordinary and compelling reasons to grant compassionate release.[35]

---

[32] *See, e.g.*, *United States v. Saad*, No. 16-20197, 2020 WL 2251808 (E.D. Mich. May 5, 2020); *United States v. Bertrand*, No. 3:00-cr-00012-LC-1, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020); *United States v. Joling*, No. 6:15-cr-00113-AA-1, 2020 WL 1903280 (D. Or. Apr. 17, 2020); *United States v. Hammond*, No. 1:02-cr-00294-BAH-1, 2020 WL 1891980 (D. D.C. Apr. 16, 2020); *United States v. Miller*, No. 2:16-cr-20222-AJT-RSW-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020); *United States v. Hansen*, No. 1:07-cr-00520-KAM-2, 2020 WL 1703672 (E.D. N.Y. Apr. 8, 2020); *United States v. Winckler*, No. 2:13-cr-00318-CB-1, 2020 WL 1666652 (W.D. Penn. Apr. 3, 2020); *United States v. Hernandez*, No. 18-cr-20474-CMA, Dkt. No. 42 (S.D. Fla. Apr. 2, 2020); and *United States v. Edwards*, No. 6:17-CR-00003, 2020 WL 1650406 (W.D. Va. Apr. 2, 2020).

[33] Coronavirus Disease 2019 (COVID-19), CDC, Who is at Increased Risk for Severe Illness?, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html

[34] *United States v. Coffman*, 5:09-CR-181-KKC, 2020 WL 6384406, at *2 (E.D. Ky. Oct. 29, 2020).

[35] *See, e.g.,* Government's Response in Opposition to Motion for Compassionate Release, *United States v. Shehata*, 2:15-cr-200520-JWL, Dkt. No. 179 at 12-13 (D. Kan. Jul. 6, 2020) ("Recently, the Department of Justice has, consistent with the Centers for Disease Control (CDC), identified certain risk factors that place inmates at higher risk of complications from COVID-19. Thus, an inmate that presents with one of the named CDC factors, as confirmed by medical records, and who is not expected to recover from that condition, is deemed to have established an extraordinary and compelling reason allowing for compassionate release[.]" (internal citations omitted)); *United States v. Nixon*, 12-10232-01-EFM, 2020 WL 5513617, at *2, n. 9 (D. Kan. Sept. 14, 2020) ("The Court notes that the Department of Justice has identified certain risk factors, consistent with the CDC, that place inmates at higher

Moreover, hypertension, another serious medical condition that Dr. MacDonald has been diagnosed with and currently suffers from, has been recognized by the CDC as a serious heart condition that might increase the risk of severe illness from COVID-19[36], and accordingly, courts have recognized hypertension as an "extraordinary and compelling" reason for compassionate release.[37]

---

risk of complications from COVID-19. Those inmates that present with one of the named CDC factors, and who is not expected to recover from that condition, will have established an extraordinary and compelling reason allowing for compassionate release.); *Wise v. United States*, Criminal No. ELH-18-72, 2020 WL 2614816, at *6 n.4 (D. Md. May 22, 2020) (explaining that the DOJ has "taken the position that inmates who suffer from a condition identified ... as putting them at higher risk for severe illness from COVID-19 and who are not expected to recover from that condition, present an 'extraordinary and compelling reason' to be considered for compassionate release."); *United States v. Giron-Canas*, Case No.: 20-CR-10022 DMS, 2020 WL 4697965, at *2 (S.D. Cal. Aug. 13, 2020) (referencing DOJ guidance "directing the Government to concede that any defendant who presents any of the CDC's identified high-risk factors during the pandemic can establish 'extraordinary and compelling reasons' "); *cf.* Government's Response in Opposition to Motion for Compassionate Release, *United States v. Simon*, 1:14-cr-00300-LMB, Dkt. No. 332 at 11 (E.D. Va. August 7, 2020) (acknowledging that defendant's "obesity qualifies as an 'extraordinary and compelling' reason for [compassionate release].").

[36] *Supra*, note 26.

[37] *United States v. White*, No. 2:13-cr-20653-MFL-MAR-1, 2020 WL 2557077 (E.D. Mich. May 20, 2020); *United States v. Doshi*, No. 2:13-cr-20349-AJT-LJM-1, 2020 WL 2556794 (E.D. Mich. May 20, 2020); *United States v. Hill*, No. 3:19-cr-00038-JAM-1, 2020 WL 2542725 (D. Conn May 19, 2020); *United States v. Copeland*, No. 1:03-cr-01120-FB-1, 2020 WL 2537250 (E.D. N.Y. May 19, 2020); *United States v. Bright*, No. 2:15-cr-00015-JPJ-PMS-5, 2020 WL 2537508 (W.D. Va. May 19, 2020); *United States v. El-Hanafi*, No. 1:10-cr-00162-KMW-1, 2020 WL 2538384 (S.D. N.Y. May 19, 2020); *United States v. Anderson*, No. 3:15-cr-30015-SEM-TSH-1, 2020 WL 2521513 (C.D. Ill. May 18, 2020); *United States v. Cotinola*, No. 1:13-cr-03890-MV-1, 2020 WL 2526717 (D. N.M. May 18, 2020); *United States v. Bennett*, No. 1:05-cr-01192-NRB-1, 2020 WL 2539077 (S.D. N.Y. May 18, 2020); *United States v. Johnson*, No. 15-CR-125 (KBJ), 2020 WL 2515856 (D.D.C. May 16, 2020); *United States v. Pomante*, No. 19-20316, 2020 WL 2513095 (E.D. Mich. May 15, 2020); *United States v. Brooks*, No. 07-CR-20047-JES-DGB, 2020 WL 2509107 (C.D. Ill. May 15, 2020); *United States v. Ennis*, No. 3:02-cr-01430-PRM-1, 2020 WL 2513109 (W.D. Tex. May 14, 2020); *United States v. Mattingley*, No. 6:15-cr-00005-NKM-JCH, 2020 WL 2499707 (W.D. Va. May 14, 2020); *United States v. Lopez*, No. 1:18-cr-02846-MV-1, 2020 WL 2489746 (D. N.M. May 14, 2020); *United States v. Handy*, No. 3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020); *United States v. Manning*, No. 3:15-cr-50007, Dkt. No. 90 (N.D. Ill. Apr. 20, 2020); *United States v. Cassidy*, No. 1:17-cr-00116-WMS-MJR, 2020 WL 2465078 (W.D.N.Y. May 13, 2020); *United States v. Sedge*, No. 1:16-cr-00537-KAM, 2020 WL 2475071 (E.D. N.Y. May 13, 2020); *United States v. Gutman*, No. 1:19-cr-00069-RDB-2, 2020 WL 2467435 (D. Md. May 13, 2020); *United States v. Barber*, No. 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Rivernider*, No. 3:10-cr-00222-RNC, 2020 WL 2393959 (D. Conn. May 12, 2020); *United States v. Ramirez*, No. 1:17-cr-10328-WGY, 2020 WL 2402858 (D. Mass. May 12, 2020); *United States v. Ullings*, No. 1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May 12, 2020); *United States v. Foreman*, No. 3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May 11, 2020); *United States v. Valencia*, No. 1:15-cr-00163-AT-1, 2020 WL 2319323 (S.D. N.Y. May 11, 2020); *United States v. Reddy*, No. 2:13-cr-20358-MFL-LJM-1, 2020 WL 2320093 (E.D. Mich. May 11, 2020); *United States v. Connell*, No. 18-cr-00281-RS-1, 2020 WL 2315858 (N.D. Cal. May 8, 2020); United States v. Pena, No. 1:15-cr-00551-AJN-1, 2020 WL 2301199 (S.D. N.Y. May 8, 2020); *United States v. Vo*, No. 15-CR-00310-BLF-2, 2020 WL 2300101 (N.D. Cal. May 7, 2020); *United States v. Quintero*, No. 6:08-cr-06007-DGL-1, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); *United States v. Reid*, No. 3:17-cr-001750-CRB-2, 2020 WL 2128855 (N.D. Cal. May 5, 2020); *United States v. Pabon*, No. 2:17-cr-00165-AB-1, 2020 WL 2112265

Throughout the COVID-19 pandemic, hypertension has remained a leading comorbidity associated with an increased risk of infection and the development of severe lung damage and mortality from COVID-19.[38] In a study of 5,700 patients hospitalized with COVID-19 in the New York City area, the most common comorbidity was hypertension with 56.6 percent of patients hospitalized suffering from hypertension.[39] Similarly, a study of patients hospitalized with COVID-19 in China where the COVID-19 outbreak began, revealed hypertension was the

---

(E.D. Penn. May 4, 2020); *United States v. Lacy*, No. 3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1, 2020); *United States v. Ardila*, No. 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Guzman Soto*, No. 1:18-cr-10086-IT-1, 2020 WL 2104787 (D. Mass. May 1, 2020); *United States v. Etzel*, No. 6:17-CR-00001-AA, 2020 WL 2096423 (D. Or. May 1, 2020); *United States v. Pinkerton*, No. 15-CR-30045-3, 2020 WL 2083968 (C.D. Ill. Apr. 30, 2020); *United States v. Brown*, No. 4:05-cr-00227-RP-CFB-1, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020); *United States v. Saad*, No. 16-20197, 2020 WL 2251808 (E.D. Mich. May 5, 2020); *United States v. Bertrand*, No. 3:00-cr-00012-LC-1, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020); *United States v. Harper*, No. 7:18-cr-00025-EKD-JCH-1, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020); *United States v. Musumeci*, No. 1:07-cr-00402-RMB-1, Dkt. No. 58 (S.D. N.Y. Apr. 28, 2020); *United States v. Handy*, No. 8:04-cr-00559-PJM-7, 2020 WL 2041666 (D. Md. Apr. 28, 2020); *United States v. Robinson*, No. 3:18-cr-00597-RS-1, 2020 WL 1982872 (N.D. Cal. Apr. 27, 2020); *United States v. Sanchez*, No. 1:95-cr-00421-MGC-1, Dkt. No. 290 (S.D. Fla. Apr. 27, 2020); *United States v. Dillard*, No. 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020); *United States v. Coles*, No. 2:00-cr-20051-SEM-TSH-1, 2020 WL 1976296 (C.D. Ill. Apr. 24, 2020); *United States v. Williams*, No. 3:17-CR-121-(VAB)-1, 2020 WL 1974372 (D. Conn. Apr. 24, 2020); *United States v. Jackson*, No. 4:14-CR-00576, 2020 WL 1955402 (S.D. Tex. Apr. 23, 2020); *United States v. Logan*, No. 1:12-cr-00307-LEK-1, Dkt. No. 140 (N.D. N.Y. Apr. 22, 2020); *United States v. Curtis*, No. 1:03-cr-00533-BAH-1, 2020 WL 1935543 (D. D.C. Apr. 22, 2020); *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809 (W.D.N.Y. Apr. 22, 2020); *United States v. Scparta*, No. 1:18-cr-00578-AJN-1, 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020); *United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL 1904666 (D. Conn. Apr. 17, 2020); *United States v. Joling*, No. 6:15-cr-00113-AA-1, 2020 WL 1903280 (D. Or. Apr. 17, 2020); *United States v. Hammond*, No. 1:02-cr-00294-BAH-1, 2020 WL 1891980 (D. D.C. Apr. 16, 2020); *United States v. Samy*, No. 2:16-cr-20610-AJT-DRG-1, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020); *United States v. Ben-Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Burrill*, No. 17-CR-00491-RS-2, 2e (N.D. Cal. Apr. 10, 2020); *United States v. Sawicz*, No. 1:08-cr-00287-ARR-1, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020); *United States v. Miller*, No. 2:16-cr-20222-AJT-RSW-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020); *United States v. Hansen*, No. 1:07-cr-00520-KAM-2, 2020 WL 1703672 (E.D. N.Y. Apr. 8, 2020); *United States v. Gross*, No. 1:15-cr-00769-AJN-3, 2020 WL 1673244 (S.D. N.Y. Apr. 6, 2020); *United States v. Ghorbani*, No. 18-cr-255-PLF (D.D.C. Apr. 3, 2020); *United States v. Zukerman*, No. 1:16-cr-00194-AT-1, 2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020); *United States v. Colvin*, No. 3:19-cr-00179-JBA-1, 2020 WL 1613943 (D. Conn. Apr. 2, 2020); *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331 (E.D. Penn. Apr. 1, 2020); *United States v. Muniz*, No. 4:09-cr-00199-1, 2020 WL 1540325 (S.D. Tex. Mar. 31, 2020); *United States v. Harpine*, No. 6:91-cr-60156-MC-1, Dkt. No. 221 (D. Or. Mar. 27, 2020).

[38] *See* Schiffrin, Ernesto L., Flack, John M., Ito, Sadayoshi, Muntner, Paul, and Webb, R. Clinton, *Hypertension and COVID-19*, American Journal of Hypertension, Vol. 33, Issue 5, May 2020.

[39] Safiya Richardson, MD, MPH, Jamie S. Hirsch, MD, MA, MSB, Mangala Narasimhan, DO, *Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, Journal of American Medical Association, April 22, 2020.

leading comorbidity[40] and in Italy, another epicenter of the COVID-19 outbreak, hypertension was the leading comorbidity among patients who died from COVID-19 with 73.8 percent of deceased patients having a prior diagnosis of hypertension.[41]

In light of Dr. MacDonald's age and diagnoses with serious underlying medical conditions – comorbidities that place him at a significant risk of severe illness or death from COVID-19 according to the criteria set forth by the CDC, Dr. MacDonald respectfully asks this Court to exercise its authority under 18 U.S.C. § 3582(c)(1)(A) and grant Dr. MacDonald's request for compassionate release and reduce his sentence to time served.

## IV. Dr. MacDonald's Age and Time Served Warrant Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)(ii).

Under 18 U.S.C. § 3582(c)(1)(A)(ii), the Court may order compassionate release for an inmate, who as here, is at least 70 years of age, has served at least 30 years in prison, and the BOP has determined is not a danger to the safety of any other person or to the community.

Dr. MacDonald is 77 years old,[42] he has served more than 39 years in the custody of the BOP, and the BOP has determined that he has a minimum risk of recidivating, and thus, he is not a danger to the safety of any other person or to the community. *See* Exhibit 1, Progress Report (date sentence computation began is August 29, 1979).

Because Dr. MacDonald is at least 70 years of age, has served at least 30 years in prison, and the BOP has determined that Dr. MacDonald is not a danger to the safety of any other person

[40] China Medical Treatment Expert Group for COVID-19, *Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis*, European Respiratory Journal, May 14, 2020.
[41] *See* Characteristics of COVID-19 Patients Dying in Italy, Report Based on Available Data on March 20, 2020, Istituto Superiore Di Sanita, available at https://www.epicentro.iss.it/coronavirus/bollettino/Report-COVID-2019_20_marzo_eng.pdf
[42] Inmate Locator for Jeffrey MacDonald, Register Number 00131-177, Federal Bureau of Prisons, available at https://www.bop.gov/inmateloc/ (last accessed October 29, 2020).

or the community, Dr. MacDonald has satisfied the requirements for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(ii) and his sentence should be reduced to time served.

## V. Consideration of the § 3553(a) Factors Warrants Dr. MacDonald's Compassionate Release.

Under 18 U.S.C. § 3582(c)(1)(A), the Court is to consider the § 3553(a) factors in determining whether a sentence reduction is appropriate. Dr. MacDonald respectfully submits that consideration of those factors supports a finding that Dr. MacDonald has already served sufficient time to satisfy the purposes of sentencing, and accordingly, the Court should reduce his sentence to time served.

### a. Dr. MacDonald's History and Characteristics.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035, 135 L.Ed.2d 392 (1996).

Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247, 69 S. Ct. 1079, 93 L.Ed. 1337 (1949). Consideration of "the fullest information possible concerning the defendant's life and characteristics," *id*., includes consideration of post sentencing rehabilitation which "may be highly relevant to several of the § 3553(a) factors." *Pepper v. United States*, 562 U.S. 476, 491 (2011) (internal citations omitted).

Dr. MacDonald is serving a term of life imprisonment imposed by the court for three counts of murder on a government reservation in violation of 18 U.S.C. § 1111. Although his offenses were indeed serious and the circumstances surrounding them undoubtedly tragic, Dr. MacDonald has maintained his innocence since the date of the offenses on February 17, 1970.

Despite maintaining his innocence and despite the newly discovered evidence that has emerged in the years since the offenses occurred that would support Dr. MacDonald's claim of innocence, Dr. MacDonald has remained in the custody of the BOP for more than 39 years.

While in the custody of the BOP, Dr. MacDonald has "completed an extensive amount of programs since he has been incarcerated" and "has progressed to different areas in the institution that enables him to display his wide variety of skill set." Exhibit 1, Progress Report. In fact, Dr. McDonald has completed nearly 50 programs and has an extensive work detail history based upon various work assignments while in the custody of the BOP. *See id*. Dr. MacDonald "currently works in Unicor in the engraving department as the quality and assurance inspector. He has acquired a vast skill set at FCI Cumberland ranging from teaching in Education, working inmate pay in Food Service, and most recently Q&A inspector in the Unicor factory" – all of which carry an "increased responsibility." *Id*.

As a former Green Beret Army doctor, Dr. Macdonald has also "been active in FCI Veterans program for the past five years" and "has adhered to the Unit Team recommendation of participating in teaching educational courses," *id*., and has earned numerous certificates for his participation, *see* Exhibit 13, Certificates of Completion and Participation.

According to the BOP, Dr. MacDonald "has not been an institutional problem" and "has not received any serious incident reports at FCI Cumberland." Exhibit 1, Progress Report. The BOP further noted that Dr. MacDonald "strives to make the best of his situation by challenging himself in the Unicor department, maintaining clear conduct and completing a wide variety of programs that are offered to him." *Id*.

As evidenced by the programs he has taught and the departments he has worked in, Dr. MacDonald has consistently tried to use his pre-incarceration education and experience to help

those around him while in the custody of the BOP. After the date of the offenses in the instant case but prior to his incarceration in 1979, Dr. MacDonald worked as an emergency medicine doctor. He returned to emergency medicine briefly between 1980 and 1982 after the Fourth Circuit overturned his convictions. Shortly after the Supreme Court upheld his convictions and Dr. MacDonald was returned to federal prison, he was credited with saving a fellow inmate's life after the inmate swallowed a toxic substance and Dr. MacDonald accompanied the inmate to the hospital while presumably performing cardiopulmonary resuscitation.[43]

In addition, John Gardner, a former inmate who was housed with Dr. MacDonald at FCI Sheridan nearly twenty years ago, recalled "inmates would always come up to [Dr. MacDonald] asking him questions because they had a cold or got hurt playing sports" and "[Dr.MacDonald] always took the time to answer everyone's questions." Exhibit 12, Letter from John Gardner. Mr. Gardner also described Dr. MacDonald as a mentor who "encouraged me to always try to better myself." *Id*. Mr. Gardner followed his advice and started his own HVAC company after his release from the BOP. *See id*.

Moreover, the BOP has determined that Dr. MacDonald has a minimum risk of recidivating. Dr. MacDonald's minimum risk of recidivating is further supported by his age which corresponds to a reduced likelihood of recidivating according to the findings issued by the United States Sentencing Commission.[44] Thus, Dr. MacDonald does not pose a danger to any other person or the community.

---

[43] *Macdonald saves inmate's life*, UPI Archives, Nov. 18, 1984, available at https://www.upi.com/Archives/1984/11/18/Macdonald-saves-inmates-life/4757469602000/.

[44] *The Effects of Aging on Recidivism Among Federal Offenders*, United States Sentencing Commission Report, available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders (finding "Older offenders were substantially less likely than younger offenders to recidivate following release.")

While the nature and circumstances of the offenses supported the serious sentence imposed in this case, Dr. MacDonald's history and characteristics support a sentence reduction under the compassionate release statute.

**b. Modification of Dr. MacDonald's Sentence Will Serve the Goals of Sentencing.**

Because of his advanced age, documented medical history of serious chronic health conditions, custodial record evidencing the completion of numerous programs and work assignments during his incarceration, and his minimum risk of recidivating, Dr. MacDonald respectfully submits that his sentence of more than 39 years has already served many of the goals of sentencing and a sentence reduction is warranted.

Additionally, reducing Dr. MacDonald's sentence to time served in the midst of an unprecedented global pandemic does not diminish the seriousness of the offense or respect for the law. Future offenders could not rationally expect to be imprisoned under such dire circumstances, and therefore, releasing Dr. MacDonald or any other inmate due to the substantial risk that they would otherwise contract a highly contagious disease and die in prison due to an unprecedented global pandemic would not undermine general deterrence or respect for the law. Accordingly, courts have granted compassionate release to individuals serving sentences of life imprisonment, when as is the case here, extraordinary and compelling circumstances warrant a sentence reduction.[45]

[45] *See, e.g., United States v. Parker*, No. 2:98-cr-00749-CAS-1, 461 F. Supp. 3d 966 (C.D. Cal. 2020); *United States v. Heffington*, No. 1:93-cr-05021, --- F. Supp. 3d ---, 2020 WL 4476485 (E.D. Cal. 2020) (defendant's medical conditions, his advanced age of 75 years old, the risks posed by COVID-19 pandemic, and the 27 years that he had already served in prison constituted extraordinary and compelling reasons to support compassionate release from life sentence); *United States v. Price*, No. 07-0152-06 (ESH), 2020 WL 5909789 (D.D.C. 2020); *United States v. Hansen*, 07-CR-00520(KAM), 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020); *United States v. Rodriguez*, 00 CR. 761-2 (JSR), 2020 WL 5810161 (S.D.N.Y. Sept. 30, 2020) (compassionate release granted to prisoner serving sentence of life without possibility of parole for murder of government informant based on finding of extraordinary and compelling circumstances); *United States v. Tidwell*, CR 94-353, 2020 WL 4504448 (E.D. Pa. Aug. 5, 2020)

**c. Compassionate Release Will Provide Dr. MacDonald with the Ability to Obtain Medical Care in the Most Effective Manner.**

As Dr. MacDonald's medical records show, Dr. MacDonald has a well-documented medical history of serious underlying medical conditions that have required extensive medical care, attention, and treatment.

Based upon Dr. MacDonald's medical history throughout his incarceration, Dr. MacDonald will undoubtedly require substantial medical care to treat his underlying medical conditions particularly as these conditions are compounded by the mental and physical deterioration associated with aging that has likely been accelerated within the confines of a correctional facility.

After a review of Dr. MacDonald's medical records, Dr. Cyril H. Wecht, who has more than 50 years of experience as an anatomic, clinical, and forensic pathologist, opined that Dr. MacDonald's "medical records depict a significant, worsening history of kidney disease dating back to 2007." Exhibit 15, Letter from Dr. Cyril H. Wecht and Curriculum Vitae. According to Dr. Wecht, "[h]is blood tests and physical examinations indicate progressive pathological changes in his kidneys" and "[a]fter being seen by a nephrologist, has been classified as stage 3-4." *Id.* "Based upon the rate of his progressive deterioration over the past decade, it is most likely that Jeffrey MacDonald will be requiring regularly scheduled dialysis sessions within the near future." *Id.* It is Dr. Wecht's professional opinion that "Jeffrey MacDonald requires specialized medical care at this time because of his advanced kidney disease and several

(compassionate release granted to 64 year old inmate with cancer serving life sentence following conviction for engaging in continuing criminal enterprise, murder in furtherance of a continuing criminal enterprise, possession with intent to distribute more than 500 grams of cocaine, tax evasion, possession of a firearm by a convicted felon, and criminal forfeiture).

comorbidities. The kind of care that he requires to prevent further deterioration of his condition and death is highly unlikely to be obtained in a prison facility." *Id.*

Dr. Wecht's opinion is supported by that of Dr. Owen Murray, the chief physician for the University of Texas Medical Branch's correctional managed care program, the primary health care provider for inmates at 109 state prisons. According to Dr. Murray, inmates with kidney disease are "more difficult to care for."[46] Because many inmates with kidney disease have "elevated blood pressure and have gone so long without treatment, they've made their kidneys work harder, to the point of needing dialysis" – a large financial burden on the prison system[47] which is already dealing with rising medical costs associated with aging inmates who are, as a group, more expensive because of their medical needs. In 2013, medical costs for inmates increased to $1.1 billion in 2013, representing 17 percent of the BOP's $6.5 billion budget that year.[48] In short, the financial strain on the BOP system and the inability of correctional facilities to provide the necessary care to inmates such as Dr. MacDonald with advanced medical conditions requiring specialized care supports compassionate release in this case because a reduction in his sentence will ensure that Dr. MacDonald is able to obtain medical care in the most effective manner consistent with § 3553(a).

Should he be released, Dr. MacDonald has a verifiable reentry plan. He will reside with his wife of more than 18 years who currently lives in Columbia, Maryland near FCI Cumberland where Dr. MacDonald is housed, who is familiar with him and his medical history, and who has agreed to house him and ensure that he complies with any conditions of release. She is also

[46] *With More Inmates on Dialysis, Officials Deal With Rising Costs*, New York Times, May 31, 2014, available at https://www.nytimes.com/2014/06/01/us/with-more-inmates-on-dialysis-officials-deal-with-rising-costs.html
[47] *Id.*
[48] *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Office of the Inspector General, U.S. DOJ, available at https://oig.justice.gov/reports/2015/e1505.pdf

prepared to arrange COVID-19 testing and medical treatment by oncologists, nephrologists, cardiologists and any other medical specialists as needed to treat Dr. MacDonald's medical conditions.

## VI. Modification of Dr. MacDonald's Sentence is Consistent with Applicable Policy Statements.

The Court has the discretion to modify the term of imprisonment imposed in this case pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) "if it finds that extraordinary and compelling reasons warrant such a reduction" and the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to "describe what should be considered extraordinary and compelling reasons for a sentence reduction, including the criteria to be applied and a list of specific examples."

The commentary of the policy statement issued in exercise of that authority in U.S.S.G. §1B1.13, explains that a defendant's medical condition may be an extraordinary and compelling reason to grant relief if "the defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. §1B1.13 comment n.1(A)(ii).

The commentary further explains that extraordinary and compelling reasons exist if "the defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. §1B1.13 comment n.1(B).

Consistent with §1B1.13 and the commentary thereto, Dr. MacDonald suffers from serious physical and medical conditions that substantially diminish his ability to provide self-care

within the environment of a correctional facility and from which he is not expected to recover. Specifically, Dr. MacDonald has been diagnosed with chronic kidney disease since 2007. Once dialysis begins, the average lifespan for kidney disease patients between the ages of 74 and 79 years old, is, on average, 3.1 years. *See* Exhibit 15, Letter of Dr. Cyril H. Wecht.

Additionally, Dr. MacDonald has been diagnosed with skin cancer and has repeatedly required treatment for skin abnormalities associated with his basal and squamous cell carcinoma – aggressive forms of which can be fatal if left untreated.[49] Given the extensive amount of examinations and biopsies that Dr. MacDonald's skin cancer has required, Dr. MacDonald's ability to provide self-care in a correctional facility is substantially diminished. During one of his dermatology appointments on September 25, 2019, for example, Dr. MacDonald was seen for his actinic keratosis or pre-cancerous proliferations that if left untreated, can develop into squamous cell carcinoma. In addition to having six lesions treated with liquid nitrogen, Dr. MacDonald was counseled that the actinic keratoses "can resolve with cryotherapy, photodynamic therapy, and imiquimod" – treatments beyond the scope of self-care within a correctional facility. Exhibit 2, BOP Medical Records.

Moreover, Dr. MacDonald (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years of his term of imprisonment consistent with U.S.S.G. §1B1.13 comment n.1(B). Here, Dr. MacDonald is 77 years old; is experiencing a serious deterioration in his physical health because of the aging process; and has served more than 39 years in prison. Thus, a sentence reduction in this case is consistent with applicable policy statements and Dr. MacDonald's request for compassionate release should be granted.

---

[49] *See, e.g.*, Skin Cancer Foundation, available at https://www.skincancer.org/

## CONCLUSION

For the foregoing reasons, Dr. MacDonald respectfully submits that granting his motion for a sentence reduction is both factually and legally appropriate. Therefore, Dr. MacDonald requests that the Court grant the instant motion for compassionate release pursuant to 18 U.S.C. § 3582.

Respectfully submitted, this the 11th day of November 2020.


CHESHIRE PARKER SCHNEIDER, PLLC

/s/ Hart Miles
Hart Miles
N.C. State Bar # 23342
hart.miles@cheshirepark.com

/s/ Elliot Sol Abrams
Elliot Sol Abrams
N.C. State Bar # 42639
elliot.abrams@cheshirepark.com

/s/ Catherine S. Brown
Catherine S. Brown
N.C. State Bar # 50598
catherine.brown@cheshirepark.com

P. O. Box 1029
Raleigh, NC 27602
Tel: (919) 833-3114
Fax: (919) 832-0739

GAMMON, HOWARD, & ZESZOTARSKI, PLLC

/s/ Joseph E. Zeszotarski, Jr.
Joseph E. Zeszotarski, Jr.
N.C. State Bar # 21310
P.O. Box 1127
Raleigh, NC 27602
(919) 521-5878
jzeszotarski@ghz-law.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date shown below he electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for the United States.

This the 11th day of November 2020.

/s/ Hart Miles
Hart Miles
CHESHIRE PARKER SCHNEIDER, PLLC