IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 3:75-CR-00026-1BO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEFFREY MACDONALD | )<br>)<br>)<br>)<br>) | UNITED STATES' RESPONSE IN OPPOSITION TO MOTION FOR COMPASSIONATE RELEASE |

In the early morning hours of February 17, 1970, Jeffrey MacDonald murdered his pregnant wife, Colette; his five-year-old daughter, Kimberly; and his two-year-old daughter, Kristen. MacDonald cracked Kimberly's skull with a wooden club. He used the same club to bludgeon Colette repeatedly, breaking both her arms as she sought to defend herself. And he stabbed Colette, Kimberly, and little Kristen over and over again with a paring knife—and Colette and Kristen yet again with an ice pick—all in an effort to support his cover story of a ritualistic killing by a group of home-invading hippies. Indeed, since the very night he killed his own family, and for the past five decades, MacDonald has been trying to escape justice.

Justice persevered. A jury convicted MacDonald on three counts of murder. He was sentenced to three consecutive life sentences. Court after court, including the U.S. Supreme Court, upheld his conviction. And less than two years ago, in an opinion spanning more than a hundred pages, the Fourth Circuit surveyed the evidence in the case again—including new evidence MacDonald was allowed to present in a 2012 hearing—and again decided not to disturb the jury's verdict.

After these repeated failures to secure his early release from prison, MacDonald now moves for "compassionate release" pursuant to 18 U.S.C. § 3582(c)(1)(A), citing his age, health issues, and the current COVID-19 pandemic. But just like his previous attempts at gaining an

early release, his latest effort is devoid of legal and factual basis.

*First*, as a legal matter, MacDonald has no right to file a motion for compassionate release, and this Court lacks jurisdiction to consider it. The statute that MacDonald claims authorizes his motion (18 U.S.C. § 3582(c)(1)(A)) does not apply to him. It applies only to those whose criminal offenses occurred on or after November 1, 1987. MacDonald is subject to an entirely different statutory regime (18 U.S.C. § 4205(g)), which only authorizes "compassionate release" upon motion of the United States Bureau of Prisons ("BOP"). BOP's discretion in that regard is unreviewable. Moreover, even if BOP's discretion *were* reviewable, the only "relief" available to MacDonald under 18 U.S.C. § 4205(g) is immediate eligibility for parole. But MacDonald is *already* currently eligible for parole; in fact, he waived his right to two parole hearings just this year. Importantly, the First Step Act did not change any of the foregoing. Since 2018, every court to consider the issue has found that an inmate sentenced under the old regime is not eligible to petition the Court for release under § 3582(c) as amended by the First Step Act; rather, the old law still applies. Accordingly, the Court must dismiss or otherwise deny MacDonald's motion.

*Second*, even if the Court were to conclude that it can consider MacDonald's motion under 18 U.S.C. § 3582(c)(1)(A), compassionate release is not warranted when due consideration is given to the § 3553(a) factors the Court must consider. Put simply, the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct, among others, all support requiring MacDonald to serve out his sentence until his mandatory parole date of 2071. It is difficult to conceive of a crime more serious than murdering one's own family, including one's own two-year-old daughter in cold blood, to preserve one's own future and career. In short, MacDonald sacrificed his family's young lives to

save his own. Extending "compassionate release" to one who showed no compassion to his young daughters and pregnant wife is a contradiction in terms. Thus, to let MacDonald out early, pandemic notwithstanding, would undermine the seriousness of his crimes and do a great disservice to respect for the law. This is especially true in MacDonald's case, where he has consistently refused responsibility for his crime, and would undoubtedly claim an early release as vindication. The message would be clear: deny long enough, and one can overcome the demands of justice.

For these and other reasons explained below, the Court should dismiss the motion for lack of jurisdiction or otherwise deny it.

## FACTUAL BACKGROUND[1]

### I. MacDonald's Murder Convictions

On August 29, 1979, after a multi-week trial, a jury empaneled in federal court in Raleigh, North Carolina found MacDonald guilty of killing Colette MacDonald, Kimberly MacDonald, and Kristen MacDonald while the family resided in military housing at Fort Bragg, the United States military base adjacent to Fayetteville, North Carolina. The evidence at trial was extensive, and the government's case was largely built on physical evidence at the crime scene.[2]

The physical evidence demonstrated that sometime in the early morning hours of February 17, 1970, an altercation between Colette and MacDonald in their master bedroom became physical: MacDonald's pajama top was torn and the pocket ripped off, and MacDonald grabbed a nearly

[1] A detailed and extensive description of the evidence in the case as well as the relevant procedural history was recited in *United States v. MacDonald*, 32 F. Supp. 3d 608 (E.D.N.C. 2014). The Fourth Circuit provided a similarly detailed review in *United States v. MacDonald*, 911 F.3d 723 (4th Cir. 2018).

[2] Notably, each of the four members of the MacDonald family—MacDonald, Colette, Kimberly, and Kristen—had a different blood type, which, in conjunction with other physical evidence at the scene, allowed investigators to piece together key facts as to how the murders occurred.

three-foot-long wooden club to fend off Colette, poking it into her sternum. Colette was approximately five months' pregnant with the couple's unborn child at the time. At some point in the altercation, five-year-old Kimberly was in the room, and MacDonald struck a potentially fatal blow to Kimberly's head with the club. A large bloodstain in Kimberly's blood type soaked into the master bedroom's shag rug. Colette was severely beaten with the club in the MacDonalds' bedroom as well, ultimately sustaining two broken arms and lacerations on the back of her hands, found to be consistent with efforts to defend herself. MacDonald clubbed Colette repeatedly in the head, resulting in five separate ragged tears in the skin—some as long as four or five inches. When police found her body, "the skin was gaping, so that Colette's skull was easy to see." *United States v. MacDonald*, 911 F.3d 723, 734 (4th Cir. 2018).

After knocking Kimberly unconscious with the first blow to the head, and with Colette likely unconscious or incapacitated, MacDonald carried his five-year-old daughter back to her bed, and then delivered another brutal blow to the other side of her face with the club, shattering her cheek bone and leaving it protruding through the side of her face.

Having likely killed his daughter and assaulted his wife, and in an effort to salvage his own freedom and career, MacDonald moved into cover-up mode: staging a ritualistic killing to support his would-be cover story that a group of hippies entered his home and murdered his family. He would use both an Old Hickory paring knife and an ice pick.

In what may have been a last effort by Colette to protect Kristen, the physical evidence shows that Colette likely regained consciousness and made it to Kristen's room, where MacDonald bludgeoned Colette with the club yet again. Colette's blood was splattered on the wall about Kristen's bed and large bloodstains in Colette's blood type were found on Kristen's top sheet.

After knocking Colette unconscious, MacDonald wrapped her in the sheet from their bed and carried her back from Kristen's room to the master bedroom.

Whether before or after Colette's efforts, MacDonald nevertheless carried out what Colette likely tried to prevent—he stabbed little Kristen seventeen times in her chest, neck, and back with the Old Hickory knife. One of the thrusts penetrated her heart. He separately stabbed Kristen at least fifteen times with an ice pick.

To ensure they were dead and to conform the scene to his cover story, MacDonald stabbed Colette and Kimberly, too. He stabbed Kimberly repeatedly in the chest and neck with the Old Hickory knife. He stabbed Colette at least nine times in the neck and seven times in the chest with the Old Hickory knife, and stabbed her twenty-one times with the ice pick. It was determined that the stab wounds were the cause of Colette's death. The unborn child she was carrying, a son, did not survive.

MacDonald told investigators that a group of hippies entered his home, knocked him unconscious, and murdered his family. He testified in his own defense at trial and described his version of events to the jury. The jury rejected his cover story, agreeing with the government that MacDonald had committed the murders and staged the scene to support his coverup. It found him guilty of two counts of second-degree murder in violation of 18 U.S.C. § 1111 for the deaths of Colette and Kimberly, and one count of first-degree murder in violation of 18 U.S.C. § 1111 for the death of Kristen. The first-degree murder conviction was consistent with the prosecution's theory of the case—that MacDonald's killing of Kristen was in cold blood after he had assaulted Kimberly and Colette. MacDonald was sentenced to a life sentence on each count, with each sentence to be served consecutively.

## II. MacDonald's Appeals and Postconviction Proceedings

MacDonald appealed his convictions. After years of legal wrangling, his direct appeal was finalized in 1982 when the Fourth Circuit, on remand from the United States Supreme Court, ultimately affirmed his conviction. *United States v. MacDonald*, 688 F.2d 224 (4th Cir. 1982). Thereafter, MacDonald engaged in lengthy postconviction proceedings to have his conviction vacated, repeatedly alleging that he had discovered "new" evidence that established his innocence. *See United States v. MacDonald*, 32 F. Supp. 3d 608, 613 (E.D.N.C. 2014) (describing postconviction proceedings).

Ultimately, the Fourth Circuit allowed MacDonald to make certain DNA-based claims and directed the district court to consider whether the evidence as a whole, expansively defined, provided a basis for new successive collateral attacks on his conviction. *United States v. MacDonald*, 641 F.3d 596 (4th Cir. 2011). Accordingly, in 2012, the U.S. District Court for the Eastern District of North Carolina held an extensive evidentiary hearing wherein MacDonald was allowed to offer wide-ranging categories of "new" evidence that he alleged supported his innocence. *See MacDonald*, 32 F. Supp. 3d 608 (summarizing evidence presented at hearing). The hearing was hotly contested. In 2014, the Court issued a 112-page written opinion surveying the evidence from the trial and the new evidence offered by MacDonald. *MacDonald*, 32 F. Supp. 3d 608. After considering the evidence, the Court upheld MacDonald's convictions. *Id.* at 709. MacDonald appealed. In December 2018, the Fourth Circuit issued its own 154-page opinion, again walking through the extensive evidence in the case, affirming the district court's conclusion, and upholding the conviction. *United States v. MacDonald*, 911 F.3d 723 (4th Cir. 2018). The U.S. Supreme Court denied certiorari. *MacDonald v. United States*, 140 S. Ct. 282 (Oct. 7, 2019) (Mem.).

### III. MacDonald's Request for Parole is Denied

Under the sentencing regime applicable to MacDonald, a federal inmate becomes eligible for parole consideration upon serving one-third of his criminal sentence. 18 U.S.C. § 4205(a). Furthermore, any prisoner serving a sentence of five years or longer has a *mandatory* parole date; subject to certain exceptions, a prisoner serving a life sentence shall be released on parole after serving thirty years of each consecutive term or terms. 18 U.S.C. § 4206(d). MacDonald was deemed eligible for parole after serving ten years—*i.e.*, in April 1991.[3] MacDonald eventually applied for parole in 2005, but the Parole Commission denied parole and set the matter for reconsideration in fifteen years—the maximum amount of time authorized by law. *See* Notice of Action (June 15, 2005), attached as **Gov. Ex. 1**. During these proceedings, one Parole Commissioner wrote a separate memorandum to the file regarding her views on MacDonald's parole, stating, "I do not believe the United States Parole Commission should ever exercise its discretion to release this criminal one day earlier than his mandatory parole date which is in 2071. If this Commission were to do so, it would depreciate the absolutely brutal nature of these murders – and it would serve to reward [a] defendant who has proven himself to be a very smart psychopath – the most dangerous kind of criminal." Mem. to File from Comm'r Spagnoli Re: Jeffrey MacDonald 00131-177 (June 4, 2005), attached as **Gov. Ex. 2**. MacDonald was eligible to seek parole as early as May 2020; however, he waived his past two opportunities for parole in May

[3] MacDonald was originally sentenced and remanded to custody to begin his sentence on August 29, 1979; however, he was released for more than eighteen months after the Fourth Circuit vacated his convictions on July 29, 1980 on speedy-trial grounds and while intervening appeals were pending. Ultimately, the U.S. Supreme Court reinstated his convictions and he was returned to prison on March 31, 1982. Thus, he had not served a total of ten years in custody on his sentence until 1991.

2020 and October 2020. He is currently eligible to seek fifteen-year reconsideration of parole by the Parole Commission at the next available hearing date.[4]

### IV. MacDonald Seeks Compassionate Release

Having had his innocence-based claims repeatedly rejected and parole denied, MacDonald now tries a new tack: seeking "compassionate release" from this Court. On November 11, 2020, MacDonald filed his Motion for Compassionate Release and Memorandum in Support (the "Motion"). (D.E. 403.) In the Motion, MacDonald claims that, "pursuant to 18 U.S.C. § 3582(c)(1)(A)," extraordinary and compelling reasons, as well as his age and time served, justify his early release from prison. (D.E. 403, at 1.). The United States now responds in opposition to the Motion and urges the Court to deny it.

## ARGUMENT

The Court must deny MacDonald's Motion for at least two reasons. The first is dispositive: MacDonald is facially ineligible for compassionate release under 18 U.S.C. § 3582(c)(1)(A), as his criminal offenses occurred before November 1, 1987. He is therefore not authorized to file the Motion, and the Court lacks jurisdiction to consider it. Second, even if the Court were to entertain the motion, release is not warranted. Given the nature and circumstances of the brutal murders of his family, including his little girls, to release MacDonald now would not reflect the seriousness of his crimes, would engender disrespect for the law, and would undermine the just punishment he deserves for his crimes.

### I. The Court lacks jurisdiction to consider MacDonald's Motion.

MacDonald seeks a reduction in the term of his imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) on the grounds of "compassionate release"—*i.e.*, the modification of a criminal

[4] For many of the same reasons included herein, the government strongly opposes MacDonald's parole, as it is not warranted under the relevant parole criteria.

sentence "due to certain age, health, or family circumstance factors." *United States v. Norris*, 458 F. Supp. 3d 383, 385 (E.D.N.C. 2020). Prior to the passage of the First Step Act, Pub. L. 115-391, 132 Stat. 5194, on December 21, 2018, criminal defendants could not file compassionate-release motions with the Court directly; rather, the discretion to file such a motion "rested entirely with the Director of the Bureau of Prisons (BOP)." *Norris*, 458 F. Supp. 3d at 385. The First Step Act amended § 3582(c) to allow defendants, after administrative exhaustion, to seek compassionate release directly from the Court under U.S.C. § 3582(c)(1)(A). *Id.*

Here, MacDonald claims that he should be released under 18 U.S.C. § 3582(c) because "extraordinary or compelling reasons warrant such a reduction"; and, alternatively, because of his age and time served in prison. (D.E. 403, at 3–4.) MacDonald proceeds to argue that he satisfies the requisite conditions and should be released. (*See* D.E. 403.)

But there is a fatal flaw in this analysis: 18 U.S.C. § 3582(c)(1)(A) is only effective for defendants whose crimes were committed *on or after* November 1, 1987. MacDonald's murders were committed on February 17, 1970, and he was convicted and sentenced on August 29, 1979. As a result, MacDonald is subject to a different compassionate-release statute: 18 U.S.C. § 4205(g). That statute authorizes *only* the BOP to move the Court for a prisoner's "compassionate release." Thus, because MacDonald is effectively seeking district-court review of BOP's denial of his compassionate-release request, this Court lacks jurisdiction to consider the Motion and must deny it.

**A. Section 3582(c)(1)(A) does not apply to MacDonald's sentence.**

In 1984, Congress passed the Sentencing Reform Act of 1984 (the "SRA"), which enacted large-scale changes to the federal statutory sentencing regime. *See* Sentencing Reform Act of 1984, Pub. L. No. 98-473, §§ 211 *et seq.*, 98 Stat. 1837 (1984). Prior to its passage, the applicable federal sentencing regime provided wide-ranging sentencing discretion to district courts, but also

vested the United States Parole Commission with the ability to grant parole to eligible prisoners. *See, e.g.*, 18 U.S.C. §§ 4202–4205. In general, federal prisoners became eligible for parole after serving one-third of their prison sentence. 18 U.S.C. § 4205(a). Subject to certain exceptions, federal prisoners were also assigned a mandatory parole date, set at two-thirds of each consecutive term or, for forty-five-to-life terms, thirty years of each consecutive term. 18 U.S.C. § 4206(d).

The parole regime also had a statutory mechanism whereby inmates could seek immediate parole eligibility for extraordinary or compelling circumstances, a program that came to be known as compassionate release. Specifically, under 18 U.S.C. § 4205(g), "[a]t any time upon motion of the Bureau of Prisons, the court may reduce any minimum term to the time the defendant has served." As set forth in BOP regulations, "[u]nder 18 U.S.C. § 4205(g), a sentencing court, on motion of the Bureau of Prisons, may make an inmate with a minimum term sentence immediately eligible for parole by reducing the minimum term of the sentence to time served." 28 C.F.R. § 571.60. An inmate can request that the BOP bring a motion under 18 U.S.C. § 4205(g) by submitting a written request to the Warden describing the "extraordinary or compelling circumstances" that, among other things, justify making the prisoner immediately eligible for parole. 28 C.F.R. § 571.61. Section 4205(g) did not, however, allow a prisoner to petition the Court for compassionate release directly; only BOP could do so.

The enactment of the SRA in 1984 changed the pre-1984 parole regime—but, critically, only for certain prisoners. The SRA eliminated parole, replaced it with supervised release, and established the general statutory regime now familiar in federal criminal sentencing, including the use of the United States Sentencing Guidelines. Sentencing Reform Act of 1984, Pub. L. No. 98-473, §§ 211 *et seq.*, 98 Stat. 1837 (1984). The SRA also repealed § 4205(g) and largely replaced

it with § 3582(c), which authorized compassionate release for "extraordinary and compelling reasons," but still only upon motion by the BOP.[5] *Id* § 212(a)(2).

However, the SRA did not end the old parole regime or § 4205(g) for good. Instead, the original SRA was initially not to become effective until November 1, 1986. *Id.* § 235(a)(1). Subsequent amendments to the SRA moved out the SRA's effective date to November 1, 1987. Sentencing Reform Amendments Act of 1985, Pub. L. No. 99-217, § 4, 99 Stat. 1728 (1985). And in the Sentencing Act of 1987, Congress made clear that the substantive provisions of the SRA, including the chapter containing 18 U.S.C. § 3582(c), "shall apply *only* to offenses committed after the taking effect of this chapter." Pub. L. No. 100-182, § 2(a), 101 Stat. 1266 (1987) (emphasis added).

Thus, "old law" prisoners who committed their crimes prior to November 1, 1987 are still subject to the "old law"—the parole regime in place before the SRA. *See, e.g.*, United States Parole Commission Extension Act of 2020, Pub. L. No. 116-159, § 4202, 134 Stat. 709, 741 (2020) (extending parole-regime through November 1, 2022). By contrast, "new law" prisoners who committed their crimes after November 1, 1987 are subject to the SRA. This means that, for purposes of compassionate release, "[s]ection 4205(g) applies to inmates serving 'old law' sentences," while "[i]nmates serving 'new law' sentences must avail themselves of the SRA-

[5] Though § 3582(c) may rightly be viewed as the SRA replacement for § 4205(g), there are some subtle differences. Namely, under 18 U.S.C. § 4205(g) and the old parole regime, a court was only authorized to reduce a prisoner's "minimum term" to time served and thereby make the prisoner immediately eligible for parole. The Parole Commission would ultimately decide whether release on parole was appropriate in light of applicable parole criteria. *See, e.g.*, *Turner v. U.S. Parole Comm'n*, 810 F.2d 612, 617 (7th Cir. 1987) ("[E]ven if the court does reduce the minimum sentence to time served [under § 4205(g)], the Parole Commission in its discretion may well not grant parole."). By contrast, under 18 U.S.C. § 3582(c), the court itself can reduce a term of imprisonment to time served and order release. Thus, under 18 U.S.C. § 3582(c), even if extraordinary and compelling reasons exist, the Court must still weigh the applicable sentencing factors under 18 U.S.C. § 3553(a) and consider relevant policy statements by the U.S. Sentencing Commission before reducing a sentence.

created 18 U.S.C. § 3582(c)(1)(A).” *Wade v. Warden Fairton FCI*, 773 F. App’x 106, 107 n.3 (3d Cir. 2019).

This conclusion has been codified in federal regulations and confirmed repeatedly by the courts. For example, BOP regulations provide as follows: “18 U.S.C. § 4205(g) was repealed effective November 1, 1987, but remains the controlling law for inmates whose offenses occurred prior to that date. For inmates whose offenses occurred on or after November 1, 1987, the applicable statute is 18 U.S.C. § 3582(c)(1)(A).” 28 C.F.R. § 572.40; *see also* 28 C.F.R. § 571.60 (distinguishing between the two statutes).

Likewise, courts have consistently held that the provisions of the SRA do not apply to prisoners who committed their crimes before November 1, 1987. *E.g.*, *United States v. Polk*, 905 F.2d 54, 55 (4th Cir. 1990) (holding that Federal Sentencing Guidelines do not apply to offenses committed prior to November 1, 1987); *United States v. Stewart*, 865 F.2d 115, 117–18 (7th Cir. 1988) (“Congress never intended, even with respect to the pre-amendment Act, for the SRA to apply to offenses committed prior to November 1, 1987.”); *United States v. Burgess*, 858 F.2d 1512, 1513–14 (11th Cir. 1988) (“Congress has evinced an explicit intent that defendants who have been convicted of crimes committed prior to November 1, 1987 be sentenced under the old law.”).

Courts have held the same with respect to § 3582(c) specifically. *E.g.*, *United States v. Watson*, 588 F.2d 157, 158 (5th Cir. 1989) (holding that § 3582 applies only to sentences imposed for offenses committed on or after November 1, 1987); *United States v. Argitakos*, 862 F.2d 423, 424 (2d Cir. 1988) (holding that section 3582(c) “clearly does not apply to defendants’ sentences” for offenses committed in 1982 and 1983); *United States v. Wilkins*, 426 F. App’x 443, 446 (6th Cir. 2011) (“[C]ourts that have considered the issue have concluded that defendants who

committed offenses prior to November 1, 1987, and therefore were sentenced under the pre-Reform Act law, are ineligible for sentence reduction under § 3582(c) because that provision was not in effect for their sentence."); *Sims v. Holenchik*, No. CV 08-0978-RGK (MLG), 2009 WL 1505175, at *2 (C.D. Cal. 2009) ("18 U.S.C. § 4205, including the provision regarding early release found in section 4205(g), is still applicable to federal offenders . . . who committed their offenses prior to November 1, 1987.").

Here, MacDonald committed murder, was convicted of murder, and was sentenced for murder all before November 1, 1987. The crimes occurred on February 17, 1970. The conviction and sentence were handed down on August 29, 1979. MacDonald has been eligible for and has sought parole under the pre-1984 regime, 18 U.S.C. § 4205(a), and he has a mandatory release date set under the pre-1984 regime, 18 U.S.C. § 4206(d). Accordingly, for purposes of compassionate release, the old law (18 U.S.C. § 4205(g)) applies to his case. The new law (18 U.S.C. § 3582(c)) does not.

**B. Section 4205(g) does not authorize MacDonald to file his Motion.**

Because MacDonald is subject to § 4205(g) rather than 18 U.S.C. § 3582(c), MacDonald has no basis for filing his Motion, and this Court lacks jurisdiction to consider it.

Section 4205(g) states: "At any time *upon motion of the Bureau of Prisons*, the court may reduce any minimum term to the time the defendant has served. The court shall have jurisdiction to act upon the application at any time and no hearing shall be required." (emphasis added). Thus, by its terms, § 4205(g) requires a compassionate-release motion to be filed by BOP. When the BOP denies a prisoner's request to file a compassionate-release motion seeking a reduction in the prisoner's sentence, courts have consistently held that an inmate has no right to file a motion under § 4205(g) in district court or otherwise seek judicial review of the BOP's decision *not* to file such a motion. *See, e.g.*, *Turner v. United States Parole Comm'n*, 810 F.2d 612, 618 (7th Cir. 1987)

("We hold that the Parole and Reorganization Act precludes the federal courts from reviewing the Bureau of Prisons' decisions whether to move a sentencing court for the reduction of a minimum term to time served under 18 U.S.C. § 4205(g)."); *accord Simmons v. Christensen*, 894 F.2d 1041, 1043 (9th Cir. 1990); *Fernandez v. United States*, 941 F.2d 1488, 1492–93 (11th Cir. 1991); *see also Nichols v. United States*, No. 4:11-cr-92-BO-1, 2019 WL 938867, at *1 (E.D.N.C. Feb. 25, 2019) (dismissing petitioner's motion for compassionate release under pre-First Step Act version of § 3582(c) for lack of jurisdiction because BOP's decision to move for compassionate release "is not subject to judicial review").

Here, MacDonald sought compassionate release from BOP. (D.E. 404-3.) BOP rejected his request and declined to file a motion on his behalf. (D.E. 404-4, D.E. 404-8). Thus, under 18 U.S.C. § 4205(g), the statute applicable to MacDonald's case, BOP's decision is unreviewable, and MacDonald's Motion is effectively a request for the Court to review and reverse BOP's decision. The Court lacks jurisdiction to take such an action. Accordingly, it must deny MacDonald's Motion.[6]

### C. The First Step Act's amendment to § 3582(c)(1)(A) does not make that statute applicable to MacDonald's case.

Importantly, nothing about the First Step Act's amendment to § 3582(c)(1)(A) alters the foregoing analysis. In the First Step Act, Congress amended § 3582(c)(1)(A) to expressly allow defendants sentenced under the SRA to file a motion with the Court seeking a reduction in sentence after exhausting administrative remedies. First Step Act, Pub. Law No. 115-391, § 603(b)(1), 132

[6] It is also worth noting that under 18 U.S.C. § 4205(g), the *most* relief MacDonald could obtain from the Court is the reduction of his "minimum term," so that he would become immediately eligible to seek parole. But MacDonald is *already* currently eligible to seek parole. He has already served his ten-year minimum term, and he became eligible for parole in 1991. In fact, he is currently eligible for a 15-year reconsideration hearing at the next available parole hearing at his institution. In short, there is simply no "relief" available to him via compassionate-release under 18 U.S.C. § 4205(g) that would put him in a different position than he currently occupies.

Stat. 5194 (2018). But Congress did *not* amend 18 U.S.C. § 4205(g) to allow defendants sentenced under the parole regime to do the same. Thus, because 18 U.S.C. § 3582(c)(1)(A), even as amended, *still* does not apply to MacDonald's case, the First Step Act's changes to the statute make no difference in his case.

Since the passage of the First Step Act, and with increasing frequency since the advent of the COVID-19 pandemic, numerous district courts have confronted the question of whether an old-law inmate like MacDonald may seek compassionate release from the Court pursuant to § 3582(c)(1)(A). The government is not aware of a single decision finding § 3582(c)(1)(A) applicable to an old-law inmate; to the contrary, every court to consider the issue has found that old-law inmates cannot petition the Court for compassionate release or a reduction in sentence pursuant to § 3582(c)(1)(A). *United States v. Whitmore*, 00-cr-00194-EMC-1, 2020 WL 4226515, at *6 (N.D. Cal. July 23, 2020) ("[T]he Court concludes that, based on traditional tools of statutory construction, the government's position is correct as a technical matter—*i.e.*, the FSA amendment to § 3582(c) does not apply to old law defendants who continue to be subject to § 4205(g)."); *United States v. Erwin*, No. 3:84-cr-168-N (BT), 2020 WL 3442053, at *1 (N.D. Tex. Mar. 9, 2020) ("The FSA's amendment to § 3582(c)(1)(A) . . . does not apply to Erwin because his offense occurred prior to the enactment of § 3582(c)(1)(A)."); *United States v. Scarbrough*, No. 1:73-CR-32-HAB, 2019 WL 2482710, at *2 (N.D. Ind. June 14, 2019); *United States v. Woolum*, Criminal Action No. 5:84-CR-21-TBR, 2020 WL 1963787 (W.D. Ky. April 23, 2020); *United States v. Rivera*, No. 86 Cr. 1124 (JFK), 2020 WL 2094094 (S.D.N.Y. May 1, 2020); *United States v. Matta-Lopez*, Case No. LA CR85-00606 JAK(1), 2020 WL 2128644 (C.D. Cal. May 4, 2020); *United States v. Rios*, 70-cr-592 (BMC), 2020 WL 2522069 (E.D.N.Y. May 18, 2020); *United States v. Battle-Bey*, No. 3:81-38 (DWF), 2020 WL 4735352, at *1 n.3 (D. Minn. Aug. 14, 2020).

Moreover, as one court has noted, "there is a rational basis" for treating old-law and new-law inmates differently *vis a vis* the opportunity to petition the Court for compassionate release. *Whitmore*, 2020 WL 4226515, at *4. New-law inmates do not have the possibility of parole. Although they may be able to earn good-time credits or other forms of modest reductions in their term of imprisonment, petitioning the Court for compassionate release may be their only means of early release for extraordinary and compelling circumstances. Old-law inmates like MacDonald, by contrast, still have the possibility of parole; indeed, "compassionate release" in the old-law context means only that the prisoner becomes immediately eligible for parole, not that the prisoner is immediately released. 18 U.S.C. § 4205(g). As the *Whitmore* court noted, "[t]here is no evidence in the legislative record that Congress believed either the parole system or the Parole Commission (the system's administrator) was deficient (as it is so found with respect to BOP's administration of compassionate release)." *Id.* at *4.

In sum, although the First Step Act authorizes new-law inmates to seek compassionate release from the Court in certain circumstances under 18 U.S.C. § 3582(c), nothing in the First Step Act extended the provisions of § 3582(c) to inmates subject to the old-law parole regime or otherwise authorized them to seek release from the Court under 18 U.S.C. § 4205(g).

For MacDonald, then, the First Step Act did not change the rules. He is entitled to request compassionate release from the BOP under § 4205(g). But if, as here, the BOP denies the request, this Court lacks jurisdiction to review that decision, and there is no statutory basis upon which MacDonald can seek release from the Court. Accordingly, the Court must dismiss or otherwise deny MacDonald's Motion.

## II. Even if § 3582(c) applied to MacDonald, the § 3553(a) factors do not support release.

Even if this Court were to apply § 3582(c) to MacDonald's case and consider the merits of his Motion, the Court should nevertheless deny the Motion because the § 3553(a) factors do not support release.

### A. The government acknowledges that MacDonald's chronic kidney disease is an "extraordinary and compelling" reason in light of the COVID-19 pandemic.

As an initial matter, the United States acknowledges that due to the COVID-19 pandemic, MacDonald's chronic kidney disease is sufficient to satisfy the "extraordinary and compelling reasons" inquiry under 18 U.S.C. § 3582(c)(1)(A)(i). Although § 3582(c)(1)(A) does not define what reasons qualify as "extraordinary and compelling," 28 U.S.C. § 994 authorizes the United States Sentencing Commission to define the term. *United States v. Handerhan*, No. 1:10-CR-00298, 2019 WL 1437903, at *1 (M.D. Pa. Apr. 1, 2019). The Sentencing Commission has thus defined "extraordinary and compelling reasons" in Application Note 1 to United States Sentencing Guidelines § 1B1.13 to include:

> (A) Medical Condition of the Defendant.
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specified time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,

> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, app. 1.

While the First Step Act authorized inmates to seek compassionate release from the Court without a motion from BOP, it did not create two different standards of review between the Court and BOP when considering the "extraordinary and compelling" criteria for compassionate release. *See United States v. Fox*, Criminal No. 2:14-cr-03-DBH, 2019 WL 3046086, at *3 (D. Maine July 11, 2019) (district court's consideration of what constitutes extraordinary and compelling reasons should be comparable to what the Commission has already articulated as criteria for compassionate release). In fact, Congress specifically instructed that such decisions must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1).

In fulfilling its duty to review compassionate-release cases, the BOP has generally restricted application of 18 U.S.C. § 3582(c)(1)(A) to inmates who have been diagnosed with medical conditions that are terminal within one year, who suffer from severely debilitating and irreversible conditions that render them unable to provide self-care, who are of advanced age, and who need to care for family members otherwise unable to receive needed care. *Williams v. Van Buren*, 117 Fed. App'x 985, 987 (5th Cir. 2004); *see Leja v. Sabol*, 487 F. Supp. 2d 1, 3 (D. Mass. 2007) (BOP determined that chronic, nonlife-threatening conditions do not qualify for compassionate release); BOP Program Statement § 5050.50.

Nonetheless, during the ongoing COVID-19 pandemic, the government has taken a broader view of the circumstances qualifying as "extraordinary and compelling." Though BOP has taken aggressive steps to control the pandemic's spread in its correctional facilities, an inmate who presents one of the medical risk factors that definitively entail a greater likelihood of severe

outcomes from COVID-19 as promulgated by the Centers for Disease Control and Prevention ("CDC"), will satisfy the "extraordinary and compelling reasons" requirement.

At the present time, it is apparent that, but for the COVID-19 pandemic, MacDonald would present no basis for compassionate release. His medical ailments, which include chronic kidney disease, a history of skin cancer, and high blood pressure (D.E. 403, at 10), are not terminal within one year and under normal circumstances would not present any impediment to his ability to provide self-care in the institution. The only question, then, is whether the risk of COVID-19 changes that assessment.

The United States acknowledges that MacDonald has identified a risk factor (Stage III chronic kidney disease) identified by the CDC as heightening the risk of severe injury or death were the inmate to contract COVID-19.[7] The United States thus agrees that Stage III chronic kidney disease presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in § 1B1.13, cmt. n. 1(A)(ii), in that at this time the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic condition itself.[8]

---

[7] The CDC has stated that "[h]aving chronic kidney disease of any stage increases your risk for severe illness from COVID-19." *See* CDC, People with Certain Medical Conditions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#cancer (updated Nov. 2, 2020).

[8] Because the Government acknowledges that MacDonald's chronic kidney disease is sufficient to meet the "extraordinary and compelling" circumstances standard during the COVID-19 pandemic, his other purported bases for relief are unnecessary to the analysis.

That said, there are good reasons to conclude that absent his chronic kidney disease, MacDonald would not satisfy the "extraordinary and compelling" circumstances requirement. Although MacDonald does have a history of skin cancer, the medical records he has filed suggest it has been multiple years since he has been diagnosed with an active malignant lesion. Although the CDC has stated that "[h]aving cancer *currently* increases your risk of severe illness from COVID-19," it has also stated that "[a]t this time, it is

### B. The § 3553(a) factors do not support MacDonald's release.

Even if an inmate demonstrates "extraordinary and compelling reasons" for a reduction in sentence, under § 3582(c)(1)(A), "[t]he Court must also consider the § 3553(a) factors and [the defendant's] dangerousness before determining whether a reduction in his term of imprisonment is appropriate." *Norris*, 458 F. Supp. 3d at 386–87; *United States v. Edmonds*, No. 5:08-CR-00368-BO, 2020 WL 6193638, at *1 (E.D.N.C. Sept. 14, 2020) (assuming that the defendant demonstrated extraordinary and compelling reasons but denying compassionate-release motion "upon consideration of the § 3553(a) factors"); *see also United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020) (affirming denial of compassionate-release motion for terminally ill inmate based on consideration of § 3553(a) factors).

---

not known whether having a *history* of cancer increases your risk." *See* CDC, People with Certain Medical Conditions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus_%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#cancer (updated Nov. 2, 2020) (emphasis added).

With respect to MacDonald's other medical condition, hypertension, the CDC has categorized this condition in a second category of conditions that "might" increase your risk of severe illness from COVID-19." *Id.* Here, MacDonald's medical record does not indicate that his hypertension would substantially diminish his ability to provide self-care against serious injury or death (whether because of COVID-19 or otherwise).

Similarly, MacDonald claims that he also satisfies the requirements of § 3582(c)(1)(A)(ii), (D.E. 403, at 16), which authorizes the reduction of the sentence when a "defendant who is serving a sentence imposed pursuant to 18 U.S.C. § 3559(c) is at least seventy years old and has served at least thirty years in prison." *Norris*, 458 F. Supp. 3d at 385. He asserts that he is seventy-seven years old, has served more than thirty-nine years in the custody of the BOP, the BOP has determined that he has a minimum risk of recidivating, and he therefore satisfies the relevant criteria. (D.E. 403, at 16.) But these assertions ignore a critical point: Section 3582(c)(1)(A)(ii) only applies to prisoners who have served thirty years "pursuant to a sentence imposed under section 3559(c)." 18 U.S.C. § 3582(c). Even if the Court were to conclude that through the First Step Act or otherwise, 18 U.S.C. § 3582(c) was somehow extended to an old-law defendant like MacDonald, for MacDonald to receive a sentence reduction under § 3582(c)(1)(A)(ii), the Court would *also* have to conclude that his consecutive life sentences were imposed "pursuant to 18 U.S.C. § 3559(c)." But section 3559(c) was not enacted until the SRA was passed in 1984 and was not effective until 1987. *See* Pub. L. No. 98-473, § 212(a)(2). MacDonald's sentence, rendered in 1979, simply cannot have been "imposed pursuant to § 3559(c)."

Among the applicable § 3553(a) factors the Court must consider in this case are (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence of the offense to promote respect for the law and provide just punishment; (3) the need for the sentence imposed to provide the defendant with needed medical care; and (4) the kinds of sentences available and the sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the U.S. Sentencing Guidelines. 18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(2)(D), (a)(3), (a)(4), and (a)(5).[9] MacDonald claims that consideration of the § 3553(a) factors "supports a finding that [he] has already served sufficient time to satisfy the purposes of sentencing, and accordingly, the Court should reduce his sentence to time served." (D.E. 403, at 17.) Not so. A careful review of the factors demonstrates the opposite: MacDonald should be required to serve the life sentence he was given for the lives he took.

**1. The nature and circumstances of the offense and the history and characteristics of the defendant.**

MacDonald argues that because "the punishment should fit the offender and not merely the crime," his record in prison supports release. (D.E. 403, at 17–18.) While he acknowledges that "his offenses were indeed serious and the circumstances surrounding them undoubtedly tragic," he continues to deny responsibility for them, vaguely referencing "newly discovered evidence" that he fails to acknowledge has been repeatedly rejected by the courts. (D.E. 403, at 17–18.)

---

[9] Consideration of the § 3553(a) sentencing factors, including consideration of the appropriate guideline-range applicable to the offense, yet again underscores why § 3582(c) does not—and should not—apply to an old-law inmate like MacDonald. At the time he was originally sentenced, § 3553(a) did not exist. The U.S. Sentencing Guidelines did not exist. A court attempting to apply the § 3553(a) sentencing factors to an old-law inmate as required by § 3582(c)(1)(A) is thus applying an entirely new sentencing regime to reduce a sentence imposed under an old regime. That fundamental disconnect only further goes to show why 18 U.S.C. § 4205(g), rather than § 3582(c), applies to MacDonald with respect to compassionate release.

To put it charitably, "serious" and "tragic" as descriptors for MacDonald's crimes do not adequately grapple with the physical brutality and shamelessness of the crimes. (D.E. 403, at 17.) The circumstances of MacDonald's offenses were horrific. After he had beaten the five-months-pregnant Colette to a pulp, he stabbed her repeatedly with the knife and the ice pick. He murdered his two young daughters using the same weapons—the club and knife on Kimberly, and the knife and ice pick on Kristen. Both two-year-old Kristen and five-year-old Kimberly were found tucked into their bloody bedsheets. The following crime-scene trial exhibits best convey the sheer brutality of the crimes:

***Colette MacDonald***



***Kimberly MacDonald***




***Kristen MacDonald***



Moreover, MacDonald killed Kristen *in cold blood* after assaulting Kimberly and Colette; otherwise, she would have been a witness and could have created other problems with his band-of-hippies cover story. The jury that heard the evidence rightfully found him guilty of first-degree murder for Kristen's death. In rejecting MacDonald's cover story, the jury instead acknowledged the reality: the brutality of the crimes was directly associated with MacDonald's own effort to cover up his assault and pass the murders off on hippies.

The repercussions of these crimes did not end with the deaths of Colette, Kimberly, and Kristen. As vividly described in the statement of Colette's brother, Bob Stevenson, MacDonald's crimes wreaked havoc on numerous lives.[10]

Thus, while MacDonald has completed numerous prison programs, assisted other inmates, and, with some exceptions, maintained a reasonably clear record while in BOP custody, (*see* D.E. 403, at 18–19), this prison record does not outweigh the horrific decisions that he made in the early morning hours of February 17, 1970, when he took the lives of his wife, two daughters, and unborn child.

**2. The need for the sentence to promote respect for the law and provide just punishment.**

MacDonald argues that reducing his sentence "in the midst of an unprecedented global pandemic does not diminish the seriousness of the offense or respect for the law" because "[f]uture offenders could not rationally expect to be imprisoned under such dire circumstances." (D.E. 403, at 20.) MacDonald's argument essentially boils down to a claim that if the country were not currently experiencing a pandemic, then releasing a person early who is serving multiple life

[10] The United States is filing Mr. Stevenson's statement under seal by separate filing for the Court's consideration. In accordance with the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, should the Court order a hearing in this matter, Mr. Stevenson has requested that the Court allow him an opportunity appear and make a statement to the Court in addition to his written statement.

sentences for a triple murder *would* undermine general deterrence or respect for the law. The government agrees with MacDonald on that—releasing a person convicted of brutally murdering his family would normally do a great disservice to respect for the law. The government's view, however, is that the pandemic simply does not change that analysis. MacDonald was duly convicted of three murder counts and duly sentenced to three consecutive life sentences. His mandatory parole date is 2071, well past his current life expectancy. MacDonald's sentence was an appropriate punishment for his heinous acts, and if he were released early based only because of a temporary heightened health risk while in BOP custody, it would not only undermine the justice of his punishment, but it would erode public confidence that the most serious punishments reserved for the most serious offenders will in fact be carried out.

Moreover, MacDonald has always denied guilt and undertaken significant efforts, from the very beginning of the case, to generate public sympathy through mass media. If MacDonald were released early, without ever acknowledging his guilt, he will claim vindication of his innocence, and public confidence in the administration of justice will be further undermined.

Furthermore, the government is not aware of any case where a court has granted compassionate release in a case involving the triple murder of a pregnant woman and two young children. Although MacDonald cites six cases where life sentences have been reduced under 18 U.S.C. § 3582(c)(1)(A) (*see* D.E. 403, at 20 & n.45), these cases are distinguishable in significant ways.

In the first four, the defendants were not convicted of murder at all; rather, they were sentenced to life imprisonment for their roles in drug trafficking organizations. *United States v. Parker*, 461 F. Supp. 3d 966, 970 (C.D. Cal. 2020) (possession and distribution of cocaine, money laundering, filing a false tax return); *United States v. Heffington*, No. 1:93-cr-05021, 2020 WL

4476485 (E.D. Cal. Aug. 4, 2020) (methamphetamine conspiracy); *United States v. Price*, No. 07-0152-06 (ESH), 2020 WL 5909789 (D.D.C. Oct. 6, 2020) (PCP conspiracy); *United States v. Hansen*, 07-CR-00520(KAM), 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (heroin and cocaine conspiracy).

The other two cases involved murders. Notably, however, in both cases, the defendants accepted responsibility and showed extensive rehabilitation while in prison. In *United States v. Rodriguez*, 00 Cr. 761-2 (JSR), 2020 WL 5810161 (S.D.N.Y. Sept. 30, 2020), the defendant had been involved in killing a government informant and sentenced to life imprisonment. But unlike MacDonald, the Court found Rodriguez's rehabilitation "nothing short of remarkable," citing "[a]n extraordinary collection of letters – from fellow inmates, family, friends, and, most important, 27 members of the prison staff" that evidenced how he had used his prison time to better himself and the community. *Id.* at *4. The Court found those letters "written by the unbiased people who have spent more time with Rodriguez than anyone else" to be particularly persuasive. Furthermore, the Court found "substantial evidence of Rodriguez's remorse" in letters from friends and family, who stated that Rodriguez regretted his crime. *Id.* at *6.

Likewise, in *United States v. Tidwell*, CR-94-353, 2020 WL 4504448 (E.D. Pa. Aug. 5, 2020), the defendant had been found guilty of committing murders in the course of a continuing criminal enterprise—a drug operation. *Id.* at *1. But unlike MacDonald, Tidwell pled guilty and accepted responsibility for his crimes. *Id.* at *1. Furthermore, at the time of his compassionate-release motion, Tidwell had Stage IV pancreatic cancer and had less than a year to live. *Id.* at *4.

In sum, none of these individuals had killed their wives and children, and those convicted of murder had not denied responsibility for five decades. Thus, these cases offer little support to MacDonald's contention that releasing him will serve the goals of sentencing.

A better comparator is *United States v. Wright*, Case No. 2:96-cr-80876-3, 2020 WL 6268443 (E.D. Mich. Oct. 26, 2020). In that case, the defendant was convicted by a jury of murder for hire and conspiracy to distribute cocaine, among other crimes. *Id.* at *1. The government alleged that the defendant shot his drug-trafficking co-conspirator in the back of the head for $50,000. *Id.* at *1. The defendant had significant medical issues, including obesity, cataracts, diabetes, end-stage renal disease, and peripheral vascular disease, which led to multiple amputations of his fingers and legs, and led to him being on dialysis. *Id.* at *2. The government conceded that the defendant established "extraordinary and compelling reasons" for release, but opposed release on the grounds of the § 3553(a) sentencing factors. *Id.* at *3–4. The court agreed that release was not appropriate. The court focused particularly on the defendant's "lack of remorse," noting that "[f]or most of his incarceration, Defendant has not taken responsibility for his crimes." *Id.* at *3. The court also found that even though releasing someone possessing the defendant's significant medical conditions "may provide more benefit to society than further incarceration," keeping the defendant in prison "is the only way to reflect the seriousness of his crimes, provide just punishment, and afford adequate general deterrence," given that the jury convicted the defendant of "the ultimate violence—the taking of a human life." *Id.* at *4–5; *see also United States v. Arana*, Case No. 2:95-cr-80272-LJM-13, 2020 WL 2214232 (E.D. Mich. May 7, 2020) (denying compassionate-release motion for defendant convicted of murder for hire who "has never taken any responsibility or expressed any remorse for his conduct").

**3. The need to provide needed medical care.**

MacDonald also argues that release is necessary for him to obtain medical care for his medical conditions. (D.E. 403, at 21.) However, as those same records demonstrate, MacDonald has received significant medical services over the course of his imprisonment, and there is no evidence indicating that the care he has received is inadequate or that BOP is not capable of

providing the care he currently needs or will need in the future. Indeed, although those his conditions place him at a higher risk for negative outcomes if he contracts COVID-19, to date, BOP procedures and care have kept him from doing so.

**4. The kinds of sentences available and applicable guideline range and policy statements.**

At the time MacDonald was sentenced, and today, the only congressionally authorized sentences for murder in the first degree in violation of 18 U.S.C. § 1111 have been life imprisonment or death. *See, e.g.*, 18 U.S.C. § 1111 (1976) ("Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment,' in which event *he shall be sentenced to imprisonment for life*." (emphasis added)), attached as **Gov. Ex. 3**; 18 U.S.C. § 1111 (2018) ("Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life.") As set forth in the current commentary to the Sentencing Guidelines, "[i]n the case of premediated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed. A downward departure would not be appropriate in such a case. A downward departure from a mandatory statutory term of life imprisonment is permissible only in cases in which the government files a motion for a downward departure for the defendant's substantial assistance, as provided in 18 U.S.C. § 3553(e)." U.S.S.G. § 2A1.1 app. 2(A). Accordingly, it would not serve the purposes of federal sentencing under 18 U.S.C. § 1111, 18 U.S.C. § 3553, or the Guidelines to release MacDonald early when he received, and is serving, the only congressionally authorized sentence for his crime short of death.

Furthermore, this is not a compassionate-release case where the defendant received a statutory-maximum or above-guideline sentence when a significantly lower sentence was available at the time of sentencing. In such a case, the lower available sentence may be a relevant factor to consider in determining whether release is appropriate. But here, the argument cuts the other way.

Once the jury found MacDonald guilty of first-degree murder (in addition to two other counts of second-degree murder), there was no lower available sentence other than life imprisonment; MacDonald got the *statutory minimum sentence* for first-degree murder. And that is still the case under 18 U.S.C. § 1111 today. This factor thus weighs heavily against release.

* * *

Weighing these factors together, they support keeping MacDonald in prison, not releasing him. To release him would undermine the seriousness of his crimes, cause disrespect for the law, fail to adequately punish him for taking the lives of three innocent people, is not necessary for him to obtain requisite medical care, and would run afoul of the clear and consistent congressional directive that premeditated murderers should spend their lives in prison. That is especially true when the victims were innocent children—his own children—and he has never accepted responsibility or shown remorse for his actions.

## CONCLUSION

For the foregoing reasons, the Court should dismiss MacDonald's motion for lack of jurisdiction or otherwise deny his request because he is facially ineligible to seek release under 18 U.S.C. § 3582(c) and even if he were, release is not warranted.

Respectfully submitted this 23rd day of November, 2020.

ROBERT J. HIGDON, JR.
United States Attorney

By: /s/ John E. Harris
JOHN E. HARRIS
Attorney for United States of America
Assistant United States Attorney
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
Email: john.harris5@usdoj.gov
N.C. Bar No. 49253

## CERTIFICATE OF SERVICE

I do hereby certify that I have this 23rd day of November, 2020, served a copy of the foregoing upon the below-listed party by electronically filing the foregoing with the Court on this date using the CM/ECF system or placing a copy in the United States Mail to the following:

Hart Miles
hart.miles@cheshirepark.com

Elliot Sol Abrams
elliot.abrams@cheshirepark.com

Catherine S. Brown
catherine.brown@cheshirepark.com

Cheshire Parker Schneider, PLLC
PO Box 1029
Raleigh, NC 27602

Joseph E. Zeszotarski, Jr.
Gammon, Howard, and Zeszotarki, PLLC
P.O. Box 1127
Raleigh, NC 27602
jzeszotarski@ghz-law.com

*Counsel for the Defendant*

ROBERT J. HIGDON, JR.
United States Attorney

By: /s/ John E. Harris
JOHN E. HARRIS
Attorney for United States of America
Assistant United States Attorney
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
Email: john.harris5@usdoj.gov
N.C. Bar No. 49253